## DISCLAIMER

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE JOINT PLAN OF REORGANIZATION OF AVADO BRANDS, INC. AND ITS AFFILIATED DEBTORS AND DEBTORS IN POSSESSION (THE "PLAN") AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESEN-TATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CREDITORS AND EQUITY HOLDERS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS AND PLAN SCHEDULES ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCOR-DANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAP-PROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHAS-ING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF AVADO BRANDS, INC. OR ANY OF THE AFFILIATED DEBTORS AND DEBTORS IN POSSESSION IN THESE CASES SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, AVADO BRANDS, INC. OR ANY OF THE AFFILIATED DEBTORS AND DEBTORS IN POSSESSION IN THESE CASES.

## SUMMARY OF PLAN

The following introduction and summary is a general overview only and is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information, and financial statements and notes thereto appearing elsewhere in this Disclosure Statement and the Joint Plan of Reorganization of Avado Brands, Inc. and Its Affiliated Debtors and Debtors in Possession (the "Plan").  All capitalized terms not defined in this Disclosure Statement have the meanings ascribed to such terms in the Plan.  A copy of the Plan is annexed hereto as Appendix A.

This Disclosure Statement contains, among other things, descriptions and summaries of provisions of the Plan being proposed by Avado Brands, Inc. ("Avado" or the "Company") and sixty-four of its domestic subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debt-ors-in-possession (collectively, the "Debtors") as filed on February 4 and 5, 2004, with the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court").  Certain provisions of the Plan, and thus the descriptions and summaries contained herein, are the subject of continuing negotiations among the Debtors and various parties, have not been finally agreed upon, and may be modified and, therefore, remain subject to modification.  The Debtors do not anticipate that such modifications, however, will have a material effect on the distributions contem-plated by the Plan and any such modification will be disclosed at the Confirmation Hearing.

### A.      Business Overview

Avado Brands, Inc. and its subsidiaries operate two proprietary restaurant concepts:  Don Pablo's Mexican Kitchen and Hops Restaurant Bar and Brewery.  Don Pablo's Mexican Kitchen features traditional Mexican dishes served in a distinctive, festive dining atmosphere reminiscent of a Mexican village plaza.  Hops Restaurant Bar and Brewery features a diverse menu of popular foods, and distinctive microbrews, often brewed at an on-premises microwbrewery.

Avado was originally formed in 1986.  The Company employed a strategy of aggressive growth through new restaurant development and acquisitions.  By 1997, the Company, then operating as Apple South, Inc., had grown to become the nation's largest franchisee of Applebee's Neighborhood Grill and Bar restaurants.  In late 1997, the Company announced its decision to sell its franchised Applebee's restaurants in order to focus on the development of its proprietary brands:  Don Pablo's Mexican Kitchen, Hops Restaurant Bar and Brewery, McCormick & Schmick's Seafood and Canyon Café.

At the end of 1997, the Company operated 154 core brand restaurants.  By the end of 1998, the core brands had expanded to 212 restaurants, and by the end of 1999 the Company was operating 243 core brand restaurants.  Although the Company was able to expand revenues through the opening of new core brand restaurants, average unit volumes and profit margins were declining during 1998 and 1999.  At the end of 1999, the Company's debt level was $443 million and debt service require-ments were such that the Company was increasingly becoming a net user of cash.

After divestiture of the McCormick & Schmick's and Canyon Café brands in 2000 and 2001, respectively, as part of a strategy to reduce debt, the Company was left with the core brands of Don Pablo's and Hops.  By the end of 2002, the Don Pablo's and Hops brands were operating 120 and 66 restaurants, respectively, and the Company had reduced its long term debt to $198 million.  Although the Company was able to reduce outstanding debt, in 2002 and 2003 the Company's financial

performance continued to fall short of expectations, leading to a continuing liquidity crisis and an inability to satisfy debt requirements.

In November 2003, the Company's chief executive officer and chief administrative officer resigned. In December 2003, the Company failed to make semi-annual interest payments due on its public debt, which if uncured within a 30-day grace period would have represented an event of default under which all outstanding obligations under the Company's public debt as well as the outstanding obligations under its revolving credit facility would have become immediately due and payable. Consequently, on February 4, 2004, the Company filed voluntary petitions in the U.S. Bankruptcy Court for the Northern District of Texas for relief under chapter 11 of the U.S. Bankruptcy Code. At the time of its bankruptcy filing, the Company operated 106 Don Pablo's and 62 Hops restaurants.

**B.      General Structure of the Plan**

Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The Plan provides for the substantive consolidation of the Debtors' Estates for purposes of voting on the Plan and making distributions thereunder. Moreover, the plan provides for the possible merger of certain Affiliate Debtors as described in Section 7.2 of the Plan.

The Plan contemplates that the Reorganized Debtors will receive exit financing from three different sources: (i) up to a $40 million New Tranche A Financing Facility; (ii) the $12.5 million New Tranche B Financing Facility with the Investors; and (iii) the sale of $17.5 million of New Convertible Preferred Stock to the Investors. The Investors will, subject to the conditions of their commitments and the New Tranche B Credit Agreement and the New Convertible Preferred Purchase Agreement, respectively, fund the New Tranche B Financing Facility and purchase the New Convertible Preferred Stock, as further discussed in <u>Section V.D.</u> Prior to the Disclosure Statement hearing, the Investors expressed their willingness to make available to all holders who will receive New Common Stock the opportunity to participate in the New Tranche B Financing Facility and the New Convertible Preferred Stock on a unitary basis if the Creditors' Committee concluded that there would be sufficient interest to warrant the additional costs of a subscription rights program. While the Creditors' Committee became aware of expressions of interest from a few creditors, ultimately the Creditors Committee concluded, and the Debtors concurred, that there was insufficient interest expressed by the creditor body as a whole to justify the additional costs of implementing a subscription rights program.

In connection with the above mentioned exit financing transactions, and the Debtors' decision to emerge as a privately held company, as further discussed below, the Investors will be a controlling shareholder of the Company and own more than 60% of the New Common Stock on an as diluted basis.

After careful review of the Debtors' current and projected operations, estimated recoveries in a liquidation scenario, prospects as an ongoing business, and the strategic Business Plan developed by management and discussed more fully in <u>Section IV.G.</u>, the Debtors have concluded that the recovery to the Debtors' stakeholders will be maximized by the Debtors' continued operation as a going concern. The Debtors believe that their businesses and assets have significant value that would not be realized in a liquidation, either in whole or in substantial part. According to the liquidation and other analyses prepared by the Debtors with the assistance of their financial advisors, the value of the

Debtors' Estates is considerably greater as a going concern than in a liquidation.  For a complete discussion of the liquidation value of the Debtors, please refer to <u>Appendix C</u>, attached hereto.

**C.      Summary of Treatment of Claims and Interests Under the Plan**

Under the Plan, Claims against and Interests in the Debtors are divided into Classes.  Certain unclassified Claims, specifically Administrative Claims and Tax Priority Claims are not classified, as contemplated by the Bankruptcy Code.  Administrative Claims will be paid in full in Cash or will be provided such lesser treatment as agreed to by an Administrative Claim holder and Tax Priority Claims will be paid in cash in full, provided that holders of Tax Priority Claims may be paid over a six-year period as provided by the Bankruptcy Code.  All other Claims and Interests are classified separately in various Classes in the Debtors' Chapter 11 Cases and will receive the distributions and recoveries (if any) described herein.

The Company has determined that, given its size after its reorganization and the costs of remaining a public company, it will emerge from these Chapter 11 Cases as a privately held company. In order to effectuate its emergence as a privately held company, the Company will distribute Cash to each holder of a Class 7 Small Claim, rather than New Common Stock. With fewer than 300 holders of record of the New Common Stock, the Company will not be subject to the periodic reporting and other procedural requirements of the Exchange Act.  The Company estimates that the savings of becoming a privately held company will exceed $2 million annually.

The Plan assumes the total reorganization value of the Company to be $96.37 million as of April 30, 2005.  This reorganization value has been agreed to among the Debtors, the Creditors' Committee and the DIP Lenders and falls within the reorganization valuation performed by Miller Buckfire Ying & Co., LLC  ("MBY"), the Debtors' retained investment banker.  The reorganization common equity value, which takes into account the total reorganization value less estimated debt outstanding as of April 30, 2005, was estimated to be approximately $28.15 million, as of April 30, 2005.  These valuations are based on numerous assumptions, including, among other things:  (i) the proposed capitalization of the Company will be as set forth in the Plan; (ii) there will be no material change in current market, business and general economic conditions; and (iii) the Plan is confirmed without material changes.

The following chart summarizes the classification and treatment of the prepetition Claims and Interests under the Plan, and in each case reflects the amount and form of consideration that will be distributed in exchange for and in full satisfaction, settlement, release, and discharge of such Claims and Interests.  The recoveries reflected in the following chart assume that all shares of New Common Stock and Litigation Trust Beneficial Interests that would otherwise be payable to the holders of Class 4 and 5 Claims will be redistributed, on account of certain subordination provisions, to the holders of Class 4 claims, without any regard to the rights of setoff that might be asserted by holders of Claims subordinated to the Senior Notes. The classification and treatment for all Classes are described in more detail under <u>Section V.C.</u> of this Disclosure Statement.  In each case, payments on account of Claims which are entitled to a distribution under the Plan will be (i) subject to <u>Articles IX</u> and <u>X</u> of the Plan, which sets forth general procedures for treating and resolving Disputed and Contingent Claims, and (ii) in full satisfaction, settlement, release and discharge of and in exchange for such Claims.

| **Class Description** | **Treatment Under Plan** |
|---|---|
| **Class 1**<br>**Secured Claims** | **Class 1 is Unimpaired by the Plan.**<br><br>In accordance with the provisions for treatment of Claims and Interests and the distribution provisions provided in <u>Section 5.1(a)</u> and <u>Article IX</u> of the Plan, respectively, each Holder of an Allowed Secured Claim will recover in full on account of such Allowed Secured Claim.<br><br>Because Holders of Secured Claims are Unimpaired, they are conclusively presumed to have accepted the Plan and therefore are not entitled to vote to accept or reject the Plan.<br><br>**Estimated Amount of Allowed Claims: 0**<br>**Estimated Percentage of Recovery: 100%** |
| **Class 2**<br>**Non-Tax Priority**<br>**Claims** | **Class 2 is Unimpaired by the Plan.**<br><br>In accordance with the provisions for treatment of Claims and Interests and the distribution provisions provided in <u>Section 5.1(b)</u> and <u>Article IX</u> of the Plan, respectively, each Holder of an Allowed Non-Tax Priority Claim will recover in full on account of such Allowed Non-Tax Priority Claim.<br><br>Because Holders of Non-Tax Priority Claims are Unimpaired, they are conclusively presumed to have accepted the Plan and therefore are not entitled to vote to accept or reject the Plan.<br><br>**Estimated Amount of Allowed Claims: 0**<br>**Estimated Percentage of Recovery: 100%** |

| **Class Description** | **Treatment Under Plan** |
|---|---|
| **Class 3**<br>**General Unsecured**<br>**Claims** | **Class 3 is Impaired by the Plan.**<br><br>In accordance with the provisions for treatment of Claims and Interests and the distribution provisions provided in <u>Section 5.1(c)</u> and <u>Article IX</u> of the Plan, on the Distribution Date, holders of Allowed Class 3 Claims shall receive (i) New Common Stock, which the Disbursing Agent will distribute Pro Rata to or for the benefit of holders of Allowed Class 3 Claims as if Classes 3, 4, 5 and 6 were a single class, and (ii) Litigation Trust Beneficial Interests, which the Disbursing Agent will distribute Pro Rata to or for the benefit of holders of Allowed Class 3 Claims as if Classes 3, 4, 5 and 6 were a single class.<br><br>Because holders of General Unsecured Claims are Impaired, they are entitled to vote to accept or reject the Plan.<br><br>**Estimated Amount of Claims:  $16-$30 million**<br>**Estimated Percentage of Recovery:  13.8% to 15.0%** |
| **Class 4**<br>**Senior Noteholder**<br>**Claims** | **Class 4 is Impaired by the Plan.**<br><br>In accordance with the provisions for treatment of Claims and Interests and the distribution provisions provided in <u>Section 5.1(d)</u> and <u>Article IX</u> of the Plan, on the Distribution Date, holders of Class 4 Claims will receive (i) New Common Stock, which the Disbursing Agent will distribute Pro Rata to or for the benefit of holders of Allowed Class 4 Claims as if Classes 3, 4, 5 and 6 were a single class, (ii)  the Subordinated Notes Redistribution Shares, which the Disbursing Agent will distribute Pro Rata to or for the benefit of holders of Allowed Class 4 Claims, (iii) the TECONS Redistribution Shares, which the Disbursing Agent will distribute Pro Rata to or for the benefit of holders of Allowed Class 4 Claims, (iv) Litigation Trust Beneficial Interests, which the Disbursing Agent will distribute Pro Rata to or for the benefit of holders of Allowed Class 4 Claims as if Classes 3, 4, 5 and 6 were a single class, (v)  the Subordinated Notes Redistribution Interests, which the Disbursing Agent will distribute Pro Rata to or for the benefit of holders of Allowed Class 4 Claims, (vi) the TECONS Redistribution Interests, which the Disbursing Agent will distribute Pro Rata to or for the benefit of holders of Allowed Class 4 Claims.<br><br>Because holders of Senior Noteholder Claims are Impaired, they are entitled to vote to accept or reject the Plan.<br><br>**Estimated Amount of Claims:  $113.6 million**<br>**Estimated Percentage of Recovery:  20.4% to 22.2%** |

| **Class Description** | **Treatment Under Plan** |
|---|---|

**Class 5 Subordinated Noteholder Claims**

**Class 5 is Impaired by the Plan.**

In accordance with the provisions for treatment of Claims and Interests and the distribution provisions provided in Section 5.1(e) and Article IX of the Plan, if Classes 4 and 5 vote to accept the Plan, on the Distribution Date, holders of Class 5 Claims will receive Class A Warrants, which the Disbursing Agent will distribute Pro Rata to or for the benefit of holders of Allowed Class 5 Claims.

As reflected in the treatment of Class 4, and in accordance with the Subordinated Notes Subordination Rights, holders of Class 5 Claims shall not receive or retain a distribution of New Common Stock or Litigation Trust Beneficial Interests. Instead, shares of New Common Stock and Litigation Trust Beneficial Interests otherwise distributable to or for the benefit of holders of Allowed Class 5 Claims shall instead be redistributed by the Disbursing Agent to holders of Allowed Class 4 Claims pursuant to the subordination provisions of the Subordinated Notes Indenture, all at such times and in such manner as provided in Articles IX and X of the Plan.

If any of Class 4 or 5 does not vote to accept the Plan, the holders of Class 5 Claims shall not receive and retain any Class A Warrants or any other property under the Plan; provided, however, that the vote of Class 5 shall not affect the distribution of the Subordinated Noteholder Redistribution Shares and the Subordinated Noteholder Redistribution Interests.

Because holders of Subordinated Noteholder Claims are Impaired, they are entitled to vote to accept or reject the Plan.

**Estimated Amount of Claims: $51.2 million**
**Estimated Percentage of Recovery: The Debtors believe that the value of the Class A Warrant distribution is uncertain.**

| **Class Description** | **Treatment Under Plan** |
|---|---|

**Class 6**
**TECONs Claims**

**Class 6 is Impaired by the Plan.**

In accordance with the provisions for treatment of Claims and Interests and the distribution provisions provided in Section 5.1(f) and Article IX of the Plan, if Classes 4, 5, and 6 vote to accept the Plan, on the Distribution Date holders of Class 6 Claims will receive Class B Warrants, which the Disbursing Agent will distribute Pro Rata to or for the benefit of holders of Allowed Class 6 Claims.

As reflected in the treatment of Class 4, and in accordance with the TECONS Subordination Rights, holders of Class 6 Claims shall not receive or retain a distribution of New Common Stock or Litigation Trust Beneficial Interests. Instead, shares of New Common Stock and Litigation Trust Beneficial Interests otherwise distributable to or for the benefit of holders of Allowed Class 6 Claims shall instead be redistributed by the Disbursing Agent to holders of Allowed Class 4 Claims pursuant to the subordination provisions of the TECONS Indenture, all at such times and in such manner as provided in Articles IX and X of the Plan.

If any of Class 4, 5 or 6 does not vote to accept the Plan, the holders of Class 6 Claims shall not receive and retain any Class B Warrants or any other property under the Plan provided, however, that the vote of Classes 5 and 6 shall not affect the distribution of the TECONS Redistribution Shares and the TECONS Redistribution Interests.

Because holders of TECONs Claims are Impaired, they are entitled to vote to accept or reject the Plan.

**Estimated Amount of Claims: $3.3 million**
**Estimated Percentage of Recovery: The Debtors believe that the value of the Class B Warrant distribution is uncertain.**

| **Class Description** | **Treatment Under Plan** |
|---|---|

**Class 7**
**Small Claims**

**Class 7 is Impaired by the Plan.**

In accordance with the provisions for treatment of Claims and Interests and the distribution provisions provided in Section 5.1(g) and Article IX of the Plan, on, or as soon as reasonably practicable after, the later of (i) the Effective Date, or (ii) the date on which a Small Claim becomes an Allowed Small Claim, each holder of an Allowed Small Claim shall receive, in full satisfaction, settlement and release of, and in exchange for, such Allowed Small Claim, Cash equal to 14.5% of such Allowed Small Claim.

Because holders of Small Claims are Impaired, they are entitled to vote to accept or reject the Plan.

**Estimated Amount of Claims: $4.0-$6.0 million**
**Estimated Percentage of Recovery: 14.5%**

**Class 8**
**Old Avado Common**
**Stock Interests and**
**Subordinated Claims**

**Class 8 is Impaired by the Plan.**

In accordance with the provisions for treatment of Claims and Interests provided in Section 5.1(h) of the Plan, neither the Holders of Old Avado Common Stock, nor the Holders of Subordinated Claims shall receive or retain any distribution on account of such Old Avado Common Stock or Subordinated Claims.

Because Holders of Old Avado Common Stock and Subordinated Claims are not receiving or retaining any property under the Plan, they are conclusively presumed to have rejected the Plan and therefore are not entitled to vote to accept or reject the Plan.

**Estimated Recovery: 0%**

**THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR THE HOLDERS OF CLAIMS AGAINST THE DEBTORS. ACCORD-INGLY, THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

TABLE OF CONTENTS

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. PLAN VOTING INSTRUCTIONS AND PROCEDURES . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    A.     Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    B.     Notice to Holders of Claims and Interests . . . . . . . . . . . . . . . . . . . . . . . . . 2
    C.     Solicitation Package . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    D.     Voting Procedures, Ballots and Voting Deadline . . . . . . . . . . . . . . . . . . . . . 3
    E.     Confirmation Hearing and Deadline for Objections to Confirmation . . . . . . . . . . 4

III. HISTORY OF THE DEBTORS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    A.     Background and Formation of Avado Brands, Inc. . . . . . . . . . . . . . . . . . . . . . . 5
    B.     Description of Business and Restaurant Brands . . . . . . . . . . . . . . . . . . . . . . . 6
           1.    *Don Pablo's* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
           2.    *Hops* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    C.     Events Leading to Commencement of the Chapter 11 Cases . . . . . . . . . . . . . . . 7
           1.    *Acquisitions* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
           2.    *Applebee's Divestitures* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
           3.    *Capital Structure* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
           4.    *Prepetition Restructuring Efforts* . . . . . . . . . . . . . . . . . . . . . . . . . 8
           5.    *Prepetition Issues of Default* . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    D.     Prepetition Capital Structure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
           1.    *Prepetition Credit Facility* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
           2.    *Prepetition Securities* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
           3.    *Sale-leaseback transactions* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    E.     Discussion of Audit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    F.     Corporate Structure of the Debtors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
           1.    *Prepetition Corporate Structure* . . . . . . . . . . . . . . . . . . . . . . . . . 15
           2.    *Board of Directors* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
           3.    *Current Executive Management* . . . . . . . . . . . . . . . . . . . . . . . . . . 15

IV. THE CHAPTER 11 CASES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    A.     Continuation of Business; Stay of Litigation . . . . . . . . . . . . . . . . . . . . . . . . 16
    B.     Summary of Certain Relief Obtained at the Outset of the Chapter 11 Cases . . . . . 17
           1.    *First Day Orders* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
           2.    *Appointment of Creditors' Committee* . . . . . . . . . . . . . . . . . . . . . 18
    C.     Post-Petition Financing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    D.     Other Material Relief Obtained During the Chapter 11 Cases . . . . . . . . . . . . . . 19
    E.     Settlement Agreement With Internal Revenue Service and Related Issues . . . . . . 19
    F.     Summary of Claims Process, Bar Date, and Claims Filed . . . . . . . . . . . . . . . . 20
           1.    *Schedules and Statements of Financial Affairs* . . . . . . . . . . . . . . . 20
           2.    *Claims Bar Date* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
           3.    *Proofs of Claim and Other Claims* . . . . . . . . . . . . . . . . . . . . . . . 20
           4.    *Claims Reconciliation* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
           5.    *Significant Disputed Claims* . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    G.     Development and Summary of Business Plan . . . . . . . . . . . . . . . . . . . . . . . . 24

i

V.  SUMMARY OF THE REORGANIZATION PLAN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
   A.      Overall Structure of the Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
   B.      Substantive Consolidation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
          1.      *Discussion of Substantive Consolidation Generally* . . . . . . . . . . . . . 26
          2.      *Application to the Debtors* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
   C.      Classification and Treatment of Claims and Interests . . . . . . . . . . . . . . . . . . . . . 28
          1.      *Treatment of Unclassified Claims Under the Plan* . . . . . . . . . . . . . . 28
          2.      *Treatment of Classified Claims* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
   D.      Other Significant Plan Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
          1.      *Restructuring Transactions* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
          2.      *Exit Financing* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
          3.      *Incentive Plan* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
          4.      *Employee Payments* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
   E.      Description of Securities to Be Issued in Connection with the Plan . . . . . . . . . . 36
          1.      *New Common Stock of Reorganized Avado* . . . . . . . . . . . . . . . . . . 37
          2.      *New Convertible Preferred Stock* . . . . . . . . . . . . . . . . . . . . . . . . . . 37
          3.      *Class A Warrants* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
          4.      *Class B Warrants* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
   F.      Shareholders' Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
   G.      Post-Consummation Operations of the Debtors . . . . . . . . . . . . . . . . . . . . . . . . . 38
          1.      *Reorganized Debtors* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
          2.      *Officers* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
          3.      *Directors* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
   H.      Distributions Under the Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
          1.      *Time of Distributions* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
          2.      *Interest on Claims* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
          3.      *Disbursing Agent* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
          4.      *Delivery of Distributions* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
          5.      *Surrender and Cancellation of Securities* . . . . . . . . . . . . . . . . . . . . . 41
          6.      *Procedures for Resolving Disputed, Contingent, and Unliquidated*
                    *Claims* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
          7.      *Setoff* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
          8.      *Fractional Shares* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
          9.      *De Minimis Distributions* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
          10.    *Allocation of Plan Distributions Between Principal and Interest* . . . 44
          11.    *Allowance of Certain Claims* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
   I.      Litigation Trust . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
          1.      *Appointment of Litigation Trustee* . . . . . . . . . . . . . . . . . . . . . . . . . . 47
          2.      *Funding of the Litigation Trust.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
          3.      *Transfer of Trust Assets to the Litigation Trust* . . . . . . . . . . . . . . . . 48
          4.      *The Litigation Trust* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
          5.      *The Trust Advisory Board* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
          6.      *Distributions of Trust Assets* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
   J.      Miscellaneous Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
          1.      *Treatment of Executory Contracts and Unexpired Leases* . . . . . . . . 50
          2.      *Exculpation and Limitation of Liability* . . . . . . . . . . . . . . . . . . . . . . 53
          3.      *Indemnification Obligations* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
          4.      *Releases by Debtors and Debtors-in-Possession* . . . . . . . . . . . . . . . 54

|   |   | 5. | *Release by Holders of Claims and Interests* | 54 |
|---|---|---|---|---|
|   |   | 6. | *Injunction* | 55 |
|   | K. | | Preservation of Causes of Action | 55 |

**VI.  CERTAIN FACTORS TO BE CONSIDERED** ............................................... 56
|   | A. | General Considerations | 56 |
|---|---|---|---|
|   | B. | Certain Bankruptcy Considerations | 56 |
|   | C. | Inherent Uncertainty of Financial Projections | 56 |
|   | D. | Dividends or Other Distributions | 57 |
|   | E. | Claims Estimations | 57 |
|   | F. | Employees | 57 |
|   | G. | Market for New Securities | 57 |
|   | H. | Effect of Inflation | 57 |
|   | I. | Forward-Looking Information | 57 |
|   | J. | Competition | 58 |
|   | K. | Economic, Market and Other Conditions | 58 |
|   | L. | Importance of Location | 58 |
|   | M. | Government Regulation | 58 |
|   | N. | Quantitative and Qualitative Disclosures About Market Risk | 59 |

**VII.  APPLICABILITY OF FEDERAL AND OTHER SECURITIES LAWS** ............... 60
|   | A. | Offer and Sale of New Securities Pursuant to the Plan | 60 |
|---|---|---|---|
|   | B. | Subsequent Transfers of Securities | 60 |

**VIII.  CERTAIN UNITED STATES FEDERAL INCOME
TAX CONSEQUENCES OF THE PLAN** ............................................ 61
|   | A. | | Certain United States Federal Income Tax Consequences to the Debtors | 62 |
|---|---|---|---|---|
|   |   | 1. | *Cancellation of Indebtedness Income* | 62 |
|   |   | 2. | *Utilization of Net Operating Losses and General Business Credits* | 62 |
|   |   | 3. | *Alternative Minimum Tax* | 63 |
|   | B. | | Certain United States Federal Income Tax Consequences to Holders of Claims | 63 |
|   |   | 1. | *Class 3 (Allowed General Unsecured Claims)* | 64 |
|   |   | 2. | *Class 4 (Allowed Senior Noteholder Claims)* | 64 |
|   |   | 3. | *Class 5 (Allowed Subordinated Noteholder Claims)* | 66 |
|   |   | 4. | *Class 6 (Allowed TECONS Securities Claims)* | 67 |
|   |   | 5. | *Class 7 (Allowed Small Claims)* | 68 |
|   |   | 6. | *Market Discount* | 69 |
|   |   | 7. | *Allocations of Plan Distributions Between Principal and Interest* | 69 |
|   |   | 8. | *Receipt of Distributions on Subsequent Distribution Dates* | 69 |
|   | C. | | United States Federal Income Tax Treatment of Disputed Claims Reserves and Supplemental Distribution Accounts | 70 |
|   | D. | | Transfer of Litigation Trust Assets to Litigation Trust | 70 |
|   | E. | | Information Reporting and Backup Withholding | 71 |
|   | F. | | Importance of Obtaining Professional Tax Assistance | 71 |

**IX.  CONFIRMATION** ............................................................................. 72
|   | A. | Feasibility of the Plan | 72 |
|---|---|---|---|
|   | B. | Acceptance of the Plan | 73 |

|   | C. | Best Interests of Claim Holders | 73 |
|---|----|----|----|
|   | D. | Liquidation Analysis | 74 |
|   |    | *1. The Debtors* | 74 |
|   |    | *2. Liquidation Analysis Is Speculative* | 74 |
|   | E. | Valuation of the Reorganized Debtors | 74 |
|   |    | *1. Valuation* | 74 |
|   |    | *2. Valuation Overview* | 75 |
|   |    | *3. Methodology* | 75 |
|   |    | *4. Valuation of Reorganized Company* | 76 |
|   | F. | Application of the "Best Interests" of Creditors Test to the Liquidation Analysis and the Valuation | 77 |
|   | G. | Confirmation Without Acceptance of All Impaired Classes: The "Cramdown" Alternative | 78 |
|   | H. | Conditions to Confirmation and/or Consummation | 79 |
|   |    | *1. Conditions to Confirmation* | 79 |
|   |    | *2. Conditions to the Effective Date* | 79 |
|   | I. | Waiver of Conditions to Confirmation and/or Consummation | 80 |
|   | J. | Retention of Jurisdiction | 80 |
| X. | ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN | | 82 |
|   | A. | Continuation of the Chapter 11 Cases | 82 |
|   | B. | Alternative Plans of Reorganization | 83 |
|   | C. | Liquidation under Chapter 7 or Chapter 11 | 83 |
| XI. | VOTING REQUIREMENTS | | 84 |
|   | A. | Parties in Interest Entitled to Vote | 84 |
|   | B. | Classes Impaired Under the Plan | 85 |
|   |    | *1. Voting Impaired Classes of Claims* | 85 |
|   |    | *2. Non-Voting Impaired Classes of Claims and Interests* | 86 |
| XII. | CONCLUSION | | 86 |
|   | A. | Hearing on and Objections to Confirmation | 86 |
|   |    | *1. Confirmation Hearing* | 86 |
|   |    | *2. Date Set for Filing Objections to Confirmation* | 86 |
|   | B. | Recommendation | 87 |

iv

**APPENDICES**

Appendix A  — Joint Plan of Reorganization of Avado Brands, Inc. and its Affiliated Debtors and Debtors in Possession

Appendix B  — Corporate Organization Chart

Appendix C  — Liquidation Analysis

Appendix D  — Projections

Appendix E  — Restated Financials

Appendix F  — DDJ Capital Management Commitment Letter

Appendix G  — Shareholders' Agreement

**DISCLOSURE STATEMENT WITH RESPECT TO**
**THE JOINT PLAN OF REORGANIZATION OF AVADO BRANDS, INC.**
**AND ITS AFFILIATED DEBTORS AND DEBTORS IN POSSESSION**

## I. INTRODUCTION

Avado Brands, Inc. ("Avado") and sixty-four of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession (collectively, the "Debtors") submit this disclosure statement (the "Disclosure Statement") pursuant to Section 1125 of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") for use in the solicitation of votes on the Joint Plan of Reorganization of Avado Brands, Inc. and its Affiliated Debtors and Debtors in Possession (the "Plan") proposed by the Debtors and filed with the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court"), on February 3, 2005. A copy of the Plan is annexed as Appendix A to this Disclosure Statement.

On February 4 and 5, 2004 (as applicable, the "Petition Date"), the Debtors Filed voluntary petitions (the "Voluntary Petitions") for reorganization relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. Concurrently with the Filing of this Disclosure Statement, the Debtors filed the Plan which sets forth how Claims and Interests in the Debtors will be treated. This Disclosure Statement describes certain aspects of the Plan, the Debtors' prepetition operating and financial history, the need to seek chapter 11 protection, significant events occurring in the Debtors' Chapter 11 Cases and other related matters. **For a complete understanding of the Plan, you should read this Disclosure Statement, the Plan and the Exhibits and Plan Schedules thereto in their entirety.**

FOR A DESCRIPTION OF THE PLAN AND VARIOUS RISK AND OTHER FACTORS PERTAINING TO THE PLAN AS IT RELATES TO CLAIMS AGAINST AND INTERESTS IN THE DEBTORS, PLEASE SEE ARTICLES V AND VI.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVI-SIONS OF THE PLAN, CERTAIN DOCUMENTS RELATED TO THE PLAN, CERTAIN EVENTS IN THE CHAPTER 11 CASES, AND CERTAIN FINANCIAL INFORMATION. ALTHOUGH THE DEBTORS BELIEVE THAT SUCH SUMMARIES ARE FAIR AND ACCU-RATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS. FACTUAL INFORMATION CON-TAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY MATERIAL INACCU-RACY OR OMISSION.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND INTERESTS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALI-FIES ALL SUMMARIES. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.

## II. PLAN VOTING INSTRUCTIONS AND PROCEDURES

A.      **Definitions**

Except as otherwise defined herein, capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the Plan.  In addition, all references in this Disclosure Statement to monetary figures refer to United States currency.

B.      **Notice to Holders of Claims and Interests**

This Disclosure Statement is being transmitted to holders of Claims that are entitled under the Bankruptcy Code to vote on the Plan, as well as to other parties in interest pursuant to prior orders entered by the Bankruptcy Court.  See Article V of this Disclosure Statement for a discussion and listing of those holders of Claims and Interests that are entitled to vote on the Plan and those holders of Claims that are not entitled to vote on the Plan.  The purpose of this Disclosure Statement is to provide adequate information to enable such holders to make a reasonably informed decision with respect to the Plan prior to exercising their right to vote to accept or reject the Plan.

On March 2, 2005, the Bankruptcy Court entered an order approving this Disclosure Statement as containing information of a kind and in sufficient and adequate detail to enable such holders to make an informed judgment with respect to acceptance or rejection of the Plan.  THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE EITHER A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.

ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS APPENDICES CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR TO REJECT THE PLAN.  This Disclosure Statement contains important information about the Plan, considerations pertinent to acceptance or rejection of the Plan, and developments concerning the Chapter 11 Cases.

THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN.  No solicitation of votes may be made except after distribution of this Disclosure Statement, and no Person has been authorized to distribute any information concerning the Debtors other than the information contained herein.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS.  Except with respect to the projections set forth in Appendix D annexed hereto (the "Projections") and except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur subsequent to the date hereof and that may have a material impact on the information contained in this Disclosure Statement.  Neither the Debtors nor the Reorganized Debtors intend to update the Disclosure Statement; thus, the Disclosure Statement will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Projections.  Further, the Debtors do not anticipate that any amendments or supple-

2

ments to this Disclosure Statement will be distributed to reflect such occurrences. Accordingly, the delivery of this Disclosure Statement shall not under any circumstance imply that the information herein is correct or complete as of any time subsequent to the date hereof.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTING FIRM, BUT IN THE COMPANY'S BELIEF HAS BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

**C.      Solicitation Package**

Accompanying this Disclosure Statement are copies of (1) the Plan; (2) the notice of, among other things, the time for submitting Ballots to accept or reject the Plan, the date, time and place of the hearing to consider confirmation of the Plan and related matters, and the time for filing objections to confirmation of the Plan (the "Confirmation Hearing Notice"); and (3) (a) if you are the holder of a Claim(s) entitled to vote on the Plan, one or more Ballots (and return envelopes) to be used by you in voting to accept or to reject the Plan – and (b) if you are the holder of a Claim or Interest not entitled to vote on the Plan, a notice of non-voting status.

**D.      Voting Procedures, Ballots and Voting Deadline**

If you are a holder of a Claim entitled to vote on the Plan and a Ballot is included herewith, after carefully reviewing the Plan, this Disclosure Statement and the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed Ballot. Please complete and sign your original Ballot (copies will not be accepted) and return it in the envelope provided.

Each Ballot has been coded to reflect the Class of Claims it represents. Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot or Ballots sent to you with this Disclosure Statement.

IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROP-ERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND <u>RECEIVED</u> NO LATER THAN APRIL 12, 2005, AT 4:00 P.M. (EASTERN TIME) (THE "VOTING DEADLINE") BY BANKRUPTCY SERVICES LLC ("BSI"), AT THE FOLLOWING ADDRESS: AVADO BALLOT PROCESSING, C/O BSI, LLC, ATTN: DAVE MALO, 757 3RD AVENUE, NEW YORK, NY 10017. DO NOT RETURN ANY STOCK CERTIFICATES OR DEBT INSTRUMENTS WITH YOUR BALLOT. Additionally, if you have any questions about (1) the procedure for voting your Claim or Interest with respect to the packet of materials that you have received or (2) the amount of your Claim or Interest, you should contact BSI at the address set forth above.

If you wish to obtain, at your own expense, unless otherwise specifically required by Federal Rule of Bankruptcy Procedure 3017(d), an additional copy of the Plan, this Disclosure Statement, or any appendices or exhibits to such documents, please contact BSI at the address set forth above. In addition, copies of the Plan and Disclosure Statement (including after the Plan Supplement Filing Date all Exhibits, Plan Schedules and Appendices) and all pleadings and orders of the Bankruptcy Court are publicly available, at the BSI's general website address: http://www.bsillc.com.

FOR FURTHER INFORMATION AND INSTRUCTION ON VOTING TO ACCEPT OR REJECT THE PLAN, SEE SECTION XI OF THIS DISCLOSURE STATEMENT.

**E.     Confirmation Hearing and Deadline for Objections to Confirmation**

Pursuant to section 1128 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 3017(c), the Bankruptcy Court has scheduled the Confirmation Hearing for April 21, 2005, at 10:30 a.m. (Central Time) before the Honorable Steven Felsenthal, Chief United States Bankruptcy Judge for the Northern District of Texas, Dallas Division, at 1100 Commerce Street, Dallas, Texas 75242. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed with the Clerk of the Bankruptcy Court and served so that they are RECEIVED on or before April 12, 2005, at 4:00 p.m. (Central Time) by the following parties (the "Notice Parties"):

*Counsel for the Debtors*

Skadden, Arps, Slate, Meagher & Flom LLP
333 West Wacker Drive
Chicago, Illinois  60606-1285
        Attn:  George N. Panagakis, Esq.
               Timothy P. Olson, Esq.
               Nathan L. Stuart, Esq.

and

Cox Smith Matthews Incorporated
112 East Pecan Street, Suite 1800
San Antonio, Texas  78205-1251
        Attn:  Deborah D. Williamson, Esq.
               Thomas Rice, Esq.

*United States Trustee*

The Office of the United States Trustee
1100 Commerce Street, Room 9C60
Dallas, Texas 75242
        Attn:  George F. McElreath, Esq.

*Counsel for the Creditors' Committee*

Anderson Kill & Olick, P.C.
1251 Avenue of the Americas
New York, New York  10020
        Attn:  J. Andrew Rahl, Esq.
               Andrea Pincus, Esq.

4

<u>and</u>

Munsch Hardt Kopf & Harr, P.C.
4000 Fountain Place
1445 Ross Avenue
Dallas, Texas 75202
     Attn: E. Lee Morris, Esq.

*Counsel for the Postpetition Lenders*

Goodwin Procter
Exchange Place
53 State Street
Boston, Massachusetts 02109
     Attn: Jon D. Schneider, Esq.

<u>and</u>

Vinson & Elkins LLP
3700 Trammell Crow Center
2001 Ross Avenue
Dallas, Texas 75201-2975
     Attn: Paul Heath, Esq.

## III. HISTORY OF THE DEBTORS

**A.**    **Background and Formation of Avado Brands, Inc.**

Avado Brands, Inc. ("Avado" or the "Company") and its subsidiaries is a multi-concept restaurant company. The Company was incorporated in December 1986 as the MRG Company, Inc., a Georgia corporation wholly owned by Thomas E. DuPree, Jr. The Company's casual dining business began with two Applebee's restaurants, which were opened in 1986. In 1988, following various mergers, the Company changed its name to Apple South, Inc. By the end of 1988, the Company was operating a total of 18 Applebee's and 10 Hardee's restaurants in five states. Over the next 8 years, through the development of new restaurants and the acquisition of existing restaurants and development territories, the Company would become the nations largest operator of Applebee's restaurants.

In November of 1991, the Company completed an initial public offering of one million shares of Apple South, Inc. common stock. At the time of the offering, the Company operated 40 Applebee's and 10 Hardee's restaurants. Over the course of the next three years, the Company completed two additional registered public offerings of common stock generating net proceeds of approximately $61.9 million and opened 80 Applebee's and 11 Gianni's Little Italy restaurants.

In 1997, the decision was made to divest the the Company's 279 restaurant Applebee's business in order to focus on the Company's four proprietary brands: Don Pablo's Mexican Kitchen, Canyon Café, Hops Restaurant Bar and Brewery, and McCormick & Schmick's. In connection with the decision to divest its Applebee's division, the Company changed its name from Apple South, Inc. to Avado Brands, Inc. in 1998. The Company's business plan was to focus capital as well as

5

human resources on its proprietary concepts which were believed to have greater profitability potential due in part to the absence of franchisee commitments, royalties and development territory restrictions. At the end of 1997, outstanding long-term debt, including $115 million in convertible securities, was approximately $497 million.

Net proceeds of approximately $400 million from the sale of Applebee's were used to pay down debt, repurchase outstanding shares of the Company's common stock and finance growth of the core brand restaurants. By the end of 1998, the core brands had expanded to 212 restaurants and by the end of 1999, the Company was operating 243 core brand restaurants. Despite efforts to pay down debt, at the end of 1999, the Company's debt level was $443 million and debt service requirements were such that while the Company was still generating cash flow, the Company's debt service was greater than the operating cash flow.

Although the Company was able to expand revenues through the opening of new core brand restaurants, average unit volumes and profit margins were declining during 1998 and 1999. In 2000, the Company committed to strategies to reduce debt, improve liquidity and increase profitability through a significant decrease in new store openings, the closing of unprofitable locations and the sale of non-core assets. In 2001, the Company decided to divest of McCormick & Schmicks' and Canyon Café. Also, beginning in 2001, the Company began to more aggressively target under-performing restaurants for closure, due in large part to the Company's lack of liquidity. The closed locations were subsequently sold in order to generate liquidity for debt service payments and other general corporate purposes. In addition, the Company divested of substantially all of the Canyon Café brand in 2002.

By the end of 2002, the Don Pablo's and Hops brands were operating 120 and 66 restaurants, respectively and the Company had reduced its long-term debt to $198 million. Although efforts to reduce outstanding debt were successful, in 2002 and 2003 the Company's financial performance continued to fall short of expectations leading to a continuing liquidity crisis and an inability to satisfy debt requirements.

As of the Petition Date, the Company operated 106 Don Pablo's and 62 Hops Restaurants and employed approximately 11,150 employees.

**B.      Description of Business and Restaurant Brands**

*1.      Don Pablo's*

The first Don Pablo's was opened in Lubbock, Texas in 1985. The restaurants feature traditional Mexican dishes served in a distinctive, festive dining atmosphere reminiscent of a Mexican village plaza. Don Pablo's was acquired by Avado in 1995. Each restaurant is staffed with a highly experienced management team that is visible in the dining area and interacts with both customers and staff to ensure attentive customer service and consistent food quality. Items are prepared fresh on site using high quality ingredients at relatively low prices. The diverse menu, generous portions and attractive price/value relationship appeal to a broad customer base. Don Pablo's is a national brand with locations in 19 states, predominately located in the Midwest, Northeast and Southeast.

In 2003, average unit volumes for the 108 restaurants that were open for the full year were $2.2 million. In 2003, Don Pablo's did not open any new restaurants and 12 under-performing restaurants were closed. These restaurants that were closed were generally in single unit markets or

markets which the Company no longer intends to develop and were not generating positive cash flow. Subsequent to the Petition Date, an additional 10 Don Pablo's restaurants have been closed. The Company has also entered into a lease for a new Don Pablo's restaurant which will be located in Cincinnati, Ohio and is scheduled to open during the first half of 2005. An extensive interior and exterior remodeling program has also begun at Don Pablo's, with the first remodels currently underway in Minnesota. The Company plans to remodel 15 existing locations during 2005.

Don Pablo's faces competition from not only the casual dining industry, but the rapidly developing fast-casual industry segment as well. Some of Don Pablo's chief competitors on a national and regional level include: On The Border, Chevy's, Chili's, Baja Fresh, and Chipotle. In addition to the restaurants listed, Don Pablo's faces competition from independent, local Mexican eateries located within each of its markets.

    *2.*     *Hops*

The first Hops was opened in Clearwater, Florida in 1989. Each restaurant offers a diverse menu of popular foods, freshly prepared in a display kitchen with a strict commitment to quality and value. Additionally, Hops restaurants feature an on-premises microbrewery. Hops was acquired by Avado in 1997. Hops restaurants are located in 12 states, with the majority of Hops restaurant locations in Florida.

In 2003, average unit volumes for the 63 restaurants that were open for the full year were $2.4 million. In 2003, Hops did not open any new restaurants and three under-performing restaurants were closed. The restaurants that were closed were generally in single unit markets and were not generating positive cash flow. Subsequent to the Petition Date, an additional 40 Hops restaurants have been closed. During 2004, Hops began testing a re-image of the brand, and converted one existing Hops location in Lakeland, Florida to a Hops City Grille, and in early 2005 an existing Hops location in Carrollwood, Florida was converted to a Hops City Grille. The Company has evaluated the performance of the Hops City Grille conversions, and has determined that additional Hops City Grille conversions should not take place and that the locations in Lakeland and Carrollwood will cease operations. Certain other Hops locations will be part of a remodeling program during 2005, which will focus on updating the existing Hops Grillhouse & Brewery image.

Hops faces a great deal of competition from the casual dining industry. A few of Hops' chief competitors on a national and regional level include: Outback, Longhorn's, Applebee's, Chili's, Ruby Tuesday's and O'Charley's. In addition to these restaurant chains, Hops faces competition from independent, local eateries located within each of its markets.

**C.**     **Events Leading to Commencement of the Chapter 11 Cases**

    *1.*     *Acquisitions*

The rapid pace of the Company's acquisitions during the late 1990's presented many challenges that were difficult to overcome, particularly during 1997 when three new concepts were acquired. The integration of these three new proprietary concepts into the existing Company structure and culture was difficult. As a result, performance began to suffer, most notably at newly developed locations. Not only was the pace of acquisitions a tremendous challenge but the development of new restaurant locations was taking place just as rapidly. Newly opened restaurants for the Company's

Don Pablo's and Hops' brands did not perform up to the Company's expectations and the overall performance of the newly acquired Canyon Café concept quickly fell into sharp decline.

       2.       *Applebee's Divestitures*

On December 23, 1997, the Company announced its decision to sell its franchised Applebee's Neighborhood Grill & Bar restaurants in order to focus on the continued development of its proprietary restaurant concepts and the acquisition of new proprietary concepts. The divestiture of the Company's 279 Applebee's restaurants involved 16 individual transactions over a 16-month period, yielding net proceeds of approximately $400 million, and was completed in 1999. Proceeds from the divestiture were used to pay down debt, repurchase outstanding shares of the Company's common stock and finance the growth of the Company's four core brands, Don Pablo's, Hops, McCormick & Schmick's, and Canyon Café.

Several years subsequently, the Company's tax treatment of the divestiture of its Applebee's restaurants triggered an audit of the Company's 1998 Federal income tax returns by the Internal Revenue Service. During the first quarter of 2003, the Company, which had a recorded tax liability of $41.1 million related to the transaction, submitted an Offer in Compromise to the IRS whereby the Company offered to settle its potential obligations at a discounted amount. At the time of the bankruptcy filing, the outcome of the audit was uncertain and the Company did not have sufficient liquidity to pay any significant portion of its recorded liability. On October 26, 2004, the Bankruptcy Court entered an order (Docket No. 1125) approving a settlement agreement with the Internal Revenue Service, which granted the IRS an allowed Tax Priority Claim under 11 U.S.C. § 507(a)(8) in the amount of $15,684,295 payable over six years at five percent interest, with the first payment due one year after the Effective Date. The settlement of the 1998 audit is discussed further in <u>Section VII.</u>

       3.       *Capital Structure*

During the mid to late 90's, the Company rapidly accumulated debt primarily as a result of acquisitions and aggressive new unit growth. The Company's long-term debt at the end of 1994 was $70.1 million and had grown to $443.0 million by the end of 1999. Prior to the divestiture of Applebee's in 1998, the Company's capital structure had become highly leveraged. Although some proceeds from the divestiture were used to pay down debt, the majority of the proceeds were used to repurchase significant amounts of outstanding common stock and assist in financing the rapid development of new restaurants. The use of these proceeds along with the issuance of the Company's 9.75% Senior notes in 1996, $3.50 Convertible Preferred Securities in 1997 and 11.75% Senior Subordinated Notes in 1999 ultimately resulted in a much more highly leveraged Company than prior to the divestitures. The capital structure of the Company became so highly leveraged that it was not able to withstand the declining performance of Canyon Café and the newly developed Don Pablo's and Hops restaurants.

       4.       *Prepetition Restructuring Efforts*

The Company began its prepetition restructuring efforts in 2000 with a commitment to reduce debt and improve liquidity. The Company also made a commitment to focus its available financial and human capital on its core brands and eliminate other joint ventures and activities that had become distractions. Over the next three years, new unit development was all but cancelled, under-performing restaurants were closed, non-core assets and closed restaurants were sold, corporate and brand offices

were consolidated and general and administrative expenses were dramatically reduced. Unprofitable joint ventures were exited and dividends on both common stock and convertible preferred securities were suspended. The Company entered into sale-leaseback transactions and used proceeds from the sale of assets to pay down debt and make debt service payments on its outstanding bonds. The Company also repurchased $19.7 million in face value of outstanding Senior Notes and $52.4 million in face value of Senior Subordinated Notes.

Two of the Company's four proprietary brands were also divested during prepetition restructuring. In 2001, the Company engaged Credit Suisse First Boston, LLC to serve as its financial advisors to explore potential financing alternatives to reduce debt and improve liquidity. Subsequently, the decision was made to divest of the Company's 34-unit McCormick & Schmick's brand and net proceeds from the sale were primarily used to repay the Company's revolving line of credit. The Company's Canyon Café brand was subsequently divested during 2002.

Various operational initiatives were implemented from 2001 through 2003 in an effort to improve the profitability of the Company's two remaining core brands, Don Pablo's and Hops. At Don Pablo's, a Managing Partner Program was introduced, improved customer service initiatives were implemented and menu enhancements were introduced. At Hops, a new management structure was implemented which increased the number of management positions in order to improve customer service and overall guest satisfaction, the Managing Partner Program was revised, new menus were introduced and discount promotional marketing strategies were implemented.

Despite these operational initiatives and debt reduction strategies, the performance of the Company's Don Pablo's and Hops brands was insufficient to continue supporting the capital structure of the Company. The financial performance of Don Pablo's and Hops continued to fall short of expectations resulting in a continued liquidity crisis and inability to manage debt service obligations. In addition, the Company was not able to generate sufficient funds to meet the repair and maintenance and capital expenditure needs of its existing restaurants; thus placing it at a competitive disadvantage relative to some competitors. In November of 2003, the Company's Chief Executive Officer and Chief Administrative Officer resigned. Following those resignations, the Company's Board of Directors engaged Alix Partners, LLC. to serve as advisors to the Company on restructuring alternatives and named Kevin Leary of Alix Partners as Interim Chief Executive Officer and Michael Feder as Chief Restructuring Officer.

     5.    *Prepetition Issues of Default*

At December 28, 2003, the Company was not in compliance with certain financial requirements contained in the Prepetition Credit Facility (as defined below). Additionally, prior to the bankruptcy filing, the Company incurred events of default with respect to its Senior Notes and Senior Subordinated Notes for failure to make interest payments which were due on December 1, 2003 and December 15, 2003, respectively, and may have been in default of certain covenants contained in the respective indentures. Also, the Company was not in compliance with a net worth requirement contained in its 2000 Hops sale-leaseback agreement at December 29, 2002. The lessor, however, waived this requirement until March 31, 2004 at which time the minimum net worth requirement would become $150.0 million.

Under the terms of the Prepetition Credit Facility, the failure to meet the prescribed financial targets represented an event of default whereby the lender had the right to declare all obligations under the agreement

9

immediately due and payable. On January 2, 2004, the Company entered into a forbearance agreement with its Prepetition Credit Facility lender whereby the lender agreed not to exercise any remedies under the Prepetition Credit Facility during the forbearance period, which was set to expire on January 31, 2004. While the lender did not notify the Company of its intent to do so, acceleration of the obligations after the expiration of the forbearance period would have had a material adverse effect on the Company.

If the obligations under the Prepetition Credit Facility had been accelerated after the expiration of the forbearance period, cross-default provisions contained in the indentures for the Senior Notes and Subordinated Notes would have been triggered, creating an event of default under those agreements as well. An event of default under the Prepetition Credit Facility would not have resulted in a cross-default under the Company's sale-leaseback agreements. If some or all of the obligations under the Company's credit agreements had become immediately due and payable, the Company did not have sufficient liquidity to satisfy these obligations.

In the event that any of the above mentioned defaults had remained uncured, all outstanding obligations under these agreements could have become immediately due and payable. As a result, the Company sought to restructure its existing capital structure, which culminated in the voluntary filing of petitions under Chapter 11 of the Bankruptcy Code on February 4, 2004. At the time of the filing the Company was operating 106 Don Pablo's and 62 Hops. The Company is continuing to operate its restaurants while it restructures.

As the Debtors launched these Chapter 11 Cases, their initial efforts were geared towards stabilizing and rationalizing their business and ensuring the continued operations of their restaurants in an attempt to minimize the impact of the bankruptcy filing. In addition, the Debtors took steps (as described more fully below) to protect their employee interests, maintain employee morale, and continue customer satisfaction, which was critical to sustain customer service, customer loyalty and sales. Finally, the Company has worked diligently during these Chapter 11 Cases to resolve certain matters integral and necessary to the longterm stability of the Company, before filing a plan of reorganization. Specifically, the Company interviewed and hired senior management, including a new chief executive officer, and to resolved certain claims, most notably the claim of the IRS.

At the same time, the Debtors were also evaluating their strategic alternatives and formulating a go-forward business strategy. Ultimately, the Debtors decided that the Business Plan, as described in <u>Section IV.G.</u> of this Disclosure Statement, presented the best option for the Debtors' stakeholders.

**D.      Prepetition Capital Structure**

*1.      Prepetition Credit Facility*

On March 24, 2003, the Company obtained a new $39.0 million revolving credit facility (the "Prepetition Credit Facility"). The Prepetition Credit Facility limited total borrowing capacity at any given time to an amount equal to the lesser of $39.0 million or 1.95 times the Company's trailing 12 months earnings before interest, income taxes and depreciation and amortization as determined for the most recently completed four quarters as defined in the agreement. A portion of the facility, totaling $17.0 million, was restricted for the purchase of the Company's 9.75% Senior Notes due June 2006 ("Senior Notes") and 11.75% Senior Subordinated Notes due June 2009 ("Subordinated Notes"). In accordance with the agreement, the unused availability under the restricted portion of the facility terminated on May 31, 2003. The Prepetition Credit Facility was to mature on March 24, 2004 but

10

could be extended for one year at the lender's option and subject to an extension fee equal to five percent of the total commitment amount. The Prepetition Credit Facility was secured by substantially all of the Company's assets.

Immediately prior to the Company's bankruptcy filing on February 4, 2004, $7.5 million in cash borrowings were outstanding under the unrestricted portion of the Prepetition Credit Facility and an additional $13.3 million of the facility was utilized to secure letters of credit which primarily secure the Company's insurance programs. Also outstanding was $8.0 million, which was borrowed under the restricted portion of the facility to acquire $11.2 million in face value of the Company's Senior Notes and buy out the Company's master equipment lease. On February 4, 2004, $46,000 of the facility remained unused and available.

    2.    *Prepetition Securities*

    a.    *9.75% Senior Notes due 2006*

In 1996, $125 million of 9.75% Senior Notes due June 2006 ("Senior Notes") were issued under a $200.0 million shelf registration. Interest on the Senior Notes is payable semi-annually on June 1 and December 1. The Senior Notes are not redeemable prior to maturity and are not entitled to the benefit of a sinking fund. The Senior Notes are guaranteed by the Company's wholly owned principal subsidiaries on the issue date. The Company repurchased, through open market transactions, $8.5 million and $11.2 million in face value of the Senior Notes in 1998 and 2003, respectively. The Company failed to make its December 2003 interest payment on the Subordinated Notes thereby incurring a payment event of default. The outstanding balance of the Senior Notes as of the Petition Date was $112.3 million, which included accrued interest of $7.0 million.

    b.    *11.75% Senior Subordinated Notes due 2009*

In 1999, the Company issued $100.0 million of 11.75% Senior Subordinated Notes due June 2009 ("Subordinated Notes") and priced to yield 12%. Interest on the Subordinated Notes is payable semi-annually on June 15 and December 15. The Subordinated Notes are guaranteed on a senior subordinated basis by the Company's wholly owned principal subsidiaries on the issue date. The Subordinated Notes and the guarantees are unsecured and subordinated to all of the Company's and guarantors' existing and future senior debt. In 2002, the trading price of the Subordinated Notes was such that the Company believed it was in its best interest to repurchase outstanding Subordinated Notes through open market transactions. The Company repurchased $52.4 million in face value of these notes during 2002 for net consideration of $8.5 million. The Company failed to make its December 2003 interest payment on the Subordinated Notes thereby incurring a payment event of default. The outstanding balance of the Subordinated Notes as of the Petition Date was $51.2 million, which included accrued interest of $3.6 million. Of the outstanding Subordinated Notes, the Company has a security interest in certain of the Subordinated Notes as further discussed in Section IV.F. of this Disclosure Statement.

    c.    *$3.50 Term Convertible Securities, Series A*

In 1997, Avado Financing I (formerly Apple South Financing I) (the "Trust") issued 2,300,000, $3.50 term convertible securities, Series A (the "TECONS"), having a liquidation preference of $50 per security. The Trust is a Delaware statutory business trust, with its sole asset

being $115.0 million aggregate principal amount of 7% convertible subordinated debentures due March 1, 2027 of Avado Brands, Inc. (the "Convertible Debentures"). Proceeds, after deducting underwriters' fees and other offering expenses of approximately $3.7 million, were $111.3 million.

The Convertible Preferred Securities are convertible until 2027 at an initial rate of 3.3801 shares of Avado Brands common stock for each security (equivalent to a conversion price of $14.793 per share). A guarantee was originally executed by Avado Brands with regard to the Convertible Preferred Securities. The guarantee, when taken together with the obligations under the Convertible Debentures, the indenture pursuant to which the Convertible Debentures were issued, and the declaration of trust of Avado Financing I, provided a full guarantee of amounts due under the Convertible Preferred Securities. The obligations under these guarantees will likely be altered as a result of the bankruptcy filing.

The Company, consistent with its right to defer quarterly distribution payments on the Convertible Preferred Securities for up to 20 consecutive quarters, deferred each of its 2003, 2002 and 2001 quarterly distribution payments as well as its December 2000 distribution payment. Total deferred payments for 2003, 2002 and 2001 were $0.3 million, $0.3 million and $4.9 million respectively.

In 2002, a one-time payment of accrued interest, equal to $4.25 per share, was paid to holders of the Company's TECONS. The payment was conditional upon the holders of at least 90% of the outstanding TECONS agreeing to convert their securities into shares of common stock of the Company pursuant to the terms of the TECONS. Holders representing approximately 95% of the outstanding securities agreed to the terms of the offer and, in connection with the $5.4 million payment, 1,200,391 TECONS were converted into 4,057,442 shares of the Company's common stock, which were issued from treasury. As a result of this transaction, the outstanding balance of the TECONS was reduced by $60.0 million. Since their original issuance, a total of 2,236,411 TECONS have been converted into 7,559,293 shares of the Company's common stock, which were issued from treasury. As of the Petition Date, the outstanding balance of the TECONS was $3.8 million, which included accrued interest of $0.6 million.

3.      *Sale-leaseback transactions*

In October 2000, the Company completed a sale-leaseback transaction involving 20 Hops restaurant properties (the "Hops sale-leaseback"). The transaction included the sale of the land and buildings for total consideration of $28.4 million. Proceeds from the transaction were used to repay debt. The lease covers an initial term of 20 years with options to extend the lease for four periods of five years each. Rent expense related to the sale-leaseback was $3.7 million during 2003. The transaction, which has been accounted for as an operating lease, resulted in a $9.6 million loss which has been deferred and is being amortized over the lease term as additional rent expense.

As a part of the reduction of Hops units during the pendency of these Chapter 11 Cases that has previously been described, all 20 units leased in this transaction have been closed. Also, the Company has filed certain adversary actions against the lessor related to the sale-leaseback transac-tion. If successful, the Company would seek to recover monetary damages. This litigation is likely to be expensive and might take a significant amount of time to adjudicate.

On March 24, 2003, the Company completed a sale-leaseback transaction covering 15 Don Pablo's locations (the "Don Pablo's sale-leaseback"). The transaction included the sale of the land and buildings for total consideration of $20.0 million. The term of the lease is 20 years with two 10-year renewal options. Total annual payments due under the lease are $2.4 million at inception and will escalate by 10% every five years. The portion of the lease attributable to the buildings has been accounted for as a capital lease while the portion attributable to the land has been accounted for as an operating lease. As a result, at March 30, 2003 the Company recorded a capital lease obligation of $3.9 million. A loss on the transaction of $10.3 million has been deferred and is being amortized to interest expense over the 20-year term of the lease. A loss of $1.6 million, representing the excess of recorded net book value over estimated fair value for the 15 locations was recorded as a loss on disposal of assets during the first quarter of 2003.

On May 30, 2003 and August 29, 2003, the Company completed two additional sale-leaseback transactions involving one Don Pablo's location and one Hops location, respectively. Net proceeds from the two transactions totaled $2.4 million and were used to reduce amounts outstanding under the Company's Prepetition Credit Facility.

**E.      Discussion of Audit**

As a result of the events outlined below, the audit of the Company's financial statements for the fiscal year ended December 28, 2003 has not been completed. Accordingly, the Company has not filed its Annual report on Form 10-K for the year ended December 28, 2003 or is Quarterly Reports on Form 10-Q for the quarters ended March 28, 2004, June 27, 2004 and September 26, 2004. The Company anticipates that the audit of the fiscal 2003 financial statements will not be completed until after the Company emerges from bankruptcy. If the Company emerges with less than 300 sharehold-ers, it will be able to terminate its registration with the Securities and Exchange Commission (the "Commission") under the Exchange Act of 1934, as amended, which would eliminate its periodic reporting requirements with the Commission. The Company anticipates a continued delay in the completion of its fiscal 2003 audit. This fact coupled with the Company's plan to emerge from bankruptcy as a private company, led the Audit Committee of the Board of Directors to delay any consideration of the engagement of an independent auditor to audit the financial statements for fiscal 2004. The Company anticipates that the Audit Committee will retain an auditor for fiscal 2004 and that audited financial statements will be completed sometime following its emergence from bank-ruptcy.

The audit of the Company's 2003 financial statements has been delayed by events related to the Company's bankruptcy filing, including the March 30, 2004, resignation of KPMG LLP, the Company's predecessor independent auditors. On July 16, 2004, the Audit Committee of the Board of Directors of the Company appointed Deloitte & Touche LLP as its independent auditors. The engagement of Deloitte & Touche LLP to audit the Company's financial statements for the year ended December 28, 2003, was approved by the bankruptcy court on August 24, 2004.

The resignation by KPMG was prompted by the Company's assertion in its Bankruptcy Schedules and Statements of Affairs that it may have causes of action against KPMG related to KPMG's advice and counsel to the Company regarding the Company entering into the OPIS Transaction. Since that assertion, the Company believes that its potential claims against KPMG have become larger and include, but are not limited to, KPMG's resignation as Avado's auditor after receiving certain fees related to the 2003 audit and prior to completing said audit and related to

13

KPMG providing certain accounting advice that has subsequently been determined to be erroneous. The Company may have other damages due to actions or inactions by KPMG during its longer tenure as the Company's auditor. The Company has retained contingent fee counsel to assist the Company in prosecuting or settling these causes of action.

On November 24, 2004, the Company filed a current report on Form 8-K indicating that the Company's previously filed financial statements should no longer be relied upon because of errors in such financial statements. The conclusion was reached as part of an evaluation of the application of the Company's accounting policies and generally accepted accounting principles. The material errors identified included the following:

Rent Expense. Since 2001, the Company has historically had a policy of recording rent expense for a property on a straight-line basis, including future escalations, over the initial lease term. The Company now believes the proper treatment for rent that escalates over time should be to recognize the expense on a straight-line basis over the entire lease term (inclusive of renewal options the Company is reasonably expected to exercise). The Company has analyzed the impact of this change and believes that due to the number of leases and number of years of the previous policy being in effect that the cumulative understatement of rent expense and the cumulative understatement of accrued rent expense liability, as of December 28, 2003, is approximately $13.1 million.

Fixed Assets. An evaluation of the Company's premises and equipment accounting practices identified certain errors resulting in an overstatement of recorded net book values and understatement of depreciation. In addition, the Company's depreciable lives for certain leasehold improvements have historically been based upon the useful lives of the assets. For certain leasehold improvements the useful life may be longer than the remaining term of the associated lease, including available renewal option periods. The Company has determined that these assets can only be depreciated over the remaining available lease term. Because of these errors, the Company estimates the net book value of its premises and equipment, as of December 28, 2003 is overstated by approximately $5.4 million.

Employee Partner Programs. Certain of the Company's employee partner programs, which were amended in 2002 have been historically accounted for as ownership interests. The Company now believes that they should have been accounted for as compensation agreements from the date of the 2002 amendments. The cumulative effect of this error, as of December 28, 2003, is estimated to be less than $0.5 million.

In addition, subsequent to filing of the Form 8-K, the Company has determined that seven leases which had previously been accounted for as operating leases should have been accounted for as capital leases. This results in recognizing as of December 28, 2003, a capital lease asset of $7.9 million and a capital lease obligation of $9.9 million. This also results in additional annual depreciation expense of approximately $0.5 million and additional annual interest expense of approximately $0.8 million. As a result of these leases no longer being accounted for as operating leases, there is an annual reduction in rent expense of approximately $0.9 million.

On November 22, 2004, the Bankruptcy Court approved a motion to retain Alston & Bird LLP ("A&B") as special counsel to the Company's Audit Committee in connection with the Audit Committee's review of certain past accounting practices related to the matters described above. In connection with its investigation, A&B interviewed 23 individuals, including current and former employees, officers of the Company, board members, and certain consultants. While A&B was

14

provided with and reviewed a significant volume of documents, the investigation was limited due to the lack of availability of certain historical records. A&B investigated the circumstances surrounding each of the accounting issues detailed above and has reported its conclusions to the Audit Committee of the Board of Directors, a summary of which will be filed by the Company on Form 8K. A&B has made no assurances that its investigation discovered all accounting errors or irregularities that may affect the Company's current or historical financial statements.

The Company has informed the SEC of the nature of the accounting issues, the results of A&B's investigation, and the adjustments that the Company has recorded. The SEC is conducting an investigation into these issues and the Company has no assurance when this investigation will be concluded.

Attached as Exhibit E to this Disclosure Statement are unaudited financial statements for the period 2003 to 2004. These unaudited financial statements reflect the adjustments arising from the matters detailed herein. Based upon its investigation, A&B believes such adjustments are appropriate under the circumstances, although A&B offers no opinion as to the accounting. The Company does not intend to have the attached financial statements audited, but believes that they are fairly stated in accordance with Generally Accepted Accounting Principles.

F.    **Corporate Structure of the Debtors**

1.    *Prepetition Corporate Structure*

As of the Petition Date, the Debtors' corporate organization consisted of a parent corporation (Avado Brands, Inc.) and the Affiliate Debtors, all or which were directly or indirectly wholly owned by Avado. A chart of the Debtors' corporate organization as of the Petition Date is attached hereto as Appendix B.

2.    *Board of Directors*

The following persons comprise the current Board of Directors of Avado Brands, Inc.:

| Name | Position |
| --- | --- |
| Emilio Alvarez-Recio | Director |
| Jerome A. Atkinson | Director |
| William V. Lapham | Director |
| Robert Sroka | Chairman of the Board |

3.    *Current Executive Management*

Raymond P. Barbrick serves as Chief Executive Officer. Mr. Barbrick joined the Company in October 2004. Prior to joining the Company, Mr. Barbrick was with Bertucci's Corp. and New

England Restaurant Group of North Borough, Mass. Since December 2001, he served as President and Chief Operating Officer for Bertucci's and also held the positions of Executive Vice President and Chief Operating Officer and Division President. He served as the Chief Operating Officer of Bertucci's from November 1999 through November 2001 and also served as a Director of the Company beginning in January of 2001. Prior to that, he served as a Vice President of Operations for Bertucci's Brinker Concept Restaurants from January 1998 until October 1999 and was the Senior Director of Operations, from 1993 through 1997, with responsibility for all of its Chili's restaurants in Connecticut and western Massachusetts. Prior to his career with Bertucci's, Mr. Barbrick was part of the Back Bay Restaurant Group in Boston and held posts with MSM Management/CEV Corp., also of Boston.

Kurt J. Schnaubelt serves as Chief Financial Officer. Mr. Schnaubelt joined the Company in February 2005. He has been employed in the restaurant industry for 25 years. Prior to joining the Company, he served as Bertucci's Corp.'s Chief Financial Officer and Sr. Vice President - Finance & Administration from March 2001 until December 2004. Prior to that, he was Director of Financial Reporting, Planning and Analysis for Bertucci's Corp.'s from January 1999 until March 2001. His responsibilities at Bertucci's Corp. included all accounting, finance, reporting, planning and analysis functions as well as risk management, legal, purchasing and information technologies. Mr. Schnaubelt has held several other positions at the Bertucci's Corp. including Assistant Controller, Accounting Manager and Restaurant Manager. His other experience includes serving as the Controller for Quikava, a double drive through coffee and specialty beverage concept located in New England. Mr. Schnaubelt is a Certified Management Accountant and a Certified Financial Manager.

Percy V. Williams serves as Corporate Secretary and Director of Legal Services. As Corporate Secretary, he assists the Board of Directors in meeting goals for strategic planning, shareholder relations, SEC compliance and other key Board responsibilities. Mr. Williams also directs the legal compliance efforts of the Company's restaurant brands, oversees litigation and handles a variety of contract, corporate and employment issues for the Company. Prior to assuming his position with Avado Brands, Mr. Williams held various legal positions in the association, federal government and private practice sectors. Mr. Williams is a graduate of the University of Georgia and holds a law degree from the University's Lumpkin School of Law.

## IV. THE CHAPTER 11 CASES

### A.        Continuation of Business; Stay of Litigation

On the Petition Date, Avado and 64 of its subsidiaries and affiliates filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. Since the Petition Date, the Debtors have continued to operate as debtors-in-possession subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code. As debtors-in-possession, the Debtors were authorized to operate their business in the ordinary course of business, with transactions out of the ordinary course of business requiring Bankruptcy Court approval.

An immediate effect of the filing of the Debtors' bankruptcy petitions was the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoined the commencement or continuation of all collection efforts by creditors, the enforcement of liens against property of the Debtors, and the continuation of litigation against the Debtors. This relief provided the Debtors with the "breathing room" necessary to assess and stabilize their business. The automatic stay

16

remains in effect, unless modified by the Bankruptcy Court, until consummation of a plan of reorganization under section 1129 of the Bankruptcy Code.

**B.      Summary of Certain Relief Obtained at the Outset of the Chapter 11 Cases**

*1.      First Day Orders*

On February 4, 2004, and February 5, 2004, the Debtors filed several motions seeking the relief provided by certain so-called "first day orders."  First day orders are intended to facilitate the transition between a debtor's prepetition and postpetition business operations by approving certain regular business conduct that may not be authorized specifically under the Bankruptcy Code or as to which the Bankruptcy Code requires prior approval by the Bankruptcy Court.

The first day orders in the Chapter 11 Cases authorized, among other things:

- the retention of the following professionals to serve on behalf of the Debtors:  Skadden, Arps, Slate, Meagher & Flom LLP and its affiliated law practice entities as re-structuring co-counsel; Cox & Smith Incorporated,[1] as restructuring co-counsel; Miller Buckfire Lewis Ying & Co., LLC,[2] as financial advisor and investment banker; AP Services, LLC, as crisis managers; and Bankruptcy Services, LLC, as claims and noticing agent;

- the maintenance of the Debtors' bank accounts and con-tinued use of their cash management system, substantially as such systems existed prior to the Petition Date;

- the payment of certain prepetition claims, such as the payment of employees' accrued prepetition wages and employee benefit claims, liquor claims of certain liquor vendors and liquor licensing fees and taxes, charges related to goods in transit, contractors and service pro-viders in satisfaction of liens of certain prepetition obli-gations to customers, the continuation of customer pro-grams and practices, and the payment of certain fees associated with credit card transactions and gift card programs; the payment of certain prepetition tax claims;

- the authority to use cash collateral and the provision of certain financial accommodations on an interim basis

---

[1]      Effective on September 1, 2004, Cox & Smith Incorporated changed its firm name to Cox Smith Matthews Incorporated.

[2]      Effective on January 19, 2005, Miller Buckfire Lewis Ying & Co., LLC changed its firm name to Miller Buckfire Ying & Co., LLC.

pursuant to the Debtors' DIP facility until final approval of the DIP Credit Agreement;

- the continuation of utility services during the pendency of the Chapter 11 Cases;

- the authority to enter into an insurance premium financing agreement with AFCO Credit Corporation;

- the establishment of PACA and PASA Trust Claim Procedures and authority to pay valid PACA and PASA Claims; and

- the joint administration of each of the Debtors' bankruptcy cases.

*2.      Appointment of Creditors' Committee*

On February 12, 2004, the Office of the United States Trustee for the Northern District of Texas (Dallas) ("United States Trustee") appointed an Official Committee of Unsecured Creditors (the "Creditors' Committee") pursuant to section 1102 of the Bankruptcy Code to represent the interests of all unsecured creditors in these cases.  The following creditors were selected from the unsecured creditors who were willing to serve as members of the Creditors' Committee:  (a) 40/86 Advisors, Inc., (b) Delaware Investments, (c) Summit Investment Partners, (d) Pacholder Associates, Inc., (e) John Dubois, (f) Coca-Cola USA, (g) SunTrust Bank, Atlanta, (h) Wachovia Bank, (i) Law Debenture Trust Company of New York, (j) Briargrove/Tollway Ltd. and (k) Curtis 1000.

The Creditors' Committee is represented by the law firms of Anderson Kill & Olick, P.C. of New York City, New York and Munsch, Hardt, Kopf & Harr, P.C., whose office is located in Dallas, Texas.  The Creditors' Committee initially retained Ernst & Young Corporate Finance, LLC and Ernst & Young, LLP (collectively, "E&Y") as its Financial Advisors and Consultants.  The Creditors' Committee moved to retain FTI Consulting, Inc. ("FTI") as its Financial Advisors when the senior principal of E&Y involved with these Chapter 11 Cases joined FTI.  The Bankruptcy Court entered an order approving the retention of FTI on December 15, 2004.

**C.      Post-Petition Financing**

On February 9, 2004, the Debtors obtained authority from the Bankruptcy Court to enter into the Secured Super-Priority Debtor-in-Possession Revolving Credit Agreement (the "DIP Facility") with DDJ Capital Management, LLC ("DDJ"), as administrative and collateral agent, under which the lender parties to the agreement agreed to provide financing to the Debtors in an amount up to $60 million, subject to borrowing base and other limitations.  The order approving the DIP Facility was entered on an interim basis on February 9, 2004, with the principal sum not to exceed $45.5 million prior to entry of a final order.  A final order granting the Debtors the authority to borrow up to the full $60 million was entered on March 9, 2004.

The Debtors sought approval of the DIP Facility to insure the necessary liquidity during the reorganization process.  The funds available under the DIP Facility provided comfort to vendors and

resulted in the Debtors generally being able to obtain goods and services on the same terms as prior to filing these Chapter 11 Cases. The DIP Facility also provided the necessary security to the Debtors' customers so that they would continue to do business with the Debtors thereby minimizing the harm to the Debtors' businesses.

**D.      Other Material Relief Obtained During the Chapter 11 Cases**

Various other forms of relief were sought and obtained from the Bankruptcy Court during the Chapter 11 Cases. This relief included:

- various real estate lease related orders including the rejection or disposition of multiple leases;

- various employee related orders, including the implementation of a key employee retention program and the retention of a permanent chief executive officer;

- an order relating to the implementation of a new cash management system at LaSalle Bank National Association;

- orders related to the extension of the period to file a plan of reorganization and solicit acceptances of the plan; and

- an order relating to the settlement of substantial claims with the Internal Revenue Service.

**E.      Settlement Agreement With Internal Revenue Service and Related Issues**

On October 26, 2004, the Bankruptcy Court entered an order approving the Closing Agreement on Final Determination Covering Specific Matters (the "IRS Settlement") between the Debtor and the Internal Revenue Service (Docket No. 1125). The Bankruptcy Court found that the Internal Revenue Service has an allowed Priority Unsecured Claim under 11 U.S.C. §507(a)(8) against the Debtor in the amount of $15,684,295. Pursuant to applicable Treasury Regulations, Avado Brands, Inc. and each subsidiary of Avado Brands, Inc. that was a member of the consolidated group during any part of the 1998 or 1999 consolidated return year, is severally liable for the tax liability arising in such year. The Bankruptcy Court further held that the Internal Revenue Service is entitled to receive annual payments over six years, equal to one-sixth of the principal amount plus five percent (5%) interest, compounded annually, with the first payment to be due on the first anniversary of the Effective Date of the Plan of Reorganization.

The IRS Settlement finally and fully resolves substantial federal income tax matters of the Debtor for its tax years ended in 1998 through 2002. While several open tax issues were resolved in the settlement, the primary deficiency asserted by the Internal Revenue Service, which was resolved as part of the IRS Settlement, was the Debtor's investment in the Offshore Portfolio Investment Strategy ("OPIS"). The OPIS Transaction was introduced to the Debtor and facilitated by its auditor, KPMG and certain other professionals, all of which received fees for assisting in the completion of the OPIS transaction. While the OPIS transaction is extremely complex, the Debtor essentially invested $13 million to purchase Deutsche Bank stock and other related financial positions, which was intended to generate a

deduction of approximately $108 million on its 1998 tax return when the Deutsche Bank stock was sold and the other positions were settled. As part of the IRS Settlement, the IRS and the Debtor agreed that approximately 80% of the OPIS deduction would be disallowed resulting in tax liability of $7,094,952. The Internal Revenue Code requires the Debtor to pay interest thereon in the amount of $6,826,742. The IRS agreed to waive all penalties that may have been asserted related to the Debtor's investment in the OPIS transaction. The balance of the Priority Unsecured Claim is additional tax and interest resulting from the reallocation of net operating loss carrybacks due to the disallowance of the OPIS deduction. Please refer to the documents at docket numbers 1026 and 1125 for additional information.

The IRS Settlement impacts the Debtor's state and local tax liability in the 25 states and 4 municipalities. The increase in federal taxable income in 1998 requires the Debtor to file amended returns in each state and municipality. The Debtor is in the process of completing and filing all required amended returns. The debtor estimates that the amended returns will result in additional state and local taxes owed of approximately $4,900,000 exclusive of interest and penalties.

**F. Summary of Claims Process, Bar Date, and Claims Filed**

*1. Schedules and Statements of Financial Affairs*

On March 19, 2004, the Debtors filed their respective Schedules of Assets and Liabilities and Statements of Financial Affairs and the corresponding Global Notes (collectively, the "Schedules") with the Bankruptcy Court. Among other things, the Schedules set forth the Claims of known creditors against the Debtors as of the Petition Date based upon the Debtors' books and records.

*2. Claims Bar Date*

On April 13, 2004, the Bankruptcy Court entered an Order (the "Bar Date Order") establishing the general deadline for filing proofs of claim against the Debtors (the "Bar Date"). The deadline established by the Bankruptcy Court was May 17, 2004 for Claims, except Claims of governmental units for which the deadline is, in accordance with section 502(b)(9) of the Bankruptcy Code, August 2, 2004, and for Claims based on the rejection of executory contracts and unexpired leases as to which the bar date is the later of (a) May 17, 2004, or (b) 30 days after rejection as ordered by the Court. The Debtors' claims and notice agent provided notice of the Bar Date by mailing: (x) a notice of the Bar Date; (y) a proof of claim form to each person listed in the Schedules; which indicated if the Claim was listed in the Schedules; whether the Claim was listed in the Schedules as either disputed, contingent, or unliquidated; the dollar amount of each Claim; and the Debtor for which the Creditor's Claim is scheduled . In addition, the Debtors published notice of the Bar Date in The New York Times, Atlanta Journal-Constitution, The Miami Herald, The Tampa Tribune, and The Wall Street Journal (National Edition) on or about April 16, 2004.

*3. Proofs of Claim and Other Claims*

As of December 30, 2004, approximately 2,300 proofs of claim were filed and scheduled against the Debtors which account for, in the aggregate, approximately $10,860,995,245. Recognizing the time required to resolve Claims of this volume and magnitude, the Debtors promptly began the Claims reconciliation process after the Bar Date.

4.      *Claims Reconciliation*

The Debtors estimate that the ultimate amount of Claims in Classes 3, 4, 5, 6 and 7 will be approximately $188.1 to $204.1 million. The most significant disparity between the Debtors' estimate and the amount of Claims filed relates to duplicate claims filed against many of the 64 Affiliate Debtors related to intercompany guarantees with respect to the Prepetition Notes. After discussions with the Prepetition Indenture Trustees, the Debtors expect that upon confirmation of the Plan, and the substantive consolidation of these Chapter 11 Cases for Plan purposes, approximately $10.6 billion of the filed claims will be settled or withdrawn.

In addition, the Debtors have commenced the Claims objection process. Specifically, on August 6, 2004, the Debtors filed their First Omnibus Objection to Claims Under 11 U.S.C. §§ 102(1), 105(A), 501(A), and 502(B) and Fed. R. Bankr. P. 3007 (Docket No. 841) (the "First Claims Objection"), pursuant to which the Debtors objected to approximately 430 Claims. The Debtors agreed to continue their objection to approximately 92 Claims for over $7.5 billion, most of which relate to the duplicate claims described in the preceding paragraph. The Bankruptcy Court ruled on the First Claims Objection on September 8, 2004 and October 26, 2004 disallowing approximately $13.7 million in claims.

On December 10, 2004, the Debtors filed their Second Omnibus Objection to Claims Under 11 U.S.C. §§ 102(1), 105(A), and 502(B) and Fed. R. Bankr. P. 3007 (Docket No. 1290) (the "Second Claims Objection"). On January 12, 2005, the Bankruptcy Court entered an order disallowing $3,194,454. The Debtors also filed their Third Omnibus Objection to Claims Under 11 U.S.C. §§ 102(1), 105(A), 501(A), and 502(B) and Fed. R. Bankr. P. 3007 (Docket No. 1291) (the "Third Claims Objection") on December 10, 2004. The Bankruptcy Court entered on order on January 12, 2005 reducing 54 claims from $1.9 million to approximately $800,000.

On January 3, 2005, the Debtors filed their Fourth Omnibus Objection to Claims Under 11 U.S.C. §§ 102(1), 105(A), 501(A), and 502(B) and Fed. R. Bankr. P. 3007 (Docket No. 1318) (the "Fourth Claims Objection"), in which the Debtors objected to the allowance of approximately $6 million in claims. On the same date, the Debtors also filed their Fifth Omnibus Objection to Claims Under 11 U.S.C. §§ 102(1), 105(A), 501(A), and 502(B) and Fed. R. Bankr. P. 3007 (Docket No. 1319) (the "Fifth Claims Objection") objecting to approximately $14,000 in claims. The Fourth Claims Objection remains pending in the Bankruptcy Court, and Fifth Claims Objection has been resolved.

On February 18, 2005, the Debtors filed their Sixth Omnibus Objection to Claims Under 11 U.S.C. §§ 102(1), 105(a), and 502(b) and Fed. R. Bankr. P. 3007 (Docket No. 1484) (the "Sixth Claims Objection") seeking to reduce claims by approximately $10.8 million, the Seventh Omnibus Objection to Claims Under 11 U.S.C. §§ 102(1), 105(a), and 502(b) and Fed. R. Bankr. P. 3007 (Docket No. 1487) (the "Seventh Claims Objection") seeking to reduce claims by $230,000, the Eighth Omnibus Objection to Claims Under 11 U.S.C. §§ 102(1), 105(a), and 502(b) and Fed. R. Bankr. P. 3007 (Docket No. 1488) (the "Eighth Claims Objection") seeking to reduce claims by $43,000, and the Ninth Omnibus Objection to Claims Under 11 U.S.C. §§ 102(1), 105(a), and 502(b) and Fed. R. Bankr. P. 3007 (Docket No. 1489) (the "Ninth Claims Objection") seeking to reduce claims by $1.5 million. The Sixth, Seventh, Eighth and Ninth Omnibus Claims Objections are pending before the Bankruptcy Court.

The Debtors, or the Reorganized Debtors, anticipate that they will file additional Claims objections going forward.

     5.      *Significant Disputed Claims*

     a.      *DuPree Claim*

Thomas E. DuPree, Jr. ("DuPree") is the former Chairman of the Board and Chief Executive Officer of Avado. DuPree was, and continues to be, Avado's largest shareholder, holding, upon information and belief, approximately 27.7% of Avado's common stock as of December 31, 2003. On or about November 8, 2003, after members of Avado's board of directors (the "Board") observed a pattern of conduct on the part of DuPree that they believed indicated that DuPree was not objectively performing his managerial responsibilities for the benefit of all of Avado's stakeholders, and con- cluded that DuPree could not discharge his fiduciary duties going forward. Avado and DuPree reached a mutual settlement agreement by which DuPree relinquished his management and Board positions with Avado. At the time of DuPree's resignation, approximately $14 million in personal loans owed to Avado by DuPree were outstanding.

During the 1990s while he was Avado's chief executive officer, DuPree obtained personal loans from Avado and issued a number of promissory notes as collateral. The personal loans were restructured through a series of transactions, and were consolidated into a single promissory note dated March 6, 2002. As part of the restructuring, DuPree was allowed to sell the certain real estate collateral. DuPree granted Avado a security interest in the real estate proceeds account, which held approximately $3 million in proceeds from the sale of the real estate. Through the restructuring of the personal loans, DuPree used the $3 million to purchase publicly traded subordinated notes (the "Subordinated Notes") issued by Avado at a significant discount. DuPree was required to grant Avado a security interest in the Subordinated Notes pursuant to a Security Agreement (the "Security Agreement") dated March 6, 2002. The Subordinated Notes were placed in an account which was restricted by an Account Control Agreement (the "Account Control Agreement", and together with the Promissory Note and the Security Agreement, the "Loan Documents"), also dated March 6, 2002. As a result, the security interest in the Subordinated Notes is property of the Debtors' estates.

On October 6, 2004, DuPree filed a motion (Thomas E. DuPree, Jr.'s Motion for Relief from Automatic Stay, Docket No. 1052, hereinafter the "DuPree Motion") with the Bankruptcy Court in which he sought to setoff the entire amount of the personal loans against the face amount of the Subordinated Notes that he purchased for approximately $3 million. DuPree asserted that he is entitled to setoff pursuant to Georgia law and section 553 of the Bankruptcy Code.

The Debtors filed an objection (the "Objection", Docket No. 1127) to the DuPree Motion on October 26, 2004. The Debtors objected on several grounds, including: (i) DuPree had not shown cause to lift the automatic stay; (ii) setoff is not permitted by the terms of the Security Agreement; (iii) the debts that DuPree sought to set off lacked mutuality; (iv) Avado's rights as a security holder trump DuPree's setoff rights; and (v) setoff is not permitted under Georgia state law. In addition to the Debtors' objection, the Creditors' Committee and the subordinated notes indenture also filed objec- tions to the DuPree Motion.

The matter came before the Bankruptcy Court on November 9, 2004, and the Bankruptcy Court found that DuPree did not show sufficient cause to lift the automatic stay, and entered an order denying the DuPree Motion without prejudice (Docket No. 1270). The Debtors dispute the amount asserted by DuPree in his proof of claim, and believe DuPree's setoff claim is without merit. The Debtors intend to continue to oppose DuPree's setoff claim.

        *b.*         *Sale-Leaseback Agreement with Pubs Property, LLC, Suds Remainder, LLC, and FFCA Acquisition Corporation*

On October 17, 2000, Hops entered into the Sale-Leaseback Agreement (the "Sale Agreement") with Pubs Property LLC ("Pubs"), whereby Hops sold twenty-one (21) Hops properties (the "Properties") for a net sale price $28,371,573.60. Hops also agreed to transfer all legal title to all machinery, appliances, furniture, equipment, trade fixtures, and other personal property (the "Personalty") that was situated on or used in connection with the Properties. Additionally, Hops entered into a lease with Pubs to lease the Properties for twenty (20) years. The Lease provides for a Base Annual Rent of $3,402,030.24, which is increased annually by an amount equal to the product of the then current Base Annual Rent multiplied by 1.2%. Furthermore, Avado entered into the Unconditional Guaranty of Payment and Performance (the "Guaranty"), whereby Avado guaranteed Hops' obligations under the Lease. The Properties are currently subject to a mortgage in favor of GE Capital Franchise Finance Corporation f/k/a FFCA Acquisition Corporation ("FFCA"), which was granted by Pubs to finance the Sale Agreement.

The Sale Agreement included a listing of each Property, as well as the purchase price assigned to such Property for which the total Purchase Price is allocated over the entire group of Properties. The Sale Agreement did not contain a purchase price for the Personalty. Hops' books and records reflect that at the time of the Sale and Leaseback transactions, the Properties alone were valued on its books for $36 million. Based on information and belief, the Properties' fair market value actually exceeded $36 million at the time of the Sale Agreement. Furthermore, Hops' books and records reflect that the value of the Personalty exceeded $8 million.

On October 5, 2004, the Debtors filed the Motion for an Order Pursuant to 11 U.S.C. §§ 105(A) and 365(A) Authorizing Rejection of Certain Unexpired Real Property Leases (the "Rejection Motion") requesting that the Court find the lease to contain separate severable agreements, such that the Debtors could reject the lease as to certain locations. The Debtors also sought an order authorizing the rejection of the lease as to the locations the Debtors had previously closed. The parties have continued the hearing on the Rejection Motion to March 22, 2005.

On October 12, 2004, the Debtors filed a Complaint against Pubs, Suds Remainder, LLC, and FFCA styled Hops Grill & Bar, Inc., and Avado Brands, Inc. v. Pubs Property, LLC, Suds Remainder, LLC, and GE Capital Franchise Finance Corp. f/k/a FFCA Acquisition Corp., adversary proceeding number 04-03583, pending in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division. The Complaint seeks the entry of a judgment finding that the Sale Agreement constituted a fraudulent conveyance such that Hops should be able to recover the Properties, or the value of such Properties, for the benefit of its estate. Additionally, the Complaint requests that the Court avoid the mortgage placed upon the Properties by FFCA. In the alternative, the Debtors seek the entry of a judgment that finds that each of the individual properties is a fraudulent conveyance, such that each individual property, or the value of each individual property, should be returned to Hops' estate. Furthermore, the Complaint requests that the Court avoid the mortgage

placed upon each individual property  by FFCA.  As an additional alternative, the Debtors seek to recover as a fraudulent conveyance the value of the Personalty given to Pubs, since no consideration was named for the Personality in the Sale Agreement.  Avado seeks to avoid its obligations under the Guaranty as a fraudulent conveyance.  The adversary proceeding is set for docket call in March 2004.

On May 17, 2004, Pubs filed proof of claim number 1721 in the amount of $28,371,573.60 against Hops based on the obligations owed by Hops under the Lease.  Pubs also filed proof of claim number 1722 in the amount of $28,371,573.60 against Avado based on the guaranty of Hops' obligations under the Lease.  The Debtors are continuing to evaluate Pubs' claims.

On February 28, 2005, the Company closed all of the stores covered by the Lease.  The Lease will be fully rejected on or before March 22, 2005.  Pubs will have thirty days following the rejection to file its new rejection damages claim.

*c.*      *Other Disputed Claims*

As discussed above, the Prepetition Indenture Trustees have filed claims against many of the Affiliate Debtors, to which the Debtors have objected.  The Debtors expect these Claims to be resolved.

**G.     Development and Summary of Business Plan**

In connection with its reorganization efforts, the Debtors and its advisors have undertaken a thorough review of its business operations, results, and the business model on which its operations were based and have developed a business plan that addresses the issues that ultimately caused it to file this Chapter 11. Through that process, the Debtors' management developed a five (5) year business plan (the "Business Plan") and, from that Business Plan, a set of financial projections extending from 2005 to 2009 for Reorganized Avado (the "Projections") that are provided in Appendix D.

The Debtors' Business Plan includes strategies that the new senior management have successfully implemented in other restaurant chains where they have been employed.  These strategies are intended to stop the "same store sales" declines and to increase the number of diners coming to its restaurants as well as increasing the frequency of the average diner's visits.  Like all strategies, these strategies have execution risks, but management believes that their experience, flexibility and commitment suggest that there is a combination of these strategies that can be executed to achieve the planned results.  These strategies include: (1) improving restaurant level execution by improving the workforce through training and hiring; (2) investing capital into existing restaurants to refresh and update the interior and exterior of the units; (3) improving the efficiency and quality of support that the corporate headquarters provides to its field operations; (4) opening new Don Pablo's restaurants in selective core markets to improve marketing efficiency, reach and impact; (5) periodic designed menu modification and improvement; (6) providing service that will improve the quality of each customer's dining experience and (7) managing costs effectively.

The Debtors' Business Plan assumes that Hops will operate 22 restaurants consisting of 22 leased units. The Debtors have developed a general capital investment plan for their Hops restaurants that, among other things, involves investing approximately $200,000 in capital costs per unit to remodel existing units ("Hops Remodeling Program"). The Projections assume that all 22 units are remodeled by the end of 2009. The Debtors believe that the investment in the Hops Remodeling

24

Program will provide increases in same store sales and profitability. While spending capital to remodel restaurants is risky, these investments have been demonstrated to be effective in other chains.

The Debtors' Business Plan assumes that Don Pablo's will operate from a base of 96 restaurants consisting of 84 leased units and 12 owned units. The Debtors have developed a general capital investment plan for their Don Pablo's restaurants that, among other things, involves investing on average $150,000 in capital costs per unit to remodel existing units ("Don Pablo's Remodeling Program") and opening new Don Pablo's restaurants. As of the date of the Plan, the Debtor expects to have remodeled 7 Don Pablo's restaurants in the Minneapolis market. The Debtors are evaluating the results from these units and may make modifications to future capital investments under the Don Pablo's Remodeling Program that will improve the design. The Projections assume that all 96 units are re-imaged and/or remodeled by the end of 2009. The Debtors believe that the investment in the Don Pablo's Remodeling Program will provide increases in same store sales and profitability. While spending capital to remodel restaurants is risky, these investments have been demonstrated to be effective in other chains.

The Debtors anticipate becoming a privately held company under the Plan. By becoming a privately held company, the Company will no longer be required to make reports required by the Exchange Act. The Debtors project that it will begin to achieve savings from becoming a privately held company in mid-2005. The vast majority of these savings will be reflected in lower General & Administrative Expenses.

## V. SUMMARY OF THE REORGANIZATION PLAN

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE, CLASSIFICATION, TREATMENT AND IMPLEMENTATION OF THE PLAN AND IS QUALIFIED IN ITS EN-TIRETY BY REFERENCE TO THE PLAN, WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT, AND TO THE PLAN SUPPLEMENT, EXHIBITS AND PLAN SCHEDULES ATTACHED TO THE PLAN OR FILED BY THE PLAN SUPPLEMENT FILING DATE.

ALTHOUGH THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCU-MENTS REFERRED TO THEREIN, THIS DISCLOSURE STATEMENT DOES NOT PURPORT TO BE A PRECISE OR COMPLETE STATEMENT OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN WILL CONTROL THE TREATMENT OF CREDITORS AND EQUITY SECURITY HOLDERS UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS, THE REORGANIZED DEBTORS, AND OTHER PARTIES IN INTEREST.

### A. Overall Structure of the Plan

Under the Plan, Claims against, and Interest in, are divided into eight classes according to their relative seniority and other criteria.

If the Plan is confirmed by the Bankruptcy Court and consummated, (1) the holders of Allowed Class 1 and 2 Claims will receive distributions under the Plan equal to the full amount of such Allowed Claims, (2) the holders of Allowed Class 3, 4, 5, 6 and 7 Claims will receive distributions constituting a partial recovery on such Allowed Claims and (3) the Holders of Allowed Claims and Interests in Class 8 will not receive any distributions on such Allowed Claims and Interests.  On the Distribution Date and at certain times thereafter, the Reorganized Debtors will distribute Cash and securities in respect of certain Classes of Claims as provided in the Plan.  The Classes of Claims against the Debtors created under the Plan and the treatment of those Classes under the Plan are described below.

**B.      Substantive Consolidation**

The Plan provides for the substantive consolidation of the Debtors' estates only for purposes of the Plan, that is, for voting, confirmation and distribution purposes.  Substantive consolidation under the Plan will not effect a transfer or commingling of any asset of any Debtors, and all assets (whether tangible or intangible) will continue to be owned by the respective Debtors.

*1.       Discussion of Substantive Consolidation Generally*

Generally, substantive consolidation of the estates of multiple debtors in a bankruptcy case effectively combines the assets and liabilities of the multiple debtors for certain purposes under a plan. The effect of consolidation is the pooling of the assets of, and claims against, the consolidated debtors; satisfying liabilities from a common fund; and combining the creditors of the debtors for purposes of voting on reorganization plans.  In re Augie/Restivo Baking Co., 860 F.2d 515, 518 (2d Cir.1988). There is no statutory authority specifically authorizing substantive consolidation.  The authority of a Bankruptcy Court to order substantive consolidation is derived from its general equitable powers under section 105(a) of the Bankruptcy Code, which provides that the court may issue orders necessary to carry out the provisions of the Bankruptcy Code.  In re DRW Property Co.82, 54 B.R. 489, 494 (Bankr. N.D.Tex. 1985).  Nor are there statutorily prescribed standards for substantive consolidation.  Instead, judicially developed standards control whether substantive consolidation should be granted in any given case.

The propriety of substantive consolidation must be evaluated on a case-by-case basis.  See, FDIC v. Colonial Realty Co., 966 F.2d 57 (2d Cir.1992).  The extensive list of elements and factors frequently cited and relied upon by courts in determining the propriety of substantive consolidation may be viewed as variants on two critical factors, namely, (i) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit or (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors.  In re Augie/Restivo Baking Co., 860 F.2d at 518.  Some courts have viewed these elements and factors as examples of information that may be useful to courts charged with deciding whether there is substantial identity between the entities to be consolidated and whether consolidation is necessary to avoid some harm or to realize some benefit.

Among the specific factors or elements looked to by courts are the following:

•       the degree of difficulty in segregating and ascertaining the individual assets and liabilities of the entities to be consolidated;

26

- the presence or absence of consolidated financial statements among the entities to be consolidated;

- the commingling of assets and business functions among the entities to be consolidated;

- the unity of interests and ownership among the various entities;

- the existence of parent and intercorporate guarantees on loans to the various entities;

- the transfer of assets to and from the various entities without formal observance of corporate formalities; and

- the effect on the percentage recovery of a claim if substantive consolidation is allowed compared to administrative consolida-tion.

Substantive consolidation is an equitable remedy that a bankruptcy court may be asked to apply in chapter 11 cases involving affiliated debtors. Substantive consolidation involves the pooling of the assets and liabilities of the affected debtors. All of the debtors in the substantively consolidated group are treated as if they were a single corporate and economic entity. Consequently, a creditor of one of the substantively consolidated debtors is treated as a creditor of the substantively consolidated group of debtors, and issues of individual corporate ownership of property and individual corporate liability on obligations are ignored. Substantive consolidation of two or more debtors' estates generally results in the deemed consolidation of the assets and liabilities of the debtors, the elimination of multiple and duplicative creditor claims, joint and several liability claims and guarantees and the payment of allowed claims from a common fund. Absent such substantive consolidation, payment of such duplicative claims would be dilutive of the amounts ultimately payable to certain holders of Allowed Claims against the Debtors. The Debtors believe that substantive consolidation, to the limited extent provided in the Plan, is warranted in light of the criteria established by the courts in ruling on the propriety of substantive consolidation in other cases.

2.      *Application to the Debtors*

The facts and circumstances surrounding the historical business operations of Avado and the Affiliate Debtors support substantive consolidation, to the limited extent provided in the Plan, in these Chapter 11 cases. Avado Brands, Inc. and the Affiliate Debtors historically have issued consolidated financial statements. As reflected in the organization chart attached as <u>Appendix B</u> to this Disclosure Statement, with the exception of five subsidiaries, Avado Brands, Inc. directly or indirectly owns 100% of the Affiliate Debtors, and at least 90% of the remaining five subsidiaries. Avado Brands, Inc. and the Affiliate Debtors have common officers and directors and have shared key employees and outside professionals, including, but not limited to, employees of Avado who performed human resources, legal and risk management services for the benefit of all the Debtors, and accounting firms, law firms, and consultants who rendered services to all of the Debtors.

As mentioned above, the Affiliate Debtors share the same ultimate corporate parent: Avado Brands, Inc. Avado controls the operations of Don Pablo's and Hops from one headquarters, located

27

in Madison, Georgia. In addition, there is significant overlap in the officers and directors of the Affiliate Debtors. The Debtors utilize a centralized cash management system, and pays the liabilities of the Affiliate Debtors as needed. As mentioned above, the Debtors' financial statements are consolidated at Avado. Although the Debtors file separate tax returns for each of the Debtors, the returns are created using assumptions and do not necessarily reach information with respect to individual creditors or fully account of intercompany payments. In addition, many of the accounting systems currently in place do not allow Avado to track certain intercompany claims and transfers. Accordingly, for the reasons stated above, the Debtors believe that substantive consolidation for purposes of the Plan is warranted in light of the criteria established by the courts in ruling on the propriety of substantive consolidation in other cases.

### C.      Classification and Treatment of Claims and Interests

Section 1122 of the Bankruptcy Code requires that a chapter 11 plan of reorganization classify the claims of a debtor's creditors and the interests of its equity holders. The Bankruptcy Code also provides that, except for certain claims classified for administrative convenience, a plan of reorganization may place a claim of a creditor or an interest of an equity holder in a particular class only if such claim or interest is substantially similar to the other claims of such class.

The Bankruptcy Code also requires that a chapter 11 plan of reorganization provide the same treatment for each claim or interest of a particular class unless the holder of a particular claim or interest agrees to a less favorable treatment of its claim or interest. The Debtors believe that the Plan complies with such standard. If the Bankruptcy Court finds otherwise, it could deny confirmation of the Plan if the holders of Claims and Interests affected do not consent to the treatment afforded them under the Plan.

The Debtors believe that they have classified all Claims and Interests in compliance with the requirements of section 1122 of the Bankruptcy Code. If a Creditor or Interest holder challenges such classification of Claims or Interests and the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors, to the extent permitted by the Bankruptcy Court, intend to make such reasonable modifications of the classifications of Claims or Interests under the Plan to provide for whatever classification might be required by the Bankruptcy Court for confirmation. EXCEPT TO THE EXTENT THAT SUCH MODIFICATION OF CLASSIFICATION ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM OR INTEREST AND REQUIRES RESOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.

As stated above, the Plan is comprised of individual Plans proposed separately by each of the Debtors. The discussion below summarizes the classification scheme with respect to each Debtor.

#### 1.      Treatment of Unclassified Claims Under the Plan

##### a.      Administrative Claims Generally

Administrative Claims consist of the costs and expenses of the administration of the Chapter 11 Cases incurred by the Debtors. Such costs and expenses may include with respect to a particular

Debtor, but are not limited to, Claims arising under the cost of operating the business since the Petition Date, the outstanding unpaid fees and expenses of the professionals retained by the Debtors and the Creditors' Committee as approved by the Bankruptcy Court, and the payments necessary to cure prepetition defaults on unexpired leases and executory contracts that are being assumed under the Plan. All payments to professionals in connection with the Chapter 11 Cases for compensation and reimbursement of expenses and all payments to reimburse expenses of members of the Creditors' Committee will be made in accordance with the procedures established by the Bankruptcy Code and the Bankruptcy Rules and are subject to approval of the Bankruptcy Court as being reasonable.

Subject to the provisions of Article XI of the Plan, on, or as soon as reasonably practicable after, the later of (a) the Effective Date, or (b) the date on which an Administrative Claim becomes an Allowed Administrative Claim, each holder of an Allowed Administrative Claim shall receive, in full satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Administrative Claim, (i) Cash equal to the unpaid portion of such Allowed Administrative Claim or (ii) such other less favorable treatment to which the holders of an Allowed Administrative Claim shall have agreed upon in writing; provided, however, that Allowed Administrative Claims against a Debtor with respect to liabilities incurred in the ordinary course of business during the Chapter 11 Cases may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto at the discretion of the Debtors or the Reorganized Debtors; provided further, however, that each holder of a DIP Facility Claim shall receive the treatment as described in Section 7.7 of the Plan.

### b. Priority Tax Claims Generally

On, or as soon as reasonably practicable after, the later of (a) the Effective Date, or (b) the date on which a Tax Priority Claim becomes an Allowed Tax Priority Claim, each holder of an Allowed Tax Priority Claim shall receive in full satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Tax Priority Claim, at the election of the applicable Debtor or Reorganized Debtor, (i) payment in full in Cash, (ii) deferred Cash payments over a period not exceeding six years payable in six (6) annual installments at an interest rate of five per cent (5%) compounded annually from the Effective Date with the first such payment payable on the first anniversary following the Effective Date, or (iii) such other less favorable treatment as the Debtors and a particular holder of a Tax Priority Claim have agreed to pursuant to any order previously entered by the Bankruptcy Court with the consent of such holder regarding the payment of a Tax Priority Claim; provided, however, that any Allowed Tax Priority Claim that is not due and owing on the Effective Date, will be paid in accordance with this section when such Allowed Tax Priority Claim becomes due and owing.

### 2. Treatment of Classified Claims

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of classes of Claims against and Interests in each of the Debtors. All Claims and Interests, except Administrative Claims and Priority Tax Claims, are placed in the Classes set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims, have not been classified and their treatment is set forth in Article II of the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim is also placed in a

particular Class only for the purpose of voting on, and receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released or otherwise settled prior to the Effective Date.

a.      *Unimpaired Classes of Claims against Avado*

(i)      Class 1 (Secured Claims).  The legal, equitable and contractual rights of the holders of Allowed Secured Claims, if any, are unaltered by the Plan.  On, or as soon as reasonably practicable after, the later of (i) the Effective Date, or (ii) the date on which such Secured Claim becomes an Allowed Secured Claim, each holder of an Allowed Secured Claim shall, in full satisfaction, settlement and release of, and in exchange for, such Allowed Secured Claim, at the election of the Debtors or the Reorganized Debtors, either (x) have its claim Reinstated or (y) receive (1) Cash equal to the amount of such Allowed Secured Claim or (2) such other treatment that will not impair the holder of such Allowed Secured Claim pursuant to section 1124 of the Bankruptcy Code; provided, however, that any Secured Claim that is not an Allowed Claim on the Effective Date, including any Secured Claim not due and owing on the Effective Date, will be paid in accordance with this section if and when such Claim becomes Allowed and is due and owing.  Any default that existed with respect to any Secured Claim immediately prior to the Petition Date shall be deemed cured upon the Effective Date.

(ii)      Class 2 (Non-Tax Priority Claims).  The legal and equitable rights of the holders of Non-Tax Priority Claims are unaltered by the Plan.  On, or as soon as reasonably practicable after, the later of (i) the Effective Date, or (ii) the date on which such Non-Tax Priority Claim becomes an Allowed Non-Tax Priority Claim, each holder of an Allowed Non-Tax Priority Claim shall receive, in full satisfaction, settlement and release of, and in exchange for, such Non-Tax Priority Claim, at the election of the Debtors or Reorganized Debtors, (x) Cash equal to the amount of such Allowed Non-Tax Priority Claim or (y) such other treatment that will not impair the holder of such Non-Tax Priority Claim pursuant to section 1124 of the Bankruptcy Code; provided, however, that any Non-Tax Priority Claim that is not an Allowed Claim on the Effective Date, including any Non-Tax Priority Claim not due and owing on the Effective Date, will be paid in accordance with this section when such Claim becomes Allowed and is due and owing.  Any default with respect to any Non-Tax Priority Claim that existed immediately prior to the Petition Date will be deemed cured on the Effective Date.

b.      Impaired Classes of Claims Against and Interests in the Debtors

(i)      Class 3 (General Unsecured Claims).  On the Distribution Date, or as soon thereafter as is reasonably practicable, and on each Subsequent Distribution Date, the Disbursing Agent shall receive on behalf of each and every holder of a Class 3 Claim against the Debtors, in full satisfaction, settlement, release and discharge of, and in exchange for, each and every Class 3 Claim against the Debtors, (i) the Pro Rata share of the New Common Stock, and the New Common Stock held in the Supplemental Distribution Account as to Subsequent Distributions, as to which all holders of Allowed Class 3 Claims would be entitled to if Classes 3, 4, 5 and 6 were a single class, which the Disbursing Agent will distribute to each holder of an Allowed Class 3 Claim on a Pro Rata basis within such Class, and (ii)   the Pro Rata share of the Litigation Trust Beneficial Interests, and the Litigation Trust Beneficial Interests held in the Supplemental Distribution Account as to Subsequent Distributions, as to which all holders of Allowed Class 3 Claims would be entitled to if Classes 3, 4, 5 and 6 were a single class, which the Disbursing Agent will distribute to each holder of

Allowed Class 3 Claim on a Pro Rata basis within such Class.

*(ii)* <u>Class 4 (Senior Noteholder Claims)</u>. On the Distribution Date, or as soon thereafter as is reasonably practicable, and on each Subsequent Distribution Date, the Disbursing Agent shall receive on behalf of each and every holder of a Class 4 Claim against the Debtors, in full satisfaction, settlement, release and discharge of, and in exchange for, each and every Class 4 Claim against the Debtors, (i) the Pro Rata share of the New Common Stock, and the New Common Stock held in the Supplemental Distribution Account as to Subsequent Distributions, as to which all holders of Allowed Class 4 Claims would be entitled to if Classes 3, 4, 5 and 6 were a single class, which the Disbursing Agent will distribute to each holder of an Allowed Class 4 Claim on a Pro Rata basis within such Class, (ii) the Subordinated Notes Redistribution Shares, which the Disbursing Agent will distribute Pro Rata to or for the benefit of holders of Allowed Class 4 Claims, (iii) the TECONS Redistribution Shares, which the Disbursing Agent will distribute Pro Rata to or for the benefit of holders of Allowed Class 4 Claims, (iv) the Pro Rata share of the Litigation Trust Beneficial Interests, and the Litigation Trust Beneficial Interests held in the Supplemental Distribution Account as to Subsequent Distributions, as to which holders of Allowed Class 4 Claims would be entitled to if Classes 3, 4, 5 and 6 were a single class, which the Disbursing Agent will distribute to each holder of Allowed Class 4 Claim on a Pro Rata basis within such Class, (v) the Subordinated Notes Redistribution Interests, which the Disbursing Agent will distribute Pro Rata to or for the benefit of holders of Allowed Class 4 Claims, and (vi) the TECONS Redistribution Interests, which the Disbursing Agent will distribute Pro Rata to or for the benefit of holders of Allowed Class 4 Claims.

*(iii)* <u>Class 5 (Subordinated Noteholder Claims)</u>. If Classes 4 and 5 vote to accept the Plan, on the Distribution Date, or as soon thereafter as is reasonably practicable, and on each Subsequent Distribution Date, the Disbursing Agent shall receive on behalf of each and every holder of a Class 5 Claim against the Debtors, in full satisfaction, settlement, release and discharge of, and in exchange for, each and every Class 5 Claim against the Debtors, the Class A Warrants, and the Class A Warrants held in the Supplemental Distribution Account as to Subsequent Distributions, which the Disbursing Agent will distribute to each holder of an Allowed Class 5 Claim on a Pro Rata basis within such Class.

As reflected in the treatment of Class 4, and in accordance with the Subordinated Notes Subordination Rights, holders of Class 5 Claims shall not receive or retain a distribution of New Common Stock or Litigation Trust Beneficial Interests. Instead, shares of New Common Stock and Litigation Trust Beneficial Interests otherwise distributable to or for the benefit of holders of Allowed Class 5 Claims shall instead be redistributed by the Disbursing Agent to holders of Allowed Class 4 Claims pursuant to the subordination provisions of the Subordinated Notes Indenture, all at such times and in such manner as provided in <u>Articles IX and X</u> of the Plan.

If any of Class 4 or 5 does not vote to accept the Plan, the holders of Class 5 Claims shall not receive and retain any Class A Warrants or any other property under the Plan; <u>provided</u>, <u>however</u>, that the vote of Class 5 shall not affect the distribution of the Subordinated Noteholder Redistribution Shares and the Subordinated Noteholder Redistribution Interests.

*(iv)* <u>Class 6 (TECONS Securities Claims)</u>. If Classes 4, 5 and 6 vote to accept the Plan, on the Distribution Date, or as soon thereafter as is reasonably practicable, and on each Subsequent Distribution Date, the Disbursing Agent shall receive on behalf of each and every holder of a Class 6 Claim against the Debtors, in full satisfaction, settlement, release and

31

discharge of, and in exchange for, each and every Class 6 Claim against the Debtors, the Class B Warrants, and the Class B Warrants held in the Supplemental Distribution Account as to Subsequent Distributions, which the Disbursing Agent will distribute to each holder of an Allowed Class 6 Claim on a Pro Rata basis within such Class.

As reflected in the treatment of Class 4, and in accordance with the TECONS Subordination Rights, holders of Class 6 Claims shall not receive or retain a distribution of New Common Stock or Litigation Trust Beneficial Interests. Instead, shares of New Common Stock and Litigation Trust Beneficial Interests otherwise distributable to or for the benefit of holders of Allowed Class 6 Claims shall instead be redistributed by the Disbursing Agent to holders of Allowed Class 4 Claims pursuant to the subordination provisions of the TECONS Indenture, all at such times and in such manner as provided in Articles IX and X of the Plan.

If any of Class 4 or 5 or 6 does not vote to accept the Plan, the holders of Class 6 Claims shall not receive and retain any Class B Warrants or any other property under the Plan provided, however, that the vote of Classes 5 and 6 shall not affect the distribution of the TECONS Redistribution Shares and the TECONS Redistribution Interests.

*(v)* Class 7 (Small Claims). On, or as soon as reasonably practicable after, the later of (i) the Effective Date, or (ii) the date on which a Small Claim becomes an Allowed Small Claim, each holder of an Allowed Small Claim shall receive, in full satisfaction, settlement and release of, and in exchange for, such Allowed Small Claim, Cash equal to 14.5% of such Allowed Small Claim.

*(vi)* Class 8 (Equity Interests in Avado and Subordinated Claims). On the Effective Date, Old Avado Common Stock will be, and is deemd to be as of such date, cancelled and extinguished. The holders of Old Avado Common Stock shall not be entitled to, and will not, receive or retain any property or interest in property on account of such Old Avado Common Stock. Holders of Subordinated Claims shall receive no distribution under the Plan on account of such Claims. On the Effective Date, the Affiliate Interests shall be Reinstated, subject to the Restructuring Transactions.

*c. Intercompany Claims*

All Intercompany Claims will, in the sole discretion of the applicable Reorganized Debtor, (a) be preserved and Reinstated, (b) be released, waived and discharged on the Effective Date, or (c) be contributed to the capital of the obligor corporation.

**D.** **Other Significant Plan Provisions**

*1. Restructuring Transactions*

As discussed in Section 7.2 of the Plan, on or after the Effective Date, the applicable Reorganized Debtors may enter into such transactions and may take such actions as may be necessary or appropriate to simplify the overall structure of the Reorganized Debtors, or to reorganize certain of the subsidiary Debtors under the laws of jurisdictions other than the laws of which the applicable subsidiary Debtors are presently incorporated. Such restructuring may include, but is not limited to, one or more mergers, consolidations, restructures, dispositions, liquidations, dissolutions, or any other

transactions in which a Debtor transfers assets and liabilities to a new, wholly-owned direct or indirect subsidiary of Reorganized Avado as may be determined by the Debtors or Reorganized Debtors to be necessary or appropriate (collectively, the "Restructuring Transactions").  Through the Restructuring Transactions, the Debtors will simplify and consolidate their corporate structure.  Any executory contract or unexpired lease affected by the Restructuring Transactions will not be assigned to a third party, but will remain within the Reorganized Debtors' corporate structure.  The actions to effect the Restructuring Transactions may include:  (i) the execution and delivery of appropriate agreements, documents of merger, consolidation, restructuring, disposition, liquidation, dissolution or any other transactions in which a Debtor or Reorganized Debtor transfers assets and liabilities to a new, wholly-owned direct subsidiary of Reorganized Avado containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable state law and such other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, duty, or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable entities may agree; (iii) the filing of appropriate certificates or articles of merger, consolida- tion, dissolution or incorporation or declarations of trust, trust agreements or similar trust documents pursuant to applicable state law; and (iv) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with such transactions.  The Restructuring Transactions may include one or more mergers, consolidations, restructures, dispositions, liquidations, or dissolutions, as may be determined by the Reorganized Debtors to be necessary or appropriate to result in substantially all of the respective assets, properties, rights, liabilities, duties, and obligations of certain of the Reorganized Debtors vesting in one or more surviving, resulting, or acquiring wholly-owned direct subsidiaries of Reorganized Avado.  In each case in which the surviving, resulting, or acquiring wholly-owned direct subsidiary of Reorganized Avado in any such transaction is a successor to a Reorganized Debtor, such surviving, resulting, or acquiring wholly-owned direct subsidiary of Reorganized Avado  will perform the obligations of the applicable Reorganized Debtor pursuant to the Plan to pay or otherwise satisfy the Allowed Claims against such Reorganized Debtor, except as provided in any contract, instrument, or other agreement or document effecting a disposition to such surviving, resulting, or acquiring corporation, which may provide that another Reorganized Debtor will perform such obligations.

2.      <em>Exit Financing</em>

In order to repay the DIP Facility Claim and provide for adequate working capital for the Reorganized Debtors, on the Effective Date, the Reorganized Debtors shall enter into the following three financing transactions:

*New Tranche A Financing Facility:*  The New Tranche A Financing Facility shall be comprised of up to $40 million revolving credit facility with an approximate $20 million sublimit for letters of credit.  The New Tranche A Financing Facility shall be secured by a first lien in substantially all of the assets (excluding, however, certain non-core real estate assets) of the Reorganized Debtors. The proceeds of the New Tranche A Financing Facility shall be used in part to repay a portion of the DIP Facility Claim, to make such Cash payments as may be required under the Plan and to provide for adequate working capital for the Reorganized Debtors' operations, capital expenditures and other general corporate purposes.  The New Tranche A Financing Facility shall contain such other terms reasonably consistent with the form of New Tranche A Credit Agreement substantially in the form included in the Plan Supplement, which will be filed by the Plan Supplement Filing Date. The Confirmation Order shall approve the New Tranche A Credit Agreement and all documents to be

executed in connection therewith in substantially the form filed with the Bankruptcy Court (and with such changes as to which the applicable Debtors and respective lenders may agree) and authorize the applicable Reorganized Debtors to execute the same together with such other documents as the applicable Reorganized Debtors and the applicable lenders may reasonably require in order to effectuate the treatment afforded to such parties under the New Tranche A Credit Agreement.

*New Tranche B Financing Facility:* As further described in the commitment letter attached as <u>Exhibit F</u> to this Disclosure Statement, the New Tranche B Financing Facility shall be comprised of an approximate $12.5 million five year term loan (the "Loan") provided by the Investors. The Loan shall be secured by a second lien on substantially all of the assets (excluding, however, certain non-core real estate assets) of the Reorganized Debtors. The Loan will be funded, subject to the conditions of the Investors' commitment and the New Tranche B Credit Agreement, at the option of the Investors, in Cash or in exchange for a portion of the DIP Facility Claim. The Loan will bear interest at a rate equal to 16% per annum, which prior to the second anniversary of the Loan will be payable monthly, in-kind or cash, at the option of the Reorganized Debtors, and which, after such second anniversary, will be payable monthly in cash. The Loan will be subject to prepayment premiums on the original principal amount only as follows: 5% during the first year, 3% during the second year, 2% during the third year, 1% during the fourth year. The Loan will be repayable at par during the fifth year. The Investors will be entitled to a cash commitment fee of $281,250, earned upon commitment to fund the Loan. The New Tranche B Financing Facility shall contain such other terms reasonably consistent with the form of New Tranche B Credit Agreement substantially in the form included in the Plan Supplement, which will be filed by the Plan Supplement Filing Date. The Confirmation Order shall approve the New Tranche B Credit Agreement and all documents to be executed in connection therewith in substantially the form filed with the Bankruptcy Court (and with such changes as to which the applicable Debtors and respective lenders may agree) and authorize the applicable Reorganized Debtors to execute the same together with such other documents as the applicable Reorganized Debtors and the Investors may reasonably require in order to effectuate the treatment afforded to such parties under the New Tranche B Credit Agreement.

*New Convertible Preferred Stock:* Reorganized Avado shall issue $17.5 million face amount of New Convertible Preferred Stock on the Effective Date. As further described in the commitment letter attached as <u>Exhibit F</u> to this Disclosure Statement, the Investors will purchase, subject to the terms of the Investors' commitment and the terms of the New Convertible Preferred Purchase Agreement, the New Convertible Preferred Stock at the option of the Investors for a portion of the DIP Facility Claim or Cash, at the face amount. The New Convertible Preferred Stock shall accrue dividends, on a cumulative basis, at a rate of 14% per annum. Such dividend shall be payable in additional shares of New Convertible Preferred Stock, or in certain circumstances Cash, which circumstances will include, but not be limited to, certain financial tests to be agreed upon, the requirement that the outstanding balance on the Loan be less than or equal to $12.5 million, plus other requirements to be determined. The conversion price for the New Convertible Preferred Stock shall be based upon an implied common equity value of $28.15 million (which common equity value is based upon a $96.37 million enterprise valuation assumed in the Plan). The Investors will be entitled to a cash commitment fee of $393,750, earned upon commitment to purchase the New Convertible Preferred Stock. The New Convertible Preferred Stock will be subject to the restrictions on transfer described in, among other things, the Shareholders' Agreement and/or a registration rights agreement. The Confirmation Order shall approve the terms of the New Convertible Preferred Stock and the New Convertible Preferred Purchase Agreement and all documents to be executed in connection therewith in substantially the form filed with the Bankruptcy Court (and with such changes as to which the

34

applicable Debtors and respective lenders may agree) and authorize the applicable Reorganized Debtors to issue the New Convertible Preferred Stock and to execute such purchase agreement together with such other documents as the applicable Reorganized Debtors and the applicable Investors may reasonably require in order to effectuate the treatment afforded to such parties under the New Convertible Preferred Purchase Agreement.

In connection with the its funding of the New Tranche B Financing Facility and its purchase of the New Convertible Preferred Stock, the Investors offered the right to participate in such transactions to all creditors who will receive a distribution of New Common Stock on account of their Claim pursuant to the Plan, if the Creditors' Committee concluded that there would be sufficient interest to warrant the additional costs of a subscription rights program. While the Creditors' Committee became aware of expressions of interest from a few creditors, ultimately the Creditors Committee concluded, and the Debtors concurred, that there was insufficient interest expressed by the creditor body as a whole to justify the additional costs of implementing a subscription rights program.

3.      *Incentive Plan*

On the Effective Date, Reorganized Avado shall be authorized to establish and implement an incentive plan for certain members of management, non-shareholder directors, and employees of the Reorganized Debtors. Within a reasonable time after the Effective Date, the board of directors of Reorganized Avado will establish and implement such an incentive plan, pursuant to which the board of directors shall authorize no more than 10% of the New Common Stock to be issued to members of management, non-shareholder directors, and employees in the form of stock options. Of the above referenced 10% of the New Common Stock, Reorganized Avado (i) shall make available to Reorganized Avado's chief executive officer the opportunity to purchase up to 3% of the outstanding New Common Stock of Reorganized Avado, and (ii) may offer to the lead independent director the opportunity to purchase up to 1/2% of the outstanding New Common Stock of Reorganized Avado.

4.      *Employee Payments*

Pursuant to previous orders entered by the Bankruptcy Court in these Chapter 11 Cases, and subject to confirmation of the Plan, certain employee claims will be paid in full or receive such other treatment as previously authorized by the Bankruptcy Court. Because the claims employees are being satisfied in full pursuant to the Plan, each employee holding a claim treated in <u>Section 7.10</u> of the Plan shall not be entitled to vote on the Plan. The treatment provided by <u>Section 7.10</u> of the Plan for the claims held by the employees is the result of negotiations between the Debtors, the Creditors' Committee and the DIP Lenders. Specifically, on the Effective Date, the Plan provides for the payment of the following:

(a)      Persons who (a) (i) were involuntarily severed by the Debtors or (ii) are still employed by the Debtors, and (b) who participated in the Debtors' Deferred Compensation Plan, as listed in <u>Plan Schedule 7.10(a)</u>, will receive a cash payment, payable from the deferred compensation trust assets only, equal to the amount of such individual's contributions to the Deferred Compensation Plan, <u>plus</u> any interest and appreciation with respect to such Person's contributions, but excluding any matching contributions (and related interest or appreciation on matching contribution assets) the Debtors made to such Person's account under the Deferred Compensation Plan;

35

(b) each Operating Partner listed in Plan Schedule 7.10(b) to the Plan shall be entitled to a cash payment equal to approximately two-thirds of such Operating Partner's investment in the partnership, payable in eight monthly installments and the Debtors shall cancel such Operating Partner's 10% legal ownership interest in the Limited Partnership;

(c) those severed employees listed in Plan Schedule 7.10(c) to the Plan shall be entitled to receive a cash payment equal to the full amount of the Employee Severance Claim as previously agreed to by the Debtors and Creditors' Committee.

### E. Description of Securities to Be Issued in Connection with the Plan

Reorganized Avado currently expects to have fewer than 300 holders of record of New Common Stock on the Effective Date. Accordingly, it will not be subject to the periodic reporting and other procedural requirements of the Exchange Act. This is expected to result in significant cost savings to Reorganized Avado. In order to ensure that Reorganized Avado does not inadvertently become subject to the requirements of the Exchange Act, the Shareholders' Agreement, and the Amended Reorganized Avado Certificate of Incorporation and By-laws will impose restrictions on transfer that are designed to limit the number of stockholders to a number below that which would trigger the reporting requirements under the Exchange Act.

The Amended Charter and By-laws of Reorganized Avado shall be structured or amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code and shall include, as applicable among other things, (a) pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of nonvoting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code; (b) provisions authorizing the issuance of New Common Stock in amounts not less than the amounts necessary to permit the distributions thereof required or contemplated by the Plan; (c) provisions authorizing the issuance of New Convertible Preferred Stock in amounts not less than the amounts necessary to permit the distributions thereof required or contemplated by the Plan; (d) provisions that shall limit the holders of record of the New Common Stock to such a number so that Reorganized Avado will not be subject to the reporting requirements of the Exchange Act; and (e) such other provisions that are not inconsistent with the Shareholders' Agreement. The certificate or articles of incorporation and by-laws of all other Reorganized Debtors shall be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code and shall include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provisions prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code. After the Effective Date, the Reorganized Debtors may amend and restate the Certificates of Incorporation and By-laws as permitted by applicable law.

On the Effective Date, except as otherwise provided for in the Plan, (a) the Existing Securities and any other notes, bonds, indentures or other instruments or documents evidencing or creating any indebtedness or obligations of a Debtor, except such notes or other instruments evidencing indebtedness or obligations of a Debtor that are Reinstated or amended and restated under the Plan, shall be cancelled without any further action, and (b) the obligations of, and/or Claims against, the Debtors under or relating to any agreements, indentures or certificates of designation governing the Existing Securities and any other notes, bonds, indentures or other instruments or documents evidencing or creating any indebtedness or obligations of a Debtor, except such notes or other instruments evidencing indebtedness or obligations of a Debtor that are Reinstated or amended and restated under the Plan, as the case may be, shall be discharged; provided, however, that each

36

indenture or other agreement that governs the rights of the Claim holder and that is administered by an indenture trustee, an agent or a servicer shall continue in effect solely for the purposes of allowing such indenture trustee, agent or servicer to make the distributions to be made on account of such Claims under the Plan as provided in Article IX of the Plan, including, specifically, the provisions subordinating the Claims of the Subordinated Noteholders and the Claims of the TECONS Securities to the Senior Notes; provided, further, that this Section of the Plan shall not affect the discharge of the Debtors' or the Reorganized Debtors' liabilities under the Bankruptcy Code and the Confirmation Order or result in any expense or liability to the Reorganized Debtors, except as expressly provided by the Plan.

### 1.    *New Common Stock of Reorganized Avado*

Pursuant to the Amended Certificate of Incorporation of Reorganized Avado, the New Common Stock will be authorized and issued.  The respective holders of the New Common Stock shall vote on all matters in a single class and each holder of New Common Stock shall be entitled to one vote for each share of New Common Stock that it owns.

### 2.    *New Convertible Preferred Stock*

Pursuant to the Amended Certificate of Incorporation of Reorganized Avado, the New Convertible Preferred Stock will be authorized and issued.  The New Convertible Preferred Stock will accrue dividends at a rate of 14% per share of New Convertible Preferred Stock per annum in additional shares of New Convertible Preferred Stock, or in certain circumstances Cash.  The conversion price of the New Convertible Preferred Stock will be based upon an implied common equity value of $28.15 million (which equity value is based upon a $96.37 million enterprise valuation assumed in the Plan).

### 3.    *Class A Warrants*

Reorganized Avado will authorize and issue such number of Class A Warrants as will entitle the holders thereof to acquire the number of shares of New Common Stock equal to 25% of the number of shares represented by the Subordinated Notes Redistribution Shares at an exercise price that equates to a 65% recovery value to holders of General Unsecured Claims.

### 4.    *Class B Warrants*

Reorganized Avado will authorize and issue such number of Class B Warrants as will entitle the holders thereof to acquire the number of shares of New Common Stock equal to 25% of the number of shares represented by the TECONS Redistribution Shares at an exercise price that equates to a 70% recovery value to holders of General Unsecured Claims.

### F.    **Shareholders' Agreement**

On the Effective Date, all creditors receiving stock under the Plan will become parties to  the Shareholders' Agreement, substantially in the form attached to this Disclosure Statement as Exhibit G. The Shareholders' Agreement will include, in addition to other provisions, transfer and trading restrictions intended to limit the number of record holders of New Securities to no more than 290 per class of securities (as such concept is understood for purposes of Section 12 of the Exchange Act)

such that Reorganized Avado will not be subject to reporting requirements under the Exchange Act. In general, a Shareholder (as such term is defined in the Shareholders' Agreement) wishing to effect a transfer of its interest must obtain approval from the Company, however such approval will not be unreasonably withheld where the transfer would not increase the number of record holders of a particular class of securities to a number in excess of 290.

The agreement will provide for drag along and tag along rights triggered upon the sale or disposition of sixty-six and two-thirds percent (66 2/3%) of the capital stock of Reorganized Avado then issued and outstanding. In addition, holders of at least sixty-six and two-thirds percent (66 2/3%) of the New Convertible Preferred Common Stock and New Common Stock, voting together on an as-converted basis, must approve certain transactions including amendments to the charter or bylaws, redemptions of stock, declaration of dividends, mergers, increases in borrowing and other significant corporate transactions. In the event of a Qualified Initial Public Offering (as such term is defined in the Shareholders' Agreement), all shares of Reorganized Avado may be subject to a 180 day lock-up period during which transfers by existing Shareholders will be restricted. As detailed in a separate registration rights agreement, Shareholders of Reorganized Avado will have demand and piggyback registration rights and related rights customary for the type of New Securities held by them. The agreement also provides that the Board of Directors will consist of six persons including two nominated by DDJ, two nominated by the Creditors' Committee, the chief executive officer and one independent director. For a more complete understanding of the Shareholder's Agreement, please review Exhibit G to this Disclosure Statement.

### G.   Post-Consummation Operations of the Debtors

#### 1.   Reorganized Debtors

Subject to the Restructuring Transactions, each of the Debtors shall continue to exist after the Effective Date as a separate corporate entity, with all the powers of a corporation under applicable law in the jurisdiction in which it is formed, pursuant to the Certificate of Incorporation and By-laws in effect prior to the Effective Date, except to the extent such Certificate of Incorporation and By-laws are amended by the Plan, without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date. Avado Brands, Inc. shall be reorganized and reincorporated as a Delaware corporation pursuant the Plan, on or after the Effective Date.

#### 2.   Officers

The existing senior officers of Avado shall serve initially in the same capacities after the Effective Date for Reorganized Avado.

#### 3.   Directors

The initial board of directors of Reorganized Avado shall consist of a minimum of five (5), but no more than six (6), members. The Investor Agent, on behalf of the Investors, shall appoint two members of the initial board of directors. The Creditors' Committee shall appoint at least one and, should it so decide, up to two members of the initial board of directors. Reorganized Avado's chief executive officer and lead independent director to be selected by the Investor Agent, on behalf of the Investors, and reasonably acceptable to the Creditors' Committee and the chief executive officer shall

38

fill the remaining positions on the initial board of directors. The identities of the individuals appointed to the initial board of directors will be disclosed on <u>Plan Schedule 7.3</u> to the plan, which will be filed by the Plan Supplement Filing Date.

Reorganized Avado board members shall serve for an initial two (2) year term commencing on the Effective Date.

Until the second annual meeting of shareholders of Reorganized Avado after the Effective Date, any vacancy in the board of directors of Reorganized Avado shall be filled by a person designated by the constituency which sponsored the board nominee whose vacancy is being filled, as such position was initially designated on <u>Plan Schedule 7.3</u> to the Plan; <u>provided</u>, <u>however</u>, the process for replacing the Creditors' Committee's board of director nominee(s) shall be as disclosed in <u>Plan Schedule 7.3</u> to the Plan.

**H.      Distributions Under the Plan**

*1.      Time of Distributions*

Except as otherwise provided for herein or ordered by the Bankruptcy Court, all distributions under the Plan on account of claims that are an Allowed Claim as of the Effective Date shall be made on the Distribution Date or as soon thereafter as is practicable; <u>provided</u>, <u>however</u>, that with respect to any Cash distributions, such date may be after the Administrative Claims Bar Date. Any distribution to be made on the Effective Date pursuant to the Plan shall be deemed as having been made on the Effective Date if such distribution is made on the Effective Date or as soon thereafter as is practicable. Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day. Except as otherwise provided herein, distributions on account of Claims that first become Allowed Claims after the Effective Date shall be made pursuant to <u>Articles IX</u> and  <u>X</u> of the Plan.

*2.      Interest on Claims*

Unless otherwise specifically provided for in the Plan, the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on Claims, and no Claim holder shall be entitled to interest accruing on or after the Petition Date on any Claim. To the extent provided for in the Plan, the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall accrue on Claims at the applicable non-default rate. Unless otherwise specifically provided for in the Plan, the Confirmation Order, or required by applicable bankruptcy law, interest shall not accrue or be paid upon any Disputed Claim in respect of the period from the Petition Date to the date a final distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim. Until the Effective Date, nothing herein shall waive the right of any creditor to seek postpetition interest.

*3.      Disbursing Agent*

The Disbursing Agent(s) shall make all distributions required under the Plan. Distributions on account of (a) Senior Noteholder Claims, (b) Subordinated Noteholder Claims and (c) TECONS Securities Claims will first be delivered to the Disbursing Agent on behalf and on account of such Claim holders. The Disbursing Agent shall make the appropriate distributions pursuant to <u>Articles II</u>

and V of the Plan, and as provided below.

*Senior Notes*. The Disbursing Agent shall deliver distributions on account of the Senior Noteholder Claims to the Senior Notes Indenture Trustee, its agent or servicer, who shall then make distributions to the holders of Senior Noteholder Claims in accordance with the Senior Notes Indenture and the provisions of the Plan.

*Subordinated Notes*. The Disbursing Agent shall deliver distributions on account of the Subordinated Noteholder Claims to the Subordinated Notes Indenture Trustee, its agent or servicer, who shall then make distributions to the holders of Subordinated Noteholder Claims in accordance with the Subordinated Notes Indenture and the provisions of the Plan; provided, however, that in accordance with the Subordinated Notes Subordination Rights and Section 5.1 of the Plan, shares of New Common Stock and Litigation Trust Beneficial Interests otherwise distributable to or for the benefit of holders of Allowed Subordinated Noteholder Claims shall instead be distributed directly to the Disbursing Agent for the holders of Allowed Senior Noteholder Claims, who shall redistribute the shares of New Common Stock and Litigation Trust Beneficial Interests to the holders of Allowed Senior Noteholder Claims in accordance with the provisions of Section 9.3(a) of the Plan.

*TECONS Securities*. The Disbursing Agent shall deliver distributions on account of the the TECONS Securities Claims to the TECONS Indenture Trustee, its agent or servicer, who shall then make distributions to the holders of TECONS Securities Claims in accordance with the TECONS Indenture and the provisions of the Plan; provided, however, that in accordance with the TECONS Subordination Rights and Section 5.1 of the Plan, shares of New Common Stock and Litigation Trust Beneficial Interests otherwise distributable to or for the benefit of holders of Allowed TECONS Securities Claims shall instead be distributed directly to the Disbursing Agent for the holders of Allowed Senior Noteholder Claims, who shall redistribute the shares of New Common Stock and Litigation Trust Beneficial Interests to the holders of Allowed Senior Noteholder Claims in accordance with the provisions of Section 9.3(a) of the Plan.

The Disbursing Agent(s) shall reasonably cooperate with the Prepetition Indenture Trustees, as agents or servicers in making distributions in accordance with the Plan.

4.    *Delivery of Distributions*

Distributions to holders of Allowed Claims shall be made by the Disbursing Agent or the Prepetition Indenture Trustees (as agents or servicers), (for purposes of this paragraph, the "applicable disbursing agent") (i) at the addresses set forth on the proofs of claim filed by such Claim holders (or at the last known addresses of such Claim holders if no proof of claim is filed or if the Debtors have been notified of a change of address), (ii) at the addresses set forth in any written notices of address changes delivered to the applicable disbursing agent after the date of any related proof of claim, (iii) at the addresses reflected in the Schedules if no proof of claim has been filed and the applicable disbursing agent has not received a written notice of a change of address, or (iv) in the case of a Claim holder whose Claim is governed by one of the Prepetition Indentures or other agreement and is administered by one of the Prepetition Indenture Trustees, at the addresses contained in the official records of the Prepetition Indenture Trustees, including as set forth in any Ballots cast with respect to such Claims. Distributions made to holders of Claims by the Prepetition Indenture Trustees shall be subject to the rights of the Prepetition Indenture Trustees under the Prepetition Indentures or similar contract or agreement to enforce any charges or expenses thereunder.

If any Claim holder's distribution is returned as undeliverable, no further distributions to such Claim holder shall be made unless and until the applicable disbursing agent is notified of such Claim holder's then current address, at which time all missed distributions shall be made to such Claim holder without interest. Amounts in respect of undeliverable distributions shall be returned to (w) the Senior Notes Indenture Trustee with respect to Senior Noteholder Claims, (x) the Subordinated Notes Indenture Trustee with respect to Subordinated Noteholder Claims, (y) the TECONS Indenture with respect to TECONS Securities Claims; or (z) the Disbursing Agent with respect to all other claims, until such distributions are claimed. All claims for undeliverable distributions shall be made on the later of the first (1st) anniversary of the Effective Date or ninety (90) days from the date the Claim becomes an Allowed Claim. After such date, all unclaimed property relating to distributions to be made on account of Class 3, 4, 5, 6 and 7 Claims shall revert to Reorganized Avado and any New Common Stock held for distribution on account of such Claim shall be cancelled and of no further force or effect and all the other unclaimed property shall revert to the Reorganized Debtors, free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary. Nothing contained in the Plan shall require any of the applicable disbursing agents to attempt to locate any holder of an Allowed Claim or Interest.

> 5.      *Surrender and Cancellation of Securities*

On or before the date that distributions are first made by the Disbursing Agent or the Prepetition Indenture Trustees, each holder of an instrument evidencing a Claim on account of Prepetition Notes (a "Certificate") shall surrender such Certificate to the Prepetition Indenture Trustees who shall then deliver such Certificate to the Disbursing Agent in accordance with written instructions to be provided to such holder by the Prepetition Indenture Trustees as promptly as practicable following the Effective Date, and such Certificate shall be cancelled. Such instructions shall specify that delivery of such Certificate will be effected, and risk of loss and title thereto will pass, only upon the proper delivery of such Certificate with a letter of transmittal in accordance with such instructions. No distribution of property hereunder shall be made to or on behalf of any such Claim holder unless and until such Certificate is received by the Disbursing Agent or the unavailability of such Certificate is reasonably established to the satisfaction of the Disbursing Agent. Any such Claim holder who fails to surrender or cause to be surrendered such Certificate or fails to execute and deliver an affidavit of loss and indemnity holding the Reorganized Debtors, the Disbursing Agent, the Prepetition Indenture Trustees, or any other applicable agent or servicer, harmless from any damages, liabilities or costs incurred in treating such individual as a holder of an Allowed Claim and otherwise reasonably satisfactory to the Reorganized Debtors, the Disbursing Agent, the Prepetition Indenture Trustees, or any other applicable agent or servicer, prior to the first (1st) anniversary of the Effective Date, shall be deemed to have forfeited, and shall be forever barred from asserting, any and all rights and Claims in respect of such Certificate and shall not participate in any distribution hereunder, and all property in respect of such forfeited distribution, including interest accrued thereon, shall revert to the Reorganized Debtors Prepetition Indenture Trustees notwithstanding any federal or state escheat laws to the contrary. Upon compliance with <u>Section 9.7</u> of the Plan by a holder of a Claim evidenced by a Prepetition Note, such holder shall, for all purposes under the Plan, be deemed to have surrendered such note or other Security.

On the Effective Date, except as otherwise provided for in the Plan, (a) the Existing Securities and any other notes, bonds, indentures or other instruments or documents evidencing or creating any indebtedness or obligations of a Debtor, except such notes or other instruments evidencing indebtedness or obligations of a Debtor that are Reinstated or amended and restated under the

41

Plan, shall be cancelled without any further action, and (b) the obligations of, and/or Claims against, the Debtors under or relating to any agreements, indentures or certificates of designation governing the Existing Securities and any other notes, bonds, indentures or other instruments or documents evidencing or creating any indebtedness or obligations of a Debtor, except such notes or other instruments evidencing indebtedness or obligations of a Debtor that are Reinstated or amended and restated under the Plan, as the case may be, shall be discharged; provided, however, that each indenture or other agreement that governs the rights of the Claim holder and that is administered by an indenture trustee, an agent or a servicer shall continue in effect solely for the purposes of allowing such indenture trustee, agent or servicer to make the distributions to be made on account of such Claims under the Plan as provided in Article IX of the Plan, including, specifically, the provisions subordinating the Claims of the Subordinated Noteholders and the Claims of the TECONS Securities to the Senior Notes; provided, further, that this Section of the Plan shall not affect the discharge of the Debtors' or the Reorganized Debtors' liabilities under the Bankruptcy Code and the Confirmation Order or result in any expense or liability to the Reorganized Debtors, except as expressly provided by the Plan.

      *6.       Procedures for Resolving Disputed, Contingent, and Unliquidated Claims*

      *a.       Claims Administration Responsibility*

Each Reorganized Debtor (or such other Person designated by the Reorganized Debtors to act on their behalf) shall retain responsibility for administering, disputing, objecting to, compromising or otherwise resolving and making distributions on account of the respective Claims of such Debtor.

      *b.       Objection Deadline; Prosecution of Objections*

No later than the Claims Objection Deadline (unless extended by an order of the Bankruptcy Court), the Debtors and the Reorganized Debtors, as the case may be, shall file objections to Claims with the Bankruptcy Court and serve such objections upon the holders of each of the Claims to which objections are made. Nothing contained herein, however, shall limit the right of the Reorganized Debtors to object to Claims, if any, filed or amended after the Claims Objection Deadline. Moreover, notwithstanding the expiration of the Claims Objection Deadline and unless subsequently ordered for good cause shown to shorten time, the Reorganized Debtors shall continue to have the right to amend any objections and to file and prosecute supplemental objections and counterclaims to a Disputed Claim until such Disputed Claim is Allowed. The Reorganized Debtors shall be authorized to, and shall, resolve all Disputed Claims by withdrawing or settling such objections thereto, or by litigating to judgment in the Bankruptcy Court or such other court having jurisdiction on the validity, nature and/or amount thereof.

      *c.       No Distributions Pending Allowance*

Notwithstanding any other provision of the Plan, no payments or distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim and the remainder has become a Disallowed Claim.

*d.        Disputed Claim Reserve*

The Debtors and/or the Reorganized Debtors shall establish one or more Disputed Claims Reserves for the purpose of effectuating distributions to holders of Disputed Claims pending the allowance or disallowance of such claims in accordance with the Plan. The Disbursing Agent shall withhold the applicable Disputed Claims Reserves from the property to be distributed to particular classes under the Plan. The Disputed Claims Reserves shall be equal to 100% of the distributions to which holders of Disputed Claims in Classes 3, 4, 5, 6 and 7 would be entitled under the Plan as of such date if such Disputed Claims in Classes 3, 4, 5, 6 and 7 were Allowed Claims in their (a) Face Amount or (b) estimated amount of such Disputed Claim in Classes 3, 4, 5, 6 and 7 as approved in an order by the Bankruptcy Court pursuant to § 502(c) of the Bankruptcy Code. The Reorganized Debtors may request estimation for any Disputed Claim including, without limitation, any Disputed Claim that is contingent or unliquidated. Nothing in the Plan or the Disclosure Statement shall be deemed to entitle the holder of a Disputed Claim to postpetition interest on such Claim.

*e.        Distributions After Allowance*

Payments and distributions from the Disputed Claims Reserve shall be made as appropriate to the holder of any Disputed Claim that has become an Allowed Claim, as soon thereafter as is reasonably practicable after the date such Disputed Claim becomes an Allowed Claim. Such distributions shall be based upon the cumulative distributions that would have been made to the holder of such Claim under the Plan if the Disputed Claim had been Allowed on the Effective Date (excluding any present value calculations) and shall not be limited by the Disputed Claim amounts previously reserved with respect to such Disputed Claim to the extent that additional amounts are available therefor, but only to the extent that such additional amounts have not yet been distributed to holders of Allowed Claims. Upon such distribution, the reserve shall be reduced by an amount equal to the amount reserved with respect to such Disputed Claim. To the extent the amount reserved for such Disputed Claim exceeds the Allowed Amount, if any, of such Claim, the remainder shall be deposited in the applicable Supplemental Distribution Account and distributed in accordance with the provisions of Article V of the Plan.

*7.        Setoff*

Each Debtor and Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy laws, but shall not be required to, set off against any Claim and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtors, or the Reorganized Debtors, may have against the holder of such Claim; provided, however, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claim that the Debtors or the Reorganized Debtors may have against such holder. Absent the consent of the Debtors or the Reorganized Debtors or unless otherwise authorized pursuant to an order of the Bankruptcy Court, no party receiving a distribution under the Plan may offset such distribution against any obligations such party may have to the Debtors or the Reorganized Debtors. Without limiting any other rights of the Debtors, the Reorganized Debtors or the Litigation Trust provided for in the Plan, any distributions under the Plan shall also remain subject to any Causes of Action, counterclaims, security interests or other rights of the Debtors, the Reorganized Debtors or the Litigation Trust with respect to such distributions and the matters giving rise to such distributions.

43

8.     *Fractional Shares*

Any other provision of the Plan notwithstanding, distributions of fractions of shares of New Common Stock shall not be made.  Whenever any distribution of a fraction of a share of New Common Stock under the Plan would otherwise be called for, the actual distribution made shall reflect a rounding of such fraction to the nearest whole share (up or down), with half shares being rounded down.

9.     *De Minimis Distributions*

Notwithstanding any other provision of the Plan, the Reorganized Debtors and the Disbursing Agent shall have no obligation to make a distribution on account of an Allowed Claim from any account to a specific holder of an Allowed Claim if the amount to be distributed to that holder on the Distribution Date or Subsequent Distribution Date (a) does not constitute a final distribution to such holder and (b) is less than $50 or one (1) share of New Common Stock.  In addition, the Debtors and the Reorganized Debtors reserve the right to request subsequent relief from the Bankruptcy Court to exclude holders of smaller claims from the final distribution under the Plan to the extent that the amounts otherwise distributable to such claim holders in connection with such final distribution would be *de minimis* or create undue administrative expense.

10.     *Allocation of Plan Distributions Between Principal and Interest*

To the extent that any Allowed Claim entitled to a distribution under the Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated, for federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

11.     *Allowance of Certain Claims*

a.     *Professional Claims*

On the Effective Date, the Debtors shall pay all amounts owing to Professionals for all outstanding amounts relating to prior periods through the Effective Date approved by the Bankruptcy Court in accordance with the Professional Fee Order; provided, however, that Professionals shall continue to prepare fee applications in accordance with the Professional Fee Order for services rendered and expenses incurred up to the Effective Date.  No later than fifteen (15) days prior to the Confirmation Hearing, each Professional shall estimate fees and expenses due for periods that have not been billed as of the anticipated Effective Date.  Any party in interest shall have until the Confirmation Hearing to object to such estimate.  If no party objects to a Professional's estimate, then within ten (10) days of the Effective Date such Professional shall submit a bill and, provided that such bill is no more than the estimate, the fees and expenses shall be paid; provided, however, that the Reorganized Debtors shall be authorized to pay a Professional's success fee only upon approval of such fee by the Bankruptcy Court.  On the Effective Date, the Reorganized Debtors shall fund an escrow account in an amount equal to the aggregate amount of outstanding fee applications not ruled upon by the Bankruptcy Court as of the Effective Date plus the aggregate amount of all estimated fees and expenses due for periods that have not been billed as of the Effective Date.  Such escrow account shall be used by the Reorganized Debtors to pay the remaining Professional Fee Claims owing to the

44

Professionals as and when Allowed by the Bankruptcy Court. When all Professional Fee Claims have been paid in full, amounts remaining in such escrow account, if any, shall be returned to the Reorganized Debtors.

All Professionals or other entities requesting compensation or reimbursement of expenses pursuant to sections 327, 328, 330, 331, 363, 503(b) and 1103 of the Bankruptcy Code for services rendered and expenses incurred on or before the Effective Date (including compensation for making a substantial contribution in any of the Chapter 11 Cases) shall file with the Bankruptcy Court and serve such applications on counsel for the Debtors, the Creditors' Committee, the United States Trustee and as otherwise required by the Bankruptcy Court and the Bankruptcy Code an application for final allowance of compensation and reimbursement of expenses no later than forty-five (45) days after the end of the month in which the Effective Date occurred. Objections to applications of Professionals and other entities for compensation and reimbursement of expenses must be filed with the Bankruptcy Court no later than sixty-five (65) days after the end of the month in which the Effective Date occurred. All compensation and reimbursement of expenses allowed by the Bankruptcy Court shall be paid ten (10) days after the entry of an Order allowing such fees and expenses, or as soon thereafter as practicable.

Notwithstanding sections of Sections 11.1(a) and (b) of the Plan, on or within three (3) business days after the Confirmation Date, the Prepetition Indenture Trustees shall deliver an invoice for its fees and expenses to the Debtors, the Creditors' Committee and the United States Trustee, each of whom shall have the right to file an objection with the Bankruptcy Court, which objection must be filed within ten (10) days of receipt of such invoice. Absent any such objection, each Prepetition Indenture Trustee's invoice for their fees and expenses shall be paid in Cash by the Debtors or the Reorganized Debtors, as applicable, on the Effective Date, or as soon thereafter as practicable, without need to file an application for the payment of its fees and without need for further order of the Bankruptcy Court.

b.      *Other Administrative Claims*

All other requests for payment of an Administrative Claim, other than fees for the Prepetition Indenture Trustees and their counsel which shall be paid without requiring the filing of a fee application (other than as set forth in Section 11.1 of the Plan), must be filed with the Bankruptcy Court and served on counsel for the Debtors and/or the Reorganized Debtors no later than the Administrative Claims Bar Date. Unless the Debtors object to an Administrative Claim within one hundred twenty (120) days after the Administrative Claims Bar Date, such Administrative Claim shall be deemed allowed in the amount requested. In the event that the Debtors and/or the Reorganized Debtors object to an Administrative Claim and such claimant and the Reorganized Debtors are unable to resolve their dispute consensually, then the Reorganized Debtors shall file a motion for determination thirty (30) days following the request of such claimant. Thereafter, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim. Notwithstanding the foregoing, the Debtors or the Reorganized Debtors may pay, in their discretion, in accordance with the terms and conditions of any agreements relating thereto, any Administrative Claim as to which no request for payment has been timely filed but which is paid or payable by a Debtor in the ordinary course of business.

c.      *Administrative Claims Bar Date Notice*

On the Effective Date, or as soon thereafter as practicable, Reorganized Avado shall provide

45

written notice of the Administrative Claims Bar Date in substantially the same manner and fashion as the Debtors provided written notice of the Bar Date as approved by Final Order of the Bankruptcy Court on April 14, 2004.

12.      *Funding of Cash Reserves*

On or before the Effective Date, the Debtors shall fund the Cash Reserve in such amounts as determined by the Debtors as necessary in order to make the required future payments to Administrative Claims, Tax Priority Claims, Secured Claims, Non-Tax Priority Claims, Small Claims, and as otherwise provided by the Plan.

**I.      Litigation Trust**

During the period of 1998 through November 2003, Thomas E. DuPree, Jr. (the "Former Officer") served as Avado's Chairman of the Board of Directors (the "Board") and Chief Executive Officer. In 1998 and 1999, Avado made a series of unsecured loans to the Former Officer exceeding, in the aggregate, $10.9 million in principal, evidenced by certain promissory notes having maturity dates on the earlier of demand for repayment by Avado or late 2000. Thereafter, Avado extended the maturity on such notes to June 2000 and loaned an additional $3.0 million to the Former Officer, secured by certain real estate, evidenced by a promissory note also having a maturity date of June 2000. Prior to such maturity date on the notes, Avado again extended the maturity date on all of the notes to June 2002. In March 2002, the Former Officer was permitted to restructure his indebtedness to Avado, whereby all of the notes were converted into a single note (the "Former Officer Note"), having a maturity of June 2009, and the Former Officer was permitted to sell the real estate originally securing the $3.0 million loan and substitute certain Subordinated Notes as collateral for repayment of the Former Officer Note.

In addition, during the latter part of the Former Officer's tenure as Chief Executive Officer of Avado, the Company was operating under severe liquidity constraints. In the fall of 2003, members of Avado's Board observed a pattern of conduct on the part of the Former Officer that they believed indicated that the Former Officer was not objectively performing his managerial responsibilities and fiduciary duties for the benefit of all of Avado's stakeholders. As a result, the Board scheduled a meeting for the purpose of voting to remove the Former Officer as Chief Executive Officer. Prior to the occurrence of the Board meeting, however, the Former Officer filed a complaint in Georgia state court asserting that he was acting in the best interest of the Company and seeking to enjoin the board meeting from taking place. The Georgia state court granted a temporary stay and the Company subsequently removed the action to federal court. The Federal District Court ultimately dismissed the Former Officer's complaint and dissolved the injunction.

Shortly thereafter, on November 8, 2003, the Former Officer and the Company entered into a Separation and General Release Agreement (the "Separation Agreement") pursuant to which, among other things, (i) the Former Officer was to receive approximately one year's severance to be paid in two installments, one in the amount of $350,000 and one in the amount of $137,500, (the first of which was paid prior to the commencement of these Chapter 11 Cases, and the second of which was not paid as a result of the commencement of these Chapter 11 Cases), (ii) the Former Officer (who was the largest shareholder of the Company owning, upon information an belief, over 27% of the common stock of the Company) agreed not to make or participate in any proxy or other type of solicitation involving the Company for a period of 18 months, and (iii) the parties exchanged mutual releases with

respect to all matters other than (x) fraud or intentional misconduct, (y) amounts due with respect to the Subordinated Notes held for the benefit of the Former Officer but pledged to the Company to secure the Former Officer Note, and (z) the Former Officer Note.

The Creditors' Committee believes that Causes of Action may exist against the Former Officer and other members of the Board in relation to the above-described actions which took place. Accordingly, the Plan provides for the creation and funding of a Litigation Trust to, among other things, further investigate and potentially pursue Causes of Action against the Former Officer and certain Board members during the relevant period of time. On the Effective Date of the Plan, the Former Officer Actions, the Former Officer Related Actions, and any additional Causes of Action identified in the Litigation Trust Agreement will be transferred to the Litigation Trust. With respect to the Former Officer Related Actions, liability will be limited to any applicable insurance proceeds. The Reorganized Debtors may also transfer additional potential Causes of Action to the Litigation Trust after the Effective Date of the Plan.

The Former Officer has advised the Company that he will vigorously defend himself against any action or actions brought against him by the Litigation Trust. The Former Officer has also advised the Company that he reserves all of his rights and causes of action against the Company and third parties, including without limitation, his rights pursuant to the Separation Agreement. As discussed above, pursuant to the Separation Agreement, the parties exchanged mutual releases with respect to all matters not resolved or agreed to pursuant to the Separation Agreement, other than (a) fraud or intentional misconduct, (b) amounts due with respect to the Subordinated Notes held for the benefit of the Former Officer but pledged to the Company to secure the Former Officer Note, and (c) the Former Officer Note. The Litigation Trustee will evaluate the merits of any potential Causes of Action against the Former Officer and other Board members as well as any potential defenses and take such actions with respect thereto as it deems appropriate under the terms of the Litigation Trust Agreement.

The Former Officer Note is not being transferred to the Litigation Trust at this time. Nevertheless, pursuant to the Plan, unless and until the Former Officer Note is transferred into the Litigation Trust, the Reorganized Debtors shall reasonably coordinate their efforts to collect, whether by litigation or otherwise, on such note and shall not enter into a settlement with the Former Officer with respect to such note without the consent of the Litigation Trustee, which consent shall not be unreasonably withheld, so as to take into consideration any Causes of Action which the Litigation Trustee may be investigating or pursuing against the Former Officer.

*1.      Appointment of Litigation Trustee.*

The Litigation Trustee for the Litigation Trust shall be selected by the Creditors' Committee, and approved by DDJ Capital Management, LLC, in its capacity as owning or advising certain funds owning Senior Notes, which approval shall not be unreasonably withheld. Specifically, the Creditors' Committee shall file a notice by the Plan Supplement Filing Date designating the Person that has been selected as Litigation Trustee and seeking approval of such designation. The Person designated as Litigation Trustee shall file an affidavit demonstrating that such Person is disinterested. If approved by the Bankruptcy Court in the Confirmation Order, the Person so designated shall become the Litigation Trustee on the Effective Date.

The Litigation Trustee shall have and perform all of the duties, responsibilities, rights and obligations set forth in the Litigation Trust Agreement.

47

2.    *Funding of the Litigation Trust.*

On the Effective Date, the Debtors will initially contribute $250,000 in Cash to the Litigation Trust.  The Reorganized Debtors shall commit to fund the Litigation Trust with up to an additional $500,000; provided, however, that the Reorganized Debtors will not be required to provide the additional funding if the provision thereof would result in a default under the New Tranche A Financing Facility, the New Tranche B Financing Facility or any other material contract of the Reorganized Debtors, or would result in the diminishment of working capital below an amount determined to be reasonably acceptable by the board of directors of the Reorganized Debtors.  To the extent that the Litigation Trust requires funding beyond that made available by the Reorganized Debtors, the Litigation Trustee may arrange for additional funding as permitted in the Litigation Trust Agreement, including but not limited to, obtaining funding from some or all holders of the Litigation Trust Beneficial Interests.

3.    *Transfer of Trust Assets to the Litigation Trust.*

On the Effective Date, the Reorganized Debtors shall transfer and shall be deemed to have irrevocably transferred to the Litigation Trust, for and on behalf of the beneficiaries of the Trust, with no reversionary interest in the Debtors or the Reorganized Debtors, the Litigation Trust Assets.

4.    *The Litigation Trust.*

Without any further action of the directors or shareholders of the Debtors, on the Effective Date, the Litigation Trust Agreement for the Litigation Trust, substantially in the form included in the Plan Supplement, shall become effective.  The Litigation Trustee shall accept the Litigation Trust and sign the Litigation Trust Agreement on the Effective Date and the Litigation Trust will then be deemed created and effective.

The Litigation Trustee shall have full authority to take any steps necessary to administer the Litigation Trust Assets, including, without limitation, the duty and obligation to liquidate Litigation Trust Assets, and, if authorized by majority vote of those members of the Litigation Trust Advisory Board authorized to vote, to pursue and settle any other trust claims. Upon such transfer (which, as stated above, shall occur on the Effective Date), the Debtors, the Disbursing Agent and the Reorganized Debtors shall have no other further rights or obligations with respect thereto.

All costs and expenses associated with the administration of the Litigation Trust, including those rights, obligations and duties described in Section 12.4(b) of the Plan, shall be the responsibility of and paid by the Litigation Trust.  Notwithstanding the foregoing, the Reorganized Debtors shall make available to the Litigation Trustee reasonable access during normal business hours, upon reasonable notice, to personnel and books and records of the Reorganized Debtors to representatives of the Litigation Trust to enable the Litigation Trustee to perform the Litigation Trustee's tasks under the Litigation Trust Agreement and the Plan; provided, however, that the Reorganized Debtors will not be required to make expenditures in response to such requests determined by them to be unreasonable. The Bankruptcy Court retains jurisdiction to determine the reasonableness of either a request for assistance and/or a related expenditure.

The Litigation Trustee may retain such law firms, accounting firms, experts, advisors, consultants, investigators, appraisers, auctioneers or other professionals as it may deem necessary

48

(collectively, the "Litigation Trustee Professionals"), in its sole discretion, and at the sole expense of the Litigation Trust, to aid in the performance of its responsibilities pursuant to the terms of the Plan including, without limitation, the liquidation and distribution of Litigation Trust Assets.

For federal income tax purposes, it is intended that the Litigation Trust be classified as a liquidating trust under section 301.7701-4 of the Procedure and Administration Regulations and that such trust be owned by its beneficiaries. Accordingly, for federal income tax purposes, it is intended that the beneficiaries be treated as if they had received a distribution of an undivided interest in the Litigation Trust Assets and then contributed such interests to the Litigation Trust. The Litigation Trust Agreement shall (i) state that the primary purpose of the Litigation Trust is to liquidate the Litigation Trust Assets with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, its liquidating purpose and (ii) contain a fixed or determinable termination date that is generally not more than five (5) years from the date of creation of the Litigation Trust, which termination date may be extended for one or more finite terms subject to the approval of the Bankruptcy Court upon a finding that the extension is necessary to its liquidating purpose. Each such extension must be approved by the Bankruptcy Court within two (2) months before the beginning of the extended term.

The Litigation Trustee shall be responsible for filing all federal, state and local tax returns for the Litigation Trust. The Litigation Trustee shall file all federal tax returns for the Litigation Trust as a grantor trust pursuant to section 1.671-4 of the Procedure and Administration Regulations.

For so long as the Former Officer Note is retained by the Reorganized Debtors, the Reorganized Debtors shall reasonably coordinate their efforts to collect, whether by litigation or otherwise, on such note and shall not enter into a settlement with the Former Officer with respect thereto without the consent of the Litigation Trustee, which consent shall not to be unreasonably withheld, so as to take into consideration any Causes of Action which the Litigation Trustee may be investigating or pursuing against the Former Officer.

Notwithstanding any other provision of the Litigation Trust Agreement, any recoveries with respect to the Former Officer Related Actions shall be limited to the proceeds of any applicable director and officer liability insurance policy and any person against whom a Former Officer Related Action is brought shall retain all rights to defend against such action.

5.      *The Trust Advisory Board.*

The Litigation Trust Advisory Board shall be comprised of up to three (3) members selected by the Creditors' Committee, and approved by DDJ Capital Management, LLC, in its capacity as owning or advising certain funds owning Senior Notes, which approval shall not be unreasonably withheld. The Creditors' Committee shall provide written notice of the identities of such members and file such notice with the Bankruptcy Court by the Plan Supplement Filing Date. The Litigation Trust Advisory Board shall adopt such By-laws as it may deem appropriate. The Litigation Trustee shall consult regularly with the Litigation Trust Advisory Board when carrying out the purpose and intent of the Litigation Trust. Members of the Litigation Trust Advisory Board shall be entitled to reimbursement of the reasonable and necessary expenses incurred by them in carrying out the purpose of the Litigation Trust Advisory Board. Reimbursement of the reasonable and necessary expenses of the members of the Litigation Trust Advisory Board shall be payable by the Litigation Trust.

49

In the case of an inability or unwillingness of any member of the Litigation Trust Advisory Board to serve, such member shall be replaced by designation of the remaining members of the Litigation Trust Advisory Board. If the Litigation Trust Advisory Board has only one member and any position on the Litigation Trust Advisory Board remains vacant for more than thirty (30) days, such vacancy shall be filled within fifteen (15) days thereafter by the designation of the Litigation Trustee without the requirement of a vote by the other members of the Litigation Trust Advisory Board.

Upon the certification by the Litigation Trustee that all Litigation Trust Assets have been distributed, abandoned or otherwise disposed of, the members of the Litigation Trust Advisory Board shall resign their positions, whereupon they shall be discharged from further duties and responsibilities.

The Litigation Trust Advisory Board may remove the Litigation Trustee in its discretion. In the event the requisite approval is not obtained, the Litigation Trustee may be removed by the Bankruptcy Court for cause shown. In the event of the resignation or removal of the Litigation Trustee, the Litigation Trust Advisory Board shall, by majority vote, designate a person to serve as successor Litigation Trustee.

Notwithstanding anything to the contrary in the Plan, neither the Litigation Trust Advisory Board or any of its members, designees, or any duly designated agent or representatives of any such party shall be liable for the act, default or misconduct of any other member of the Litigation Trust Advisory Board, nor shall any member be liable for anything other than such member's own gross negligence or willful misconduct. The Litigation Trust Advisory Board may, in connection with the performance of its duties, and in its sole and absolute discretion, consult with its counsel, accountants or other professionals, and shall not be liable for anything done or omitted or suffered to be done in accordance with such advice or opinions. If the Litigation Trust Advisory Board determines not to consult with its counsel, accountants or other professionals, it shall not be deemed to impose any liability on the Litigation Trust Advisory Board, or its members and/or designees.

To the extent the Litigation Trust Advisory Board adopts by-laws, no provisions of such by-laws shall supersede any express provision of the Plan.

6.      *Distributions of Trust Assets.*

The Litigation Trustee shall make distributions of Net Litigation Trust Recoveries to the holders of Litigation Trust Beneficial Interests on a pro rata basis. The Litigation Trustee will make continuing efforts to prosecute or settle the Litigation Trust Actions, make timely distributions, and not unduly prolong the duration of the Litigation Trust.

**J.      Miscellaneous Matters**

1.      *Treatment of Executory Contracts and Unexpired Leases*

The Debtors are parties to numerous leases and executory contracts with various parties.

50

### a. *Generally*

Except as otherwise provided in <u>Article VIII</u> of the Plan, pursuant to sections 365 and 1123(b) of the Bankruptcy Code, all prepetition executory contracts and unexpired leases that exist between the Debtors and any Person shall be deemed rejected by the Debtors effective as of the Effective Date, subject to the occurrence of the Effective Date, except for the executory contracts and unexpired leases which: (i) have been assumed, assumed and assigned, or rejected, as applicable pursuant to an order of the Court entered prior to the Effective Date; or (ii) as of the Effective Date, are subject to a pending motion for approval of the assumption, assumption and assignment, or rejection, as applicable; or (iii) are otherwise being assumed or assumed and assigned as set forth in <u>Plan Schedule 8.2(a)</u>, in the case of unexpired non-residential real property leases, which shall be filed and served on or before April 1, 2005, or <u>Plan Schedule 8.2(b)</u>, in the case of executory contracts and unexpired leases (other than non-residential real property leases), which shall be filed on or before the Plan Supplement Filing Date;  or  (iv) expired prior to the Effective Date and/or are no longer executory on the Effective Date by their own terms, including, but not limited to, those contracts and leases set forth in <u>Plan Schedule 8.3</u>, which shall be filed on or before the Plan Supplement Filing Date.  The listing of a document on <u>Plan Schedule 8.2(a)</u> or <u>Plan Schedule 8.2(b)</u> shall not constitute an admission by the Debtors that such document is an executory contract or an unexpired lease or that the Debtors have any liability under such contract or lease.  The listing of a document on <u>Plan Schedule 8.3</u> shall not constitute an admission by the Debtors that the Debtors have any liability under such contract or lease.  With regard to any proposed assignment of executory contracts or unexpired leases, the Debtors shall provide the non-Debtor party 14 days notice with the opportunity to object and be heard regarding such proposed assignment.

### b. *Approval of Assumption and Assignment or Rejection of Executory Contracts and Unexpired Leases.*

Subject to the Effective Date, entry of the Confirmation Order shall constitute, as of the Effective Date, the approval, pursuant to section 365 and 1123(b) of the Bankruptcy Code, of the assumption, assumption and assignment, or rejection, as applicable, of the executory contracts and unexpired leases assumed, assumed and assigned, or rejected pursuant to <u>Article VIII</u> of the Plan.

Each executory contract and unexpired lease that is assumed and relates to the use, ability to acquire or occupancy of real property, if any, shall include (a) all modifications, amendments, supplements, restatements, assignments, subleases or other agreements made directly or indirectly by agreement, instrument or other document that in any manner affect such executory contract or unexpired lease and (b) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements and any other interests in real estate or rights in rem related to such premises, unless any of the foregoing agreements has been rejected pursuant to a Final Order of the Bankruptcy Court or is otherwise rejected as a part of the Plan.

### c. *Expired Leases and Non-Executory Contracts*

The Debtors believe that the leases and contracts listed on <u>Plan Schedule 8.3</u> are expired leases and non-executory contracts.  Pursuant to the confirmation of the Plan, the Debtors shall be discharged from any and all future liability from the contracts and leases listed on <u>Plan Schedule 8.3</u>. If any lease or contract listed on <u>Plan Schedule 8.3</u> is deemed to be executory by a Final Order of the

Bankruptcy Court, the Debtors reserve their right to reject, assume, or assume and assign such unexpired lease or executory contract for 30 days after the entry of such Final Order.

> d.     *Cure of Defaults of Assumed Executory Contracts and Unexpired Leases*

Any monetary amounts by which each executory contract and unexpired lease to be assumed pursuant to the Plan is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code by Cure.  The Debtors shall file and serve the proposed cure amounts, which shall be included on Plan Schedule 8.2(a) and Plan Schedule 8.2(b).  Any party to an executory contract or unexpired lease that disagrees with the Debtors' proposed cure amount must file an objection to the cure amount no later than 15 days after the schedule disclosing such amount is filed.  If there is a dispute regarding (a) the nature or amount of any Cure, (b) the ability of any Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (c) any other matter pertaining to assumption, the matter shall be set for hearing in the Bankruptcy Court on the next available hearing date, or such other date as may be agreed upon, and Cure shall occur following the entry of a Final Order of the Bankruptcy Court resolving the dispute and approving the assumption or assumption and assignment, as the case may be; provided, however, that if there is a dispute as to the amount of Cure that cannot be resolved consensually among the parties, the Debtors shall have the right to reject the contract or lease for a period of five (5) days after entry of a final order establishing a Cure amount in excess 25% of that provided by the Debtors.  If the cure amount is not disputed, the Debtors shall pay the cure claim, if any, to the claimant within twenty (20) days of the Effective Date.  Disputed cure amounts that are resolved by agreement or Final Order shall be paid by the Debtors within twenty (20) days of such agreement or Final Order.  To the extent the Debtor who is party to the executory contract or unexpired lease is to be merged or liquidated as part of a Restructuring Transaction, the non-Debtor parties to such executory contract or unexpired lease shall, upon assumption as contemplated herein, be deemed to have consented to the assignment of such executory contract or unexpired lease to the Reorganized Debtor that is the surviving entity after such Restructuring Transaction.

> e.     *Rejection Damages Bar Date*

If the rejection by a Debtor, pursuant to the Plan or otherwise, of an executory contract or unexpired lease results in a Claim, then such Claim shall be forever barred and shall not be enforce-able against any Debtor or Reorganized Debtor or the properties of any of them unless a Proof of Claim is filed with the Debtors' Claims agent, Bankruptcy Services, LLC, and served upon counsel to the Debtors, and counsel to the Creditors' Committee, within thirty (30) days after service of the earlier of (a) notice of the Effective Date, or (b) other notice that the executory contract or unexpired lease has been rejected.

> f.     *Miscellaneous*

Notwithstanding any other provision of the Plan, the Debtors will retain the right to, at any time prior to the Effective Date, modify or supplement Plan Schedule 8.2(a), Plan Schedule 8.2(b), or Plan Schedule 8.3, including, without limitation, the right to add any executory contract or unexpired lease to, or delete any executory contract or unexpired lease from such Plan Schedules.  If the treatment of the executory contracts or unexpired leases is modified, the Debtors shall provide 14 days notice of such modification with the opportunity to object and be heard regarding such modification.

52

Listing an executory contract or unexpired lease on <u>Plan Schedule 8.2(a)</u>, <u>Plan Schedule 8.2(b)</u> will not constitute an admission by any of the Debtors or Reorganized Debtors that such contract or lease (including any related agreements that may exist) is an executory contract or unexpired lease or that the applicable Debtor or Reorganized Debtor has any liability thereunder. Listing any contract or lease on <u>Plan Schedule 8.3</u> will not constitute an admission by any of the Debtors or Reorganized Debtors that the applicable Debtor or Reorganized Debtor has any liability thereunder. Notice shall be provided only to those parties affected by the Debtors' modification of, or supplement to, <u>Plan Schedule 8.2(a)</u>, <u>Plan Schedule 8.2(b)</u> or <u>Plan Schedule 8.3</u>.

2.        *Exculpation and Limitation of Liability*

Except as otherwise specifically provided in the Plan, the Debtors, the Reorganized Debtors, the Creditors' Committee, the members of the Creditors' Committee in their representative capacity, any of such parties' respective present or former members, officers, directors, employees, advisors, representatives, Restructuring Professionals or agents, the DIP Agent, and DIP Lenders, the other Released Parties, and the Investor Agent and the Investors, any such parties' respective present or former members, officers, directors, employees, advisors, representatives, agents, and professionals, and their successors and assigns, shall not have or incur, and are hereby released from, any claim, obligation, Cause of Action or liability to one another or to any holder of any Claim or Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys or affiliates, or any of their successors or assigns, for any act or omission in connection with, or arising out of the Chapter 11 Cases, the pursuit of confirmation of the Plan, the consummation of the Plan, the administration of the Plan or the property to be distributed under the Plan except for their willful misconduct and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

Notwithstanding any other provision of the Plan, no Claim holder or Interest holder, or other party in interest, none of their respective agents, employees, representatives, financial advisors, attorneys or affiliates, and no successors or assigns of the foregoing, shall have any right of action against the Debtors, the Reorganized Debtors, the Creditors' Committee, the members of the Creditors' Committee in their representative capacity, the Restructuring Professionals, the DIP Lender, the DIP Agent, any other Released Party, the Investor Agent and the Investors, or any of such parties' respective present or former members, officers, directors, employees, advisors, representatives, agents and professionals or any of such parties' successors and assigns, for any act or omission in connection with, relating to or arising out of the Chapter 11 Cases, the pursuit of confirmation of the Plan, the consummation of the Plan, the administration of the Plan or the property to be distributed under the Plan except for their willful misconduct, provided that nothing in <u>Section 14.4</u> of the Plan shall apply to any Professional who is not a Restructuring Professional.

3.        *Indemnification Obligations*

In satisfaction and compromise of any obligations or rights of any of the Indemnitees' Indemnification Rights, (a) all Indemnification Rights except (i) all Indemnification Rights of an Indemnitee who is also a Released Party, and (ii) those based solely upon any act or omission arising out of or relating to any Indemnitee's service with, for or on behalf of a Debtor on or after the Petition Date (collectively, the "Continuing Indemnification Rights"), shall be released and discharged on and as of the Effective Date; provided that the Continuing Indemnification Rights shall remain in full force and effect on and after the Effective Date and shall not be modified, reduced, discharged or otherwise

53

affected in any way by the Chapter 11 Cases, (b) the Debtors or the Reorganized Debtors, as the case may be, covenant to purchase and maintain director and officer insurance providing coverage for those Indemnitees with Continuing Indemnification Rights for a period of two years after the Effective Date insuring such parties in respect of any claims, demands, suits, causes of action or proceedings against such Indemnitees based upon any act or omission related to such Indemnitee's service with, for or on behalf of the Debtors in at least the scope and amount as currently maintained by the Debtors (the "Insurance Coverage"), (c) the insurers are authorized to pay any professional fees and expenses incurred in connection with any action relating to any Continuing Indemnification Rights and (d) the Debtors or the Reorganized Debtors, as the case may be, hereby indemnify Indemnitees with Continuing Indemnification Rights and agree to pay for any deductible or retention amount that may be payable in connection with any claim covered by either under the foregoing Insurance Coverage or any prior similar policy.

4.      *Releases by Debtors and Debtors-in-Possession*

Pursuant to section 1123(b)(3) of the Bankruptcy Code, effective as of the Effective Date, each Debtor, in its individual capacity and as a Debtor in Possession, for and on behalf of its Estate, shall release and discharge all Released Parties for and from any and all claims or Causes of Action existing as of the Effective Date in any manner arising from, based on or relating to, in whole or in part, the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, or any act, omission, occurrence or event in any manner related to any such Claims, Interest, restructuring or the Chapter 11 Cases, except (i) Avoidance Actions except to the extent the Avoidance Actions that are initiated by the Confirmation Date, and (ii) the Former Officer Related Actions (which are being transferred to the Litigation Trust pursuant to the terms of the Plan), provided that, any recoveries relating to the Former Officer Related Actions shall be limited to the proceeds of any applicable director and officer liability insurance policy and any person against whom a Former Officer Related Action is brought shall retain all rights to defend against such action.

No provision of the Plan or of the Confirmation Order, including without limitation, any release or exculpation provision, shall modify, release or otherwise limit the liability of the Former Officer or any Person not specifically released hereunder, including without limitation, any Person that is a co-obligor or joint tortfeasor of a Released Party or that otherwise is liable under theories of vicarious or other derivative liability.

The Reorganized Debtors and any newly-formed entities that will be continuing the Debtors' businesses after the Effective Date shall be bound, to the same extent the Debtors are bound, by all of the releases set forth above.

5.      *Release by Holders of Claims and Interests*

**On the Effective Date(s) (a) each Person that votes to accept the Plan, and (b) to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, all holders of Claims, in consideration for the obligations of the Debtors and the Reorganized Debtors under the Plan and the Cash and other contracts, instruments, releases, agreements or documents to be delivered in connection with the Plan, each entity (other than a Debtor) that has held, holds or may hold a Claim (each, a "Release**

Obligor"), shall have conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged each Released Party from any claim or Cause of Action existing as of the Effective Date arising from, based on or relating to, in whole or in part, the subject matter of, or the transaction or event giving rise to, the Claim or Interest of such Release Obligor, and any act, omission, occurrence or event in any manner related to such subject matter, transaction or obligation; provided, however, that this Section 14.7 shall not release any Released Party from any claim or Cause of Action existing as of the Petition Date, based on (i) the Internal Revenue Code or other domestic state, city or municipal tax code, (ii) the environmental laws of the United States or any domestic state, city or municipality, (iii) any criminal laws of the United States or any domestic state, city or municipality, or (iv) the Litigation Trust Actions; and provided further, however, that Section 14.7 of the Plan shall not apply to Pubs Property, LLC, Suds Remainder, LLC and GE Capital Franchise Finance Corporation f/k/a FFCA Acquisition Corporation, such entities being the defendants in Adversary Proceeding No. 04-03583-SAF, or to any affiliate, successor or assign thereof that may be entitled to vote in connection with the Plan (collectively, the "Defendant Landlord Parties"), it being expressly understood that any of the Defendant Landlord Parties entitled to vote to accept or reject the Plan may do so without such vote constituting or being construed as a release of any entity pursuant to Section 14.7 of the Plan or otherwise.

      6.      *Injunction*

      The satisfaction, release and discharge pursuant to Article XIV of the Plan shall also act as an injunction against any Person commencing or continuing any action, employment of process, or act to collect, offset or recover any Claim or Cause of Action satisfied, released or discharged under the Plan to the fullest extent authorized or provided by the Bankruptcy Code, including, without limitation, to the extent provided for or authorized by sections 524 and 1141 thereof.

      K.      **Preservation of Causes of Action**

      Except as otherwise provided in the Plan, the Confirmation Order, or in any document, contract, instrument, release, indenture or other agreement entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain all Causes of Action. Subject to the provisions of Article XII of the Plan, pursuant to which the Litigation Trust Actions shall be transferred on the Effective Date to the Litigation Trust, each Reorganized Debtor or its successor(s) may pursue, enforce, settle, or compromise (or decline to do any of the foregoing) any or all of the Retained Actions as appropriate, including, without limitation, those Causes of Action listed on Plan Schedule 7.18 to the Plan, in accordance with the best interests of the Reorganized Debtor or its successor(s) who hold such rights.

      Except as is otherwise expressly provided herein or in the Confirmation Order, nothing in the Plan or the Confirmation Order shall preclude or estop the Reorganized Debtors or their privies, as successors in interest to the Debtors and their privies, from bringing a subsequent action in any court or adjudicative body of competent jurisdiction, to enforce any or all of its or their rights in connection with the Causes of Action, irrespective of the identity of any interest, cause of action, or nexus of fact, issues or events which is now or which could have been asserted in these Chapter 11 Cases, the present litigation, and those which may be asserted in any subsequent litigation brought by the Reorganized Debtors or their privies. Moreover, the failure to commence any Retained Action prior

to the Confirmation Date shall not constitute res judicata, judicial or collateral estoppel.

## VI. CERTAIN FACTORS TO BE CONSIDERED

The holder of a Claim against a Debtor should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or to reject the Plan.

### A.      General Considerations

The formulation of a reorganization plan is the principal purpose of a Chapter 11 case.  The Plan sets forth the means for satisfying the Claims against and Interests in each of the Debtors. Certain Classes of Claims will not be paid in full pursuant to the Plan, and Interests will not receive any distributions pursuant to the Plan.

### B.      Certain Bankruptcy Considerations

If the Plan is not confirmed and consummated, there can be no assurance that the Chapter 11 Cases will continue rather than be converted to a liquidation or that any alternative plan of reorganization would be on terms as favorable to the holders of Claims as the terms of the Plan.  If a liquidation or protracted reorganization were to occur, there is a substantial risk that the value of the Debtors' enterprise would be substantially eroded to the detriment of all stakeholders.  See Appendix C annexed hereto for a liquidation analysis of the Debtors.

### C.      Inherent Uncertainty of Financial Projections

The Projections set forth in Appendix D annexed hereto cover the operations of the Reorganized Debtors on a consolidated basis through fiscal year 2009.  These Projections are based on numerous assumptions including the timing, confirmation, and consummation of the Plan in accordance with its terms, the anticipated future performance of the Reorganized Debtors' restaurant concepts, general business and economic conditions, and other matters, many of which are beyond the control of the Reorganized Debtors and some or all of which may not materialize.  In addition, unanticipated events and circumstances occurring subsequent to the date that this Disclosure Statement is approved by the Bankruptcy Court may affect the actual financial results of the Debtors' operations. These variations may be material.  Because the actual results achieved throughout the periods covered by the Projections may vary from the projected results, the Projections should not be relied upon as a guaranty, representation, or other assurance that the actual results will occur.

Except with respect to the Projections and except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur subsequent to the date hereof and that may have a material impact on the information contained in this Disclosure Statement.  Neither the Debtors nor the Reorganized Debtors intend to update the Projections for the purposes hereof; thus, the Projections will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Projections.

D.      **Dividends or Other Distributions**

The Debtors do not anticipate that cash dividends or other distributions will be paid with respect to the New Common Stock in the foreseeable future.

E.      **Claims Estimations**

There can be no assurance that the estimated Claim amounts set forth herein are correct. The actual Allowed amount of Claims likely will differ in some respect from the estimates. The estimated amounts are subject to certain risks, uncertainties, and assumptions. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual Allowed amount of Claims may vary from those estimated herein.

F.      **Employees**

There can be no assurance that the Debtors will be able to retain their employees. If the Debtors are not able to retain their employees, the ability of the Debtors to maximize the value of the portfolio and meet the projections set forth in Appendix D will be negatively impacted.

G.      **Market for New Securities**

There may not be an active market for the New Common Stock or Warrants distributed pursuant to the Plan. No assurances can be given as to the prices at which the New Common Stock or Warrants will trade in the future, if they are traded at all.

H.      **Effect of Inflation**

Management believes that inflation has not had a material effect on earnings during the past several years. Future inflationary increases in the cost of labor, food and other operating costs could adversely affect the Company's restaurant operating margins. In the past, however, the Company generally has been able to modify its operations to offset increases in its operating costs.

The Company is subject to Federal and state laws governing matters such as minimum wage, overtime, and working conditions. Accordingly, increases in minimum wage or decreases in the allowable tip credit (which reduces the minimum wage that must be paid to tipped employees in certain states) increase the Company's labor costs. Although the Company has experienced slight increases in hourly labor costs in recent years, the effect of increases in minimum wage have been significantly diluted due to the fact that the majority of the Company's hourly employees are tipped and the Company's non-tipped employees have historically earned wages greater than federal and state minimums.

I.      **Forward-Looking Information**

Certain information contained herein, particularly information regarding the future economic performance and finances, restaurant development plans, capital requirements and objectives of management, is forward looking. In some cases, information regarding certain important factors that could cause actual results to differ materially from any such forward-looking statement appear together with such statement. In addition, the following factors, in addition to other possible factors

57

not listed, could affect the Company's actual results and cause such results to differ materially from those expressed in forward-looking statements. These factors include future compliance with debt covenants; intense competition within the casual dining restaurant industry; changes in economic conditions such as inflation or a recession; consumer perceptions of food safety; weather conditions; changes in consumer tastes; labor and benefit costs; legal claims; government monetary and fiscal policies; laws and regulations; and governmental initiatives such as minimum wage rates and taxes.

### J.   Competition

The casual dining restaurant industry is intensely competitive with respect to price, service, location, personnel, and type and quality of food. The Company competes with national, regional and local organizations primarily through the quality, variety and value perception of food products offered. The number and location of units, quality of service, attractiveness of facilities and effective-ness of advertising and marketing programs are also important factors.

### K.   Economic, Market and Other Conditions

The casual dining restaurant industry is affected by changes in national, regional and local economic conditions, consumer preferences and spending patterns, demographic trends, consumer perceptions of food safety, weather, traffic patterns and the type, number and location of competing restaurants. Factors such as inflation, food costs, labor and benefit costs, legal claims, and the availability of management and hourly employees also affect restaurant operations and administrative expenses. The ability of the Company to finance new restaurant development, improvements and additions to existing restaurants is affected by economic conditions, including interest rates and other government policies impacting land and construction costs and the cost and availability of borrowed funds.

### L.   Importance of Location

The success of the Company's restaurants is dependent in substantial part on location. There can be no assurance that current locations will continue to be attractive, as demographic patterns change. It is possible the neighborhood or economic conditions where restaurants are located could decline in the future, thus resulting in potentially reduced sales in those locations.

### M.   Government Regulation

The Company is subject to various federal, state and local laws affecting its business. The development and operation of restaurants depend to a significant extent on the selection and acquisi-tion of suitable sites, which are subject to zoning, land use, environmental, traffic and other regula-tions. Restaurant operations are also subject to licensing and regulation by state and local departments relating to health, sanitation and safety standards, alcoholic beverage control laws, federal and state labor laws (including applicable minimum wage requirements, overtime, working and safety condi-tions, and citizenship requirements), state "dram shop" statutes, and federal and state laws which prohibit discrimination and other laws regulating the design and operation of facilities, such as the Americans With Disabilities Act of 1990. Changes in these laws and regulations, particularly increases in applicable minimum wages, may adversely affect financial results. The Company cannot predict the effect on its operations of the future enactment of additional legislation.

### a. Alcoholic Beverage Regulation

Each restaurant is subject to licensing and regulation by a number of governmental authorities, which include alcoholic beverage control and health, safety and fire agencies in the state, county and municipality in which the restaurant is located. Alcoholic beverage control regulations require restaurants to apply to a state authority and, in certain locations, county or municipal authorities for a license or permit to sell alcoholic beverages on the premises and to provide service for extended hours and on Sundays. Some counties prohibit the sale of alcoholic beverages on Sundays. Typically, licenses or permits must be renewed annually and may be revoked or suspended for cause at any time. Alcoholic beverage control regulations relate to numerous aspects of a restaurant's operations, including minimum age of patrons and employees, hours of operation, advertising, wholesale purchasing, inventory control and handling, storage and dispensing of alcoholic beverages.

As is the case with all restaurants that serve alcohol, the Company may be subject in certain states to "dram-shop" statutes which generally provide a person injured by an intoxicated patron the right to recover damages from an establishment that wrongfully served alcoholic beverages to the intoxicated person. The Company carries liquor liability coverage as part of its existing comprehensive general liability insurance coverage.

### b. Brewpub Regulation

Hops is subject to additional regulations as a result of the on-premises microbrewery in each restaurant. Historically, the alcoholic beverage laws of most states prohibited the manufacture and retail sale of beer to consumers by a single person or entity or related persons or entities. At present, all 50 states allow for the limited manufacture and retail sale of microbrewer beer by restaurants and bars classified as "brewpubs" under state law. The Hops restaurants are required to comply with such state brewpub laws in order to obtain necessary state licenses and permits. Additionally, many states impose restrictions on the operations of brewpubs, such as a prohibition on the bottling of beer, a prohibition on the sale of beer for consumption off of restaurant premises, and a limitation on the volume of beer that may be brewed at any location, as well as certain geographic limitations. In addition, certain states limit the number of brewpubs that may be owned by any person or entity or a related group of entities. The Company's ability to own and operate Hops in-restaurant breweries in any state is and will continue to be dependent upon its ability to operate within the regulatory scheme of such states.

### N.    Quantitative and Qualitative Disclosures About Market Risk

The Company is exposed to market risk from changes in interest rates and changes in commodity prices. The Company's exposure to interest rate risk relates primarily to Libor-based rate obligations on the Company's revolving credit agreement.

The Company purchases certain commodities such as beef, chicken, flour and cooking oil. Purchases of these commodities are generally based on vendor agreements, which often contain contractual features that limit the price paid by establishing price floors or caps. As commodity price aberrations are generally short-term in nature and have not historically had a significant impact on operating performance, financial instruments are not used to hedge commodity price risk.

59

## VII.  APPLICABILITY OF FEDERAL AND OTHER SECURITIES LAWS

### A.      Offer and Sale of New Securities Pursuant to the Plan

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act and state laws if three principal requirements are satisfied:  (1) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan; (2) the recipients of the securities must hold a prepetition or administrative expense claim against the debtor or an interest in the debtor; and (3) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in such exchange and partly for cash or property.  The Debtors believe that the offer and sale of the New Common Stock and Warrants under the Plan satisfies the requirements of section 1145(a)(1) of the Bankruptcy Code and is, therefore, exempt from registration under the Securities Act and state securities laws.

### B.      Subsequent Transfers of Securities

Subject to the provisions of the Shareholders' Agreement and Reorganized Avado's Amended Charter and By-laws, and pursuant to section 1145(b) of the Bankruptcy Code, the New Common Stock and Warrants issued in exchange for the claims of Classes 3, 4, 5, and 6 is freely transferrable, unless the holder is an "underwriter" with respect to such securities.  Section 1145(b) of the Bankruptcy Code defines four types of "underwriters":

(1)      persons who purchase a claim against, an interest in, or a claim for an administrative expense against the debtor with a view to distributing any security received in exchange for such a claim or interest;

(2)      persons who offer to sell securities offered under a plan for the holders of such securities;

(3)      persons who offer to buy such securities for the holders of such securities, if the offer to buy is:  (A) with a view to distributing such securities; or (B) made under a distribution agreement; and

(4)      a person who is an "Issuer" with respect to the securities, as the term "Issuer" is defined in Section 2(11) of the Securities Act.

Under Section 2(11) of the Securities Act, an "Issuer" includes any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control of the issuer.

To the extent that Persons who receive New Common Stock and Warrants pursuant to the Plan are deemed to be "underwriters," resales by such persons would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  Persons

deemed to be underwriters would, however, be permitted to sell such Securities without registration pursuant to the provisions of Rule 144 under the Securities Act.  These rules permit the public sale of securities received by "underwriters" if current information regarding the issuer is publicly available and if volume limitations and certain other conditions are met.

Whether or not any particular person would be deemed to be an "underwriter" with respect to the New Common Stock and Warrants to be issued pursuant to the Plan would depend upon various facts and circumstances applicable to that Person.  Accordingly, the Debtors express no view as to whether any particular Person receiving New Common Stock and Warrants under the Plan would be an "underwriter" with respect to such securities.

Given the complex and subjective nature of the question of whether a particular holder may be an underwriter, the Debtors make no representation concerning the right of any Person to trade in the New Common Stock and Warrants.  The Debtors recommend that potential recipients of the New Common Stock and Warrants consult their own counsel concerning whether they may freely trade the New Common Stock and Warrants without compliance with the Securities Act or the Exchange Act.

## VIII.  CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

A summary description of certain material United States federal income tax consequences of the Plan is provided below.  This description is for informational purposes only and, due to a lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various tax consequences of the Plan as discussed herein.  Only the principal consequences of the Plan for holders of Claims who are entitled to vote to accept or reject the Plan are described below.  No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan.  No rulings or determinations of the Internal Revenue Service ("IRS") or any other tax authorities have been or will be sought or obtained with respect to any tax consequences of the Plan, and the discussion below is not binding upon the IRS or such other authorities.  No representations are being made regarding the particular tax consequences of the confirmation or implementation of the Plan as to any holder of a Claim.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein.

The discussion of United States federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "IRC"), the Treasury Regulations promulgated thereunder, judicial authorities, published positions of the IRS, and other applicable authorities, all as in effect on the date hereof and all of which are subject to change or differing interpretations (possibly with retroactive effect).

The following discussion does not address foreign, state or local tax consequences of the Plan, nor does it purport to address the United States federal income tax consequences of the Plan to special classes of taxpayers (e.g., banks and certain other financial institutions, insurance companies, tax-exempt organizations, holders of Claims who are (or who hold their Claims through) pass-through entities, persons whose functional currency is not the United States dollar, foreign persons, dealers in securities or foreign currency, persons who received their shares of Old Avado Common Stock pursuant to the exercise of an employee stock option or otherwise as compensation and persons holding Claims that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale or conversion transaction).  The following discussion assumes that holders

of Claims hold their Claims as capital assets for United States federal income tax purposes. Further-more, the following discussion does not address United States federal taxes other than income taxes. **Each holder of a Claim is strongly urged to consult its own tax advisor regarding the United States federal, state, local and any foreign tax consequences of the transactions described herein or in the Plan.**

### A.      Certain United States Federal Income Tax Consequences to the Debtors

#### 1.      *Cancellation of Indebtedness Income*

Under general United States federal income tax principles, each Debtor will realize cancellation of debt ("COD") income to the extent that its obligation to a Claim holder is discharged pursuant to the Plan for an amount less than the adjusted issue price (in most cases, the amount the Debtors received upon incurring the obligation, with certain adjustments) of such holder's Claim. For this purpose, the amount paid to a Claim holder in discharge of its Claim generally will equal the amount of Cash and the fair market value of any other property paid to such Claim holder.

Because the Debtors each will be debtors in a bankruptcy case at the time they realize COD income, they will not be required to include such COD income in their gross income, but rather will be required to reduce certain of their respective tax attributes by the amounts of COD income so excluded. Under the general rules of IRC section 108, the required attribute reduction will be applied to reduce the net operating losses ("NOLs") and NOL carryforwards, to the extent of such NOLs and carryforwards, general business credits, asset basis and certain other tax attributes of the Debtors. IRC section 108(b)(5) permits a corporation in bankruptcy proceedings to elect to apply the required attribute reduction to reduce first the basis of its depreciable property to the extent of such basis, with any excess applied next to reduce its NOLs and NOL carryforwards, and then certain other tax attributes.

Although not free from doubt, based on existing authorities, the Debtors believe and plan to take the position that any cancellation of intercompany debt will be treated as a contribution to capital.

#### 2.      *Utilization of Net Operating Losses and General Business Credits*

Under IRC section 382, whenever there is a more than fifty percent ownership change of a corporation during a three-year testing period, the ability of the corporation to utilize its NOL carryovers, general business credit carryovers and certain subsequently recognized built-in losses and deductions to offset future taxable income may be subject to an annual limitation. The issuance of the New Common Stock pursuant to the Plan will constitute an ownership change for purposes of IRC section 382.

Under IRC section 382(l)(6) and the Treasury Regulations promulgated thereunder, the amount of the annual limitation to which the Debtors would be subject should generally be equal to the product of (i) the lesser of the value of the equity of the Reorganized Debtors immediately after the ownership change or the value of the Debtors' consolidated gross assets immediately before such change (with certain adjustments) and (ii) the "long-term tax-exempt rate" in effect for the month of the Effective Date as published in the Internal Revenue Bulletin of the United States Treasury Department.

If the Debtors have a net unrealized built-in loss at the time of the ownership change, any recognized built-in loss generally during the five-year period following the ownership change is also subject to the annual limitation. Additionally, any amount which is allowable to a Debtor as a deduction during the five-year period but which is attributable to periods before the ownership change date will be treated as a recognized built-in loss for the taxable year for which it is allowable as a deduction. If the amount of the net unrealized built-in loss is not greater than the lesser of ten million dollars or fifteen percent of the fair market value of the Debtors' assets immediately before the ownership change date, then the net unrealized built-in loss of the Debtors is presumed to be zero. The Debtors have preliminarily determined that they will have a net unrealized built-in loss as of the Effective Date.

An exception to the annual limitation under IRC section 382 applies in the case of certain reorganizations under the Bankruptcy Code (the "section 382(1)(5) bankruptcy exception"). If the Debtors qualify for and do not elect out of the section 382(l)(5) bankruptcy exception, the Debtors will be subject to a different tax regime under which NOLs are not limited on an annual basis but are reduced by the amount of interest deductions claimed during the three taxable years preceding the date of the reorganization and during the part of the taxable year prior to and including the reorganization in respect of the debt converted into stock in the reorganization. In addition, the Debtors' utilization of general business credit carryovers would not be limited. If the section 382(1)(5) bankruptcy exception applies, net unrealized built-in loss of the Debtors at the time of the ownership change will not be subject to an annual limitation under IRC section 382, nor will any recognized built-in loss or any deduction attributable to such built-in loss be subject to such limitation. If the section 382(1)(5) bankruptcy exception applies, any further ownership change of the Debtors within the two-year period following the Effective Date will result in forfeiture of all of the Debtors' NOLs incurred, as well as general business credit carryovers existing, prior to the date of the second ownership change.

The section 382(l)(5) bankruptcy exception will generally only apply if the reorganization of the Debtors results in an exchange by qualifying creditors of their Claims for at least fifty percent of the Reorganized Debtors' stock (in vote and value). Stock transferred to a creditor will be taken into account for the purpose of the fifty percent test only to the extent that such stock is transferred in satisfaction of indebtedness and only if such indebtedness was held by the creditor for at least eighteen months before the Petition Date or arose in the ordinary course of the Debtors' trade or business and is held by the person who at all times held the beneficial interest in such indebtedness. The Debtors have not yet determined whether they qualify for the section 382(l)(5) bankruptcy exception or whether, if they qualify, they will elect out of the section 382(l)(5) bankruptcy exception.

3.      *Alternative Minimum Tax*

A corporation may incur alternative minimum tax liability even in the case that NOL carryovers and other tax attributes are sufficient to eliminate its taxable income as computed under the regular corporate income tax. It is possible that the Debtors may be liable for the alternative minimum tax.

**B.      Certain United States Federal Income Tax Consequences to Holders of Claims**

The United States federal income tax consequences of the transactions contemplated by the Plan to holders of Allowed Claims generally will be as follows. These consequences (including the character, timing and amount of income, gain or loss recognized) will depend upon, among other

things: (1) the manner in which a holder acquired a Claim; (2) the length of time the Claim has been held; (3) the holder's method of tax accounting; (4) whether the Claim holder has taken a bad debt or worthless stock deduction with respect to the Claim (or any portion of the Claim) in the current or prior years; (5) whether the Claim was acquired at a discount; (6) whether the Claim holder has previously included accrued but unpaid interest with respect to the Claim; (7) whether the Claim is an installment obligation for United States federal income tax purposes; (8) whether the Claim constitutes a "security" for United States federal income tax purposes; (9) what type of consideration was received in exchange for the Claim; and (10) whether the holder receives distributions under the Plan in more than one taxable year. **Therefore, holders of Claims should consult their own tax advisors for information that may be relevant to their particular situations and circumstances and the particular tax consequences to them of the transactions contemplated by the Plan.**

    *1.  Class 3 (Allowed General Unsecured Claims)*

    In connection with the Plan (and except as provided in Section 7.10 of the Plan), each holder of an Allowed General Unsecured Claim will realize gain or loss in an amount equal to the difference, if any, between (x) the sum of (i) the fair market value of the New Common Stock and (ii) the fair market value of the Litigation Trust Beneficial Interests, each received by such holder in exchange for its Claim (other than any property received in respect of accrued interest), and (y) the holder's adjusted tax basis in the Claim (other than any portion of the Claim attributable to accrued interest). Subject to the discussion below under the heading "—Allocation of Plan Distributions Between Principal and Interest," each holder of an Allowed General Unsecured Claim will recognize ordinary income to the extent it receives property in respect of accrued interest that has not already been included in income under the holder's method of tax accounting.

    *2.  Class 4 (Allowed Senior Noteholder Claims)*

    The Plan provides that the New Common Stock and Litigation Trust Beneficial Interests that otherwise would be distributable to holders of Allowed Subordinated Noteholder Claims and Allowed TECONS Securities Claims shall instead be redistributed by the Disbursing Agent to holders of Allowed Senior Noteholder Claims in accordance with the Subordinated Notes Subordination Rights and TECONS Subordination Rights. It is possible that the holders of Allowed Senior Noteholder Claims could be treated, for United States federal income tax purposes, as having transferred a portion of their Allowed Senior Noteholder Claims to (i) holders of Allowed Subordinated Noteholder Claims in exchange for Subordinated Notes Redistribution Shares and Subordinated Notes Redistribution Interests and (ii) holders of Allowed TECONS Securities Claims in exchange for TECONS Redistribution Shares and TECONS Redistribution Interests. Although the matter is not free from doubt, the Debtors believe and intend to take the position that, for United States federal income tax purposes, holders of Allowed Senior Noteholder Claims should be treated as having exchanged their Allowed Senior Noteholder Claims for all of the consideration they are entitled to receive pursuant to the Plan, *i.e.*, New Common Stock, Subordinated Notes Redistribution Shares and TECONS Redistribution Shares (collectively, the "Senior Noteholder Shares") and Litigation Trust Beneficial Interests, Subordinated Notes Redistribution Interests and TECONS Redistribution Interests (collectively, the "Senior Noteholder Litigation Trust Beneficial Interests"). The remainder of the discussion under this heading assumes such treatment.

The United States federal income tax treatment of the exchange of Allowed Senior Noteholder Claims for Senior Noteholder Shares and Senior Noteholder Litigation Trust Beneficial Interests pursuant to the Plan will depend upon, among other things, whether the Senior Noteholder Claims constitute "securities" for United States federal income tax purposes. The determination of whether a debt instrument constitutes a "security" is based upon an evaluation of the term and nature of the debt instrument. Generally, corporate debt instruments with maturities when issued of less than five years are not considered securities, and corporate debt instruments with maturities when issued of ten years or more are considered securities. The Debtors believe and intend to take the position that the receipt of Senior Noteholder Shares and Senior Noteholder Litigation Trust Beneficial Interests in respect of Allowed Senior Noteholder Claims pursuant to the Plan should generally be treated as a "reorganization" for United States federal income tax purposes. Accordingly, except as discussed below, a holder of an Allowed Senior Noteholder Claim who realizes gain on the exchange should be required to recognize the lesser of (i) the amount of such realized gain and (ii) the fair market value of the Senior Noteholder Litigation Trust Beneficial Interests. Holders of Allowed Senior Noteholder Claims who realize losses as a result of the implementation of the Plan would not be permitted to recognize those losses.

Assuming that the exchange constitutes a "reorganization" for United States federal income tax purposes, except as discussed below, the aggregate tax basis of a holder of an Allowed Senior Noteholder Claim in its Senior Noteholder Shares received pursuant to the Plan should be equal to (i) the holder's aggregate tax basis in its Allowed Senior Noteholder Claim immediately prior to the exchange, increased by (ii) the amount of gain, if any, recognized in the exchange and decreased by (iii) the fair market value of the Senior Noteholder Litigation Trust Beneficial Interests. The initial tax basis of a holder of an Allowed Senior Noteholder Claim in the Senior Noteholder Litigation Trust Beneficial Interests received pursuant to the Plan should equal the fair market value of such interests. Except as discussed below, the holder's holding period for its Senior Noteholder Shares received pursuant to the Plan should include the holding period for its Allowed Senior Noteholder Claim surrendered in exchange therefor, and the holder's holding period for its Senior Noteholder Litigation Trust Beneficial Interests should begin on the day following the day of receipt. Subject to the discussion below under the heading "—Allocation of Plan Distributions Between Principal and Interest," a holder should recognize ordinary income to the extent it receives Senior Noteholder Shares and Senior Noteholder Litigation Trust Beneficial Interests in respect of accrued interest or accrued market discount that has not already been included in income under the holder's method of accounting and the amount of such income should increase the holder's aggregate tax basis in its Senior Noteholder Shares and Senior Noteholder Litigation Trust Beneficial Interests. The holding period for the Senior Noteholder Shares and Senior Noteholder Litigation Trust Beneficial Interests received in respect of accrued but unpaid interest should begin on the day following the day of receipt.

If, contrary to the Debtors' intended position, the receipt of Senior Noteholder Shares and Senior Noteholder Litigation Trust Beneficial Interests in respect of Allowed Senior Noteholder Claims pursuant to the Plan were not treated as a reorganization, then such receipt would be treated as a taxable transaction for United States federal income tax purposes. As a result, a holder of an Allowed Senior Noteholder Claim would, except as described in the next sentence, generally recognize capital gain or loss for United States federal income tax purposes in an amount equal to the difference between (x) the sum of (i) the fair market value of the Senior Noteholder Shares and (ii) the fair market value of the Senior Noteholder Litigation Trust Beneficial Interests, each received in respect of its Allowed Senior Noteholder Claim, and (y) such holder's adjusted tax basis in its Allowed Senior Noteholder Claim. Subject to the discussion below under the heading "—Allocation

of Plan Distributions Between Principal and Interest," a holder should recognize ordinary income to the extent it receives Senior Noteholder Shares and Senior Noteholder Litigation Trust Beneficial Interests in respect of accrued interest or accrued market discount that has not already been included in income under the holder's method of tax accounting. A holder of an Allowed Senior Noteholder Claim recognizing a loss as a result of the Plan could be entitled to a bad debt deduction, either in the taxable year of the exchange or a prior taxable year. A holder's aggregate tax basis in the Senior Noteholder Shares and Senior Noteholder Litigation Trust Beneficial Interests received in exchange for its Allowed Senior Noteholder Claims would generally be equal to the aggregate fair market value of such shares and interests. Any gain or loss would be long-term gain or loss if the holder's holding period for its Allowed Senior Noteholder Claim is more than one year. The holder's holding period for Senior Noteholder Shares and Senior Noteholder Litigation Trust Beneficial Interests received pursuant to the Plan would begin on the day following the day of receipt.

Additionally, a creditor that receives stock in exchange for debt is required, to the extent that gain is recognized upon a subsequent disposition of such stock, to "recapture" as ordinary income any bad debt deductions taken by the creditor with respect to such debt and any ordinary loss claimed by the creditor upon the receipt of the stock in satisfaction of such debt, reduced by any amount included in income upon the receipt of the stock. A holder of Allowed Senior Noteholder Claims may therefore recognize ordinary income, depending on the deductions previously taken by such holder.

*3.     Class 5 (Allowed Subordinated Noteholder Claims)*

The Plan provides that holders of Allowed Subordinated Noteholder Claims will receive Class A Warrants (if and only if Classes 4 and 5 vote to accept the Plan), and that the New Common Stock and Litigation Trust Beneficial Interests that otherwise would be distributable to such holders shall instead be redistributed by the Disbursing Agent to holders of Allowed Senior Noteholder Claims in accordance with the Subordinated Notes Subordination Rights. It is possible that, for United States federal income tax purposes, holders of Allowed Subordinated Noteholder Claims could be treated as having (i) received the Subordinated Notes Redistribution Shares and the Subordinated Notes Redistribution Interests and (ii) transferred such shares and interests to the Disbursing Agent for redistribution to holders of Allowed Senior Noteholder Claims pursuant to the Subordinated Notes Subordination Rights. Although the matter is not free from doubt, the Debtors believe and intend to take the position that holders of Allowed Subordinated Noteholder Claims should be treated as receiving only Class A Warrants (if the voting conditions are met), and should not be treated as receiving Subordinated Notes Redistribution Shares or Subordinated Notes Redistribution Interests. The remainder of the discussion under this heading assumes such treatment.

The United States federal income tax treatment of the exchange of Allowed Subordinated Noteholder Claims for Class A Warrants pursuant to the Plan will depend upon, among other things, whether the Subordinated Noteholder Claims constitute "securities" for United States federal income tax purposes. The determination of whether a debt instrument constitutes a "security" is based upon an evaluation of the term and nature of the debt instrument. Generally, corporate debt instruments with maturities when issued of less than five years are not considered securities, and corporate debt instruments with maturities when issued of ten years or more are considered securities. While it is possible that the receipt of Class A Warrants could be treated as a fee received in exchange for voting to accept the Plan, the Debtors believe and intend to take the position that the receipt of Class A Warrants in exchange for Allowed Subordinated Noteholder Claims should generally be treated a "reorganization" for United States federal income tax purposes. Accordingly, except as discussed

66

below, a holder of an Allowed Subordinated Noteholder Claim should not recognize gain or loss for United States federal income tax purposes as a result of the implementation of the Plan. In addition, except as discussed below, such a holder's aggregate tax basis in any Class A Warrants received pursuant to the Plan should be equal to the aggregate tax basis in its Allowed Subordinated Noteholder Claim surrendered in exchange therefor. Except as discussed below, a holder's holding period for any Class A Warrants received pursuant to the Plan should include the holding period for its Allowed Senior Noteholder Claim surrendered in exchange therefor. Subject to the discussion below under the heading "—Allocation of Plan Distributions Between Principal and Interest," a holder should recognize ordinary income to the extent it receives any Class A Warrants in respect of accrued interest or accrued market discount that has not already been included in income under the holder's method of accounting and the amount of such income should increase the holder's aggregate tax basis in the Class A Warrants. The holding period for any Class A Warrants received in respect of accrued but unpaid interest should begin on the day following the day of receipt.

If, contrary to the Debtors' intended position, the receipt of Class A Warrants in respect of Allowed Subordinated Noteholder Claims pursuant to the Plan were not treated as a reorganization, then such receipt would be treated as a taxable transaction for United States federal income tax purposes. As a result, a holder of an Allowed Subordinated Noteholder Claim would, except as described in the next sentence, generally recognize capital gain or loss for United States federal income tax purposes in an amount equal to the difference between (i) the fair market value of the Class A Warrants received in respect of its Allowed Subordinated Noteholder Claim and (ii) such holder's adjusted tax basis in its Allowed Subordinated Noteholder Claim. Subject to the discussion below under the heading "—Allocation of Plan Distributions Between Principal and Interest," a holder should recognize ordinary income to the extent it receives any Class A Warrants in respect of accrued interest or accrued market discount that has not already been included in income under the holder's method of tax accounting. A holder of an Allowed Subordinated Noteholder Claim recognizing a loss as a result of the Plan could be entitled to a bad debt deduction, either in the taxable year of the exchange or a prior taxable year. A holder's tax basis in any Class A Warrants received in exchange for Allowed Subordinated Noteholder Claims would generally be equal to the fair market value of such warrants. Any gain or loss would be long-term gain or loss if the holder's holding period for its Allowed Subordinated Noteholder Claim is more than one year. The holding period for any Class A Warrants received pursuant to the Plan would begin on the day following the day of receipt.

### 4. Class 6 (Allowed TECONS Securities Claims)

The Plan provides that holders of Allowed TECONS Securities Claims will receive Class B Warrants (if and only if Classes 4, 5 and 6 vote to accept the Plan), and that the New Common Stock and Litigation Trust Beneficial Interests that otherwise would be distributable to such holders shall instead be redistributed by the Disbursing Agent to holders of Allowed Senior Noteholder Claims in accordance with the TECONS Subordination Rights. It is possible that, for United States federal income tax purposes, holders of Allowed TECONS Securities Claims could be treated as having (i) received the TECONS Shares and the TECONS Redistribution Interests and (ii) transferred such shares and interests to the Disbursing Agent for redistribution to holders of Allowed Senior Noteholder Claims pursuant to the TECONS Subordination Rights. Although the matter is not free from doubt, the Debtors believe and intend to take the position that holders of Allowed TECONS Securities Claims should be treated as receiving only Class B Warrants (if the voting conditions are met), and should not be treated as receiving TECONS Redistribution Shares or TECONS Redistribution Interests. The remainder of the discussion under this heading assumes such treatment.

67

The United States federal income tax treatment of the exchange of Allowed TECONS Securities Claims for Class B Warrants pursuant to the Plan will depend upon, among other things, whether the TECONS Securities Claims constitute "securities" for United States federal income tax purposes. The determination of whether a debt instrument constitutes a "security" is based upon an evaluation of the term and nature of the debt instrument. Generally, corporate debt instruments with maturities when issued of less than five years are not considered securities, and corporate debt instruments with maturities when issued of ten years or more are considered securities. While it is possible that the receipt of Class B Warrants could be treated as a fee received in exchange for voting to accept the Plan, the Debtors believe and intend to take the position that the receipt of Class B Warrants in exchange for Allowed TECONS Securities Claims should generally be treated as a "reorganization" for United States federal income tax purposes. Accordingly, except as discussed below, a holder of an Allowed TECONS Securities Claim should not recognize gain or loss for United States federal income tax purposes as a result of the implementation of the Plan. In addition, except as discussed below, such a holder's aggregate tax basis in any Class B Warrants received pursuant to the Plan should be equal to the aggregate tax basis in its Allowed TECONS Securities Claim surrendered in exchange therefor. Except as discussed below, a holder's holding period for any Class B Warrants received pursuant to the Plan should include the holding period for its Allowed TECONS Securities Claim surrendered in exchange therefor. Subject to the discussion below under the heading "—Allocation of Plan Distributions Between Principal and Interest," a holder should recognize ordinary income to the extent it receives any Class B Warrants in respect of accrued interest or accrued market discount that has not already been included in income under the holder's method of accounting and the amount of such income should increase the holder's aggregate tax basis in the Class B Warrants. The holding period for any Class B Warrants received in respect of accrued but unpaid interest should begin on the day following the day of receipt.

If, contrary to the Debtors' intended position, the receipt of any Class B Warrants in respect of Allowed TECONS Securities Claims pursuant to the Plan were not treated as a reorganization, then such receipt would be treated as a taxable transaction for United States federal income tax purposes. As a result, a holder of an Allowed TECONS Securities Claim would, except as described in the next sentence, generally recognize capital gain or loss for United States federal income tax purposes in an amount equal to the difference between (i) the fair market value of any Class B Warrants received in respect of its Allowed TECONS Securities Claim and (ii) such holder's adjusted tax basis in its Allowed TECONS Securities Claim. Subject to the discussion below under the heading "—Allocation of Plan Distributions Between Principal and Interest," a holder should recognize ordinary income to the extent it receives any Class B Warrants in respect of accrued interest or accrued market discount that has not already been included in income under the holder's method of tax accounting. A holder of an Allowed TECONS Securities Claim recognizing a loss as a result of the Plan could be entitled to a bad debt deduction, either in the taxable year of the exchange or a prior taxable year. A holder's tax basis in any Class B Warrants received in exchange for Allowed TECONS Securities Claims would generally be equal to the fair market value of such warrants. Any gain or loss would be long-term gain or loss if the holder's holding period for its Allowed TECONS Securities Claim is more than one year. The holding period for any Class B Warrants received pursuant to the Plan would begin on the day following the day of receipt.

5.     *Class 7 (Allowed Small Claims)*

The United States federal income tax treatment of the exchange of Allowed Small Claims for Cash pursuant to the Plan will be a taxable transaction for United States federal income tax purposes.

As a result, a holder of an Allowed Small Claim will, except as described in the next sentence, generally recognize capital gain or loss for federal income tax purposes in an amount equal to the difference between (i) the Cash received respect of its Allowed Small Claim and (ii) such holder's adjusted tax basis in its Allowed Small Claim. Any gain or loss will be long-term gain or loss if the holder's holding period for its Small Claim is more than one year. Subject to the discussion below under the heading "—Allocation of Plan Distributions Between Principal and Interest," a holder should recognize ordinary income to the extent it receives Cash in respect of accrued interest or accrued market discount that has not already been included in income under the holder's method of tax accounting. A holder of an Allowed Small Claim recognizing a loss as a result of the Plan could be entitled to a bad debt deduction, either in the taxable year of the exchange or a prior taxable year.

6.      *Market Discount*

The market discount provisions of the IRC may apply to holders of certain Allowed Claims. In general, a debt obligation (other than a debt obligation with a fixed maturity of one year or less) that is acquired by a holder in the secondary market (or, in certain circumstances, upon original issuance) is a "market discount bond" as to that holder if its stated redemption price at maturity (or, in the case of a debt obligation having original issue discount, its revised issue price) exceeds the tax basis of the debt obligation in the holder's hands immediately after its acquisition. However, a debt obligation will not be a market discount bond if such excess is less than a statutory *de minimis* amount. Gain recognized by a holder of an Allowed Claim with respect to a market discount bond generally will be treated as ordinary interest income to the extent of the market discount accrued on such bond during the holder's period of ownership, unless the holder elected to include the accrued market discount in taxable income currently. A holder of a market discount bond that is required under the market discount rules of the IRC to defer deduction of all or a portion of the interest on indebtedness incurred or maintained to acquire or carry the bond may be allowed to deduct such interest, in whole or in part, on the disposition of such bond. To the extent that a holder's Claim is exchanged in a "recapitalization" for United States federal income tax purposes, any accrued market discount not treated as ordinary income upon such exchange should carry over, on an allocable basis, to the consideration received by such holder in the exchange.

7.      *Allocations of Plan Distributions Between Principal and Interest*

The Plan provides that, to the extent that any Allowed Claim entitled to a distribution under the Plan is composed of indebtedness and accrued but unpaid interest on such indebtedness, such distribution will, to the extent permitted by applicable law, be allocated for United States federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest. The Debtors intend to take the position that any distributions made under the Plan with respect to an Allowed Claim will be allocated first to the principal amount of the Claim, with the excess over the principal amount being allocated to accrued but unpaid interest. However, current United States federal income tax law is unclear on this point and no assurance can be given that the IRS will not challenge the Debtors' position.

8.      *Receipt of Distributions on Subsequent Distribution Dates*

The Plan provides that the Reorganized Debtors will determine, in accordance with the Plan, whether to make Subsequent Distributions. In addition to the tax consequences to holders of Allowed

Claims described above, the timing and amount of income, gain or loss recognized as a consequence of any Subsequent Distributions will depend on, among other things, whether a holder of an Allowed Claim receives multiple distributions pursuant to the Plan and whether the Debtors' or Reorganized Debtors' obligation to make such distributions is treated as a new debt obligation for United States federal income tax purposes. It is possible that any loss, or a portion of any gain, realized by a holder of an Allowed Claim may have to be deferred until all of the distributions to such holder have been received.

A Subsequent Distribution to a holder with respect to its Allowed Claim may be treated as a payment under a contract for the sale or exchange of such Claim to which IRC section 483 applies. Under IRC section 483, a portion of the Subsequent Distribution made with respect to the Claim may be treated as interest ("Section 483 Interest") which would be ordinary income to the holder. The amount of Section 483 Interest will equal the excess of the amount of the Subsequent Distribution to which IRC section 483 applies over the present value of such Subsequent Distribution on the Effective Date, calculated using the applicable federal rate as the discount rate. Each holder of an Allowed Claim that receives a Subsequent Distribution must include any Section 483 Interest in income using such holder's regular method of accounting (such amount being taken into account when paid, in the case of a cash method holder, and when fixed, in the case of an accrual method holder). The portion of such Subsequent Distribution made pursuant to a holder's Allowed Claim that is not treated as Section 483 Interest will be treated as discussed above under the heading corresponding to such holder's Class of Claim.

In the event that the Claim holder's right to Subsequent Distributions is treated as a debt instrument for United States federal income tax purposes, the tax treatment would be as described above except that, instead of including interest income at the time of any Subsequent Distribution under IRC section 483, the holder would be required to include currently an amount in income as interest (based on the yield of "comparable" debt instruments) in advance of the receipt of such Subsequent Distribution, regardless of the holder's method of tax accounting.

C.      **United States Federal Income Tax Treatment of Disputed Claims Reserves and Supplemental Distribution Accounts**

Under the IRC, amounts earned by an escrow account, settlement fund or similar fund must be subject to current tax. Although certain Treasury Regulations have been issued, no Treasury Regulations have been promulgated to address the tax treatment of such funds in a bankruptcy context. Accordingly, the proper tax treatment of such funds is uncertain. Depending on the facts and the relevant law, such funds possibly could be treated as grantor trusts, separately taxable trusts or otherwise. The Debtors and Reorganized Debtors intend to treat the assets held in the Disputed Claims Reserves and Supplemental Distribution Accounts as held by a grantor trust with respect to which Reorganized Avado is the grantor and beneficiary. The Debtors anticipate that any income generated by such assets will be reported on the Debtors' or the Reorganized Debtors' United States federal income tax returns.

D.      **Transfer of Litigation Trust Assets to Litigation Trust**

On the Effective Date, the Debtors will transfer the Litigation Trust Assets to the Litigation Trust, for and on behalf of holders of Allowed Claims in Classes 3, 4, 5 and 6. In consideration

thereof, the Litigation Trust will assume the Debtors' obligations to make distributions to holders of Allowed Claims in such Classes in accordance with the Plan.

As discussed below, although the matter is not certain, the Debtors believe that the Litigation Trust will qualify as a liquidating trust, as defined in Treasury Regulation section 301.7701-4(d). Thus, the transfer of assets from the Debtors to the Litigation Trust will be treated for United States federal income tax purposes as if the Debtors transferred the Litigation Trust Assets to the respective Allowed Claimholders who then in turn transferred the Litigation Trust Assets to the Litigation Trust. The Debtors will be treated as having transferred the Litigation Trust Assets to the holders of Allowed Claims in Classes 3, 4, 5 and 6 in exchange for relief from an amount of debt equal to the fair market value of the Litigation Trust Assets. The Debtors will realize gain or loss on the difference between the fair market value of the Litigation Trust Assets and the Debtors' tax basis in such assets.

The Debtors have not assessed the amount of any federal, state or local tax liability that may be incurred in connection with the transfer of the Litigation Trust Assets to the Litigation Trust. Nonetheless, the Debtors' determination of gain or loss and the resulting tax liability, if any, may be subject to adjustment on audit by the IRS or other tax authorities. In addition, the fair market value of the Litigation Trust Assets transferred to the Litigation Trust may vary from current estimates and may be subject to challenge by the IRS or other tax authorities. Any federal, state or local tax liabilities incurred by the Debtors as a consequence of the transfer will be Administrative Claims in the Debtors' Chapter 11 Cases and will be required to be paid in full, and this may reduce the value of the distribution that Claimholders in Classes 3, 4, 5 and 6 would otherwise receive under the Plan.

## E.      Information Reporting and Backup Withholding

Certain payments, including the distributions or payments in respect of Claims pursuant to the Plan, are generally subject to information reporting by the payor (here, the relevant Debtor or Reorganized Debtor, the Disbursing Agent, the Prepetition Indenture Trustees or other servicer or agent) to the IRS. Moreover, such reportable payments are subject to backup withholding under certain circumstances. Under the IRC's backup withholding rules, a Claim holder may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless the holder (1) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (2) provides a correct United States taxpayer identification number and makes certain certifications under penalties of perjury, generally on an IRS Form W-9.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a Claim holder's United States federal income tax liability, and such Claim holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a United States federal income tax return). A holder of a Claim may be required to establish an exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

## F.      Importance of Obtaining Professional Tax Assistance

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CER-TAIN INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSE-

QUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE, AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSE-QUENCES OF THE PLAN.

## IX. CONFIRMATION

### A.      Feasibility of the Plan

In connection with confirmation of the Plan, the Bankruptcy Court will have to determine that the Plan is feasible pursuant to section 1129(a)(11) of the Bankruptcy Code, which means that the confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors. Because the Plan constitutes a separate Plan for each Debtor, the requirements of section 1129(a)(11) of the Bankruptcy Code must be satisfied separately for each Debtor.

To support the feasibility of the Plan, the Debtors have prepared the Projections, which are Pro Forma Financial Projections for Fiscal Years 2005 through 2009 (the "Projections"), as set forth in Appendix D annexed to this Disclosure Statement. The Projections indicate that the Debtors should have sufficient cash flow to pay and service their respective debt obligations, and to fund their operations as contemplated by the business plan. Accordingly, the Debtors believe that the Plan complies with the financial feasibility standard of section 1129(a)(11) of the Bankruptcy Code with respect to each Debtor. As noted in the Projections, however, the Debtors caution that no representa-tions can be made as to the accuracy of the Projections or as to a Reorganized Debtor's ability to achieve the projected results. Many of the assumptions upon which the Projections are based are subject to uncertainties outside of the control of the Debtors. Some assumptions inevitably will not materialize and events and circumstances occurring after the date on which the Projections were prepared may be different from those assumed or may be unanticipated, and may affect adversely the Reorganized Debtors' financial results. Therefore, the actual results may vary from the projected results and the variations may be material and adverse. See Article IX of this Disclosure Statement for a discussion of certain risk factors that may affect financial feasibility of the Plan with respect to the Debtors.

THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLI-ANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS OR THE RULES AND REGULATIONS OF THE SEC REGARDING PROJECTIONS. FURTHERMORE, THE PROJECTIONS HAVE NOT BEEN AUDITED BY THE DEBTORS' INDEPENDENT CERTIFIED PUBLIC ACCOUNTANTS. ALTHOUGH PRESENTED WITH NUMERICAL SPECIFICITY, THE PROJECTIONS ARE BASED UPON A VARIETY OF ASSUMPTIONS, SOME OF WHICH IN THE PAST HAVE NOT BEEN ACHIEVED AND WHICH MAY NOT BE REALIZED IN THE FUTURE, AND ARE

SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS. CONSEQUENTLY, THE PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTORS, OR ANY OTHER PERSON, THAT THE PROJECTIONS WILL BE REALIZED. ACTUAL RESULTS MAY VARY MATERIALLY FROM THOSE PRESENTED IN THE PROJECTIONS.

B.        **Acceptance of the Plan**

As a condition to Confirmation, the Bankruptcy Code requires that each Class of Impaired Claims vote to accept the Plan, except under certain circumstances.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (½) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the Plan. Thus, a Class will have voted to accept the Plan only if two-thirds (2/3) in amount and a majority in number actually voting cast their Ballots in favor of acceptance. Claim holders who fail to vote are not counted as either accepting or rejecting a plan.

C.        **Best Interests of Claim Holders**

Even if a plan is accepted by each class of Claim holders and Interest holders, the Bankruptcy Code requires a bankruptcy court to determine that the plan is in the best interests of all Claim holders and Interest holders that are impaired by the plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court to find either that all members of an impaired class of claims have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under Chapter 7 of the Bankruptcy Code. The best interests test does not apply to holders of Claims that are Unimpaired.

To calculate the probable distribution to members of each impaired class of Claim holders and Interest holders if the debtor were liquidated under Chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its Chapter 11 case was converted to a case under Chapter 7 of the Bankruptcy Code (the "Liquidation Value"). This Liquidation Value would consist primarily of the proceeds from a forced sale of the debtor's assets by a Chapter 7 trustee.

If a Chapter 7 liquidation were pursued for the Debtors, the amount of Liquidation Value available to unsecured creditors would be reduced, first, by the claims of secured creditors to the extent of the value of their collateral, and, second, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the Chapter 7 case and the Chapter 11 Cases. Costs of liquidation under Chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the Chapter 11 case (such as compensation of attorneys, financial advisors and accountants) that are allowed in the Chapter 7 case, litigation costs, and claims arising from the operations of the debtor during the pendency of the Chapter 11 case. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of

73

business.  Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity interests.

Once the bankruptcy court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation.  If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under the plan, then the plan is not in the best interests of creditors and equity security holders.  The Debtors believe that the members of each Class of Impaired Claims will receive more under the Plan than they would receive if the Debtors were liquidated under Chapter 7.

**D.      Liquidation Analysis**

*1.      The Debtors*

The Debtors believe that the Plan meets the "best interests of creditors" test of section 1129(a)(7) of the Bankruptcy Code with respect to the Avado Debtors.  The liquidation analysis for the Avado Debtors is annexed hereto as <u>Appendix C</u> to this Disclosure Statement.  As indicated in <u>Appendix C</u>, the estimated net liquidation value of the Avado Debtors is approximately $55,690,000.

After considering the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the Chapter 11 Cases, the Debtors have determined that a chapter 7 liquidation might result in a substantial diminution in the value to be realized by the holders of certain Claims and a delay in making distributions to all Classes of Claims entitled to a distribution.  Finally, the Debtors believe that holders of Class 8 Claims and Interests would not receive any distribution in a chapter 7 liquidation.  Therefore, the Debtors believe that the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

*2.      Liquidation Analysis Is Speculative*

The Debtors believe that any liquidation analysis with respect to the Debtors is inherently speculative.  The liquidation analyses for the Debtors necessarily contain estimates of the amount of Claims that will ultimately become Allowed Claims.  These estimates are based solely upon the Debtors' review of Claims filed and the Debtors' books and records to date.  No Order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the liquidation analyses.  In preparing the liquidation analyses, the Debtors have projected an amount of Allowed Claims that is at the lowest end of a range of reasonableness such that, for purposes of the liquidation analyses, the largest possible Chapter 7 liquidation dividend to holders of Allowed Claims can be assessed.  The estimate of the amount of Allowed Claims set forth in the liquidation analyses should not be relied on for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims under the Plan.

**E.      Valuation of the Reorganized Debtors**

*1.      Valuation*

74

In conjunction with formulating the Plan, the Company determined that it was necessary to estimate a post-confirmation going-concern enterprise value for the Reorganized Company. Accordingly, the Company directed MBY to prepare such a valuation.

2.      *Valuation Overview*

The estimates of enterprise value set forth herein represent an estimated reorganization enterprise value that was developed solely for the purpose of the Plan. The estimates of the reorganization value prepared by MBY assume that the Reorganized Debtors will continue as the owner and operator of their business and assets. Such estimates reflect the computations of the estimated enterprise value of the Reorganized Company through the application of various generally accepted valuation techniques and do not reflect or constitute appraisals of assets of the Company or the actual market value of the Company. Such estimates are inherently uncertain, and neither the Company, nor MBY, assumes any responsibility for the accuracy and completeness of such estimates.

MBY has assumed and relied upon the accuracy and completeness of all information provided to it by the Company and has not assumed any responsibility for independent verification of such information or for any independent valuation of appraisal of any assets of the Company. MBY has assumed, without independent investigation, the accuracy of all representations and statements made by management and employees of the Debtors. MBY has assumed that the financial projections were reasonably prepared on bases reflecting the best estimates and good faith judgment of the management of the Company as of the date of their preparation, and management has informed MBY of all circumstances occurring since such date that could make the financial projections incomplete or misleading. The valuation was delivered by MBY with the explicit understanding that it is based on standards of assessment, including economic, market, political, legal and other conditions, in existence as of the date hereof and that standards of assessment may change in the future. MBY disclaims any responsibility for any impact any such change may have on the assessment of the valuation of the Reorganized Company set forth herein.

In preparing its analysis, MBY, among other things, (i) reviewed certain unaudited financial statements of the Company for recent years and interim periods; (ii) reviewed certain internal financial and operating data prepared by the Company; (iii) discussed the current operations and prospects of the business with the management of the Company; (iv) considered the financial forecasts and reviewed the assumptions underlying the financial forecasts prepared by the management of the Company; (v) reviewed publicly available information regarding certain companies engaged in businesses deemed reasonably comparable to the Company; (vi) reviewed certain information regarding merger and acquisition transactions, to the extent publicly available, involving certain companies engaged in business deemed reasonably comparable to that of the Company; (vii) considered certain economic and industry information relevant to the business of the Company; (viii) reviewed various documents relating to the Plan; and (ix) reviewed such other information, performed such other analyses and took into account such other factors as MBY deemed relevant, necessary or appropriate.

3.      *Methodology*

MBY has employed generally accepted valuation techniques in estimating the reorganization value of Reorganized Avado. The two methodologies upon which MBY primarily relied are: comparable public company analysis and discounted cash flow analysis. These valuation techniques

75

reflect both the market's current view of the Debtors' business plan and operations, as well as longer term focus on the intrinsic value of the cash flow projections in the Debtors' business plan.

a.       *Comparable Public Company Analysis*

In a comparable public company analysis, a subject company is valued by comparing it with publicly held companies in reasonably similar lines of business. The comparable public companies are chosen based on, among other attributes, their similarity to the subject company's size, profitability, and market presence. The price that an investor is willing to pay in the public markets for each company's publicly traded securities represents that company's current and future prospects as well as the rate of return required on the investment.

In selecting comparable public companies, MBY considered factors such as the focus of the comparable companies' businesses as well as such companies' current and projected operating performance relative to that of the Debtors. The analytical work performed includes, among other things, a comparison of each company's income, balance sheet and cash flow statement. Numerous financial multiples and ratios were developed to measure each company's valuation and relative performance. Some of the specific analyses entailed comparing the enterprise value (defined as market value of equity plus market value of debt, book value of preferred stock and minority interest minus excess cash) for each of the comparable public companies to their revenue and EBITDA. These multiples were then applied to Avado to determine the range of enterprise value and equity value using this methodology.

b.       *Discounted Cash Flow ("DCF") Analysis*

The second common valuation methodology, which was used to determine the reorganization value of Reorganized Avado, was the discounted cash flow method. The discounted cash flow of an enterprise represents the present value of unleveraged, after tax cash flows available to all providers of capital using an appropriate set of discount rates. The DCF approach takes into account the projected operating cash flows of the subject company by using company projections as the basis for the financial model. The underlying concept of the DCF approach is that debt free, after tax cash flows are estimated for a projection period and a terminal value is estimated to determine the going concern value of the subject company from the end of the projection period forward. These cash flows are then discounted at an appropriate weighted average cost of capital that is determined by referring to, among other things, the average cost of debt and equity for the other participants throughout the industry.

4.       *Valuation of Reorganized Company*

MBY advised the Company that for purposes of the valuation expressed above, MBY assumed that (i) the proposed capitalization of the Company will be as set forth in the Plan; (ii) there will be no material change in current market, business and general economic conditions; and (iii) the Plan is confirmed without material changes. Based upon the analyses detailed above, the assumptions made, matters considered and limits of review also set forth above, MBY estimated the total reorganization value range of the Company to be between $90 million to $115 million with a midpoint of approximately $102.5 million as of April 30, 2005. As part of the Plan, the total reorganization value of the Company is assumed to be $96.37 million, as agreed to among the Debtors, the Creditors' Committee and the DIP Lenders. The $96.37 million valuation falls within the reorganization

76

valuation performed by MBY.

THE FOREGOING VALUATION IS BASED UPON A NUMBER OF ESTIMATES AND ASSUMPTIONS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE COMPANY AND MBY. AC-CORDINGLY, THERE CAN BE NO ASSURANCE THAT THE RANGES REFLECTED IN THE VALUATION WOULD BE REALIZED IF THE PLAN WERE TO BECOME EFFECTIVE, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE. ADDI-TIONALLY, THE POST REORGANIZATION VALUE ESTIMATED BY MBY DOES NOT NECESSARILY REFLECT, AND SHOULD NOT BE CONSTRUED AS REFLECTING, VALUES THAT WILL BE ATTAINED IN THE PUBLIC OR PRIVATE MARKETS. THE VALUE DESCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET TRADING VALUE. SUCH TRADING VALUE MAY BE MATERIALLY DIFFERENT FROM THE REORGANIZATION VALUE RANGES ASSOCIATED WITH MBY'S VALUATION ANALYSIS. INDEED, THERE CAN BE NO ASSURANCE THAT A TRADING MARKET WILL DEVELOP FOR THE NEW SECURITIES ISSUED PURSUANT TO THE PLAN OF REORGANIZATION.

> F.      **Application of the "Best Interests" of Creditors Test to the Liquidation Analysis and the Valuation**

It is impossible to determine with any specificity the value each Creditor will receive as a percentage of its Allowed Claim. This difficulty in estimating the value of recoveries is due to, among other things, the inherent uncertainty with respect to the lack of any public market for the New Common Stock. Such a valuation is made even more difficult because the analysis regarding the amount of General Unsecured Claims that ultimately will be Allowed is preliminary and subject to change.

Notwithstanding the difficulty in quantifying recoveries to holders of Allowed Claims with precision, the Debtors believe that the financial disclosures contained herein and the Projections imply a greater recovery to holders of Claims in each Impaired Class under the Plan than the recovery available in a Chapter 7 liquidation.

Set forth below are tables and discussions that compare, for each Impaired Class for which the Plan provides a distribution, the estimated recoveries under the Plan with estimated recoveries in a Chapter 7 liquidation (utilizing the mid-point of the ranges set forth in the Liquidation Analysis). Estimated Liquidation Analysis Recoveries set forth below are calculated at the mid-point of the ranges set forth in the Liquidation Analysis:

| Impaired Class | Estimated Recovery Under the Plan | Estimated Liquidation Analysis Recovery |
|---|---|---|
| Class 3 | 13.8%-15.0% | 0% |
| Class 4 | 20.4%-22.2% | 0% |

| Impaired Class | Estimated Recovery Under the Plan | Estimated Liquidation Analysis Recovery |
|---|---|---|
| Class 5 | Speculative | 0% |
| Class 6 | Speculative | 0% |
| Class 7 | 14.5% | 0% |
| Class 8 | 0% | 0% |

G.    **Confirmation Without Acceptance of All Impaired Classes:  The "Cramdown" Alternative**

In the event that a Class of Claims does not accept the Plan or is deemed to have rejected the Plan, the Debtors intend to seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code.  Specifically, section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if the plan is not accepted by all impaired classes, as long as at least one impaired class of Claims has accepted it.  The Bankruptcy Court may confirm the Plan at the request of the Debtors if the Plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has not accepted the Plan.  A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

A plan is fair and equitable as to a class of secured claims that rejects such plan if the plan provides: (1)(a) that the Claim holders included in the rejecting class retain the liens securing those claims whether the property subject to those liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and (b) that each holder of a claim of such class receives on account of that claim deferred cash payments totaling at least the allowed amount of that claim, of a value, as of the effective date of the plan, of at least the value of the holder's interest in the estate's interest in such property; (2) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of the liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on proceeds under clause (1) or (2) of this paragraph; or (3) for the realization by such holders of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims which rejects a plan if the plan provides: (1) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (2) that the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property at all.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides: (1) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greater of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (2) that the holder of

78

any interest that is junior to the interest of such class will not receive or retain under the plan on account of such junior interest any property at all.

At the Confirmation Hearing, the Debtors shall request confirmation pursuant to section 1129(b) of the Bankruptcy Code with respect to each class of Claims or Interests that does not or is deemed not to have accepted the Plan. See Section XI for a summary of those Claims deemed not to have accepted the Plan.

As described above, Holders of Claims and Interests in Class 8 will not receive or retain any property under the Plan on account of their Claims and Interests in such Class. Accordingly, under section 1126(g) of the Bankruptcy Code, such classes are presumed to have rejected the Plan. The Debtors (a) request confirmation of the Plan under section 1129(b) of the Bankruptcy Code notwith-standing the deemed rejection of the Plan by Class 8 and (b) reserve the right to seek confirmation of the Plan under 1129(b) of the Bankruptcy Code notwithstanding the rejection of the Plan by other Classes of Claims. The Debtors believe that the Plan may be confirmed pursuant to the above-described "cramdown" provisions, over the dissent of certain Classes of Claims and Interests, in view of the treatment proposed for such Classes. The Debtors believe that the treatment under the Plan of the Holders of Claims and Interests in Class 8 satisfies the "fair and equitable" test since, although no distribution will be made in respect of Claims and Interests in such Class and, as a result, such class will be deemed to have rejected the Plan, no class junior to such non-accepting Class will receive or retain any property under the Plan. In addition, the Debtors do not believe that the Plan unfairly discriminates against any dissenting Class because all dissenting Classes of equal rank are treated equally under the Plan.

**H.    Conditions to Confirmation and/or Consummation**

*1.    Conditions to Confirmation*

The following are conditions precedent to confirmation of the Plan that may be satisfied or waived in accordance with Section 13.3 of the Plan:

> *a.*    The Bankruptcy Court shall have approved by Final Order a Disclosure Statement with respect to the Plan in form and sub-stance reasonably acceptable to the Debtors.

> *b.*    The Confirmation Order shall be in form and substance reasonably acceptable to the Debtors.

*2.    Conditions to the Effective Date*

The following are conditions precedent to the occurrence of the Effective Date:

> *a.*    Reorganized Avado shall have entered into the New Tranche A Financing Facility, the New Tranche B Financing Facility, and the New Convertible Preferred Purchase Agreement, and all condi-tions precedent to the consummation thereof shall have been waived or satisfied in accordance with Section 13.3 of the Plan.

79

      *b.*      The Debtors or the Reorganized Debtors shall have Cash on hand sufficient to fund the Cash Reserve and make any other payments required to be paid under the Plan by the Debtors or the Reorganized Debtors on or as soon as practicable after the Effective Date.

      *c.*      The Confirmation Order shall be in form and substance acceptable to the Debtors and shall have been entered by the Bankruptcy Court and shall be a Final Order, and no request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending.

      *d.*      Any order necessary to satisfy any condition to the effectiveness of the Plan shall have become a Final Order and all documents provided for under the Plan shall have been executed and delivered by the parties thereto.

**I.**      **Waiver of Conditions to Confirmation and/or Consummation**

The conditions set forth in Sections 13.1 and 13.2 of the Plan may be waived, in whole or in part, by the Debtors with the consent of the Creditors' Committee, which consent shall not be unreasonably withheld, without a hearing. The failure to satisfy or waive any condition to the Confirmation Date or the Effective Date may be asserted by the Debtors in their reasonable discretion based on the circumstances giving rise to the failure of such condition to be satisfied. The failure of the Debtors to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

**J.**      **Retention of Jurisdiction**

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and the Plan, including, among other things, the following matters:

      *1.*      to hear and determine pending motions for the assumption or rejection of executory contracts or unexpired leases or the assumption and assignment, as the case may be, of executory contracts or unexpired leases to which any of the Debtors are a party or with respect to which any of the Debtors may be liable, and to hear and determine the allowance of Claims resulting therefrom including the amount of Cure, if any, required to be paid to such Claim holders;

      *2.*      to adjudicate any and all Causes of Action, adversary proceedings, applications and contested matters that have been or hereafter are commenced or maintained in or in connection with the Chapter 11 Cases or the Plan, including, without limitation, any adversary proceeding or contested matter, proceedings to adjudicate the allowance of Disputed Claims, and all controversies and issues arising from or relating to any of the foregoing;

3.      to ensure that distributions to Allowed Claim holders are accomplished as provided herein;

4.      to hear and determine any and all objections to the allowance or estimation of Claims filed, both before and after the Confirmation Date, including any objections to the classification of any Claim or Interest, and to allow or disallow any Claim, in whole or in part;

5.      to enter and implement such orders as may be appropriate if the Confirmation Order is for any reason stayed, revoked, modified and/or vacated;

6.      to issue orders in aid of execution, implementation or consummation of the Plan;

7.      to consider any modifications of the Plan with respect to any Debtor, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

8.      to hear and determine all matters involving claims or Causes of Action involving any of the Debtors or their property;

9.      to hear and determine all applications for allowance of compensation and reimbursement of Professional Fee Claims under the Plan or under sections 330, 331, 503(b), 1103 and 1129(a)(4) of the Bankruptcy Code;

10.     to hear and determine all motions or objections regarding compensation and reimbursement of expenses made by any professionals, including, without limitation, the ability of the Bankruptcy Court to enter an order to show cause and commence a hearing to examine any issue concerning the fees and expenses of any professionals;

11.     to determine requests for the payment of Claims entitled to priority under section 507(a)(1) of the Bankruptcy Code, including compensation of and reimbursement of expenses of parties entitled thereto;

12.     to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

13.     to hear and determine all suits or adversary proceedings to recover assets of any of the Debtors and property of their Estates, wherever located;

14.     to hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

15.     to hear any other matter not inconsistent with the Bankruptcy Code;

81

*16.*     to hear and determine all disputes involving the existence, nature or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

*17.*     to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Litigation Trust;

*18.*     to hear and determine disputes arising in connection with the New Convertible Preferred Purchase Agreement;

*19.*     to enter a final decree closing the Chapter 11 Cases; and

*20.*     to enforce all orders previously entered by the Bankruptcy Court.

Notwithstanding anything contained herein to the contrary, the Bankruptcy Court retains exclusive jurisdiction to hear and determine disputes concerning (i) Claims or (ii) Causes of Action and any motions to compromise or settle such disputes. Despite the foregoing, if the Bankruptcy Court is determined not to have jurisdiction with respect to the foregoing, or if the Reorganized Debtors choose to pursue any Claim or Cause of Action (as applicable) in another court of competent jurisdiction, the Reorganized Debtors will have authority to bring such action in any other court of competent jurisdiction.

## X. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors believe that the Plan affords holders of Claims the potential for the greatest realization on the Debtors' assets and, therefore, is in the best interests of such holders.

If the Plan is not confirmed, however, the theoretical alternatives include (a) continuation of the pending Chapter 11 Cases, (b) an alternative plan or plans of reorganization, or (c) liquidation of the Debtors under Chapter 7 or Chapter 11 of the Bankruptcy Code.

### A.     Continuation of the Chapter 11 Cases

If the Debtors remain in Chapter 11, the Debtors could continue to operate their businesses and manage their properties as Debtors in Possession, but they would remain subject to the restrictions imposed by the Bankruptcy Code. It is not clear whether the Debtors could retain employees and implement their strategy in protracted Chapter 11 cases. Ultimately, the Debtors (or other parties in interest) could propose another plan or liquidate under Chapter 7.

B.      **Alternative Plans of Reorganization**

If the Plan is not confirmed, the Debtors, or, if the Bankruptcy Court did not grant further extensions of the Debtors' exclusive period in which to solicit a reorganization plan, any other party in interest in the Chapter 11 Cases, could propose a different plan or plans. Such plans might involve either a reorganization and continuation of the Debtors' businesses, an orderly liquidation of their assets, or a combination of both. The Debtors believe that the Plan provides the best return for all stakeholders.

C.      **Liquidation under Chapter 7 or Chapter 11**

If no plan is confirmed, the Debtors' Chapter 11 Cases may be converted to cases under Chapter 7 of the Bankruptcy Code. In a Chapter 7 case, a trustee or trustees would be appointed to liquidate the assets of the Debtors. It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective holders of Claims and Interests.

The Debtors believe that in liquidation under Chapter 7, before creditors receive any distribution, additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants and other professionals to assist such trustees would cause a substantial diminution in the value of the estates. The assets available for distribution to creditors would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, which would arise by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of the Debtors' operations and the failure to realize the greater going concern value of the Debtors' assets.

The Debtors also may be liquidated pursuant to the provisions of a Chapter 11 plan. In a liquidation under Chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under Chapter 7. Thus, a Chapter 11 liquidation might result in larger recoveries than in a Chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs. Because a trustee is not required in a Chapter 11 case, expenses for professional fees could be lower than in a Chapter 7 case, in which a trustee must be appointed. Any distribution to the Claim holders of the Debtors under a Chapter 11 liquidation plan likely would be delayed substantially.

The liquidation analysis for the Debtors, prepared with the assistance of the Debtors' financial advisors, is premised upon a liquidation in a Chapter 7 case and is annexed as Appendix C to this Disclosure Statement. In the liquidation analyses, the Debtors have taken into account the nature, status and underlying value of their assets, the ultimate realizable value of their assets, and the extent to which such assets are subject to liens and security interests.

The likely form of any liquidation would be the sale of individual assets. Based on this analysis, it is likely that a liquidation of the Debtors' assets would produce less value for distribution to creditors than that recoverable in each instance under the Plan. In the opinion of the Debtors, the recoveries projected to be available in liquidation of the Debtors are not likely to afford holders of Claims as great a realization potential as does the Plan.

## XI. VOTING REQUIREMENTS

On March 2, 2005, the Bankruptcy Court entered an Order approving, among other things, this Disclosure Statement, setting voting procedures and scheduling the hearing on confirmation of the Plan (the "Solicitation Order"). A copy of the Notice of Confirmation Hearing is enclosed with this Disclosure Statement. The Notice of the Confirmation Hearing sets forth in detail, among other things, the voting deadlines and objection deadlines. The Notice of Confirmation Hearing and the instructions attached to the Ballot should be read in connection with this section of this Disclosure Statement.

If you are the holder of a Claim entitled to vote on the Plan, and you have any questions about (a) the procedure for voting your Claim, (b) the packet of materials that you have received or (c) the amount of your Claim, or if you wish to obtain, at your own expense, unless otherwise specifically required by Federal Rule of Bankruptcy Procedure 3017(d), an additional copy of the Plan, this Disclosure Statement or any appendices or exhibits to such documents, please contact BSI, LLC at the following address:

> Bankruptcy Services, LLC
> Attn: Dave Malo
> 757 3rd Avenue, 3rd Floor
> New York, NY 10017

The Bankruptcy Court may confirm the Plan only if it determines that the Plan complies with the technical requirements of Chapter 11 of the Bankruptcy Code and that the disclosures by the Debtors concerning the Plan have been adequate and have included information concerning all payments made or promised by the Debtors in connection with the Plan and the Chapter 11 Cases. In addition, the Bankruptcy Court must determine that the Plan has been proposed in good faith and not by any means forbidden by law, and under Bankruptcy Rule 3020(b)(2), it may do so without receiving evidence if no objection is timely filed.

In particular, the Bankruptcy Code requires the Bankruptcy Court to find, among other things, that (a) the Plan has been accepted by the requisite votes of all Classes of Impaired Claims and Interests unless approval will be sought under section 1129(b) of the Bankruptcy Code in spite of the dissent of one or more such Classes, (b) the Plan is "feasible," which means that there is a reasonable probability that the Debtors will be able to perform their obligations under the Plan and continue to operate their businesses without further financial reorganization or liquidation, and (c) the Plan is in the "best interests" of all Claim holders, which means that such holders will receive at least as much under the Plan as they would receive in a liquidation under Chapter 7 of the Bankruptcy Code. The Bankruptcy Court must find that all conditions mentioned above are met before it can confirm the Plan. Thus, even if all the Classes of Impaired Claims against the Debtors accept the Plan by the requisite votes, the Bankruptcy Court must make an independent finding that the Plan conforms to the requirements of the Bankruptcy Code, that the Plan is feasible, and that the Plan is in the best interests of the holders of Claims against the Debtors. These statutory conditions to confirmation are discussed above.

UNLESS THE BALLOT OR MASTER BALLOT BEING FURNISHED IS TIMELY SUBMITTED TO THE APPLICABLE VOTING AGENT ON OR PRIOR TO THE VOTING DEADLINE TOGETHER WITH ANY OTHER DOCUMENTS REQUIRED BY SUCH BALLOT,

THE PROCEDURES ORDER PROVIDES FOR THE REJECTION OF SUCH BALLOT AS INVALID AND, THEREFORE, SUCH BALLOT SHALL NOT BE COUNTED AS AN ACCEPTANCE OR REJECTION OF THE PLAN.  IN NO CASE SHOULD A BALLOT BE DELIVERED TO THE DEBTORS OR ANY OF THEIR ADVISORS.

### A.      Parties in Interest Entitled to Vote

Under section 1124 of the Bankruptcy Code, a class of claims is deemed to be "impaired" under a plan unless (1) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof or (2) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, a holder of a claim or interest may vote to accept or to reject a plan if (1) the claim or interest is "allowed," which means generally that no party in interest has objected to such claim or interest, and (2) the claim or interest is impaired by the Plan.  If the holder of an impaired claim or interest will not receive any distribution under the plan in respect of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan.  If the claim or interest is not impaired, the Bankruptcy Code deems that the holder of such claim or interest has accepted the plan and the plan proponent need not solicit such holder's vote.

The holder of a Claim against the Debtors that is "impaired" under the Plan is entitled to vote to accept or reject the Plan if (1) the Plan provides a distribution in respect of such Claim, and (2)(a) the Claim has been scheduled by the Debtors (and such claim is not scheduled as disputed, contingent or unliquidated), or (b) it has filed a proof of claim on or before the bar date applicable to such holder, pursuant to sections 502(a) and 1126(a) of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 3003 and 3018.  Any Claim as to which an objection has been timely filed and has not been withdrawn or dismissed is not entitled to vote, unless the Bankruptcy Court, pursuant to Federal Rule of Bankruptcy Procedure 3018(a), upon application of the holder of the Claim with respect to which there has been an objection, temporarily allows the Claim in an amount that the Bankruptcy Court deems proper for the purpose of accepting or rejecting the Plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.  The Procedures Order also sets forth assumptions and procedures for tabulating Ballots that are not completed fully or correctly.

### B.      Classes Impaired Under the Plan

#### 1.      Voting Impaired Classes of Claims

The following Classes are Impaired under, and entitled to vote on, the Plan:

Class 3  (General Unsecured Claims)
Class 4  (Senior Noteholder Claims)
Class 5  (Subordinated Noteholder Claims)
Class 6  (TECONS Securities Claims)

Class 7  (Small Claims)

     *2.*     *Non-Voting Impaired Classes of Claims and Interests*

The Class listed below is not entitled to receive or retain any property under the Plan. Under section 1126(g) of the Bankruptcy Code, Interest holders in such Class are deemed to reject the Plan, and the votes of such Interest holders will not be solicited.

Class 8  (Old Avado Equity Interests and Subordinated Claims)

     *3.*     *Unimpaired Classes of Claims*

The Classes of Claims listed below are Unimpaired under the Plan and deemed under section 1126(f) of the Bankruptcy Code to have accepted the Plan. Their votes to accept or reject the Plan will not be solicited. Acceptances of the Plan are being solicited only from those who hold Claims in an Impaired Class whose members will receive a distribution under the Plan.

Class 1  (Secured Claims)
Class 2  (Non-Tax Priority Claims)

## XII.  CONCLUSION

This Disclosure Statement was approved by the Bankruptcy Court after notice and a hearing. The Bankruptcy Court has determined that this Disclosure Statement contains information adequate to permit Claim holders and Interest holders to make an informed judgment about the Plan. Such approval, however, does not mean that the Bankruptcy Court recommends either acceptance or rejection of the Plan.

     **A.**     **Hearing on and Objections to Confirmation**

     *1.*     *Confirmation Hearing*

The hearing on confirmation of the Plan has been scheduled for April 21, 2005 at 10:30 a.m. (Central Time). Such hearing may be adjourned from time to time by announcing such adjournment in open court, all without further notice to parties in interest, and the Plan may be modified by the Debtors pursuant to section 1127 of the Bankruptcy Code prior to, during, or as a result of that hearing, without further notice to parties in interest.

     *2.*     *Date Set for Filing Objections to Confirmation*

The time by which all objections to confirmation of the Plan must be filed with the Bankruptcy Court and received by the parties listed in the Confirmation Hearing Notice has been set for April 12, 2005 at 4:00 p.m. (Central Time). A copy of the Confirmation Hearing Notice has been provided with this Disclosure Statement.

**B.      Recommendation**

The Plan provides for an equitable and timely distribution to the Debtors' Creditors.  The Debtors believe that any alternative to confirmation of the Plan, such as liquidation or attempts by another party in interest to file a plan, could result in significant delays, litigation and costs.  More-over, the Debtors believe that creditors will receive greater and earlier recoveries under the Plan than those that would be achieved in liquidation.

**ACCORDINGLY, THE DEBTORS BELIEVE THAT THE CONFIRMATION AND CONSUMMATION OF THE PLAN IS PREFERABLE TO ALL OTHER ALTERNATIVES. FOR THESE REASONS, THE DEBTORS URGE YOU TO RETURN YOUR BALLOT ACCEPTING THE PLAN.**

Dated:   March 2, 2005                                   Respectfully Submitted,

                                                         AVADO BRANDS, INC.
                                                         (for itself and on behalf of the
                                                          Affiliate Debtors)

                                                         By:/s/ Michael A. Feder
                                                              Michael A. Feder
                                                              Chief Restructuring Officer of
                                                              Avado Brands, Inc.

**APPENDIX A**

**Joint Plan of Reorganization of Avado Brands, Inc. and its
Affiliated Debtors and Debtors in Possession**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>AVADO BRANDS, INC. et al.,<br><br>                    Debtors. | Chapter 11<br><br>Case No. 04-31555-SAF-11<br><br>Jointly Administered |

**JOINT PLAN OF REORGANIZATION OF AVADO BRANDS, INC.**
**AND ITS AFFILIATED DEBTORS AND DEBTORS IN POSSESSION**

George N. Panagakis
Illinois State Bar No. 06205271
Timothy P. Olson
Illinois State Bar No. 06237809
Nathan L. Stuart
Illinois State Bar No. 06276845
SKADDEN, ARPS, SLATE, MEAGHER &
  FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606-1285
(312) 407-0700
(312) 407-0411 (Fax)
avado@skadden.com

Deborah D. Williamson
Texas State Bar No. 21617500
Carol E. Jendrzey
Texas State Bar No. 10617420
Thomas Rice
Texas State Bar No. 24025613
COX SMITH MATTHEWS
  INCORPORATED
112 East Pecan Street, Suite 1800
San Antonio, Texas 78205-1521
(210) 554-5500
(210) 226-8395 (Fax)
avado@coxsmith.com

ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

Dated: March 2, 2005

TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 1

ARTICLE I

    DEFINED TERMS AND RULES OF INTERPRETATION . . . . . . . . . . . . . . . . . . . . . Plan - 3

A.   Definitions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 3
         1.1      *"Administrative Claim"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 3
         1.2      *"Administrative Claims Bar Date"* . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 3
         1.3      *"Affiliate Debtors"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 3
         1.4      *"Affiliate Interest"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 4
         1.5      *"Affiliates"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 4
         1.6      *"Allowed Claim"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 4
         1.7      *"Allowed Class... Claim"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 4
         1.8      *"Avado"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 4
         1.9      *"Avoidance Actions"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 4
         1.10    *"Ballot"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 4
         1.11    *"Bankruptcy Code"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 4
         1.12    *"Bankruptcy Court"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 4
         1.13    *"Bankruptcy Rules"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 5
         1.14    *"Bar Date"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 5
         1.15    *"Bar Date Order"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 5
         1.16    *"Business Day"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 5
         1.17    *"Cash"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 5
         1.18    *"Cash Reserve"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 5
         1.19    *"Causes of Action"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 5
         1.20    *"Chapter 11 Case"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 5
         1.21    *"Claim"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 5
         1.22    *"Claims Objection Deadline"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 5
         1.23    *"Class"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 5
         1.24    *"Class A Warrants"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 5
         1.25    *"Class B Warrants"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 6
         1.26    *"Collateral"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 6
         1.27    *"Confirmation Date"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 6
         1.28    *"Confirmation Hearing"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 6
         1.29    *"Confirmation Order"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 6
         1.30    *"Creditors' Committee"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 6
         1.31    *"Cure"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 6
         1.32    *"Debtors"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 6
         1.33    *"Deferred Compensation Plan"* . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 6
         1.35    *"DIP Credit Agreement"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 6
         1.36    *"DIP Facility"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 6
         1.37    *"DIP Facility Claim"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 7
         1.38    *"DIP Facility Order"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 7
         1.39    *"DIP Lenders"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 7
         1.40    *"Disallowed Claim"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 7

i

1.41     *"Disbursing Agent"* ........................................ Plan - 7
1.42     *"Disclosure Statement"* .................................... Plan - 7
1.43     *"Disclosure Statement Hearing"* ............................ Plan - 7
1.44     *"Disputed Claim"* ........................................ Plan - 7
1.45     *"Disputed Claims Reserves"* ............................... Plan - 7
1.46     *"Distribution Date"* ...................................... Plan - 7
1.47     *"Effective Date"* ........................................ Plan - 7
1.48     *"Employee Severance Claim"* ............................... Plan - 8
1.49     *"Estates"* .............................................. Plan - 8
1.50     *"Exchange Act"* .......................................... Plan - 8
1.51     *"Exhibit"* .............................................. Plan - 8
1.52     *"Existing Securities"* .................................... Plan - 8
1.53     *"Face Amount"* .......................................... Plan - 8
1.54     *"Final Order"* .......................................... Plan - 8
1.55     *"Former Officer"* ........................................ Plan - 8
1.56     *"Former Officer Actions"* ................................. Plan - 8
1.57     *"Former Officer Note"* .................................... Plan - 8
1.58     *"Former Officer Related Actions"* ......................... Plan - 8
1.59     *"General Unsecured Claim"* ................................ Plan - 8
1.60     *"Impaired"* ............................................. Plan - 8
1.61     *"Indemnification Rights"* ................................. Plan - 9
1.62     *"Indemnitee"* ........................................... Plan - 9
1.63     *"Initial Distribution"* ................................... Plan - 9
1.64     *"Intercompany Claim"* .................................... Plan - 9
1.65     *"Interest"* ............................................. Plan - 9
1.66     *"Investor(s)"* .......................................... Plan - 9
1.67     *"Investor Agent"* ........................................ Plan - 9
1.68     *"IRC"* ................................................. Plan - 9
1.69     *"IRS"* ................................................. Plan - 9
1.70     *"Limited Partnership Interests"* ........................... Plan - 9
1.71     *"Litigation Trust"* ...................................... Plan - 9
1.72     *"Litigation Trust Actions"* ............................... Plan - 9
*1.73*     *"Litigation Trust Advisory Board"* ......................... Plan - 9
1.74     *"Litigation Trust Agreement"* ............................. Plan - 10
1.75     *"Litigation Trust Assets"* ................................ Plan - 10
1.76     *"Litigation Trust Beneficial Interests"* ................... Plan - 10
1.77     *"Litigation Trust Recoveries"* ............................ Plan - 10
1.78     *"Litigation Trustee"* .................................... Plan - 10
1.79     *"Net Litigation Trust Recoveries"* ........................ Plan - 10
1.80     *"New Common Stock"* ...................................... Plan - 10
1.81     *"New Convertible Preferred Purchase Agreement"* ............ Plan - 10
1.82     *"New Convertible Preferred Stock"* ........................ Plan - 10
1.83     *"New Securities"* ........................................ Plan - 10
1.84     *"New Tranche A Financing Facility"* ....................... Plan - 10
1.85     *"New Tranche A Credit Agreement"* ......................... Plan - 11
1.86     *"New Tranche B Financing Facility"* ....................... Plan - 11

| 1.87 | *"New Tranche B Credit Agreement"* | Plan - 11 |
|------|-------------------------------------|-----------|
| 1.88 | *"Non-Tax Priority Claim"* | Plan - 11 |
| 1.89 | *"Old Avado Common Stock"* | Plan - 11 |
| 1.90 | *"Operating Partners"* | Plan - 11 |
| 1.91 | *"Person"* | Plan - 11 |
| 1.92 | *"Petition Date"* | Plan - 11 |
| 1.93 | *"Plan"* | Plan - 11 |
| 1.94 | *"Plan Schedules"* | Plan - 11 |
| 1.95 | *"Plan Supplement"* | Plan - 11 |
| 1.96 | *"Plan Supplement Filing Date"* | Plan - 12 |
| 1.97 | *"Prepetition Indenture Trustees"* | Plan - 12 |
| 1.98 | *"Prepetition Notes"* | Plan - 12 |
| 1.99 | *"Pro Rata"* | Plan - 12 |
| 1.100 | *"Procedure and Administration Regulations"* | Plan - 12 |
| 1.101 | *"Professional"* | Plan - 12 |
| 1.102 | *"Professional Fee Claim"* | Plan - 12 |
| 1.103 | *"Professional Fee Order"* | Plan - 12 |
| 1.104 | *"Record Date"* | Plan - 12 |
| 1.105 | *"Reinstated"* or *"Reinstatement"* | Plan - 12 |
| 1.106 | *"Released Party"* | Plan - 13 |
| 1.107 | *"Reorganized Avado"* | Plan - 13 |
| 1.108 | *"Reorganized Debtor"* or *"Reorganized Debtors"* | Plan - 13 |
| 1.109 | *"Restructuring Professionals"* | Plan - 13 |
| 1.110 | *"Restructuring Transaction"* | Plan - 13 |
| 1.111 | *"Retained Actions"* | Plan - 13 |
| 1.112 | *"Scheduled"* | Plan - 13 |
| 1.113 | *"Schedules"* | Plan - 13 |
| 1.114 | *"Secured Claim"* | Plan - 14 |
| 1.115 | *"Securities Act"* | Plan - 14 |
| 1.116 | *"Senior Noteholder Claim"* | Plan - 14 |
| 1.117 | *"Senior Notes"* | Plan - 14 |
| 1.118 | *"Senior Notes Indenture"* | Plan - 14 |
| 1.119 | *"Senior Notes Indenture Trustee"* | Plan - 14 |
| 1.120 | *"Small Claim"* | Plan - 14 |
| 1.121 | *"Shareholders' Agreement"* | Plan - 14 |
| 1.122 | *"Solicitation Order"* | Plan - 14 |
| 1.123 | *"Subordinated Claims"* | Plan - 14 |
| 1.124 | *"Subordinated Noteholder Claim"* | Plan - 14 |
| 1.125 | *"Subordinated Notes"* | Plan - 14 |
| 1.126 | *"Subordinated Notes Indenture"* | Plan - 14 |
| 1.127 | *"Subordinated Notes Indenture Trustee"* | Plan - 15 |
| 1.128 | *"Subordinated Notes Redistribution Interests"* | Plan - 15 |
| 1.129 | *"Subordinated Notes Redistribution Shares"* | Plan - 15 |
| 1.130 | *"Subordinated Notes Subordination Rights"* | Plan - 15 |
| 1.131 | *"Subsequent Distribution"* | Plan - 15 |
| 1.132 | *"Subsequent Distribution Date"* | Plan - 15 |

1.133 *"Supplemental Distribution Accounts"* . . . . . . . . . . . . . . . . . . . . . . . . Plan - 15
1.134 *"Tax Priority Claim"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 15
1.135 *"TECONS Indenture"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 15
1.136 *"TECONS Indenture Trustee"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 15
1.137 *"TECONS Redistribution Interests"* . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 16
1.138 *"TECONS Redistribution Shares"* . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 16
1.139 *"TECONS Securities"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 16
1.140 *"TECONS Securities Claim"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 16
1.141 *"TECONS Subordination Rights"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 16
1.142 *"TECONS Trust"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 16
1.143 *"Unimpaired Claim"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 16
1.144 *"Voting Deadline"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 16
1.145 *"Voting Record Date"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 16
1.146 *"Warrants"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 16
B. Rules of Interpretation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 16
C. Computation of Time . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 17
D. References to Monetary Figures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 17
E. Exhibits, Plan Schedules and Plan Supplement. . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 17

ARTICLE II

ADMINISTRATIVE EXPENSES AND TAX PRIORITY CLAIMS . . . . . . . . . . . . . . Plan - 17
2.1 Administrative Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 17
2.2 Tax Priority Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 17

ARTICLE III

CLASSIFICATION OF CLAIMS AND INTERESTS . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 18
3.1 Classification of Claims Against and Interests in the Debtors. . . . . . . . . Plan - 18

ARTICLE IV

IDENTIFICATION OF CLASSES OF CLAIMS AND
INTERESTS IMPAIRED AND NOT IMPAIRED BY THE PLAN . . . . . . . . . . . . . . Plan - 19
4.1 Unimpaired Classes of Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 19
4.2 Impaired Classes of Claims and Interests . . . . . . . . . . . . . . . . . . . . . . . . Plan - 19

ARTICLE V

PROVISIONS FOR TREATMENT OF CLAIMS AND INTERESTS . . . . . . . . . . . . Plan - 19
5.1 Provisions For Treatment Of Claims And Interests . . . . . . . . . . . . . . . . Plan - 19
5.2 Intercompany Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 22
5.3 Special Provision Regarding Unimpaired Claims . . . . . . . . . . . . . . . . . . Plan - 22

ARTICLE VI

ACCEPTANCE OR REJECTION OF THE PLAN . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 22
    6.1    Classes Entitled to Vote . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 22
    6.2    Acceptance by Impaired Classes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 22
    6.3    Presumed Acceptances by Unimpaired Classes . . . . . . . . . . . . . . . . . . . Plan - 22
    6.4    Classes Deemed to Reject Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 23
    6.5    Summary of Classes Voting on the Plan . . . . . . . . . . . . . . . . . . . . . . . Plan - 23
    6.6    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code . . . Plan - 23
    6.7    Confirmability and Severability of a Plan . . . . . . . . . . . . . . . . . . . . . . Plan - 23

ARTICLE VII

MEANS FOR IMPLEMENTATION OF THE PLAN . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 23
    7.1    Substantive Consolidation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 23
    7.2    Corporate Existence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 24
    7.3    Directors and Officers of the Reorganized Debtors. . . . . . . . . . . . . . . Plan - 25
    7.4    Effectuating Documents; Further Transactions. . . . . . . . . . . . . . . . . . . Plan - 26
    7.5    Corporate Action. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 26
    7.6    Revesting of Assets; Releases of Liens . . . . . . . . . . . . . . . . . . . . . . . . Plan - 26
    7.7    Post-Effective Date Financing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 26
    7.8    Sources of Cash for Plan Distributions. . . . . . . . . . . . . . . . . . . . . . . . Plan - 28
    7.9    Funding of Cash Reserve. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 28
    7.10    Employee Payments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 28
    7.11    Incentive Plan. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 29
    7.12    Employee Benefits and Retiree Benefits . . . . . . . . . . . . . . . . . . . . . . . Plan - 29
    7.13    Exclusivity Period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 29
    7.14    Exemption from Certain Transfer Taxes . . . . . . . . . . . . . . . . . . . . . . . Plan - 29
    7.15    Cancellation of Existing Securities. . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 30
    7.16    Issuance of New Securities and Related Documentation . . . . . . . . . . . Plan - 30
    7.17    Shareholders' Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 31
    7.18    Preservation of Causes of Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 31

ARTICLE VIII

TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES . . . . Plan - 32
    8.1    Generally. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 32
    8.2    Approval of Assumption and Assignment or
            Rejection of Executory Contracts and Unexpired Leases. . . . . . . . . . . Plan - 32
    8.3    Expired Leases and Non-Executory Contracts. . . . . . . . . . . . . . . . . . . Plan - 33
    8.4    Cure of Defaults of Assumed Executory Contracts
            and Unexpired Leases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 33
    8.5    Rejection Damages Bar Date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 33
    8.6    Miscellaneous. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 34

ARTICLE IX

PROVISIONS GOVERNING DISTRIBUTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Plan - 34
    9.1      Time of Distributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Plan - 34
    9.2      Interest on Claims  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Plan - 34
    9.3      Disbursing Agent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Plan - 34
    9.4      Subsequent Distributions.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Plan - 35
    9.5      Delivery of Distributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Plan - 35
    9.6      Record Date for Distributions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Plan - 36
    9.7      Surrender of Securities.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Plan - 36
    9.8      Services of Prepetition Indenture Trustees . . . . . . . . . . . . . . . . . . . . . . .  Plan - 37
    9.9      Allocation of Plan Distributions Between Principal and Interest . . . . . .  Plan - 37
    9.10    Withholding and Reporting Requirements . . . . . . . . . . . . . . . . . . . . . . .  Plan - 37
    9.11    Means of Cash Payment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Plan - 38
    9.12    Fractional Shares . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Plan - 38
    9.13    Setoffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Plan - 38
    9.14    De Minimis Distributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Plan - 38

ARTICLE X

PROCEDURES FOR RESOLVING DISPUTED,
CONTINGENT AND UNLIQUIDATED CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . .  Plan - 38
    10.1    Claims Administration Responsibility  . . . . . . . . . . . . . . . . . . . . . . . . . .  Plan - 38
    10.2    Objection Deadline; Prosecution of Objections . . . . . . . . . . . . . . . . . . .  Plan - 39
    10.3    No Distributions Pending Allowance . . . . . . . . . . . . . . . . . . . . . . . . . . .  Plan - 39
    10.4    Disputed Claims Reserves  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Plan - 39
    10.5    Distributions After Allowance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Plan - 39

ARTICLE XI

ALLOWANCE AND PAYMENT OF CERTAIN ADMINISTRATIVE CLAIMS . . . .  Plan - 40
    11.1    Professional Fee Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Plan - 40
    11.2    Administrative Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Plan - 41
    11.3    Administrative Claims Bar Date Notice. . . . . . . . . . . . . . . . . . . . . . . . .  Plan - 41

ARTICLE XII

LITIGATION TRUST . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Plan - 41
    12.1    Appointment of Litigation Trustee . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Plan - 41
    12.2    Funding of the Litigation Trust. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Plan - 41
    12.3    Transfer of Litigation Trust Assets to the Litigation Trust . . . . . . . . . . .  Plan - 42
    12.4    The Litigation Trust . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Plan - 42
    12.5    The Litigation Trust Advisory Board . . . . . . . . . . . . . . . . . . . . . . . . . . .  Plan - 43
    12.6    Distributions of Litigation Trust Assets . . . . . . . . . . . . . . . . . . . . . . . . .  Plan - 44

ARTICLE XIII

CONFIRMATION AND CONSUMMATION OF THE PLAN . . . . . . . . . . . . . . . . . . Plan - 44
    13.1    Conditions to Confirmation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 44
    13.2    Conditions to Effective Date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 45
    13.3    Waiver of Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 45

ARTICLE XIV

EFFECT OF THE PLAN ON CLAIMS AND INTERESTS . . . . . . . . . . . . . . . . . . . . Plan - 45
    14.1    Discharge of the Debtors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 45
    14.2    Compromises and Settlements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 46
    14.3    Satisfaction of Subordination Rights . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 46
    14.4    Exculpation and Limitation of Liability . . . . . . . . . . . . . . . . . . . . . . . Plan - 46
    14.5    Indemnification Obligations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 47
    14.6    Releases by Debtors and Debtors in Possession . . . . . . . . . . . . . . . . . Plan - 47
    14.7    Release by Holders of Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 48
    14.8    Injunction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 48

ARTICLE XV

RETENTION OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 48

ARTICLE XVI

MISCELLANEOUS PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 50
    16.1    Binding Effect . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 50
    16.2    Payment of Statutory Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 50
    16.3    Amendment or Modification of the Plan . . . . . . . . . . . . . . . . . . . . . . . Plan - 50
    16.4    Revocation, Withdrawal or Non-Consummation . . . . . . . . . . . . . . . . . Plan - 51
    16.5    Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 51
    16.6    Governing Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 52
    16.7    Tax Reporting and Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 52
    16.8    Committees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 52
    16.9    Term of Injunctions or Stays . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 52
    16.10   No Waiver or Estoppel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plan - 53

**Plan Schedules**

| | |
|---|---|
| Plan Schedule 7.3 | Board of Directors |
| Plan Schedule 7.10(a) | Deferred Compensation Employees |
| Plan Schedule 7.10(b) | Operating Partners |
| Plan Schedule 7.10(c) | Severed Employees |
| Plan Schedule 7.18 | Causes of Action |
| Plan Schedule 8.2(a) | Assumed Unexpired Non-Residential Real Property Leases |
| Plan Schedule 8.2(b) | Assumed Executory Contracts and Unexpired Leases (Other than Unexpired Non-Residential Real Property Leases) |
| Plan Schedule 8.3 | Executed Contracts |

## INTRODUCTION

Avado Brands, Inc. ("Avado") and 64 of its domestic Affiliates (as defined below; and together with Avado, the "Debtors"), debtors and debtors-in-possession in the above-captioned, jointly administered chapter 11 reorganization cases, hereby propose the following joint plan of reorganization for the resolution of the outstanding claims against and interests in the Debtors. Capitalized terms used herein shall have the meanings ascribed to such terms in Article I.

These reorganization cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of the Bankruptcy Court. As set forth herein, the Plan contemplates the substantive consolidation of the Debtors for voting and distribution purposes only; however, the Plan provides for the possible merger of certain Affiliate Debtors as described in Section 7.2 of the Plan. Each Debtor is a proponent of a Plan contained herein within the meaning of section 1129 of the Bankruptcy Code. The distributions to be made to claimants in each of such classes are set forth herein.

A complete list of the Debtors is set forth below. The list identifies each Debtor by its case number in these chapter 11 cases. The jurisdiction of incorporation of each Debtor also is designated.

### THE DEBTORS

- Avado Brands, Inc. (Georgia), 04-31555
- Avado Operating Corp. (Georgia), 04-31602
- Canyon Café Limited, Inc. (Georgia), 04-31603
- Canyon Café of Texas LP (Texas), 04-31556
- Canyon Café Operating Corp. (Georgia), 04-31604
- Canyon Café TX General, Inc. (Georgia), 04-31605
- Cypress Coast Construction Corporation (Florida), 04-31606
- Don Pablo's Holding Corp. (Delaware), 04-31607
- Don Pablo's Limited, Inc. (Ohio), 04-31608
- Don Pablo's of Texas, LP (Texas), 04-31554
- Don Pablo's Operating Corp. (Ohio), 04-31609
- Don Pablo's TX Liquor, Inc. (Texas), 04-31610
- Don Pablos of Baltimore County, Inc. (Maryland), 04-31611
- Don Pablos of Howard County, Inc. (Maryland), 04-31612
- Don Pablos of Prince George's County, Inc. (Florida), 04-31613
- HNEF Area Manager II, Ltd. (Florida), 04-31557
- Hops Grill & Bar, Inc. (Florida), 04-31614
- Hops Marketing, Inc. (Florida), 04-31615
- Hops of Altamonte Springs, Ltd. (Florida), 04-31558
- Hops of Atlanta, Ltd. (Florida), 04-31559
- Hops of Atlanta II, Ltd. (Florida), 04-31560
- Hops of Baltimore County, LLC (Florida), 04-31591
- Hops of Bowling Green, Ltd. (Florida), 04-31561
- Hops of Boynton Beach, Ltd. (Florida), 04-31562
- Hops of Bradenton, Ltd. (Florida), 04-31563
- Hops of Cherry Creek, Ltd. (Florida), 04-31564

- Hops of Colorado Springs, Ltd. (Florida), 04-31565
- Hops of Connecticut, Ltd. (Florida), 04-31566
- Hops of Coral Springs, Ltd. (Florida), 04-31567
- Hops of Florida Mall, Ltd. (Florida), 04-31568
- Hops of Greater Boston, Ltd. (Florida), 04-31594
- Hops of Greater Detroit, Ltd. (Florida), 04-31569
- Hops of Greater Orlando, Ltd. (Florida), 04-31595
- Hops of Greater Orlando II, Ltd. (Florida), 04-31570
- Hops of Idaho, Ltd. (Florida), 04-31571
- Hops of Indiana, Ltd. (Florida), 04-31572
- Hops of Kansas, Ltd. (Florida), 04-31596
- Hops of Lakeland, Ltd. (Florida), 04-31573
- Hops of Louisiana, Ltd. (Florida), 04-31574
- Hops of Massachusetts (Florida), 04-31575
- Hops of Matthews, Ltd. (Florida), 04-31576
- Hops of Minnesota, Ltd. (Florida), 04-31597
- Hops of Missouri, LLC (Florida), 04-31592
- Hops of Ohio, Ltd. (Florida), 04-31577
- Hops of Rhode Island, LLC (Florida), 04-31593
- Hops of South Carolina, Ltd. (Florida), 04-31578
- Hops of South Florida, Ltd. (Florida), 04-31598
- Hops of South Carolina II, Ltd. (Florida), 04-31579
- Hops of Southeast Florida, Ltd. (Florida), 04-31580
- Hops of Southwest Florida, Ltd. (Florida), 04-31581
- Hops of Southwest Florida, Inc. (Florida), 04-31617
- Hops of Stuart, Ltd. (Florida), 04-31582
- Hops of the Ohio Valley, Ltd. (Florida), 04-31599
- Hops of the Gold Coast, Ltd. (Florida), 04-31585
- Hops of the Carolinas II, Ltd. (Florida), 04-31584
- Hops of the Carolinas, Ltd. (Florida), 04-31583
- Hops of the Rockies, Ltd. (Florida), 04-31600
- Hops of the Rockies II, Ltd. (Florida), 04-31586
- Hops of the Ohio Valley, Inc. (Florida), 04-31616
- Hops of Virginia II, Ltd. (Florida), 04-31587
- Hops of Virginia, Ltd. (Florida), 04-31601
- SMAS, Inc. (Texas), 04-31618
- The Hops Northeast Florida Joint Venture No. I (Florida), 04-31588
- The Hops Northeast Florida Joint Venture No. II (Florida), 04-31589
- The Hops Northeast Florida Joint Venture No. III (Florida), 04-31590

Plan - 2

Under section 1125(b) of the Bankruptcy Code, a vote to accept or reject the Plan cannot be solicited from the holder of a Claim or Interest until such time as the Disclosure Statement has been approved by the Bankruptcy Court and distributed to claim and interest holders. In this case, the Disclosure Statement was approved by the Bankruptcy Court by order entered on March 2, 2005 and has been distributed simultaneously with this Plan to all parties whose votes are being solicited. The Disclosure Statement contains, among other things, a discussion of the Debtors' history, business, properties and operations, projections for their operations, risk factors, a summary and analysis of the Plan, and certain related matters including, among other things, the securities to be issued under the Plan.

**ALL HOLDERS OF CLAIMS AND INTERESTS ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.**

Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Fed. R. Bankr. P. 3019 and those restrictions on modifications set forth in Article XVI of this Plan, each of the Debtors expressly reserves its respective rights to alter, amend, modify, revoke or withdraw this Plan with respect to such Debtor, one or more times, prior to its substantial consummation.

## ARTICLE I

## DEFINED TERMS AND RULES OF INTERPRETATION

A.      Definitions.

For purposes of this Plan, except as otherwise provided or unless the context otherwise requires, all capitalized terms not otherwise defined shall have the meanings set forth below. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, will have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

        1.1      *"Administrative Claim"* means a Claim for payment of an administrative expense of a kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(1) of the Bankruptcy Code, including, but not limited to, (a) any actual and necessary costs and expenses, incurred after the Petition Date, of preserving the Estates and operating the business of the Debtors (including wages, salaries, or commissions for services rendered after the Petition Date), (b) Professional Fee Claims, (c) all fees and charges assessed against the Estates under chapter 123 of title 28, United States Code, and (d) DIP Facility Claim to the extent not already paid.

        1.2      *"Administrative Claims Bar Date"* means, except as modified by Section 11.1 of this Plan, the deadline for filing proofs of Administrative Claims which shall be forty-five (45) days after the date on which the Debtors mail written notice of the occurrence of the Effective Date as specified in Section 11.3 of this Plan.

        1.3      *"Affiliate Debtors"* means all the Debtors, other than Avado Brands, Inc.

**1.4** "*Affiliate Interest*" means the rights of Avado or an Affiliate Debtor who is a current or former holder or owner of any Interest of the Affiliate Debtors or any other equity securities of any of the Affiliate Debtors authorized and issued prior to the Confirmation Date.

**1.5** *"Affiliates"* has the meaning given such term by section 101(2) of the Bankruptcy Code.

**1.6** *"Allowed Claim"* means a Claim or any portion thereof:

(a) that has been allowed by a Final Order, or

(b) as to which a proof of claim has been timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, any Final Order of the Bankruptcy Court or other applicable bankruptcy law but only to the extent that such claim is identified in such proof of claim in a liquidated and noncontingent amount, and either (i) no objection to its allowance has been filed, or is intended to be filed, within the periods of limitation fixed by this Plan, the Bankruptcy Code or by any order of the Bankruptcy Court or (ii) any objection to its allowance has been settled or withdrawn, or has been denied by a Final Order, or

(c) as to which no proof of claim has been timely filed with the Bankruptcy Court and (i) the liquidated and noncontingent amount of which is Scheduled other than at zero, in an unknown amount, or as disputed and (ii) no objection to its allowance has been filed, or is intended to be filed by the Debtors or the Reorganized Debtors, within the periods of limitation fixed by this Plan, the Bankruptcy Code or by any order of the Bankruptcy Court, or

(d) that is expressly allowed in a liquidated amount in this Plan.

**1.7** *"Allowed Class... Claim"* means an Allowed Claim in the specified Class.

**1.8** *"Avado"* means Avado Brands, Inc., a Georgia company, debtor in possession in the above captioned Case No. 04-31555-SAF-11 pending in the Bankruptcy Court.

**1.9** *"Avoidance Actions"* means Causes of Action arising under sections 502, 510, 541, 542, 544, 545, 547 through 551 or 553 of the Bankruptcy Code, or under similar or related state or federal statutes and common law, including fraudulent transfer laws, whether or not litigation is commenced to prosecute such Causes of Action.

**1.10** *"Ballot"* means each of the ballot forms distributed with the Disclosure Statement to holders of Claims in Classes that are Impaired under the Plan and entitled to vote under Article VI hereof in connection with the solicitation of acceptances of the Plan.

**1.11** *"Bankruptcy Code"* means title 11, United States Code, as now in effect or hereafter amended.

**1.12** *"Bankruptcy Court"* means the United States Bankruptcy Court for the Northern District of Texas, Dallas Division or such other court as may have jurisdiction over the Chapter 11 Cases.

**1.13** *"Bankruptcy Rules"* means the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as now in effect or hereafter amended.

**1.14** *"Bar Date"* means the deadline for filing proofs of claim established by the Bankruptcy Court as May 17, 2004, pursuant to the Bar Date Order and any supplemental bar dates established by the Bankruptcy Court pursuant to the Bar Date Order or other Final Order.

**1.15** *"Bar Date Order"* means the order entered by the Bankruptcy Court on April 14, 2004, which established the Bar Date.

**1.16** *"Business Day"* means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

**1.17** *"Cash"* means legal tender of the United States of America.

**1.18** *"Cash Reserve"* means the cash reserved, as determined by the Debtors or the Reorganized Debtors to pay Administrative Claims, Tax Priority Claims, Secured Claims, Non-Tax Priority Claims and Small Claims.

**1.19** *"Causes of Action"* means any and all actions, causes of action, suits, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured and whether asserted or assertable directly or derivatively, in law, equity or otherwise, including Avoidance Actions unless otherwise waived by the Debtors or the Reorganized Debtors.

**1.20** *"Chapter 11 Case"* means (a) when used with reference to a particular Debtor, the chapter 11 case pending for that Debtor in the Bankruptcy Court and (b) when used with reference to all Debtors, the chapter 11 cases pending for the Debtors in the Bankruptcy Court.

**1.21** *"Claim"* means a claim against one of the Debtors, whether or not asserted, as defined in section 101(5) of the Bankruptcy Code.

**1.22** *"Claims Objection Deadline"* means as applicable (except for Administrative Claims) (a) the day that is the later of (i) the first Business Day that is one hundred eighty (180) days after the Effective Date, and (ii) as to proofs of claim filed after the Bar Date, the first Business Day that is one hundred eighty (180) days after a Final Order is entered deeming the late filed claim to be treated as timely filed, or (b) such later date as may be established by the Bankruptcy Court as may be requested by the Reorganized Debtors.

**1.23** *"Class"* means a category of holders of Claims or Interests as described in Articles II and III of the Plan.

**1.24** *"Class A Warrants"* means the warrants, to be authorized under Section 7.16 of the Plan as of the Effective Date, to acquire the number of shares of New Common Stock equal to 25% of the number of shares represented by the Subordinated Notes Redistribution Shares at an exercise price that equates to a 65% recovery value to holders of General Unsecured Claims.

1.25 **"Class B Warrants"** means the warrants, to be authorized under Section 7.16 of the Plan as of the Effective Date, to acquire the number of shares of New Common Stock equal to 25% of the number of shares represented by the TECONS Redistribution Shares at an exercise price that equates to a 70% recovery value to holders of General Unsecured Claims.

1.26 **"Collateral"** means any property or interest in property of the Estates that is subject to a valid and enforceable lien to secure a Claim.

1.27 **"Confirmation Date"** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

1.28 **"Confirmation Hearing"** means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

1.29 **"Confirmation Order"** means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

1.30 **"Creditors' Committee"** means the Official Committee of Unsecured Creditors appointed pursuant to section 1102(a) of the Bankruptcy Code in the Chapter 11 Cases.

1.31 **"Cure"** means the distribution within a reasonable period of time following the Effective Date of Cash, or such other property as may be agreed upon by the parties or ordered by the Bankruptcy Court, with respect to the assumption or assumption and assignment of an executory contract or unexpired lease, pursuant to section 365(b) of the Bankruptcy Code, in an amount equal to all unpaid monetary obligations, without interest, or such other amount as may be agreed upon by the parties under such executory contract or unexpired lease, to the extent such obligations are enforceable under the Bankruptcy Code and applicable bankruptcy law.

1.32 **"Debtors"** means, collectively, Avado and the Affiliate Debtors.

1.33 **"Deferred Compensation Plan"** means the Supplemental Deferred Compensation Plan maintained by Avado prior to the Petition Date.

1.34 **"DIP Agent"** means DDJ Capital Management, LLC, in its capacities as administrative agent and as collateral agent under the DIP Credit Agreement.

1.35 **"DIP Credit Agreement"** means the Post-Petition Credit Agreement, dated as of February 11, 2004 by and among Avado Brands, Inc., and its Subsidiaries as Borrowers, The Financial Institutions and Other Lenders Named Therein, as Lenders, and DDJ Capital Management, LLC as Administrative Agent and Collateral Agent, as amended.

1.36 **"DIP Facility"** means the $60 million debtor-in-possession secured financing facility provided to the Debtors by the DIP Lenders pursuant to the DIP Credit Agreement as authorized by the DIP Facility Order.

       **1.37**     ***"DIP Facility Claim"*** means all Claims of the DIP Agent and DIP Lenders arising under the DIP Facility or the DIP Facility Order.

       **1.38**     ***"DIP Facility Order"*** means the final order that was entered by the Bankruptcy Court on March 9, 2004, authorizing and approving the DIP Facility, the DIP Credit Agreement and related agreements thereto.

       **1.39**     ***"DIP Lenders"*** means those entities identified as "Lenders" in the DIP Credit Agreement and their successors and assigns.

       **1.40**     ***"Disallowed Claim"*** means a Claim, or any portion thereof, that (a) has been disallowed by a Final Order or pursuant to a settlement, or (b) (i) is Scheduled at zero or as contingent, disputed or unliquidated and (ii) as to which a Bar Date has been established but no proof of claim has been filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law.

       **1.41**     ***"Disbursing Agent"*** means the Reorganized Debtors or such other entity as may be designated by the Reorganized Debtors, including the Litigation Trustee and the Prepetition Indenture Trustees, to serve as a disbursing agent under Section 9.3 of this Plan.

       **1.42**     ***"Disclosure Statement"*** means the written disclosure statement (including all schedules thereto or referenced therein) that relates to this Plan, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, as such disclosure statement may be amended, modified or supplemented from time to time.

       **1.43**     ***"Disclosure Statement Hearing"*** means the hearing before the Bankruptcy Court held to consider the adequacy of the Disclosure Statement, as such hearing may be adjourned or continued from time to time.

       **1.44**     ***"Disputed Claim"*** means a Claim, or any portion thereof, that is neither an Allowed Claim nor a Disallowed Claim, and includes, without limitation, Claims that (a) have not been Scheduled by the Debtors or have been Scheduled at zero, or as contingent, unliquidated or disputed or (b) are the subject of a pending objection filed in the Bankruptcy Court and which objection has not been withdrawn or overruled by a Final Order of the Bankruptcy Court.

       **1.45**     ***"Disputed Claims Reserves"*** means, as applicable, one or more reserves of Cash, New Common Stock, Class A Warrants, Class B Warrants, or Litigation Trust Beneficial Interests for distribution to holders of Allowed Claims to be reserved pending allowance of Disputed Claims in accordance with Article X of the Plan.

       **1.46**     ***"Distribution Date"*** means the date, as determined by the Reorganized Debtors, upon which Initial Distributions are made to holders of Allowed Claims entitled to receive distributions under the Plan.

       **1.47**     ***"Effective Date"*** means the Business Day this Plan becomes effective as provided in Section 13.2 of this Plan.

**1.48** ***"Employee Severance Claim"*** means those claims of employees severed by the Debtors prepetition, as described in Section 7.10.

**1.49** ***"Estates"*** means the bankruptcy estates of the Debtors as created under section 541 of the Bankruptcy Code.

**1.50** ***"Exchange Act"*** means the Securities and Exchange Act of 1934, as amended.

**1.51** ***"Exhibit"*** means an exhibit annexed to either this Plan or as an appendix to the Disclosure Statement.

**1.52** ***"Existing Securities"*** means the Old Avado Common Stock, the Senior Notes, the Subordinated Notes, and the TECONS Securities, including any such securities that have been authorized but not issued; provided, however, that Existing Securities shall not include the Affiliate Interests.

**1.53** ***"Face Amount"*** means (a) when used in reference to a Disputed or Disallowed Claim, the full stated amount claimed by the Claim holder in any proof of claim timely filed with the Bankruptcy Court or otherwise deemed timely filed by any Final Order of the Bankruptcy Court or other applicable bankruptcy law, and (b) when used in reference to an Allowed Claim, the allowed amount of such Claim.

**1.54** ***"Final Order"*** means an order or judgment, the operation or effect of which has not been stayed, reversed or amended and as to which order or judgment (or any revision, modification or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending.

**1.55** ***"Former Officer"*** means Avado's former chief executive officer, Thomas E. DuPree, Jr.

**1.56** ***"Former Officer Actions"*** means any and all Causes of Action of Avado against the Former Officer other than Causes of Action against the Former Officer with respect to collecting on the Former Officer Note.

**1.57** ***"Former Officer Note"*** means that certain promissory note, dated March 6, 2002, between Tom E. DuPree, Jr., as borrower, and Avado Brands, Inc., as lender.

**1.58** ***"Former Officer Related Actions"*** means any potential Causes of Action of Avado against any person who was an officer or director of Avado on or after the Petition Date relating to any Causes of Action which may be brought against the Former Officer.

**1.59** ***"General Unsecured Claim"*** means a Claim that is not an Administrative Claim, Tax Priority Claim, Secured Claim, Non-Tax Priority Claim, Senior Noteholder Claim, Subordinated Noteholder Claim, TECONS Securities Claim, Small Claim or Subordinated Claim.

**1.60** ***"Impaired"*** means, when used in reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.