**1.61** *"Indemnification Rights"* means any obligations or rights of any of the Debtors to indemnify or contribute to the losses, liabilities or expenses of an Indemnitee pursuant to such Debtor's charter, by-laws or policy of providing employee indemnification, or applicable state law or specific agreement in respect of any claims, demands, suits, causes of action or proceedings against an Indemnitee based upon any act or omission related to an Indemnitee's service with, for or on behalf of such Debtor.

**1.62** *"Indemnitee"* means all present and former directors, officers, employees, agents or representatives of a Debtor who are entitled to assert Indemnification Rights.

**1.63** *"Initial Distribution"* means the distribution made to holders of Allowed Claims on the Distribution Date.

**1.64** *"Intercompany Claim"* means any Claim arising prior to the Petition Date against a Debtor by another Debtor or a non-Debtor subsidiary or affiliate of a Debtor, excluding any Claim Avado Financing I might have against a Debtor.

**1.65** *"Interest"* means the rights of any current or former holder or owner of any shares of Old Avado Common Stock, or any other equity securities as defined in the Bankruptcy Code of any of the Debtors authorized and issued prior to the Confirmation Date.

**1.66** *"Investor(s)"* means funds and accounts managed by or affiliated with DDJ Capital Management, LLC.

**1.67** *"Investor Agent"* means DDJ Capital Management, LLC, in its capacity as agent for the Investors.

**1.68** *"IRC"* means the Internal Revenue Code of 1986, as amended.

**1.69** *"IRS"* means the Internal Revenue Service of the United States of America.

**1.70** *"Limited Partnership Interests"* means the rights of any current or former holder or owner of any Interests of any of the Affiliate Debtors which are organized as limited partnerships under applicable state law authorized and issued prior to the Confirmation Date.

**1.71** *"Litigation Trust"* means that certain trust that may be created pursuant to this Plan to be administered by the Litigation Trustee with the advice and/or direction of the Litigation Trust Advisory Board to pursue the Litigation Trust Actions, as set forth in Article XII of the Plan.

**1.72** *"Litigation Trust Actions"* means (a) the Former Officer Actions, (b) the Former Officer Related Actions, and (c) such other Causes of Action to be identified in the Litigation Trust Agreement, which shall be filed by the Plan Supplement Filing Date.

**1.73** *"Litigation Trust Advisory Board"* means the Board that is to be created pursuant to Section 12.4 of the Plan for the purpose of advising the Litigation Trustee with respect to decisions affecting the Litigation Trust.

**1.74** *"Litigation Trust Agreement"* means that certain Litigation Trust Agreement that is to govern the Litigation Trust, in substantially the form of such document included in the Plan Supplement, pursuant to which, among other things, the Litigation Trust Assets shall initially be conveyed to the Litigation Trust and the Net Litigation Trust Recoveries shall ultimately be distributed to holders of Litigation Trust Beneficial Interests, as set forth in, and in a manner consistent with the terms of, this Plan.

**1.75** *"Litigation Trust Assets"* means the Litigation Trust Actions and the Cash to fund the Litigation Trust as set forth in Article XII of this Plan and as set forth in the Litigation Trust Agreement.

**1.76** *"Litigation Trust Beneficial Interests"* means the beneficial ownership interests of the Litigation Trust to be distributed to holders of the Allowed Claims in Classes 3, 4, 5 and 6 as set forth in Article V of this Plan.

**1.77** *"Litigation Trust Recoveries"* means any and all proceeds received by the Litigation Trust from (a) the prosecution to and collection of a final judgment of the Litigation Trust Actions; or (b) the settlement or the compromise of the Litigation Trust Actions.

**1.78** *"Litigation Trustee"* means the trustee of the Litigation Trust.

**1.79** *"Net Litigation Trust Recoveries"* means the amount by which the aggregate amount of Litigation Trust Recoveries exceeds the aggregate of (a) the reasonable and necessary expenses incurred by the Litigation Trustee or to be incurred by the Litigation Trustee (as estimated by the Litigation Trustee in consultation with the Litigation Trust Advisory Board) in fulfilling the obligations set forth in the Plan and the Litigation Trust Agreement and (b) the reasonable and necessary expenses of the Litigation Trust Advisory Board.

**1.80** *"New Common Stock"* means shares of common stock of Reorganized Avado authorized under Section 7.16 of the Plan and under the Certificate of Incorporation or other organizational documents of Reorganized Avado.

**1.81** *"New Convertible Preferred Purchase Agreement"* means the agreement to be entered into by the Reorganized Debtors and the Investors, substantially in the form of such document included in the Plan Supplement, to be entered into by the Reorganized Debtors on or before the Effective Date as a condition to consummation of the Plan.

**1.82** *"New Convertible Preferred Stock"* means the convertible preferred shares of Reorganized Avado to be authorized under Section 7.16 of the Plan as of the Effective Date.

**1.83** *"New Securities"* means, collectively, the New Common Stock, the New Convertible Preferred Stock, the Class A Warrants, and the Class B Warrants.

**1.84** *"New Tranche A Financing Facility"* means the financing facility described in Section 7.7.

**1.85** *"New Tranche A Credit Agreement"* means the credit agreement to be entered into by the Reorganized Debtors, substantially in the form of such document included in the Plan Supplement, to be entered into by the Reorganized Debtors on or before the Effective Date as a condition to consummation of the Plan.

**1.86** *"New Tranche B Financing Facility"* means the financing facility described in <u>Section 7.7</u>.

**1.87** *"New Tranche B Credit Agreement"* means the credit agreement to be entered into by the Reorganized Debtors and the Investors, substantially in the form of such document included in the Plan Supplement, to be entered into by the Reorganized Debtors on or before the Effective Date as a condition to consummation of the Plan.

**1.88** *"Non-Tax Priority Claim"* means a Claim, other than an Administrative Claim or Tax Priority Claim, that is entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code.

**1.89** *"Old Avado Common Stock"* means, shares of common stock of Avado Brands, Inc. and all options, warrants or rights, contractual or otherwise, if any, to acquire any such common stock.

**1.90** *"Operating Partners"* means certain individuals, as described in <u>Section 7.10</u>, each an employee of the Debtors who owns a Limited Partnership Interest in certain of the Affiliate Debtors which are organized as limited partnerships.

**1.91** *"Person"* means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization or other entity.

**1.92** *"Petition Date"* means, as applicable, (i) February 4, 2004 with respect to those Debtors filing their petitions for relief in the Bankruptcy Court on such date, or (ii) February 5, 2004 with respect to those Debtors filing their petitions for relief in the Bankruptcy Court on such date.

**1.93** *"Plan"* means this joint chapter 11 plan of reorganization for the Debtors as herein proposed, including all supplements, appendices and schedules thereto, either in its present form or as the same may be further altered, amended or modified from time to time in accordance with the Bankruptcy Code.

**1.94** *"Plan Schedules"* means a schedule annexed to either this Plan or as an appendix to the Disclosure Statement, as the same may be altered, amended or modified from time to time.

**1.95** *"Plan Supplement"* means the supplement to the Plan containing the forms of the New Tranche A Credit Agreement, New Tranche B Credit Agreement, the New Convertible Preferred Purchase Agreement, the Warrant Agreement, Reorganized Avado's Certificate of Incorporation and By-laws, and the Litigation Trust Agreement.

**1.96** *"Plan Supplement Filing Date"* means the date by which the Plan Supplement, and any Exhibits or Plan Schedules not filed with the Plan, shall be filed with the Bankruptcy Court, which date shall be at least five (5) days prior to the Voting Deadline.

**1.97** *"Prepetition Indenture Trustees"* means collectively, the Senior Notes Indenture Trustee, Subordinated Notes Indenture Trustee and TECONS Indenture Trustee, respectively.

**1.98** *"Prepetition Notes"* means, collectively, the Senior Notes, Subordinated Notes and TECONS Securities.

**1.99** *"Pro Rata"* means with respect to a distribution regarding a particular Class (or, if applicable, several Classes taken as a whole), the proportion that (a) the Face Amount of a Claim in a particular Class (or, if applicable, several Classes taken as a whole) bears to (b) the aggregate Face Amount or all Claims (including Disputed Claims, but excluding Disallowed Claims) in such Class (or, if applicable, several Classes taken as a whole), unless this Plan provides otherwise.

**1.100** *"Procedure and Administration Regulations"* means the Procedure and Administration Regulations promulgated by the Department of Treasury of the United States of America under the IRC.

**1.101** *"Professional"* means (a) any professional employed in the Chapter 11 Cases pursuant to section 327, 328, 330 or 1103 of the Bankruptcy Code or otherwise, (b) any professional or other entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code and supported by both the (i) Debtors or Reorganized Avado and (ii) Creditors' Committee and (c) interim management retained under section 363 of the Bankruptcy Code.

**1.102** *"Professional Fee Claim"* means a Claim under section 330(a), 331, 503 or 1103 of the Bankruptcy Code for compensation of a Professional or other entity for services rendered or expenses incurred in the Chapter 11 Cases on or prior to the Effective Date (including expenses of the members of the Creditors' Committee incurred as members of the Creditors' Committee in discharge of their duties as such).

**1.103** *"Professional Fee Order"* means the order entered by the Bankruptcy Court on March 22, 2004, authorizing the interim payment of Professional Fee Claims, as may be amended from time to time prior to the entry on the docket of the Confirmation Order.

**1.104** *"Record Date"* means the record date for purposes of making distributions under the Plan on account of Allowed Claims, which date shall be the same date as the Voting Record Date.

**1.105** *"Reinstated"* or *"Reinstatement"* means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim or Interest entitles the Claim so as to leave such Claim or Interest Unimpaired in accordance with section 1124 of the Bankruptcy Code, or (b) notwithstanding any contractual provision or applicable law that entitles the Claim or Interest holder to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default (i) curing any such default that occurred before or after the Petition Date, other than a default

of a kind specified in section 365(b)(2) of the Bankruptcy Code; (ii) reinstating the maturity of such Claim or Interest as such maturity existed before such default; (iii) compensating the Claim holder for any damages incurred as a result of any reasonable reliance by such Claim holder on such contractual provision or such applicable law; and (iv) not otherwise altering the legal, equitable or contractual rights to which such Claim or Interest entitles the Interest holder; provided, however, that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, and affirmative covenants regarding corporate existence prohibiting certain transactions or actions contemplated by the Plan, or conditioning such transactions or actions on certain factors, shall not be required to be reinstated in order to accomplish Reinstatement.

1.106    *"Released Party"* means (i) all directors, officers and employees of each of the Debtors from and after the Petition Date, (ii) the Creditors' Committee and each member of the Creditors' Committee in its representative capacity, (iii) the Restructuring Professionals; and (iv) the DIP Agent and the DIP Lenders, and, with respect to each of the foregoing, such Person's respective officers, directors, partners, members, employees, attorneys, financial advisors, accountants, investment bankers, agents, professionals and representatives retained by such Person, as well as each fund or account managed or advised by the DIP Agent, in any capacity including, without limitation, as holders of any Existing Securities or New Securities.

1.107    *"Reorganized Avado"* means Avado Brands, Inc., as reorganized and to be reincorporated as a Delaware corporation, pursuant to this Plan on or after the Effective Date.

1.108    *"Reorganized Debtor"* or *"Reorganized Debtors"* means individually any Debtor and collectively all Debtors from and after the Effective Date, subject to the Restructuring Transactions and Section 7.2 of the Plan.

1.109    *"Restructuring Professionals"* means, collectively, Anderson, Kill & Olick, P.C., AP Services, LLC, Bankruptcy Services LLC, Cox Smith Mathews Incorporated, DJM Asset Management, LLC, Ernst & Young Corporate Finance LLC, FTI Consulting, Inc., Jones Day, Miller Buckfire Ying & Co., LLC, Munsch Hardt Kopf & Harr, P.C., Skadden, Arps, Slate, Meagher & Flom LLP and their respective Affiliates, members, partners, shareholders, officers, directors and employees.

1.110    *"Restructuring Transaction"* has the meaning ascribed in Section 7.2 of this Plan.

1.111    *"Retained Actions"* means all Causes of Action which any Debtor may hold against any Person, other than any Causes of Action against a Released Party; provided, however, that the Debtors shall transfer the Litigation Trust Actions to the Litigation Trust on the Effective Date.

1.112    *"Scheduled"* means with respect to any Claim, the status and amount, if any, of such Claim as set forth in the Schedules.

1.113    *"Schedules"* means the schedules of assets and liabilities and the statements of financial affairs filed in the Bankruptcy Court by the Debtors, as such schedules have

been or may be further modified, amended or supplemented from time to time in accordance with Rule 1009 of the Bankruptcy Rules or Orders of the Bankruptcy Court.

      **1.114** ***"Secured Claim"*** means a Claim that is secured by a security interest in or a lien on property in which a Debtor's Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in the applicable Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

      **1.115** ***"Securities Act"*** means the Securities Act of 1933, 15 U.S.C. §§ 77c-77aa, as now in effect or hereafter amended.

      **1.116** ***"Senior Noteholder Claim"*** means a Claim against the Debtors arising out of the Senior Notes.

      **1.117** ***"Senior Notes"*** means those notes issued pursuant to the Senior Note Indenture.

      **1.118** ***"Senior Notes Indenture"*** means that certain indenture for the 9.75% Senior Notes due 2006.

      **1.119** ***"Senior Notes Indenture Trustee"*** means SunTrust Bank.

      **1.120** ***"Small Claim"*** means a Claim which would otherwise be a General Unsecured Claim in an amount equal to or less than $20,000.

      **1.121** ***"Shareholders' Agreement"*** means the shareholders' agreement, in substantially the form contained in the Plan Supplement to this Plan.

      **1.122** ***"Solicitation Order"*** means the order entered by the Bankruptcy Court establishing procedures with respect to the solicitation and tabulation of votes to accept or reject this Plan.

      **1.123** ***"Subordinated Claims"*** means any Claim subordinated pursuant to section 510(b) of the Bankruptcy Code, which shall include, without limitation, any Claim arising from the rescission of a purchase or sale of any Old Avado Common Stock, any Claim for damages arising from the purchase or sale of Old Avado Common Stock or any Claim for reimbursement, contribution or indemnification on account of any such Claim.

      **1.124** ***"Subordinated Noteholder Claim"*** means a Claim against the Debtors arising out of the Subordinated Notes.

      **1.125** ***"Subordinated Notes"*** means those notes issued pursuant to the Subordinated Notes Indenture.

      **1.126** ***"Subordinated Notes Indenture"*** means that certain indenture for the 11.75% Senior Subordinated Notes due 2009.

**1.127** *"Subordinated Notes Indenture Trustee"* means Law Debenture Trust Company of New York.

**1.128** *"Subordinated Notes Redistribution Interests"* means the Litigation Trust Beneficial Interests that, but for the Subordinate Notes Subordination Rights, the Disbursing Agent would distribute Pro Rata to or for the benefit of holders of Allowed Class 5 Claims as if Classes 3, 4, 5 an 6 were a single class, but will instead redistribute to or for the benefit of holders of Allowed Class 4 Claims.

**1.129** *"Subordinated Notes Redistribution Shares"* means the shares of New Common Stock that, but for the Subordinated Notes Subordination Rights, the Disbursing Agent would distribute Pro Rata to or for the benefit of holders of Allowed Class 5 Claims as if Classes 3, 4, 5 and 6 were a single class, but will instead redistribute to or for the benefit of holders of Allowed Class 4 Claims.

**1.130** *"Subordinated Notes Subordination Rights"* means the subordination rights of the holders of the Senior Notes pursuant to the Subordinated Notes Indenture, or any supplemental indenture thereto.

**1.131** *"Subsequent Distribution"* means any distribution after the Initial Distribution.

**1.132** *"Subsequent Distribution Date"* means the date upon which the Reorganized Debtors determine, in accordance with this Plan, to conduct a Subsequent Distribution.

**1.133** *"Supplemental Distribution Accounts"* means, as applicable, (a) the New Common Stock remaining in the applicable Disputed Claims Reserves, if any, to the extent that a Disputed Claim is Disallowed or is Allowed in an amount less than the amount reserved for the such Disputed Claim, (b) the Class A Warrants remaining in the applicable Disputed Claims Reserves, if any, to the extent that a Disputed Claim is Disallowed or is Allowed in an amount less than the amount reserved for such Disputed Claim, (c) the Class B Warrants remaining in the applicable Disputed Claims Reserves, if any, to the extent that a Disputed Claim is Disallowed or is Allowed in an amount less than the amount reserved for such Disputed Claim, (d) the Litigation Trust Beneficial Interests remaining in the applicable Disputed Claims Reserves, if any, to the extent that a Disputed Claim is Disallowed or is Allowed in an mount less than then amount reserved for such Disputed Claim, or (e) any remaining Cash Reserves after all obligations for which such reserves were established are satisfied and the Chapter 11 Cases are closed.

**1.134** *"Tax Priority Claim"* means a Claim entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.

**1.135** *"TECONS Indenture"* means that certain indenture between Apple South, Inc. (n/k/a Avado Brands, Inc.) and First Union Nation Bank of Georgia (n/k/a Wachovia Bank, N.A.), dated as of March 6, 1997.

**1.136** *"TECONS Indenture Trustee"* means Wachovia Bank, N.A.

     **1.137** ***"TECONS Redistribution Interests"*** means the Litigation Trust Beneficial Interests that, but for the TECONS Subordination Rights, the Disbursing Agent would distribute Pro Rata to or for the benefit of holders of Allowed Class 6 Claims as if Classes 3, 4, 5 an 6 were a single class, but will instead redistribute to or for the benefit of holders of Allowed Class 4 Claims.

     **1.138** ***"TECONS Redistribution Shares"*** means the shares of New Common Stock that, but for the TECONS Subordination Rights, the Disbursing Agent would distribute Pro Rata to or for the benefit of holders of Allowed Class 6 Claims as if Classes 3, 4, 5 and 6 were a single class, but will instead redistribute to or for the benefit of holders of Allowed Class 4 Claims.

     **1.139** ***"TECONS Securities"*** means (i) the $3.50 Term Convertible Securities, Series A issued by Apple South Financing I pursuant to the TECONS Trust, and (ii) the 7% Convertible Subordinated Debentures issued by Avado Brands, Inc. pursuant to the TECONS Indenture.

     *1.140* ***"TECONS Securities Claim"*** means a Claim against the Debtors arising out of the TECONS Securities.

     **1.141** ***"TECONS Subordination Rights"*** means the subordination rights of the holders of the Senior Notes pursuant to the TECONS Indenture, or any supplemental indenture thereto.

     **1.142** ***"TECONS Trust"*** means that certain amended and restated declaration of trust of Apple South Financing I (n/k/a Avado Financing I), dated and effect as of March 11, 1997.

     **1.143** ***"Unimpaired Claim"*** means a Claim that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

     **1.144** ***"Voting Deadline"*** means April 12, 2005, as the last day and time for submitting Ballots to accept or reject this Plan in accordance with section 1126 of the Bankruptcy Code as specified in the Solicitation Order.

     **1.145** ***"Voting Record Date"*** means the date and time established by the Bankruptcy Court in the Solicitation Order for determining those holders of Claims against the Debtors entitled to vote on the Plan.

     **1.146** ***"Warrants"*** means the Class A Warrants and the Class B Warrants.

**B.** **Rules of Interpretation.**

     For purposes of this Plan, unless otherwise provided herein: (1) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, includes both the singular and the plural, and each pronoun stated in the masculine, feminine or neuter includes the masculine, feminine and neuter; (2) unless otherwise provided in this Plan, any reference in this Plan to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (3) any reference in this Plan to an existing document or schedule filed or to be filed means such document or schedule, as it may have been or may be amended, modified or supplemented pursuant to this Plan; (4) any reference to an entity as a holder of

a Claim or Interest includes that entity's successors and assigns; (5) all references in this Plan to Sections, Articles and Plan Schedules are references to Sections, Articles and Plan Schedules of or to this Plan; (6) the words "herein," "hereunder" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (7) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (8) subject to the provisions of any contract, Certificates of Incorporation, Bylaws, instrument, release or other agreement or document entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules; and (9) the rules of construction set forth in section 102 of the Bankruptcy Code will apply.

**C.**      **Computation of Time.**

In computing any period of time prescribed or allowed by this Plan, unless otherwise expressly provided for, the provisions of Bankruptcy Rule 9006(a) shall apply.

**D.**      **References to Monetary Figures.**

All references in the Plan to monetary figures shall refer to United States currency.

**E.**      **Exhibits, Plan Schedules and Plan Supplement.**

All Exhibits, Plan Schedules and the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full herein and, to the extent not annexed hereto, such Exhibits and Plan Schedules shall be filed with the Bankruptcy Court on or before the Plan Supplement Filing Date.

## ARTICLE II

### ADMINISTRATIVE EXPENSES AND TAX PRIORITY CLAIMS

**2.1**      **Administrative Claims**.  Subject to the provisions of <u>Article XI</u> of this Plan, on, or as soon as reasonably practicable after, the later of (a) the Effective Date, or (b) the date on which an Administrative Claim becomes an Allowed Administrative Claim, each holder of an Allowed Administrative Claim shall receive, in full satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Administrative Claim, (i) Cash equal to the unpaid portion of such Allowed Administrative Claim or (ii) such other less favorable treatment to which the holders of an Allowed Administrative Claim shall have agreed upon in writing; <u>provided, however</u>, that Allowed Administrative Claims against a Debtor with respect to liabilities incurred in the ordinary course of business during the Chapter 11 Cases may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto at the discretion of the Debtors or the Reorganized Debtors; <u>provided further, however</u>, that each holder of a DIP Facility Claim shall receive the treatment as described in Section 7.7 of this Plan.

**2.2**      **Tax Priority Claims**.  On, or as soon as reasonably practicable after, the later of (a) the Effective Date, or (b) the date on which a Tax Priority Claim becomes an Allowed Tax Priority Claim, each holder of an Allowed Tax Priority Claim shall receive in full satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Tax Priority Claim, at the

election of the applicable Debtor or Reorganized Debtor, (i) payment in full in Cash, (ii) deferred Cash payments over a period not exceeding six years payable in six (6) annual installments at an interest rate of five per cent (5%) compounded annually from the Effective Date with the first such payment payable on the first anniversary following the Effective Date, or (iii) such other less favorable treatment as the Debtors and a particular holder of a Tax Priority Claim have agreed to pursuant to any order previously entered by the Bankruptcy Court with the consent of such holder regarding the payment of a Tax Priority Claim; provided, however, that any Allowed Tax Priority Claim that is not due and owing on the Effective Date, will be paid in accordance with this section when such Allowed Tax Priority Claim becomes due and owing.

## ARTICLE III

## CLASSIFICATION OF CLAIMS AND INTERESTS

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of classes of Claims against and Interests in the Debtors. All Claims and Interests, except Administrative Claims and Tax Priority Claims, are placed in the Classes set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Tax Priority Claims of the kinds specified in sections 507(a)(1) and 507(a)(8) of the Bankruptcy Code have not been classified, and their treatment is set forth in Article II above.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim or Interest is also placed in a particular Class only for the purpose of voting on, and receiving distributions pursuant to, the Plan to the extent that such Claim or Interest is an Allowed Claim or an Allowed Interest in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date.

3.1     **Classification of Claims Against and Interests in the Debtors.**

(a)     Class 1. Class 1 consists of all Secured Claims against the Debtors.

(b)     Class 2. Class 2 consists of all Non-Tax Priority Claims against the Debtors.

(c)     Class 3. Class 3 consists of all General Unsecured Claims against the Debtors.

(d)     Class 4. Class 4 consists of all Senior Noteholder Claims against the Debtors.

(e)     Class 5. Class 5 consists of all Subordinated Noteholder Claims against the Debtors.

(f)     Class 6. Class 6 consists of all TECONS Securities Claims against the Debtors.

    (g)    <u>Class 7</u>.  Class 7 consists of all Small Claims against the Debtors.

    (h)    <u>Class 8</u>.  Class 8 consists of all Interests directly arising from or under, or relating in any way to, any of the Old Avado Common Stock and Subordinated Claims.

## ARTICLE IV

### IDENTIFICATION OF CLASSES OF CLAIMS AND INTERESTS IMPAIRED AND NOT IMPAIRED BY THE PLAN

    **4.1**    **Unimpaired Classes of Claims**.  The Classes listed below are Unimpaired by the Plan:

> Class 1 (Secured Claims)
> Class 2 (Non-Tax Priority Claims)

    **4.2**    **Impaired Classes of Claims and Interests**.  The Classes listed below are Impaired by the Plan:

> Class 3 (General Unsecured Claims)
> Class 4 (Senior Noteholder Claims)
> Class 5 (Subordinated Noteholder Claims)
> Class 6 (TECONS Securities Claims)
> Class 7 (Small Claims)
> Class 8 (Equity Interests in Avado and Subordinated Claims)

## ARTICLE V

### PROVISIONS FOR TREATMENT OF CLAIMS AND INTERESTS

    **5.1**    **Provisions For Treatment Of Claims And Interests**.

    (a)    <u>Class 1 (Secured Claims)</u>.  The legal, equitable and contractual rights of the holders of Allowed Secured Claims, if any, are unaltered by the Plan.  On, or as soon as reasonably practicable after, the later of (i) the Effective Date, or (ii) the date on which such Secured Claim becomes an Allowed Secured Claim, each holder of an Allowed Secured Claim shall, in full satisfaction, settlement and release of, and in exchange for, such Allowed Secured Claim, at the election of the Debtors or the Reorganized Debtors, either (x) have its claim Reinstated or (y) receive (1) Cash equal to the amount of such Allowed Secured Claim or (2) such other treatment that will not impair the holder of such Allowed Secured Claim pursuant to section 1124 of the Bankruptcy Code; <u>provided</u>, <u>however</u>, that any Secured Claim that is not an Allowed Claim on the Effective Date, including any Secured Claim not due and owing on the Effective Date, will be paid in accordance with this section if and when such Claim becomes Allowed and is due and owing.  Any default that existed with respect to any Secured Claim immediately prior to the Petition Date shall be deemed cured upon the Effective Date.

(b)     Class 2 (Non-Tax Priority Claims).  The legal and equitable rights of the holders of Non-Tax Priority Claims are unaltered by the Plan.  On, or as soon as reasonably practicable after, the later of (i) the Effective Date, or (ii) the date on which such Non-Tax Priority Claim becomes an Allowed Non-Tax Priority Claim, each holder of an Allowed Non-Tax Priority Claim shall receive, in full satisfaction, settlement and release of, and in exchange for, such Non-Tax Priority Claim, at the election of the Debtors or Reorganized Debtors, (x) Cash equal to the amount of such Allowed Non-Tax Priority Claim or (y) such other treatment that will not impair the holder of such Non-Tax Priority Claim pursuant to section 1124 of the Bankruptcy Code; provided, however, that any Non-Tax Priority Claim that is not an Allowed Claim on the Effective Date, including any Non-Tax Priority Claim not due and owing on the Effective Date, will be paid in accordance with this section when such Claim becomes Allowed and is due and owing.  Any default with respect to any Non-Tax Priority Claim that existed immediately prior to the Petition Date will be deemed cured on the Effective Date.

(c)     Class 3 (General Unsecured Claims).   On the Distribution Date, or as soon thereafter as is reasonably practicable, and on each Subsequent Distribution Date, the Disbursing Agent shall receive on behalf of each and every holder of a Class 3 Claim against the Debtors, in full satisfaction, settlement, release and discharge of, and in exchange for, each and every Class 3 Claim against the Debtors, (i) the Pro Rata share of the New Common Stock, and the New Common Stock held in the Supplemental Distribution Account as to Subsequent Distributions, as to which all holders of Allowed Class 3 Claims would be entitled to if Classes 3, 4, 5 and 6 were a single class, which the Disbursing Agent will distribute to each holder of an Allowed Class 3 Claim on a Pro Rata basis within such Class, and (ii)   the Pro Rata share of the Litigation Trust Beneficial Interests, and the Litigation Trust Beneficial Interests held in the Supplemental Distribution Account as to Subsequent Distributions, as to which all holders of Allowed Class 3 Claims would be entitled to if Classes 3, 4, 5 and 6 were a single class, which the Disbursing Agent will distribute to each holder of Allowed Class 3 Claim on a Pro Rata basis within such Class.

(d)     Class 4 (Senior Noteholder Claims).   On the Distribution Date, or as soon thereafter as is reasonably practicable, and on each Subsequent Distribution Date, the Disbursing Agent shall receive on behalf of each and every holder of a Class 4 Claim against the Debtors, in full satisfaction, settlement, release and discharge of, and in exchange for, each and every Class 4 Claim against the Debtors, (i) the Pro Rata share of the New Common Stock, and the New Common Stock held in the Supplemental Distribution Account as to Subsequent Distributions, as to which all holders of Allowed Class 4 Claims would be entitled to if Classes 3, 4, 5 and 6 were a single class, which the Disbursing Agent will distribute to each holder of an Allowed Class 4 Claim on a Pro Rata basis within such Class, (ii)  the Subordinated Notes Redistribution Shares, which the Disbursing Agent will distribute Pro Rata to or for the benefit of holders of Allowed Class 4 Claims, (iii) the TECONS Redistribution Shares, which the Disbursing Agent will distribute Pro Rata to or for the benefit of holders of Allowed Class 4 Claims, (iv) the Pro Rata share of the Litigation Trust Beneficial Interests, and the Litigation Trust Beneficial Interests held in the Supplemental Distribution Account as to Subsequent Distributions, as to which holders of Allowed Class 4 Claims would be entitled to if Classes 3, 4, 5 and 6 were a single class, which the Disbursing Agent will distribute to each holder of Allowed Class 4 Claim on a Pro Rata basis within such Class, (v) the Subordinated Notes Redistribution Interests, which the Disbursing Agent will distribute Pro Rata to or for the benefit of holders of Allowed Class 4 Claims, and (vi) the TECONS Redistribution Interests, which the Disbursing Agent will distribute Pro Rata to or for the benefit of holders of Allowed Class 4 Claims.

        (e)     Class 5 (Subordinated Noteholder Claims).  If Classes 4 and 5 vote to accept the Plan, on the Distribution Date, or as soon thereafter as is reasonably practicable, and on each Subsequent Distribution Date, the Disbursing Agent shall receive on behalf of each and every holder of a Class 5 Claim against the Debtors, in full satisfaction, settlement, release and discharge of, and in exchange for, each and every Class 5 Claim against the Debtors, the Class A Warrants, and the Class A Warrants held in the Supplemental Distribution Account as to Subsequent Distributions, which the Disbursing Agent will distribute to each holder of an Allowed Class 5 Claim on a Pro Rata basis within such Class.

        As reflected in the treatment of Class 4, and in accordance with the Subordinated Notes Subordination Rights, holders of Class 5 Claims shall not receive or retain a distribution of New Common Stock or Litigation Trust Beneficial Interests.  Instead, shares of New Common Stock and Litigation Trust Beneficial Interests otherwise distributable to or for the benefit of holders of Allowed Class 5 Claims shall instead be redistributed by the Disbursing Agent to holders of Allowed Class 4 Claims pursuant to the subordination provisions of the Subordinated Notes Indenture, all at such times and in such manner as provided in Articles IX and X of this Plan.

        If any of Class 4 or 5 does not vote to accept the Plan, the holders of Class 5 Claims shall not receive and retain any Class A Warrants or any other property under the Plan; provided, however, that the vote of Class 5 shall not affect the distribution of the Subordinated Noteholder Redistribution Shares and the Subordinated Noteholder Redistribution Interests.

        (f)     Class 6 (TECONS Securities Claims).  If Classes 4, 5 and 6 vote to accept the Plan, on the Distribution Date, or as soon thereafter as is reasonably practicable, and on each Subsequent Distribution Date, the Disbursing Agent shall receive on behalf of each and every holder of a Class 6 Claim against the Debtors, in full satisfaction, settlement, release and discharge of, and in exchange for, each and every Class 6 Claim against the Debtors, the Class B Warrants, and the Class B Warrants held in the Supplemental Distribution Account as to Subsequent Distributions, which the Disbursing Agent will distribute to each holder of an Allowed Class 6 Claim on a Pro Rata basis within such Class.

        As reflected in the treatment of Class 4, and in accordance with the TECONS Subordination Rights, holders of Class 6 Claims shall not receive or retain a distribution of New Common Stock or Litigation Trust Beneficial Interests.  Instead, shares of New Common Stock and Litigation Trust Beneficial Interests otherwise distributable to or for the benefit of holders of Allowed Class 6 Claims shall instead be redistributed by the Disbursing Agent to holders of Allowed Class 4 Claims pursuant to the subordination provisions of the TECONS Indenture, all at such times and in such manner as provided in Articles IX and X of this Plan.

        If any of Class 4 or 5 or 6 does not vote to accept the Plan, the holders of Class 6 Claims shall not receive and retain any Class B Warrants or any other property under the Plan provided, however, that the vote of Classes 5 and 6 shall not affect the distribution of the TECONS Redistribution Shares and the TECONS Redistribution Interests.

(g)     Class 7 (Small Claims).  On, or as soon as reasonably practicable after, the later of (i) the Effective Date, or (ii) the date on which a Small Claim becomes an Allowed Small Claim, each holder of an Allowed Small Claim shall receive, in full satisfaction, settlement and release of, and in exchange for, such Allowed Small Claim, Cash equal to 14.5% of such Allowed Small Claim.

(h)     Class 8 (Equity Interests in Avado and Subordinated Claims).  On the Effective Date, Old Avado Common Stock will be, and is deemed to be as of such date, cancelled and extinguished.  The holders of Old Avado Common Stock shall not be entitled to, and will not, receive or retain any property or interest in property on account of such Old Avado Common Stock.  Holders of Subordinated Claims shall receive no distribution under the Plan on account of such Claims.  On the Effective Date, the Affiliate Interests shall be Reinstated, subject to the Restructuring Transactions.

**5.2**     **Intercompany Claims.**  All Intercompany Claims will, in the sole discretion of the applicable Reorganized Debtor, (a) be preserved and Reinstated, (b) be released, waived and discharged on the Effective Date, or (c) be contributed to the capital of the obligor corporation.

**5.3**     **Special Provision Regarding Unimpaired Claims**.  Except as otherwise provided in the Plan, nothing shall affect the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Unimpaired Claims, including, but not limited to, all rights with respect to legal and equitable defenses to setoffs or recoupments against Unimpaired Claims.

## ARTICLE VI

## ACCEPTANCE OR REJECTION OF THE PLAN

**6.1**     **Classes Entitled to Vote.**  Subject to Sections 6.3 and 6.4 of this Plan, Claim and Interest holders in Impaired Classes of Claims and Interests are entitled to vote as a class to accept or reject the Plan.

**6.2**     **Acceptance by Impaired Classes**.  In accordance with section 1126(c) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if the Plan is accepted by the holders of at least two-thirds (⅔) in dollar amount and more than one-half (½) in number of the Allowed Claims of such Class that have timely and properly voted to accept or reject the Plan.  In accordance with section 1126(d) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Interests entitled to vote shall have accepted the Plan if the Plan is accepted by holders of at least two-thirds (⅔) in amount of the Allowed Interests in such Class that have timely and properly voted to accept or reject the Plan.

**6.3**     **Presumed Acceptances by Unimpaired Classes.**  Classes 1 and 2 are Unimpaired by the Plan.  Under section 1126(f) of the Bankruptcy Code, such Claim holders are conclusively presumed to accept the Plan, and the votes of such Claim holders will not be solicited.

**6.4** **Classes Deemed to Reject Plan.** Class 8 is not entitled to receive or retain any property under the Plan. Under section 1126(g) of the Bankruptcy Code, holders of Claims and/or Interests in such Class are deemed to reject the Plan and their votes will not be solicited.

**6.5** **Summary of Classes Voting on the Plan.** As a result of the provisions of Sections 6.1, 6.3 and 6.4 of this Plan, the votes of holders of Claims in Classes 3, 4, 5, 6, and 7 will be solicited with respect to this Plan.

**6.6** **Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code.** To the extent that any Impaired Class entitled to vote rejects the Plan or is deemed to have rejected the Plan, the Debtors will request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.

**6.7** **Confirmability and Severability of a Plan.** The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan as it applies to any particular Debtor or any Exhibit or Plan Schedule. A determination by the Bankruptcy Court that the Plan, as it applies to any particular Debtor, is not confirmable pursuant to section 1129 of the Bankruptcy Code shall not limit or affect: (a) the confirmability of the Plan as it applies to any other Debtor, or (b) the Debtors' ability to modify the Plan, as it applies to any particular Debtor, to satisfy the confirmation requirements of section 1129 of the Bankruptcy Code.

## ARTICLE VII

## MEANS FOR IMPLEMENTATION OF THE PLAN

**7.1** **Substantive Consolidation**

(a) **Substantive Consolidation for Plan Purposes.** The Plan is premised upon the substantive consolidation of the Debtors' Estates only for purposes of voting and making distributions under the Plan. Except as set forth in Section 7.2, the Plan does not contemplate the merger or dissolution of any Debtor entity or the transfer or commingling of any assets of any Debtor. Such substantive consolidation (other than for purposes related to the Plan) shall not affect the legal, corporate or trust structures of the Reorganized Debtors, subject to the right of the Debtors or Reorganized Avado to effect the Restructuring Transactions as provided in Section 7.2 of the Plan.

(b) **Order Granting Substantive Consolidation.** This Plan shall serve as a motion seeking entry of an order substantively consolidating the Chapter 11 Cases, as described and to the limited extent set forth in this Section 7.1 above. Unless an objection to such substantive consolidation is made in writing by any creditor affected by the Plan as herein provided on or before five (5) days prior to the Voting Deadline, or such other date as may be fixed by the Court, an order approving the substantive consolidation described herein (which may be the Confirmation Order) may be entered by the Court. However, an order shall only be entered if the Bankruptcy Court enters the Confirmation Order. In the event any such objections are timely filed, a hearing with respect thereto shall occur at the Confirmation Hearing.

**7.2      Corporate  Existence.**

(a)      **Continued Corporate Existence.**  Except as set forth herein, each of the Debtors shall continue to exist after the Effective Date as a separate corporate entity, with all the powers of a corporation  under applicable law in the jurisdiction in which it is formed, pursuant to the Certificate of Incorporation and By-laws in effect prior to the Effective Date, except to the extent such Certificate of Incorporation and By-laws are amended by this Plan, without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date.

(b)      **Certificates of Incorporation, By-laws and Trust Documents**. Avado shall continue to exist as Reorganized Avado after the Effective Date, and shall be reorganized in accordance with the laws of the State of Delaware and pursuant to the Amended Charter and By-laws, substantially in the form of the documents included in the Plan Supplement, to be filed with the Bankruptcy Court by the Plan Supplement Filing Date.  The Amended Charter and By-laws of Reorganized Avado shall be structured or amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code and shall include, as applicable among other things, (a) pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of nonvoting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code; (b) provisions authorizing the issuance of New Common Stock in amounts not less than the amounts necessary to permit the distributions thereof required or contemplated by the Plan; (c) provisions authorizing the issuance of New Convertible Preferred Stock in amounts not less than the amounts necessary to permit the distributions thereof required or contemplated by the Plan; (d) provisions that shall limit the holders of record of the New Common Stock to such a number so that Reorganized Avado  will not be subject to the reporting requirements of the Exchange Act; and (e) such other provisions that are not inconsistent with the Shareholders' Agreement.

The certificate or articles of incorporation and by-laws of all other Reorganized Debtors shall be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code and shall include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provisions prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code.  After the Effective Date, the Reorganized Debtors may amend and restate the Certificates of Incorporation and By-laws as permitted by applicable law.

(c)      **Effecting the Restructuring Transactions.**  On or after the Effective Date, the applicable Reorganized Debtors may enter into such transactions and may take such actions as may be necessary or appropriate to simplify the overall structure of the Reorganized Debtors, or to reorganize certain of the subsidiary Debtors under the laws of jurisdictions other than the laws of which the applicable subsidiary Debtors are presently incorporated.  Such restructuring may include, but is not limited to, one or more mergers, consolidations, restructures, dispositions, liquidations, dissolutions, or any other transactions in which a Debtor transfers assets and liabilities to a new, wholly-owned direct or indirect subsidiary of Reorganized Avado as may be determined by the Debtors or Reorganized Debtors to be necessary or appropriate (collectively, the "Restructuring Transactions").  Through the Restructuring Transactions, the Debtors will simplify and consolidate their corporate structure.  Any executory contract or unexpired lease affected by the Restructuring Transactions will not be assigned to a third party, but will remain within the Reorganized Debtors' corporate structure.  The actions to effect the Restructuring Transactions may include:  (i) the execution and delivery of appropriate agreements,  documents of merger, consolidation, restructuring,

Plan - 24

disposition, liquidation, dissolution or any other transactions in which a Debtor or Reorganized Debtor transfers assets and liabilities to a new, wholly-owned direct subsidiary of Reorganized Avado containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable state law and such other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, duty, or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable entities may agree; (iii) the filing of appropriate certificates or articles of merger, consolidation, dissolution or incorporation or declarations of trust, trust agreements or similar trust documents pursuant to applicable state law; and (iv) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with such transactions. The Restructuring Transactions may include one or more mergers, consolidations, restructures, dispositions, liquidations, or dissolutions, as may be determined by the Reorganized Debtors to be necessary or appropriate to result in substantially all of the respective assets, properties, rights, liabilities, duties, and obligations of certain of the Reorganized Debtors vesting in one or more surviving, resulting, or acquiring wholly-owned direct subsidiary of Reorganized Avado. In each case in which the surviving, resulting, or acquiring wholly-owned direct subsidiary of Reorganized Avado in any such transaction is a successor to a Reorganized Debtor, such surviving, resulting, or acquiring wholly-owned direct subsidiary of Reorganized Avado will perform the obligations of the applicable Reorganized Debtor pursuant to the Plan to pay or otherwise satisfy the Allowed Claims against such Reorganized Debtor, except as provided in any contract, instrument, or other agreement or document effecting a disposition to such surviving, resulting, or acquiring corporation, which may provide that another Reorganized Debtor will perform such obligations.

### 7.3 Directors and Officers of the Reorganized Debtors.

(a) **Appointment.** The existing senior officers of Avado, shall initially serve in the same capacities after the Effective Date for Reorganized Avado. The initial board of directors of Reorganized Avado shall consist of a minimum of five (5), but no more than six (6), members. The Investor Agent, on behalf of the Investors, shall appoint two members of the initial board of directors. The Creditors' Committee shall appoint at least one and, should it so decide, up to two members of the initial board of directors. Reorganized Avado's chief executive officer and lead independent director to be selected by the Investor Agent, on behalf of the Investors, and reasonably acceptable to the Creditors' Committee and the chief executive officer shall fill the remaining positions on the initial board of directors. The identities of the individuals appointed to the initial board of directors will be disclosed on <u>Plan Schedule 7.3</u>, which will be filed by the Plan Supplement Filing Date.

(b) **Terms.** Reorganized Avado board members shall serve for an initial two (2) year term commencing on the Effective Date.

(c) **Vacancies.** Until the second annual meeting of shareholders of Reorganized Avado after the Effective Date, any vacancy in the board of directors of Reorganized Avado shall be filled by a person designated by the constituency which sponsored the board nominee whose vacancy is being filled, as such position was initially designated on <u>Plan Schedule 7.3</u>; <u>provided</u>, <u>however</u>, the process for replacing the Creditors' Committee's board of director nominee(s) shall be as disclosed in <u>Plan Schedule 7.3</u>.

**7.4** **Effectuating Documents; Further Transactions.** On the Effective Date, the chief executive officer and other executive officers of the Reorganized Debtors shall be authorized and directed to issue, execute, deliver, file or record the contracts, instruments, securities, releases, and other agreements or documents contemplated by the Plan in the name of and on behalf of the Reorganized Debtors. The secretary or any assistant secretary of the Reorganized Debtors shall be authorized to certify or attest to any of the foregoing actions.

**7.5** **Corporate Action.** On the Effective Date, the adoption of the Certificates of Incorporation or similar constituent documents, the adoption of the By-laws, the selection of directors and officers (or persons serving in similar capacities) for the Reorganized Debtors, and all other actions contemplated by the Plan shall be authorized and approved in all respects (subject to the provisions of the Plan). All matters provided for in the Plan involving the organizational structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan, shall, as of the Effective Date, be deemed to have occurred and shall be effective as provided herein, and shall be authorized and approved in all respects without any requirement of further action by the security holders or directors of the Debtors and the Reorganized Debtors; provided, however, that certain corporate actions shall be subject to the terms of the Shareholders' Agreement.

**7.6** **Revesting of Assets; Releases of Liens.** The property of each Debtor's Estate, together with any property of each Debtor that is not property of its Estate and that is not specifically disposed of pursuant to the Plan, shall revest in the applicable Debtor on the Effective Date, subject to the Restructuring Transactions. Thereafter, the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property and compromise or settle any claims or interests arising or becoming due on or after the Effective Date without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than restrictions expressly imposed by the Plan or the Confirmation Order. As of the Effective Date, all property of each Debtor shall be free and clear of all Claims and Interests, except as specifically provided in the Plan or the Confirmation Order. Without limiting the foregoing, the Reorganized Debtors may pay the reasonable charges that they incur on or after the Effective Date for Professionals' fees, disbursements, expenses or related support services without application to the Bankruptcy Court.

**7.7** **Post-Effective Date Financing.**

(a) In order to repay the DIP Facility Claim and provide for adequate working capital for the Reorganized Debtors, on the Effective Date, the Reorganized Debtors shall enter into the following three financing transactions:

*(i) New Tranche A Financing Facility:* The New Tranche A Financing Facility shall be comprised of up to $40 million revolving credit facility with an approximate $20 million sublimit for letters of credit. The New Tranche A Financing Facility shall be secured by a first lien in substantially all of the assets (excluding, however, certain non-core real estate assets) of the Reorganized Debtors. The proceeds of the New Tranche A Financing Facility shall be used in part to repay a portion of the DIP Facility Claim, to make such Cash payments as may be required under this Plan and to provide for adequate working capital for the Reorganized Debtors' operations, capital expenditures and other general corporate

purposes. The New Tranche A Financing Facility shall contain such other terms reasonably consistent with the form of New Tranche A Credit Agreement substantially in the form included in the Plan Supplement, which will be filed by the Plan Supplement Filing Date. The Confirmation Order shall approve the New Tranche A Credit Agreement and all documents to be executed in connection therewith in substantially the form filed with the Bankruptcy Court (and with such changes as to which the applicable Debtors and respective lenders may agree) and authorize the applicable Reorganized Debtors to execute the same together with such other documents as the applicable Reorganized Debtors and the applicable lenders may reasonably require in order to effectuate the treatment afforded to such parties under the New Tranche A Credit Agreement.

(ii)     *New Tranche B Financing Facility:*  As further described in the commitment letter attached as <u>Exhibit F</u> to the Disclosure Statement, the New Tranche B Financing Facility shall be comprised of an approximate $12.5 million five year term loan (the "Loan") provided by the Investors. The Loan shall be secured by a second lien on substantially all of the assets (excluding, however, certain non-core real estate assets) of the Reorganized Debtors. The Loan will be funded, subject to the conditions of the Investors' commitment and the New Tranche B Credit Agreement, at the option of the Investors, in Cash or in exchange for a portion of the DIP Facility Claim. The Loan will bear interest at a rate equal to 16% per annum, which prior to the second anniversary of the Loan will be payable monthly, in-kind or cash, at the option of the Reorganized Debtors, and which, after such second anniversary, will be payable monthly in cash. The Loan will be subject to prepayment premiums on the original principal amount only as follows: 5% during the first year, 3% during the second year, 2% during the third year, 1% during the fourth year. The Loan will be repayable at par during the fifth year. The Investors will be entitled to a cash commitment fee of $281,250, earned upon commitment to fund the Loan. The New Tranche B Financing Facility shall contain such other terms reasonably consistent with the form of New Tranche B Credit Agreement substantially in the form included in the Plan Supplement, which will be filed by the Plan Supplement Filing Date. The Confirmation Order shall approve the New Tranche B Credit Agreement and all documents to be executed in connection therewith in substantially the form filed with the Bankruptcy Court (and with such changes as to which the applicable Debtors and respective lenders may agree) and authorize the applicable Reorganized Debtors to execute the same together with such other documents as the applicable Reorganized Debtors and the Investors may reasonably require in order to effectuate the treatment afforded to such parties under the New Tranche B Credit Agreement.

(iii)     *New Convertible Preferred Stock:*  Reorganized Avado shall issue $17.5 million face amount of New Convertible Preferred Stock on the Effective Date.  As further described in the commitment letter attached as <u>Exhibit F</u> to the Disclosure Statement, the Investors will purchase, subject to the terms of the Investors' commitment and the terms of the New Convertible Preferred Purchase Agreement, the New Convertible Preferred Stock at the option of the Investors for a portion of the DIP Facility Claim or Cash, at the face amount.  The New Convertible Preferred Stock shall accrue dividends, on a cumulative basis, at a

rate of 14% per annum. Such dividend shall be payable in additional shares of New Convertible Preferred Stock, or in certain circumstances Cash, which circumstances will include, but not be limited to, certain financial tests to be agreed upon, the requirement that the outstanding balance on the Loan be less than or equal to $12.5 million, plus other requirements to be determined. The conversion price for the New Convertible Preferred Stock shall be based upon an implied common equity value of $28.15 million (which common equity value is based upon a $96.37 million enterprise valuation assumed in the Plan). The Investors will be entitled to a cash commitment fee of $393,750, earned upon commitment to purchase the New Convertible Preferred Stock. The New Convertible Preferred Stock will be subject to the restrictions on transfer described in, among other things, the Shareholders' Agreement and/or a registration rights agreement. The Confirmation Order shall approve the terms of the New Convertible Preferred Stock and the New Convertible Preferred Purchase Agreement and all documents to be executed in connection therewith in substantially the form filed with the Bankruptcy Court (and with such changes as to which the applicable Debtors and respective lenders may agree) and authorize the applicable Reorganized Debtors to issue the New Convertible Preferred Stock and to execute such purchase agreement together with such other documents as the applicable Reorganized Debtors and the applicable Investors may reasonably require in order to effectuate the treatment afforded to such parties under the New Convertible Preferred Purchase Agreement.

(b) The DIP Facility Claim will be paid in full on the Effective Date with proceeds from the New Convertible Preferred Stock, New Tranche B Financing Facility and New Tranche A Financing Facility; provided, however, that holders of the DIP Facility Claim may, with the consent of the Investor Agent, elect to receive payment of some or all of such holders DIP Facility Claim by conversion of such claim into the New Tranche B Financing Facility or New Convertible Preferred Stock.

**7.8** **Sources of Cash for Plan Distributions.** Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Reorganized Debtors to make payments pursuant to the Plan shall be obtained from (i) the New Tranche A Financing Facility; (ii) the New Tranche B Financing Facility; (iii) the New Convertible Preferred Purchase Agreement; (iv) proceeds from asset dispositions (including, without limitation, sale leaseback transactions); and (v) existing cash balances and operating cash flow.

**7.9** **Funding of Cash Reserve.** On or before the Effective Date, the Debtors shall fund the Cash Reserve in such amounts as determined by the Debtors as necessary in order to make the required future payments to Administrative Claims, Tax Priority Claims, Secured Claims, Non-Tax Priority Claims, Small Claims, and as otherwise provided by this Plan.

**7.10** **Employee Payments.** Pursuant to previous orders entered by the Bankruptcy Court in these Chapter 11 Cases, and subject to confirmation of this Plan, certain employee claims will be paid in full or receive such other treatment as previously authorized by the Bankruptcy Court. Specifically, on the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors will make the following payments:

(a) Persons who (a) (i) were involuntarily severed by the Debtors or (ii) are still employed by the Debtors, and (b) who participated in the Debtors' Deferred Compensation Plan, as listed in Plan Schedule 7.10 (a), will receive a cash payment, payable from the deferred compensation trust assets only, equal to the amount of such individual's contributions to the Deferred Compensation Plan, plus any interest and appreciation with respect to such Person's contributions, but excluding any matching contributions (and related interest or appreciation on matching contribution assets) the Debtors made to such Person's account under the Deferred Compensation Plan;

(b) (i) each Operating Partner listed in Plan Schedule 7.10(b) shall be entitled to a cash payment equal to approximately two-thirds of such Operating Partner's investment in the partnership, payable in eight monthly installments, (ii) the Debtors shall cancel the Operating Partner's promissory note to Avado (the "Promissory Note") related to the purchase of his partnership interest and old Avado Common Stock, and the Promissory Note shall be returned to such Operating Partner; and (iii) in conjunction with the Restructuring Transactions contemplated in Section 7.2, the Debtors shall cancel such Operating Partner's 10% legal ownership interest in the Limited Partnership;

(c) those severed employees listed in Plan Schedule 7.10(c) shall be entitled to receive a cash payment equal to the full amount of the Employee Severance Claim as previously agreed to by the Debtors and Creditors' Committee.

**7.11    Incentive Plan.**  On the Effective Date, Reorganized Avado shall be authorized to establish and implement an incentive plan for certain members of management, non-shareholder directors, and employees of the Reorganized Debtors.  Within a reasonable time after the Effective Date, the board of directors of Reorganized Avado will establish and implement such an incentive plan, pursuant to which the board of directors shall authorize no more than 10% of the New Common Stock to be issued to members of management, non-shareholder directors, and employees in the form of stock options.  Of the above referenced 10% of the New Common Stock, Reorganized Avado (i) shall make available to Reorganized Avado's chief executive officer the opportunity to purchase up to 3% of the outstanding New Common Stock of Reorganized Avado, and (ii) may offer to the lead independent director the opportunity to purchase up to 1/2% of the outstanding New Common Stock of Reorganized Avado.

**7.12    Employee Benefits and Retiree Benefits.**  From and after the Effective Date, the Reorganized Debtors, at their sole discretion, will continue their existing employee, severance and retention benefits policies, plans and agreements subject to any rights to amend, modify or terminate such benefits under the terms of the applicable benefits agreements, applicable non-bankruptcy law or determination by the board of directors of the Reorganized Debtors.  The Reorganized Debtors will continue to pay "retiree benefits" (as defined in section 1114(a) of the Bankruptcy Code), if any.

**7.13    Exclusivity Period.**  The Debtors shall retain the exclusive right to amend or modify the Plan (subject to the provisions of Section 16.3 of this Plan), and to solicit acceptances of any amendments to or modifications of the Plan, through and until the Effective Date.

**7.14    Exemption from Certain Transfer Taxes.**  Pursuant to section 1146(c) of the Bankruptcy Code, any transfers from the Debtors to the Reorganized Debtors or otherwise pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or

other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

7.15    **Cancellation of Existing Securities.**  On the Effective Date, except as otherwise provided for in the Plan, (a) the Existing Securities and any other notes, bonds, indentures or other instruments or documents evidencing or creating any indebtedness or obligations of a Debtor, except such notes or other instruments evidencing indebtedness or obligations of a Debtor that are Reinstated or amended and restated under the Plan, shall be cancelled without any further action, and (b) the obligations of, and/or Claims against, the Debtors under or relating to any agreements, indentures or certificates of designation governing the Existing Securities and any other notes, bonds, indentures or other instruments or documents evidencing or creating any indebtedness or obligations of a Debtor, except such notes or other instruments evidencing indebtedness or obligations of a Debtor that are Reinstated or amended and restated under the Plan, as the case may be, shall be discharged; provided, however, that each indenture or other agreement that governs the rights of the Claim holder and that is administered by an indenture trustee, an agent or a servicer shall continue in effect solely for the purposes of allowing such indenture trustee, agent or servicer to make the distributions to be made on account of such Claims under the Plan as provided in Article IX of the Plan, including, specifically, the provisions subordinating the Claims of the Subordinated Noteholders and the Claims of the TECONS Securities to the Senior Notes; provided, further, that this Section of the Plan shall not affect the discharge of the Debtors' or the Reorganized Debtors' liabilities or obligations under the Plan, the Bankruptcy Code and the Confirmation Order or result in any expense or liability to the Reorganized Debtors, except as expressly provided by the Plan.

7.16    **Issuance of New Securities and Related Documentation**

(a)    Reorganized Avado currently expects to have fewer than 300 holders of record of New Common Stock on the Effective Date.  Accordingly, it will not be subject to the periodic reporting and other procedural requirements of the Exchange Act.

(b)    On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Avado shall authorize, for issuance and distribution in accordance with the terms of the Plan, the New Common Stock.

(c)    On the Effective Date, Reorganized Avado shall authorize, for issuance and distribution in accordance with the terms of the Plan, the New Convertible Preferred Stock, the Class A Warrants, and the Class B Warrants.  On the Effective Date, Reorganized Avado shall reserve New Common Stock for issuance after the Effective Date under the incentive plan (as described in Section 7.11), upon conversion of the New Convertible Preferred Stock into New Common Stock, and upon the exercise of the Class A Warrants and Class B Warrants, without further act or action under applicable law, regulation, order or rule.

(d)    The New Securities to be issued and distributed pursuant to the Plan to Classes 3, 4, 5, and 6 shall be issued in exchange for or principally in exchange for Allowed Claims in such Classes and shall be exempt from registration under applicable securities laws pursuant to section 1145 of the Bankruptcy Code.

**7.17    Shareholders' Agreement.**  On the Effective Date, all creditors receiving stock under the Plan will become parties to  the Shareholders' Agreement, substantially in the form attached to the Disclosure Statement as <u>Exhibit G</u>. The Shareholders' Agreement will include, in addition to other provisions, transfer and trading restrictions intended to limit the number of record holders of New Securities to no more than 290 per class of securities (as such concept is understood for purposes of Section 12 of the Exchange Act) such that Reorganized Avado will not be subject to reporting requirements under the Exchange Act.  In general, a Shareholder (as such term is defined in the Shareholders' Agreement) wishing to effect a transfer of its interest must obtain approval from the Company, however such approval will not be unreasonably withheld where the transfer would not increase the number of record holders of a particular class of securities to a number in excess of 290.

The agreement will provide for drag along and tag along rights triggered upon the sale or disposition of sixty-six and two-thirds percent (66 2/3%) of the capital stock of Reorganized Avado then issued and outstanding.  In addition, holders of at least sixty-six and two-thirds percent (66 2/3%) of the New Convertible Preferred Common Stock and New Common Stock, voting together on an as-converted basis, must approve certain transactions including amendments to the charter or bylaws, redemptions of stock, declaration of dividends,  mergers, increases in borrowing and other significant corporate transactions.  In the event of a Qualified Initial Public Offering (as such term is defined in the Shareholders' Agreement), all shares of Reorganized Avado may be subject to a 180 day lock-up period during which transfers by existing Shareholders will be restricted. As detailed in a separate registration rights agreement, Shareholders of Reorganized Avado will have demand and piggyback registration rights and related rights customary for the type of New Securities held by them. The agreement also provides that the Board of Directors will consist of six persons including two nominated by DDJ, two nominated by the Creditors Committee, the chief executive officer and one independent director.  For a more complete understanding of the Shareholder's Agreement, please review <u>Exhibit G</u> to the Disclosure Statement.

**7.18    Preservation of Causes of Action.**

**(a)    Retention of Causes of Action.**  Except as otherwise provided in this Plan, the Confirmation Order, or in any document, contract, instrument, release, indenture or other agreement entered into in connection with this Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain all Causes of Action.  Subject to the provi-sions of <u>Article XII</u> of this Plan, pursuant to which the Litigation Trust Actions shall be transferred on the Effective Date to the Litigation Trust, each Reorganized Debtor or its successor(s) may pursue, enforce, settle, or compromise (or decline to do any of the foregoing) any or all of the Retained Actions as appropriate, including, without limitation, those Causes of Action listed on <u>Plan Schedule 7.18</u>, in accordance with the best interests of the Reorganized Debtor or its successor(s) who hold such rights.

**(b)    Retention of Subsequent Causes of Action.**  Except as is otherwise expressly provided herein or in the Confirmation Order, nothing in this Plan or the Confirmation Order shall preclude or estop the Reorganized Debtors or their privies, as successors in interest to the Debtors and their privies, from bringing a subsequent action in any court or adjudicative body of competent jurisdiction, to enforce any or all of its or their rights in connection with the Causes of Action, irrespective of the identity of any interest, cause of action, or nexus of fact, issues or events which is now or which could have been asserted in these Chapter 11 Cases, the present litigation, and those which may be asserted in any subsequent litigation brought by the Reorganized Debtors or their

privies. Moreover, the failure to commence any Retained Action prior to the Confirmation Date shall not constitute res judicata, judicial or collateral estoppel.

## ARTICLE VIII

### TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**8.1    Generally.**  Except as otherwise provided in this Article VIII, pursuant to sections 365 and 1123(b) of the Bankruptcy Code, all prepetition executory contracts and unexpired leases that exist between the Debtors and any Person shall be deemed rejected by the Debtors effective as of the Effective Date, subject to the occurrence of the Effective Date, except for the executory contracts and unexpired leases which:

(a)    have been assumed, assumed and assigned, or rejected, as applicable pursuant to an order of the Court entered prior to the Effective Date; or

(b)    as of the Effective Date, are subject to a pending motion for approval of the assumption, assumption and assignment, or rejection, as applicable; or

(c)    are otherwise being assumed or assumed and assigned as set forth in Plan Schedule 8.2(a), in the case of unexpired non-residential real property leases, which shall be filed and served on or before April 1, 2005, or Plan Schedule 8.2(b), in the case of executory contracts and unexpired leases (other than non-residential real property leases), which shall be filed on or before the Plan Supplement Filing Date.  The listing of a document on Plan Schedule 8.2(a) or Plan Schedule 8.2(b) shall not constitute an admission by the Debtors that such document is an executory contract or an unexpired lease or that the Debtors have any liability under such contract or lease; or

(d)    expired prior to the Effective Date and/or are no longer executory on the Effective Date by their own terms, including, but not limited to, those contracts and leases set forth in Plan Schedule 8.3, which shall be filed on or before the Plan Supplement Filing Date.  The listing of a document on Plan Schedule 8.3 shall not constitute an admission by the Debtors that the Debtors have any liability under such contract or lease.

With regard to any proposed assignment of executory contracts or unexpired leases, the Debtors shall provide the non-Debtor party 14 days notice with the opportunity to object and be heard regarding such proposed assignment.

**8.2    Approval of Assumption and Assignment or Rejection of Executory Contracts and Unexpired Leases.**  Subject to the Effective Date, entry of the Confirmation Order shall constitute, as of the Effective Date, the approval, pursuant to section 365 and 1123(b) of the Bankruptcy Code, of the assumption, assumption and assignment, or rejection, as applicable, of the executory contracts and unexpired leases assumed, assumed and assigned, or rejected pursuant to this Article VIII.

Each executory contract and unexpired lease that is assumed and relates to the use, ability to acquire or occupancy of real property, if any, shall include (a) all modifications, amendments, supplements, restatements, assignments, subleases or other agreements made directly or indirectly by agreement, instrument or other document that in any manner affect such executory

contract or unexpired lease and (b) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements and any other interests in real estate or rights in rem related to such premises, unless any of the foregoing agreements has been rejected pursuant to a Final Order of the Bankruptcy Court or is otherwise rejected as a part of this Plan.

        **8.3    Expired Leases and Non-Executory Contracts.** The Debtors believe that the leases and contracts listed on <u>Plan Schedule 8.3</u> are expired leases and non-executory contracts. Pursuant to the confirmation of this Plan, the Debtors shall be discharged from any and all future liability from the contracts and leases listed on <u>Plan Schedule 8.3</u>. If any lease or contract listed on <u>Plan Schedule 8.3</u> is deemed to be executory by a Final Order of the Bankruptcy Court, the Debtors reserve their right to reject, assume, or assume and assign such unexpired lease or executory contract for 30 days after the entry of such Final Order.

        **8.4    Cure of Defaults of Assumed Executory Contracts and Unexpired Leases.** Any monetary amounts by which each executory contract and unexpired lease to be assumed pursuant to the Plan is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code by Cure. The Debtors shall file and serve the proposed cure amounts, which shall be included on <u>Plan Schedule 8.2(a)</u> and <u>Plan Schedule 8.2(b)</u>. Any party to an executory contract or unexpired lease that disagrees with the Debtors' proposed cure amount must file an objection to the cure amount no later than 15 days after the schedule disclosing such amount is filed. If there is a dispute regarding (a) the nature or amount of any Cure, (b) the ability of any Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (c) any other matter pertaining to assumption, the matter shall be set for hearing in the Bankruptcy Court on the next available hearing date, or such other date as may be agreed upon, and Cure shall occur following the entry of a Final Order of the Bankruptcy Court resolving the dispute and approving the assumption or assumption and assignment, as the case may be; <u>provided</u>, <u>however</u>, that if there is a dispute as to the amount of Cure that cannot be resolved consensually among the parties, the Debtors shall have the right to reject the contract or lease for a period of five (5) days after entry of a final order establishing a Cure amount in excess 25% of that provided by the Debtors. If the cure amount is not disputed, the Debtors shall pay the cure claim, if any, to the claimant within twenty (20) days of the Effective Date. Disputed cure amounts that are resolved by agreement or Final Order shall be paid by the Debtors within twenty (20) days of such agreement or Final Order. To the extent the Debtor who is party to the executory contract or unexpired lease is to be merged or liquidated as part of a Restructuring Transaction, the non-Debtor parties to such executory contract or unexpired lease shall, upon assumption as contemplated herein, be deemed to have consented to the assignment of such executory contract or unexpired lease to the Reorganized Debtor that is the surviving entity after such Restructuring Transaction.

        **8.5    Rejection Damages Bar Date**. If the rejection by a Debtor, pursuant to the Plan or otherwise, of an executory contract or unexpired lease results in a Claim, then such Claim shall be forever barred and shall not be enforceable against any Debtor or Reorganized Debtor or the properties of any of them unless a Proof of Claim is filed with the Debtors' Claims agent, Bankruptcy Services, LLC, and served upon counsel to the Debtors, and counsel to the Creditors' Committee,

within thirty (30) days after service of the earlier of (a) notice of the Effective Date, or (b) other notice that the executory contract or unexpired lease has been rejected.

        **8.6**    **Miscellaneous.**  Notwithstanding any other provision of this Plan, the Debtors will retain the right to, at any time prior to the Effective Date, modify or supplement Plan Schedule 8.2(a), Plan Schedule 8.2(b), or Plan Schedule 8.3, including, without limitation, the right to add any executory contract or unexpired lease to, or delete any executory contract or unexpired lease from such Schedules. If the treatment of the executory contracts or unexpired leases is modified, the Debtors shall provide 14 days notice of such modification with the opportunity to object and be heard regarding such modification. Listing an executory contract or unexpired lease on Plan Schedule 8.2(a), Plan Schedule 8.2(b) will not constitute an admission by any of the Debtors or Reorganized Debtors that such contract or lease (including any related agreements that may exist) is an executory contract or unexpired lease or that the applicable Debtor or Reorganized Debtor has any liability thereunder. Listing any contract or lease on Plan Schedule 8.3 will not constitute an admission by any of the Debtors or Reorganized Debtors that the applicable Debtor or Reorganized Debtor has any liability thereunder. Notice shall be provided only to those parties affected by the Debtors' modification of, or supplement to, Plan Schedule 8.2(a), Plan Schedule 8.2(b) or Plan Schedule 8.3.

## ARTICLE IX

## PROVISIONS GOVERNING DISTRIBUTIONS

        **9.1**    **Time of Distributions.**  Except as otherwise provided for herein or ordered by the Bankruptcy Court, all distributions under the Plan on account of claims that are an Allowed Claim as of the Effective Date shall be made on the Distribution Date or as soon thereafter as is practicable; provided, however, that with respect to any Cash distributions, such date may be after the Administrative Claims Bar Date. Any distribution to be made on the Effective Date pursuant to this Plan shall be deemed as having been made on the Effective Date if such distribution is made on the Effective Date or as soon thereafter as is practicable. Any payment or distribution required to be made under this Plan on a day other than a Business Day shall be made on the next succeeding Business Day. Except as otherwise provided herein, distributions on account of Claims that first become Allowed Claims after the Effective Date shall be made pursuant to Articles IX and X of this Plan.

        **9.2**    **Interest on Claims.**  Unless otherwise specifically provided for in the Plan, the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on Claims, and no Claim holder shall be entitled to interest accruing on or after the Petition Date on any Claim. To the extent provided for in the Plan, the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall accrue on Claims at the applicable non-default rate. Unless otherwise specifically provided for in the Plan, the Confirmation Order, or required by applicable bankruptcy law, interest shall not accrue or be paid upon any Disputed Claim in respect of the period from the Petition Date to the date a final distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim. Until the Effective Date, nothing herein shall waive the right of any creditor to seek postpetition interest.

        **9.3**    **Disbursing Agent.**  The Disbursing Agent(s) shall make all distributions required under this Plan. Distributions on account of (a) Senior Noteholder Claims, (b) Subordinated Noteholder Claims and (c) TECONS Securities Claims will first be delivered to the Disbursing Agent

on behalf and on account of such Claim holders. The Disbursing Agent shall make the appropriate distributions pursuant to Articles II and V of this Plan, and as provided below.

(a)     Senior Notes. The Disbursing Agent shall deliver distributions on account of the Senior Noteholder Claims to the Senior Notes Indenture Trustee, its agent or servicer, who shall then make distributions to the holders of Senior Noteholder Claims in accordance with the Senior Notes Indenture and the provisions of this Plan.

(b)     Subordinated Notes. The Disbursing Agent shall deliver distributions on account of the Subordinated Noteholder Claims to the Subordinated Notes Indenture Trustee, its agent or servicer, who shall then make distributions to the holders of Subordinated Noteholder Claims in accordance with the Subordinated Notes Indenture and the provisions of this Plan; provided, however, that in accordance with the Subordinated Notes Subordination Rights and Section 5.1 of this Plan, shares of New Common Stock and Litigation Trust Beneficial Interests otherwise distributable to or for the benefit of holders of Allowed Subordinated Noteholder Claims shall instead be distributed directly to the Disbursing Agent for the holders of Allowed Senior Noteholder Claims, who shall redistribute the shares of New Common Stock and Litigation Trust Beneficial Interests to the holders of Allowed Senior Noteholder Claims in accordance with the provisions of Section 9.3(a).

(c)     TECONS Securities. The Disbursing Agent shall deliver distributions on account of the the TECONS Securities Claims to the TECONS Indenture Trustee, its agent or servicer, who shall then make distributions to the holders of TECONS Securities Claims in accordance with the TECONS Indenture and the provisions of this Plan; provided, however, that in accordance with the TECONS Subordination Rights and Section 5.1 of this Plan, shares of New Common Stock and Litigation Trust Beneficial Interests otherwise distributable to or for the benefit of holders of Allowed TECONS Securities Claims shall instead be distributed directly to the Disbursing Agent for the holders of Allowed Senior Noteholder Claims, who shall redistribute the shares of New Common Stock and Litigation Trust Beneficial Interests to the holders of Allowed Senior Noteholder Claims in accordance with the provisions of Section 9.3(a).

(d)     The Disbursing Agent(s) shall reasonably cooperate with the Prepetition Indenture Trustees, as agents or servicers in making distributions in accordance with this Plan.

**9.4     Subsequent Distributions.** The Reorganized Debtors shall determine, in accordance with this Plan, when to make a Subsequent Distribution.

**9.5     Delivery of Distributions.**

(a)     Distributions to holders of Allowed Claims shall be made by the Disbursing Agent or the Prepetition Indenture Trustees (as agents or servicers), (for purposes of this paragraph, the "applicable disbursing agent") (i) at the addresses set forth on the proofs of claim filed by such Claim holders (or at the last known addresses of such Claim holders if no proof of claim is filed or if the Debtors have been notified of a change of address), (ii) at the addresses set forth in any written notices of address changes delivered to the applicable disbursing agent after the date of any related proof of claim, (iii) at the addresses reflected in the Schedules if no proof of claim has been filed and the applicable disbursing agent has not received a written notice of a change of address, or (iv) in the case of a Claim holder whose Claim is governed by one of the Prepetition Indentures or

other agreement and is administered by one of the Prepetition Indenture Trustees, at the addresses contained in the official records of the Prepetition Indenture Trustees, including as set forth in any Ballots cast with respect to such Claims. Distributions made to holders of Claims by the Prepetition Indenture Trustees shall be subject to the rights of the Prepetition Indenture Trustees under the Prepetition Indentures or similar contract or agreement to enforce any charges or expenses thereunder.

(b)     If any Claim holder's distribution is returned as undeliverable, no further distributions to such Claim holder shall be made unless and until the applicable disbursing agent is notified of such Claim holder's then current address, at which time all missed distributions shall be made to such Claim holder without interest. Amounts in respect of undeliverable distributions shall be returned to (w) the Senior Notes Indenture Trustee with respect to Senior Noteholder Claims, (x) the Subordinated Notes Indenture Trustee with respect to Subordinated Noteholder Claims, (y) the TECONS Indenture with respect to TECONS Securities Claims; or (z) the Disbursing Agent with respect to all other claims, until such distributions are claimed. All claims for undeliverable distributions shall be made on the later of the first (1st) anniversary of the Effective Date or ninety (90) days from the date the Claim becomes an Allowed Claim. After such date, all unclaimed property relating to distributions to be made on account of Class 3, 4, 5, 6 and 7 Claims shall revert to Reorganized Avado and any New Common Stock held for distribution on account of such Claim shall be cancelled and of no further force or effect and all the other unclaimed property shall revert to the Reorganized Debtors, free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary. Nothing contained in the Plan shall require any of the applicable disbursing agents to attempt to locate any holder of an Allowed Claim or Interest.

**9.6     Record Date for Distributions.** The Disbursing Agent and the Prepetition Indenture Trustees shall have no obligation to recognize the transfer of, or the sale of any participation in, any Allowed Claim or Interest that occurs after the close of business on the Record Date, and will be entitled for all purposes herein to recognize and distribute only to those holders of Allowed Claims who are holders of such Claims, or participants therein, as of the close of business on the Record Date. The Reorganized Debtors and the Disbursing Agent shall instead be entitled to recognize and deal with for all purposes under the Plan with only those record holders stated on the official claims register or the official transfer ledger, as the case may be, as of the close of business on the Record Date. At the close of business on the Record Date, the transfer ledgers of the Prepetition Indenture Trustees, or other agents and servicers of the Prepetition Notes shall be closed, and there shall be no further changes in the record holders of the Prepetition Notes. The Reorganized Debtors, the Prepetition Indenture Trustees, and any other agents and servicers for the Prepetition Notes shall have no obligation to recognize any transfer of the Prepetition Notes occurring after the Record Date. The Reorganized Debtors, the Prepetition Indenture Trustees, and any other agents and servicers for the Prepetition Notes shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the transfer ledgers as of the close of business on the Record Date.

**9.7     Surrender of Securities.** On or before the date that distributions are first made by the Disbursing Agent or the Prepetition Indenture Trustees, each holder of an instrument evidencing a Claim on account of Prepetition Notes (a "Certificate") shall surrender such Certificate to the Prepetition Indenture Trustees who shall then deliver such Certificate to the Disbursing Agent in accordance with written instructions to be provided to such holder by the Prepetition Indenture Trustees as promptly as practicable following the Effective Date, and such Certificate shall be cancelled. Such instructions shall specify that delivery of such Certificate will be effected, and risk of loss and title thereto will pass, only upon the proper delivery of such Certificate with a letter of

transmittal in accordance with such instructions. No distribution of property hereunder shall be made to or on behalf of any such Claim holder unless and until such Certificate is received by the Disbursing Agent or the unavailability of such Certificate is reasonably established to the satisfaction of the Disbursing Agent. Any such Claim holder who fails to surrender or cause to be surrendered such Certificate or fails to execute and deliver an affidavit of loss and indemnity holding the Reorganized Debtors, the Disbursing Agent, the Prepetition Indenture Trustees, or any other applicable agent or servicer, harmless from any damages, liabilities or costs incurred in treating such individual as a holder of an Allowed Claim and otherwise reasonably satisfactory to the Reorganized Debtors, the Disbursing Agent, the Prepetition Indenture Trustees, or any other applicable agent or servicer, prior to the first (1st) anniversary of the Effective Date, shall be deemed to have forfeited, and shall be forever barred from asserting, any and all rights and Claims in respect of such Certificate and shall not participate in any distribution hereunder, and all property in respect of such forfeited distribution, including interest accrued thereon, shall revert to the Reorganized Debtors Prepetition Indenture Trustees notwithstanding any federal or state escheat laws to the contrary. Upon compliance with this Section 9.7 by a holder of a Claim evidenced by a Prepetition Note, such holder shall, for all purposes under the Plan, be deemed to have surrendered such note or other Security.

**9.8 Services of Prepetition Indenture Trustees.** The services, with respect to consummation of the Plan, of the Prepetition Indenture Trustees, including the reasonable fees and expenses of their counsel, under the Prepetition Indentures, and other agreements that govern the rights of holders of the Prepetition Notes, shall be as set forth elsewhere in this Plan. Notwithstanding the foregoing, the Reorganized Debtors, shall reimburse the Prepetition Indenture Trustees, and any other agent or servicer for reasonable and necessary services performed by them and any indemnification amounts under the Prepetition Indentures arising in connection with the performance of such services as contemplated in this Plan.

**9.9 Allocation of Plan Distributions Between Principal and Interest.** To the extent that any Allowed Claim entitled to a distribution under the Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated, for federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

**9.10 Withholding and Reporting Requirements.** The Reorganized Debtors and the Disbursing Agent (including the Litigation Trustee of the Litigation Trust, if applicable), as the case may be, shall be authorized to take any and all actions that may be necessary or appropriate to comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all payments and distributions hereunder shall be subject to such withholding and reporting requirements. All entities holding Claims or Interests shall be required to provide any information necessary to effect the withholding of such taxes. Notwithstanding any other provision of the Plan (a) each holder of an Allowed Claim that is to receive a distribution of New Common Stock pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution, and (b) no distribution shall be made to or on behalf of such holder pursuant to the Plan unless and until such holder has made arrangements satisfactory to the Reorganized Debtors and the Disbursing Agent, as the case may be, for the payment and satisfaction of such tax obligations. Any property to be distributed pursuant to the Plan shall, pending the implementation of such arrangements, be treated as an undeliverable distribution pursuant to the Plan.

**9.11      Means of Cash Payment.**  Payments of Cash made pursuant to the Plan shall be in U.S. dollars and shall be made, at the option and in the sole discretion of the Reorganized Debtors, by (a) checks drawn on, or (b) wire transfer from, a domestic bank selected by the Reorganized Debtors.

**9.12      Fractional Shares.**  Any other provision of the Plan notwithstanding, distributions of fractions of shares of New Common Stock shall not be made.  Whenever any distribution of a fraction of a share of New Common Stock under the Plan would otherwise be called for, the actual distribution made shall reflect a rounding of such fraction to the nearest whole share (up or down), with half shares being rounded down.

**9.13      Setoffs.**  Each Debtor and Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy laws, but shall not be required to, set off against any Claim and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtors, or the Reorganized Debtors, may have against the holder of such Claim; provided, however, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claim that the Debtors or the Reorganized Debtors may have against such holder.  Absent the consent of the Debtors or the Reorganized Debtors or unless otherwise authorized pursuant to an order of the Bankruptcy Court, no party receiving a distribution under this Plan may offset such distribution against any obligations such party may have to the Debtors or the Reorganized Debtors.  Without limiting any other rights of the Debtors, the Reorganized Debtors or the Litigation Trust provided for in this Plan, any distributions under this Plan shall also remain subject to any Causes of Action, counterclaims, security interests or other rights of the Debtors, the Reorganized Debtors or the Litigation Trust with respect to such distributions and the matters giving rise to such distributions.

**9.14      De Minimis Distributions.**  Notwithstanding any other provision of this Plan, the Reorganized Debtors and the Disbursing Agent shall have no obligation to make a distribution on account of an Allowed Claim from any account to a specific holder of an Allowed Claim if the amount to be distributed to that holder on the Distribution Date or Subsequent Distribution Date (a) does not constitute a final distribution to such holder and (b) is less than $50 or one (1) share of New Common Stock.  In addition, the Debtors and the Reorganized Debtors reserve the right to request subsequent relief from the Bankruptcy Court to exclude holders of smaller claims from the final distribution under this Plan to the extent that the amounts otherwise distributable to such claim holders in connection with such final distribution would be *de minimis* or create undue administrative expense.

## ARTICLE X

## PROCEDURES FOR RESOLVING DISPUTED,
## CONTINGENT AND UNLIQUIDATED CLAIMS

**10.1      Claims Administration Responsibility.**  Each Reorganized Debtor (or such other Person designated by the Reorganized Debtors to act on their behalf) shall retain responsibility for administering, disputing, objecting to, compromising or otherwise resolving and making distributions on account of the respective Claims of such Debtor.

**10.2 Objection Deadline; Prosecution of Objections.** No later than the Claims Objection Deadline (unless extended by an order of the Bankruptcy Court), the Debtors and the Reorganized Debtors, as the case may be, shall file objections to Claims with the Bankruptcy Court and serve such objections upon the holders of each of the Claims to which objections are made. Nothing contained herein, however, shall limit the right of the Reorganized Debtors to object to Claims, if any, filed or amended after the Claims Objection Deadline. Moreover, notwithstanding the expiration of the Claims Objection Deadline and unless subsequently ordered for good cause shown to shorten time, the Reorganized Debtors shall continue to have the right to amend any objections and to file and prosecute supplemental objections and counterclaims to a Disputed Claim until such Disputed Claim is Allowed. The Reorganized Debtors shall be authorized to, and shall, resolve all Disputed Claims by withdrawing or settling such objections thereto, or by litigating to judgment in the Bankruptcy Court or such other court having jurisdiction on the validity, nature and/or amount thereof.

**10.3 No Distributions Pending Allowance.** Notwithstanding any other provision of this Plan, no payments or distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim and the remainder has become a Disallowed Claim.

**10.4 Disputed Claims Reserves**. The Debtors and/or the Reorganized Debtors shall establish one or more Disputed Claims Reserves for the purpose of effectuating distributions to holders of Disputed Claims pending the allowance or disallowance of such claims in accordance with this Plan. The Disbursing Agent shall withhold the applicable Disputed Claims Reserves from the property to be distributed to particular classes under the Plan. The Disputed Claims Reserves shall be equal to 100% of the distributions to which holders of Disputed Claims in Classes 3, 4, 5, 6 and 7 would be entitled under this Plan as of such date if such Disputed Claims in Classes 3, 4, 5, 6 and 7 were Allowed Claims in their (a) Face Amount or (b) estimated amount of such Disputed Claim in Classes 3, 4, 5, 6 and 7 as approved in an order by the Bankruptcy Court pursuant to § 502(c) of the Bankruptcy Code. The Reorganized Debtors may request estimation for any Disputed Claim including, without limitation, any Disputed Claim that is contingent or unliquidated. Nothing in this Plan or the Disclosure Statement shall be deemed to entitle the holder of a Disputed Claim to postpetition interest on such Claim.

**10.5 Distributions After Allowance.** Payments and distributions from the Disputed Claims Reserve shall be made as appropriate to the holder of any Disputed Claim that has become an Allowed Claim, as soon thereafter as is reasonably practicable after the date such Disputed Claim becomes an Allowed Claim. Such distributions shall be based upon the cumulative distributions that would have been made to the holder of such Claim under the Plan if the Disputed Claim had been Allowed on the Effective Date (excluding any present value calculations) and shall not be limited by the Disputed Claim amounts previously reserved with respect to such Disputed Claim to the extent that additional amounts are available therefor, but only to the extent that such additional amounts have not yet been distributed to holders of Allowed Claims. Upon such distribution, the reserve shall be reduced by an amount equal to the amount reserved with respect to such Disputed Claim. To the extent the amount reserved for such Disputed Claim exceeds the Allowed Amount, if any, of such Claim, the remainder shall be deposited in the applicable Supplemental Distribution Account and distributed in accordance with the provisions of <u>Article V</u> of this Plan.

## ARTICLE XI

### ALLOWANCE AND PAYMENT OF CERTAIN ADMINISTRATIVE CLAIMS

**11.1     Professional Fee Claims.**

(a)     On the Effective Date, the Debtors shall pay all amounts owing to Professionals for all outstanding amounts relating to prior periods through the Effective Date approved by the Bankruptcy Court in accordance with the Professional Fee Order; provided, however, that Professionals shall continue to prepare fee applications in accordance with the Professional Fee Order for services rendered and expenses incurred up to the Effective Date.  No later than fifteen (15) days prior to the Confirmation Hearing, each Professional shall estimate fees and expenses due for periods that have not been billed as of the anticipated Effective Date.  Any party in interest shall have until the Confirmation Hearing to object to such estimate.  If no party objects to a Professional's estimate, then within ten (10) days of the Effective Date such Professional shall submit a bill and, provided that such bill is no more than the estimate, the fees and expenses shall be paid; provided, however, that the Reorganized Debtors shall be authorized to pay a Professional's success fee only upon approval of such fee by the Bankruptcy Court.  On the Effective Date, the Reorganized Debtors shall fund an escrow account in an amount equal to the aggregate amount of outstanding fee applications not ruled upon by the Bankruptcy Court as of the Effective Date plus the aggregate amount of all estimated fees and expenses due for periods that have not been billed as of the Effective Date.  Such escrow account shall be used by the Reorganized Debtors to pay the remaining Professional Fee Claims owing to the Professionals as and when Allowed by the Bankruptcy Court.  When all Professional Fee Claims have been paid in full, amounts remaining in such escrow account, if any, shall be returned to the Reorganized Debtors.

(b)     All Professionals or other entities requesting compensation or reimbursement of expenses pursuant to sections 327, 328, 330, 331, 363, 503(b) and 1103 of the Bankruptcy Code for services rendered and expenses incurred on or before the Effective Date (including compensation for making a substantial contribution in any of the Chapter 11 Cases) shall file with the Bankruptcy Court and serve such applications on counsel for the Debtors, the Creditors' Committee, the United States Trustee and as otherwise required by the Bankruptcy Court and the Bankruptcy Code an application for final allowance of compensation and reimbursement of expenses no later than forty-five (45) days after the end of the month in which the Effective Date occurred.  Objections to applications of Professionals and other entities for compensation and reimbursement of expenses must be filed with the Bankruptcy Court no later than sixty-five (65) days after the end of the month in which the Effective Date occurred.  All compensation and reimbursement of expenses allowed by the Bankruptcy Court shall be paid ten (10) days after the entry of an Order allowing such fees and expenses, or as soon thereafter as practicable.

(c)     Notwithstanding the foregoing subsections of this Section 11.1 of the Plan, on or within three (3) business days after the Confirmation Date, the Prepetition Indenture Trustees shall deliver an invoice for its fees and expenses to the Debtors, the Creditors' Committee and the United States Trustee, each of whom shall have the right to file an objection with the Bankruptcy Court, which objection must be filed within ten (10) days of receipt of such invoice.  Absent any such objection, each Prepetition Indenture Trustee's invoice for their fees and expenses shall be paid in Cash by the Debtors or the Reorganized Debtors, as applicable, on the Effective Date, or as soon

thereafter as practicable, without need to file an application for the payment of its fees and without need for further order of the Bankruptcy Court.

      **11.2**    **Administrative Claims.** All other requests for payment of an Administrative Claim, other than fees for the Prepetition Indenture Trustees and their counsel which shall be paid without requiring the filing of a fee application (other than as set forth in <u>Section 11.1</u> of this Plan), must be filed with the Bankruptcy Court and served on counsel for the Debtors and/or the Reorganized Debtors no later than the Administrative Claims Bar Date. Unless the Debtors object to an Administrative Claim within one hundred twenty (120) days after the Administrative Claims Bar Date, such Administrative Claim shall be deemed allowed in the amount requested. In the event that the Debtors and/or the Reorganized Debtors object to an Administrative Claim and such claimant and the Reorganized Debtors are unable to resolve their dispute consensually, then the Reorganized Debtors shall file a motion for determination thirty (30) days following the request of such claimant. Thereafter, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim. Notwithstanding the foregoing, the Debtors or the Reorganized Debtors may pay, in their discretion, in accordance with the terms and conditions of any agreements relating thereto, any Administrative Claim as to which no request for payment has been timely filed but which is paid or payable by a Debtor in the ordinary course of business.

      **11.3**    **Administrative Claims Bar Date Notice.** On the Effective Date, or as soon thereafter as practicable, Reorganized Avado shall provide written notice of the Administrative Claims Bar Date in substantially the same manner and fashion as the Debtors provided written notice of the Bar Date as approved by Final Order of the Bankruptcy Court on April 14, 2004.

## ARTICLE XII

## LITIGATION TRUST

      **12.1**    **Appointment of Litigation Trustee.**

      (a)    The Litigation Trustee for the Litigation Trust shall be selected by the Creditors' Committee, and approved by DDJ Capital Management, LLC, in its capacity as owning or advising certain funds owning Senior Notes, which approval shall not be unreasonably withheld. Specifically, the Creditors' Committee shall file a notice by the Plan Supplement Filing Date designating the Person that has been selected as Litigation Trustee and seeking approval of such designation. The Person designated as Litigation Trustee shall file an affidavit demonstrating that such Person is disinterested. If approved by the Bankruptcy Court in the Confirmation Order, the Person so designated shall become the Litigation Trustee on the Effective Date.

      (b)    The Litigation Trustee shall have and perform all of the duties, responsibilities, rights and obligations set forth in the Litigation Trust Agreement.

      **12.2**    **Funding of the Litigation Trust.** On the Effective Date, the Debtors will initially contribute $250,000 in Cash to the Litigation Trust. The Reorganized Debtors shall commit to fund the Litigation Trust with up to an additional $500,000; <u>provided</u>, <u>however</u>, that the Reorganized Debtors will not be required to provide the additional funding if the provision thereof would result in a default under the New Tranche A Financing Facility, the New Tranche B Financing Facility or any other material contract of the Reorganized Debtors, or would result in the diminishment of

working capital below an amount determined to be reasonably acceptable by the board of directors of the Reorganized Debtors. To the extent that the Litigation Trust requires funding beyond that made available by the Reorganized Debtors, the Litigation Trustee may arrange for additional funding as permitted in the Litigation Trust Agreement, including but not limited to, obtaining funding from some or all holders of the Litigation Trust Beneficial Interests.

       **12.3**    **Transfer of Litigation Trust Assets to the Litigation Trust.** On the Effective Date, the Reorganized Debtors shall transfer and shall be deemed to have irrevocably transferred to the Litigation Trust, for and on behalf of the beneficiaries of the Trust, with no reversionary interest in the Debtors or the Reorganized Debtors, the Litigation Trust Assets.

       **12.4**    **The Litigation Trust.**

          (a)    Without any further action of the directors or shareholders of the Debtors, on the Effective Date, the Litigation Trust Agreement for the Litigation Trust, substantially in the form included in the Plan Supplement, shall become effective. The Litigation Trustee shall accept the Litigation Trust Assets and sign the Litigation Trust Agreement on the Effective Date and the Litigation Trust will then be deemed created and effective.

          (b)    The Litigation Trustee shall have full authority to take any steps necessary to administer the Litigation Trust Assets, including, without limitation, the duty and obligation to liquidate Litigation Trust Assets, and, if authorized by majority vote of those members of the Litigation Trust Advisory Board authorized to vote, to pursue and settle any other trust claims. Upon such transfer (which, as stated above, shall occur on the Effective Date), the Debtors, the Disbursing Agent and the Reorganized Debtors shall have no other further rights or obligations with respect thereto.

          (c)    All costs and expenses associated with the administration of the Litigation Trust, including those rights, obligations and duties described in <u>Section 12.4(b)</u> of this Plan, shall be the responsibility of and paid by the Litigation Trust. Notwithstanding the foregoing, the Reorganized Debtors shall make available to the Litigation Trustee reasonable access during normal business hours, upon reasonable notice, to personnel and books and records of the Reorganized Debtors to representatives of the Litigation Trust to enable the Litigation Trustee to perform the Litigation Trustee's tasks under the Litigation Trust Agreement and this Plan; <u>provided</u>, <u>however</u>, that the Reorganized Debtors will not be required to make expenditures in response to such requests determined by them to be unreasonable. The Bankruptcy Court retains jurisdiction to determine the reasonableness of either a request for assistance and/or a related expenditure.

          (d)    The Litigation Trustee may retain such law firms, accounting firms, experts, advisors, consultants, investigators, appraisers, auctioneers or other professionals as it may deem necessary (collectively, the "Litigation Trustee Professionals"), in its sole discretion, and at the sole expense of the Litigation Trust, to aid in the performance of its responsibilities pursuant to the terms of this Plan including, without limitation, the liquidation and distribution of Litigation Trust Assets.

          (e)    For federal income tax purposes, it is intended that the Litigation Trust be classified as a liquidating trust under section 301.7701-4 of the Procedure and Administration Regulations and that such trust be owned by its beneficiaries. Accordingly, for federal income tax

purposes, it is intended that the beneficiaries be treated as if they had received a distribution of an undivided interest in the Litigation Trust Assets and then contributed such interests to the Litigation Trust. The Litigation Trust Agreement shall (i) state that the primary purpose of the Litigation Trust is to liquidate the Litigation Trust Assets with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, its liquidating purpose and (ii) contain a fixed or determinable termination date that is generally not more than five (5) years from the date of creation of the Litigation Trust, which termination date may be extended for one or more finite terms subject to the approval of the Bankruptcy Court upon a finding that the extension is necessary to its liquidating purpose. Each such extension must be approved by the Bankruptcy Court within two (2) months before the beginning of the extended term.

(f)     The Litigation Trustee shall be responsible for filing all federal, state and local tax returns for the Litigation Trust. The Litigation Trustee shall file all federal tax returns for the Litigation Trust as a grantor trust pursuant to section 1.671-4 of the Procedure and Administration Regulations.

(g)     For so long as the Former Officer Note is retained by the Reorganized Debtors, the Reorganized Debtors shall reasonably coordinate their efforts to collect, whether by litigation or otherwise, on such note and shall not enter into a settlement with the Former Officer with respect thereto without the consent of the Litigation Trustee, which consent shall not to be unreasonably withheld, so as to take into consideration any Causes of Action which the Litigation Trustee may be investigating or pursuing against the Former Officer.

(h)     Notwithstanding any other provision of the Litigation Trust Agreement, any recoveries with respect to the Former Officer Related Actions shall be limited to the proceeds of any applicable director and officer liability insurance policy and any person against whom a Former Officer Related Action is brought shall retain all rights to defend against such action.

**12.5     The Litigation Trust Advisory Board.**

(a)     The Litigation Trust Advisory Board shall be comprised of up to three (3) members selected by the Creditors' Committee, and approved by DDJ Capital Management, LLC, in its capacity as owning or advising certain funds owning Senior Notes, which approval shall not be unreasonably withheld. The Creditors' Committee shall provide written notice of the identities of such members and file such notice with the Bankruptcy Court by the Plan Supplement Filing Date. The Litigation Trust Advisory Board shall adopt such By-laws as it may deem appropriate. The Litigation Trustee shall consult regularly with the Litigation Trust Advisory Board when carrying out the purpose and intent of the Litigation Trust. Members of the Litigation Trust Advisory Board shall be entitled to reimbursement of the reasonable and necessary expenses incurred by them in carrying out the purpose of the Litigation Trust Advisory Board. Reimbursement of the reasonable and necessary expenses of the members of the Litigation Trust Advisory Board shall be payable by the Litigation Trust.

(b)     In the case of an inability or unwillingness of any member of the Litigation Trust Advisory Board to serve, such member shall be replaced by designation of the remaining members of the Litigation Trust Advisory Board. If the Litigation Trust Advisory Board has only one member and any position on the Litigation Trust Advisory Board remains vacant for more than thirty (30) days, such vacancy shall be filled within fifteen (15) days thereafter by the

designation of the Litigation Trustee without the requirement of a vote by the other members of the Litigation Trust Advisory Board.

(c)     Upon the certification by the Litigation Trustee that all Litigation Trust Assets have been distributed, abandoned or otherwise disposed of, the members of the Litigation Trust Advisory Board shall resign their positions, whereupon they shall be discharged from further duties and responsibilities.

(d)     The Litigation Trust Advisory Board may remove the Litigation Trustee in its discretion.  In the event the requisite approval is not obtained, the Litigation Trustee may be removed by the Bankruptcy Court for cause shown.  In the event of the resignation or removal of the Litigation Trustee, the Litigation Trust Advisory Board shall, by majority vote, designate a person to serve as successor Litigation Trustee.

(e)     Notwithstanding anything to the contrary in this Plan, neither the Litigation Trust Advisory Board or any of its members, designees, or any duly designated agent or representatives of any such party shall be liable for the act, default or misconduct of any other member of the Litigation Trust Advisory Board, nor shall any member be liable for anything other than such member's own gross negligence or willful misconduct.  The Litigation Trust Advisory Board may, in connection with the performance of its duties, and in its sole and absolute discretion, consult with its counsel, accountants or other professionals, and shall not be liable for anything done or omitted or suffered to be done in accordance with such advice or opinions.  If the Litigation Trust Advisory Board determines not to consult with its counsel, accountants or other professionals, it shall not be deemed to impose any liability on the Litigation Trust Advisory Board, or its members and/or designees.

(f)     To the extent the Litigation Trust Advisory Board adopts by-laws, no provisions of such by-laws shall supersede any express provision of the Plan.

**12.6     Distributions of Litigation Trust Assets.**  The Litigation Trustee shall make distributions of Net Litigation Trust Recoveries to the holders of Litigation Trust Beneficial Interests on a pro rata basis.  The Litigation Trustee will make continuing efforts to prosecute or settle the Litigation Trust Actions, make timely distributions, and not unduly prolong the duration of the Litigation Trust.

## ARTICLE XIII

## CONFIRMATION AND CONSUMMATION OF THE PLAN

**13.1     Conditions to Confirmation**.  The following are conditions precedent to confirmation of the Plan that may be satisfied or waived in accordance with Section 13.3 of the Plan:

(a)     The Bankruptcy Court shall have approved by Final Order a Disclosure Statement with respect to the Plan in form and substance reasonably acceptable to the Debtors.

(b)     The Confirmation Order shall be in form and substance reasonably acceptable to the Debtors.

**13.2** **Conditions to Effective Date.** The following are conditions precedent to the occurrence of the Effective Date:

(a) Reorganized Avado shall have entered into the New Tranche A Financing Facility, the New Tranche B Financing Facility, and the New Convertible Preferred Purchase Agreement, and all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with Section 13.3 of the Plan.

(b) The Debtors or the Reorganized Debtors shall have Cash on hand sufficient to fund the Cash Reserve and make any other payments required to be paid under this Plan by the Debtors or the Reorganized Debtors on or as soon as practicable after the Effective Date.

(c) The Confirmation Order shall be in form and substance acceptable to the Debtors and shall have been entered by the Bankruptcy Court and shall be a Final Order, and no request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending.

(d) Any order necessary to satisfy any condition to the effectiveness of the Plan shall have become a Final Order and all documents provided for under the Plan shall have been executed and delivered by the parties thereto.

**13.3** **Waiver of Conditions.** The conditions set forth in Sections 13.1 and 13.2 of the Plan may be waived, in whole or in part, by the Debtors with the consent of the Creditors' Committee, which consent shall not be unreasonably withheld, without a hearing. The failure to satisfy or waive any condition to the Confirmation Date or the Effective Date may be asserted by the Debtors in their reasonable discretion based on the circumstances giving rise to the failure of such condition to be satisfied. The failure of the Debtors to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

## ARTICLE XIV

## EFFECT OF THE PLAN ON CLAIMS AND INTERESTS

**14.1** **Discharge of the Debtors.** Pursuant to sections 524 and 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in this Plan or in the Confirmation Order, the distributions and rights that are provided in this Plan shall be in complete satisfaction, discharge and release, effective as of the Confirmation Date (but subject to the occurrence of the Effective Date), of Claims and Causes of Action, whether known or unknown, against, liabilities of, liens on, obligations of and Interests in the Debtors, the Reorganized Debtors, or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Interests, including, but not limited to, demands and liabilities that arose before the Petition Date, any liability (including withdrawal liability) to the extent such Claims relate to services performed by employees of the Debtors prior to the Confirmation Date and that arise from a termination of employment or a termination of any employee or retiree benefit program regardless of whether such termination occurred prior to or after the Confirmation Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) a

proof of claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (ii) a Claim based upon such debt is Allowed under section 502 of the Bankruptcy Code, or (iii) the Claim holder of such a Claim accepted the Plan. The Confirmation Order shall be a judicial determination of the discharge of all liabilities of the Debtors, subject to the Effective Date occurring.

**14.2    Compromises and Settlements.** Pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019(a), the Debtors may compromise and settle various Claims against them and claims that they have against other Persons. The Debtors expressly reserve the right (with Bankruptcy Court approval, following appropriate notice and opportunity for a hearing) to compromise and settle Claims against them and claims that they may have against other Persons up to and including the Effective Date. After the Effective Date, the Reorganized Debtors may compromise and settle any Claims against them and claims they may have against other Persons without approval from the Bankruptcy Court where the amount in dispute is less than $250,000 or the Claim to be settled is less than $1,000,000.

**14.3    Satisfaction of Subordination Rights.** All Claims against the Debtors and all rights and claims between or among Claim holders relating in any manner whatsoever to Claims against the Debtors, based upon any claimed subordination rights (if any), shall be deemed satisfied by the distributions under the Plan to Claim holders having such subordination rights, and such subordination rights shall be deemed waived, released, discharged and terminated as of the Effective Date. Distributions to the various Classes of Claims hereunder shall not be subject to levy, garnishment, attachment or like legal process by any Claim holder by reason of any claimed subordination rights or otherwise, so that each Claim holder shall have and receive the benefit of the distributions in the manner set forth in the Plan.

**14.4    Exculpation and Limitation of Liability.** Except as otherwise specifically provided in this Plan, the Debtors, the Reorganized Debtors, the Creditors' Committee, the members of the Creditors' Committee in their representative capacity, any of such parties' respective present or former members, officers, directors, employees, advisors, representatives, Restructuring Professionals or agents, the DIP Agent, and DIP Lenders, the other Released Parties, and the Investor Agent and the Investors, any such parties' respective present or former members, officers, directors, employees, advisors, representatives, agents, and professionals, and their successors and assigns, shall not have or incur, and are hereby released from, any claim, obligation, Cause of Action or liability to one another or to any holder of any Claim or Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys or affiliates, or any of their successors or assigns, for any act or omission in connection with, or arising out of the Chapter 11 Cases, the pursuit of confirmation of the Plan, the consummation of the Plan, the administration of the Plan or the property to be distributed under the Plan except for their willful misconduct and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

Notwithstanding any other provision of this Plan, no Claim holder or Interest holder, or other party in interest, none of their respective agents, employees, representatives, financial advisors, attorneys or affiliates, and no successors or assigns of the foregoing, shall have any right of action against the Debtors, the Reorganized Debtors, the Creditors' Committee, the members of the Creditors' Committee in their representative capacity, the Restructuring Professionals, the DIP Lender, the DIP Agent, any other Released Party, the Investor Agent and the Investors, or any of such parties' respective present or former members, officers, directors, employees, advisors, representatives, agents

and professionals or any of such parties' successors and assigns, for any act or omission in connection with, relating to or arising out of the Chapter 11 Cases, the pursuit of confirmation of the Plan, the consummation of the Plan, the administration of the Plan or the property to be distributed under the Plan except for their willful misconduct, provided that nothing in this <u>Section 14.4</u> shall apply to any Professional who is not a Restructuring Professional.

   **14.5**  **Indemnification Obligations.** In satisfaction and compromise of any obligations or rights of any of the Indemnitees' Indemnification Rights, (a) all Indemnification Rights except (i) all Indemnification Rights of an Indemnitee who is also a Released Party, and (ii) those based solely upon any act or omission arising out of or relating to any Indemnitee's service with, for or on behalf of a Debtor on or after the Petition Date (collectively, the "Continuing Indemnification Rights"), shall be released and discharged on and as of the Effective Date; provided that the Continuing Indemnification Rights shall remain in full force and effect on and after the Effective Date and shall not be modified, reduced, discharged or otherwise affected in any way by the Chapter 11 Cases, (b) the Debtors or the Reorganized Debtors, as the case may be, covenant to purchase and maintain director and officer insurance providing coverage for those Indemnitees with Continuing Indemnification Rights for a period of two years after the Effective Date insuring such parties in respect of any claims, demands, suits, causes of action or proceedings against such Indemnitees based upon any act or omission related to such Indemnitee's service with, for or on behalf of the Debtors in at least the scope and amount as currently maintained by the Debtors (the "Insurance Coverage"), (c) the insurers are authorized to pay any professional fees and expenses incurred in connection with any action relating to any Continuing Indemnification Rights and (d) the Debtors or the Reorganized Debtors, as the case may be, hereby indemnify Indemnitees with Continuing Indemnification Rights and agree to pay for any deductible or retention amount that may be payable in connection with any claim covered by either under the foregoing Insurance Coverage or any prior similar policy.

   **14.6**  **Releases by Debtors and Debtors in Possession.**

    (a)  Pursuant to section 1123(b)(3) of the Bankruptcy Code, effective as of the Effective Date, each Debtor, in its individual capacity and as a Debtor in Possession, for and on behalf of its Estate, shall release and discharge all Released Parties for and from any and all claims or Causes of Action existing as of the Effective Date in any manner arising from, based on or relating to, in whole or in part, the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, or any act, omission, occurrence or event in any manner related to any such Claims, Interest, restructuring or the Chapter 11 Cases, except (i) Avoidance Actions except to the extent the Avoidance Actions that are initiated by the Confirmation Date, and (ii) the Former Officer Related Actions (which are being transferred to the Litigation Trust pursuant to the terms of this Plan), <u>provided</u> <u>that</u>, any recoveries relating to the Former Officer Related Actions shall be limited to the proceeds of any applicable director and officer liability insurance policy and any person against whom a Former Officer Related Action is brought shall retain all rights to defend against such action.

    (b)  No provision of this Plan or of the Confirmation Order, including without limitation, any release or exculpation provision, shall modify, release or otherwise limit the liability of the Former Officer or any Person not specifically released hereunder, including without limitation, any Person that is a co-obligor or joint tortfeasor of a Released Party or that otherwise is liable under theories of vicarious or other derivative liability.

<div align="center">Plan - 47</div>

(c)     The Reorganized Debtors and any newly-formed entities that will be continuing the Debtors' businesses after the Effective Date shall be bound, to the same extent the Debtors are bound, by all of the releases set forth above.

**14.7     Release by Holders of Claims.  On the Effective Date(s) (a) each Person that votes to accept the Plan, and (b) to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, all holders of Claims, in consideration for the obligations of the Debtors and the Reorganized Debtors under the Plan and the Cash and other contracts, instruments, releases, agreements or documents to be delivered in connection with the Plan, each entity (other than a Debtor) that has held, holds or may hold a Claim (each, a "Release Obligor"), shall have conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged each Released Party from any claim or Cause of Action existing as of the Effective Date arising from, based on or relating to, in whole or in part, the subject matter of, or the transaction or event giving rise to, the Claim or Interest of such Release Obligor, and any act, omission, occurrence or event in any manner related to such subject matter, transaction or obligation; provided, however, that this Section 14.7 shall not release any Released Party from any claim or Cause of Action existing as of the Petition Date, based on (i) the Internal Revenue Code or other domestic state, city or municipal tax code, (ii) the environmental laws of the United States or any domestic state, city or municipality, (iii) any criminal laws of the United States or any domestic state, city or municipality, or (iv) the Litigation Trust Actions; and provided further, however, that this Section 14.7 shall not apply to Pubs Property, LLC, Suds Remainder, LLC and GE Capital Franchise Finance Corporation f/k/a FFCA Acquisition Corporation, such entities being the defendants in Adversary Proceeding No. 04-03583-SAF, or to any affiliate, successor or assign thereof that may be entitled to vote in connection with the Plan (collectively, the "Defendant Landlord Parties"), it being expressly understood that any of the Defendant Landlord Parties entitled to vote to accept or reject the Plan may do so without such vote constituting or being construed as a release of any entity pursuant to this Section 14.7 or otherwise.**

**14.8     Injunction.  The satisfaction, release and discharge pursuant to this Article XIV of this Plan shall also act as an injunction against any Person commencing or continuing any action, employment of process, or act to collect, offset or recover any Claim or Cause of Action satisfied, released or discharged under this Plan to the fullest extent authorized or provided by the Bankruptcy Code, including, without limitation, to the extent provided for or authorized by sections 524 and 1141 thereof.**

## ARTICLE XV

## RETENTION OF JURISDICTION

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and the Plan, including, among other things, the following matters:

(a)     to hear and determine pending motions for the assumption or rejection of executory contracts or unexpired leases or the assumption and assignment, as the case may

be, of executory contracts or unexpired leases to which any of the Debtors are a party or with respect to which any of the Debtors may be liable, and to hear and determine the allowance of Claims resulting therefrom including the amount of Cure, if any, required to be paid to such Claim holders;

(b) to adjudicate any and all Causes of Action, adversary proceedings, applications and contested matters that have been or hereafter are commenced or maintained in or in connection with the Chapter 11 Cases or the Plan, including, without limitation, any adversary proceeding or contested matter, proceedings to adjudicate the allowance of Disputed Claims, and all controversies and issues arising from or relating to any of the foregoing;

(c) to ensure that distributions to Allowed Claim holders are accomplished as provided herein;

(d) to hear and determine any and all objections to the allowance or estimation of Claims filed, both before and after the Confirmation Date, including any objections to the classification of any Claim or Interest, and to allow or disallow any Claim, in whole or in part;

(e) to enter and implement such orders as may be appropriate if the Confirmation Order is for any reason stayed, revoked, modified and/or vacated;

(f) to issue orders in aid of execution, implementation or consummation of the Plan;

(g) to consider any modifications of the Plan with respect to any Debtor, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(h) to hear and determine all matters involving claims or Causes of Action involving any of the Debtors or their property;

(i) to hear and determine all applications for allowance of compensation and reimbursement of Professional Fee Claims under the Plan or under sections 330, 331, 503(b), 1103 and 1129(a)(4) of the Bankruptcy Code;

(j) to hear and determine all motions or objections regarding compensation and reimbursement of expenses made by any professionals, including, without limitation, the ability of the Bankruptcy Court to enter an order to show cause and commence a hearing to examine any issue concerning the fees and expenses of any professionals;

(k) to determine requests for the payment of Claims entitled to priority under section 507(a)(1) of the Bankruptcy Code, including compensation of and reimbursement of expenses of parties entitled thereto;

(l) to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

(m)     to hear and determine all suits or adversary proceedings to recover assets of any of the Debtors and property of their Estates, wherever located;

(n)     to hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(o)     to hear any other matter not inconsistent with the Bankruptcy Code;

(p)     to hear and determine all disputes involving the existence, nature or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

(q)     to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Litigation Trust;

(r)     to hear and determine disputes arising in connection with the New Convertible Preferred Purchase Agreement;

(s)     to enter a final decree closing the Chapter 11 Cases; and

(t)     to enforce all orders previously entered by the Bankruptcy Court.

Notwithstanding anything contained herein to the contrary, the Bankruptcy Court retains exclusive jurisdiction to hear and determine disputes concerning (i) Claims or (ii) Causes of Action and any motions to compromise or settle such disputes.  Despite the foregoing, if the Bankruptcy Court is determined not to have jurisdiction with respect to the foregoing, or if the Reorganized Debtors choose to pursue any Claim or Cause of Action (as applicable) in another court of competent jurisdiction, the Reorganized Debtors will have authority to bring such action in any other court of competent jurisdiction.

## ARTICLE XVI

## MISCELLANEOUS PROVISIONS

**16.1     Binding Effect.**  The Plan shall be binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, all present and former holders of Claims and Interests, other parties in interest and their respective successors and assigns as of the entry of the Confirmation Order.

**16.2     Payment of Statutory Fees.**  All fees payable pursuant to section 1930 of title 28 of the United States Code, as of the entry of the Confirmation Order as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.  The Reorganized Debtors will continue to pay fees pursuant to section 1930 of title 28 of the United States Code until the Chapter 11 Cases are closed.

**16.3     Amendment or Modification of the Plan.**  The Debtors may alter, amend or modify the Plan with respect to any Debtor or any Plan Schedules, Exhibits or Plan Supplement

documents thereto under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Hearing. After the Confirmation Date and prior to substantial consummation of the Plan with respect to any Debtor as defined in section 1101(2) of the Bankruptcy Code, the Debtors or the Reorganized Debtors may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan with respect to such Debtor or Reorganized Debtor, the Disclosure Statement or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of the Plan, so long as such proceedings do not materially adversely affect the treatment of Claim holders or Interest holders under the Plan; provided, however, that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or order of the Bankruptcy Court.

16.4  **Revocation, Withdrawal or Non-Consummation.**  The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or leases affected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void, and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtors or any other Person, (ii) prejudice in any manner the rights of such Debtors or any other Person, or (iii) constitute an admission of any sort by the Debtors or any other Person.

16.5  **Notice**.  All notices, requests and demands to or upon the Debtors or the Reorganized Debtors to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

Avado Brands, Inc.
Hancock at Washington
Madison, Georgia  30650
Telephone:  (706) 342-4552
Facsimile:  (706) 342-9283
Attn:  General Counsel

*with copies to:*

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
333 West Wacker Drive
Chicago, Illinois  60606-1285
Telephone:  (312) 407-0700
Facsimile:  (312) 407-0411
Attn:  George N. Panagakis
  Timothy P. Olson
  Nathan Stuart

and

Cox Smith Matthews Incorporated
112 E. Pecan Street
Suite 1800
San Antonio, Texas
Telephone:    (210) 554-5500
Facsimile:    (210) 226-8395
Attn:         Deborah D. Williamson
              Thomas Rice

**16.6    Governing Law.**  Except to the extent the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent an exhibit or schedule or Plan Supplement document to the Plan provides otherwise, the rights and obligations arising under this Plan and any agreements, documents and instruments executed in connection with the Plan shall be governed by, and construed and enforced in accordance with, the laws of state of Delaware, without giving effect to the principles of conflicts of law of such jurisdiction.

**16.7    Tax Reporting and Compliance.**  In connection with the Plan and all instruments issued in connection therewith and distributions thereof, the Debtors and the Reorganized Debtors, as the case may be, shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all distributions hereunder shall be subject to any such withholding and reporting requirements.  The Reorganized Debtors are hereby authorized, on behalf of each of the Debtors, to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtors for all taxable periods ending after the Petition Date through, and including, the Effective Date.

**16.8    Committees.**  As of the Effective Date, the Creditors' Committee shall dissolve whereupon its members, professionals and agents shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, provided, however, that (i) the Creditors' Committee shall form a subcommittee responsible for reviewing professional fees and other Administrative Claims, which shall remain in existence after the Effective Date on behalf of the Creditors' Committee, and shall dissolve at the later of (a) sixty (60) days after the Administrative Claims Bar Date, or (b) if any objection is filed by the subcommittee, the date such objection is withdrawn or resolved by a Final Order, and (ii) the Professionals shall comply with Section 11.1 of this Plan.  The Professionals retained by the Creditors' Committee and the members thereof shall not be entitled to compensation and reimbursement of expenses for services rendered after the Effective Date, except for services rendered in connection with (i) the implementation of the transactions contemplated to occur on the Effective Date hereunder and (ii) applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or filed after the Effective Date pursuant to Section 11.1 of this Plan.

**16.9    Term of Injunctions or Stays.**  Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date, shall remain in full force and effect until the Effective Date.

**16.10    No Waiver or Estoppel**.  Each Claim holder or Interest holder shall be deemed to have waived any right to assert that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors and/or their counsel, the Creditors' Committee and/or its counsel, or any other party, if such agreement was not disclosed in the Plan, the Disclosure Statement or papers filed with the Bankruptcy Court.

Dated:        March 2, 2005

                                                Respectfully submitted,

                                                AVADO BRANDS INC. AND ITS
                                                SUBSIDIARIES AND AFFILIATES THAT ARE
                                                ALSO DEBTORS AND DEBTORS IN
                                                POSSESSION IN THE CHAPTER 11 CASES


                                                By:     */s/ Michael A. Feder*
Counsel:                                                Michael A. Feder
                                                        Chief Restructuring Officer
                                                        Avado Brands, Inc.

By:         */s/ George N. Panagakis*
            George N. Panagakis
            Timothy P. Olson
            Nathan Stuart
            SKADDEN, ARPS, SLATE, MEAGHER
                & FLOM LLP
            333 West Wacker Drive
            Chicago, Illinois  60606-1285
            (312) 407-0700

            -and-

            Deborah D. Williamson
            Thomas Rice
            COX SMITH MATTHEWS
                INCORPORATED
            112 East Pecan Street, Suite 1800
            San Antonio, Texas 78205-1521
            (210) 554-5500
            (210) 226-8395 (Fax)
            avado@coxsmith.com

            ATTORNEYS FOR DEBTORS
            AND DEBTORS IN POSSESSION

**Plan Schedule 7.3**

**Board of Directors**

[To be filed on or before the Plan Supplement Filing Date]

**Plan Schedule 7.10(a)**

**Deferred Compensation Employees**

[To be filed on or before the Plan Supplement Filing Date]

**Plan Schedule 7.10(b)**

**Operating Partners**

[To be filed on or before the Plan Supplement Filing Date]

**Plan Schedule 7.10(c)**

**Severed Employees**

[To be filed on or before the Plan Supplement Filing Date]

**Plan Schedule 8.2(a)**

**Assumed Unexpired Non-Residential Real Property Leases**

[To be filed on or before April 1, 2005]

**Plan Schedule 8.2(b)**

**Assumed Executory Contracts and Unexpired Leases
(Other than Unexpired Non-Residential Real Property Leases)**

[To be filed on or before the Plan Supplement Filing Date]

**Plan Schedule 8.3**

**Executed Contracts**

[To be filed on or before the Plan Supplement Filing Date]

**APPENDIX B**

**Corporate Organization Chart**



(1) 1% each owned by non-Debtor individuals.

(2) Although the entities noted above have been dissolved, they have not yet been wound up and certain liabilities remain.

Hops of the Ohio Valley, Inc. (Fla.)
Hops Marketing, Inc. (Fla.)
Hops of Southwest Florida, Inc. (Fla.)
Hops Grill & Bar, Inc. (Fla.)
Cypress Coast Construction Corp. (Fla.)
100%
Hops of Ohio Valley, Ltd. (Fla.)
Hops of Bowling Green, Ltd. (Fla.)
Hops of Louisiana, Ltd. (Fla.)
Hops of Baltimore County, LLC (Fla.)
Hops of Matthews, Ltd. (Fla.)
Hops of Rhode Island, LLC (RI)
Hops of the Carolinas, Ltd. (Fla.)
Hops of the Carolinas II, Ltd. (Fla.)
Hops of the Gold Coast, Ltd. (Fla.)
Hops of Cherry Creek, Ltd. (Fla.)
Hops of Colorado Springs, Ltd. (Fla.)
Hops of Connecticut, Ltd. (Fla.)
Hops of Minnesota, Ltd. (Fla.)
The Hops Northeast Florida Joint Venture No. III (Fla.)
Hops of Greater Boston, Ltd. (Fla.)
Hops of Stuart, Ltd. (Fla.)
Hops of Virginia, Ltd. (Fla.)
Hops of Virginia II, Ltd. (Fla.)
Hops of Coral Springs, Ltd. (Fla.)
Hops of the Rockies, Ltd. (Fla.)
Hops of the Rockies II, Ltd. (Fla.)
Hops of Southwest Florida, Ltd. (Fla.)
Hops of South Carolina, Ltd (Fla.)
Hops of South Florida, Ltd (Fla.)
Hops of Massachusetts, Ltd. (Fla.)
Hops of Southeast Florida, Ltd (Fla.)
HNEF Area Manager II, Ltd. (Fla.)
Hops of Greater Detroit, Ltd. (Fla.)
Hops of Bradenton, Ltd. (Fla.)
Hops of Kansas, Ltd.
Hops of Missouri, LLC (Fla.)
Hops of South Carolina II, Ltd. (Fla.)
Hops of Florida Mall, Ltd. (Fla.)
The Hops Northeast Florida Joint Venture No. I (Fla.)
The Hops Northeast Florida Joint Venture No. II (Fla.)
Hops of Atlanta, Ltd. (Fla.)
Hops of Boynton Beach, Ltd. (Fla.)
Hops of Idaho, Ltd. (Fla.)
Hops of Indiana, Ltd. (Fla.)
Hops of Lakeland, Ltd. (Fla.)
Hops of Ohio, Ltd. (Fla.)
Hops of Greater Orlando II, Ltd. (Fla.)
Hops of Greater Orlando, Ltd. (Fla.)
Hops of Altamonte Springs, Ltd. (Fla.)
1%GP; 10% LP
89% LP
98.9% LP
1% GP; 0.1%LP
9.79% LP
1% GP; 89.21% LP
97%
98.9%
90% GP
10% LP
1% GP; 0.1%LP
89% LP; 1% GP
99% LP
1% GP
98.9% LP
1%GP; 89%LP

**APPENDIX C**

**Liquidation Analysis**

**Avado Brands, Inc.**
**Chapter 7 Liquidation vs. Chapter 11 Plan of Reorganization**
**30-Apr-05**
**($000s)**

| Assets | Ref | Book Value | Recovery | Est. Proceeds |
|---|---|---|---|---|
| Cash | A | $1,441 | 100% | $1,440 |
| Restricted Cash | A | $16,427 | 100% | 5,000 |
| Accounts Receivable | B | $4,103 | 52% | 2,120 |
| Inventories | C | $3,245 | 50% | 1,620 |
| Prepaid Expenses & Other | D | $2,888 | 34% | 970 |
| Assets Held for Sale | E | $1,678 | 0% | 0 |
| Total Current Assets | | $29,782 | | 11,150 |
| | | | | |
| Net Premises & Equipment | F | $129,598 | 34% | 44,540 |
| Deferred Income Taxes | G | $11,620 | 0% | 0 |
| Other Assets | H | $21,020 | 0% | 0 |
| | | $162,238 | | 44,540 |
| | | | | |
| Total | | $192,020 | | $55,690 |

| Distribution Analysis (1) | | | | | |
|---|---|---|---|---|---|
| | | | | Recovery | Remaining |
| | | Claim | % | $ | Proceeds |
| Proceeds Available for Distribution | | | | | $55,690 |
| | | | | | |
| Chapter 7 Trustee Fees | N | $1,671 | 100.0% | $1,671 | $54,019 |
| | | | | | |
| **Secured Claims:** | | | | | |
| DIP Loan | I | $54,484 | | | |
| Less Cost Not Incurred in Ch. 7 | | | | | |
| New Credit Facility Fees | J | (1,425) | | | |
| Adjusted DIP Credit Facility | | $53,059 | 100.0% | $53,059 | $960 |
| Secured Tax Claims | | 500 | 100.0% | 500 | $460 |
| Total Secured Claims | | $106,619 | | $53,559 | |
| | | | | | |
| Remaining Proceeds Available for Distibution | | | | | $460 |
| | | | | | |
| **Priority/Administrative Claims:** | | | | | |
| Severance and Closure Costs | K | $10,620 | 0.7% | $78 | $382 |
| Post-Petition Accounts Payable and Accrued Expenses | L | 26,519 | 0.7% | 194 | 188 |
| Winddown Costs (Including Accrued Payroll) | M | 1,200 | 0.7% | 9 | 179 |
| Priority Tax Claims | O | 24,500 | 0.7% | 179 | 0 |
| Class 2 | | 0 | 0.7% | 0 | (0) |
| Total Priorty/Administrative Claims | | $62,839 | | $460 | |
| | | | | | |
| Remaining Proceeds Available for Distibution to Unsecured Claims | | | | | ($0) |
| | | | | | |
| **Unsecured Claims (2):** | | | | | |
| Class 3 | | $30,000 | 0.0% | ($0) | ($0) |
| Class 4 | | 113,600 | 0.0% | (0) | (0) |
| Class 5 | | 51,200 | 0.0% | 0 | (0) |
| Class 6 | | 3,300 | 0.0% | 0 | (0) |
| Class 7 | | 5,000 | 0.0% | (0) | (0) |
| Total Unsecured Claims | | $203,100 | | ($0) | |
| | | | | | |
| Remaining Proceeds Available for Distibution to Common Equity | | | | | ($0) |
| | | | | | |
| **Common Equity** | | | | | |
| Class 8 | | | | - | ($0) |

(1) When more than one creditor participates at the same level of priority for a distribution, recoverable proceeds are divided pro rata unless a subordination agreement between creditors provides for alternative treatment
(2) Claims represent high case.

**Exhibit C**

**Chapter 7 Liquidation**

**(All $ in 000's Unless Otherwise Noted)**

In preparing its Chapter 7 Liquidation analysis, the Debtor assumed that the liquidation would begin on April 30, 2005 and take approximately 3 months to complete.

A.  The Debtors estimate that they will be able to collect 100% of the cash and $5 million of restricted cash. The remaining balance of restricted cash is assumed to be collected by the Debtors' lender when the letters of credit that are being collateralized by the cash are drawn.

B.  The Debtors estimate that they will be able to collect 100% of its credit card receivables. Receivables related to collections from the Debtors' former CEO and unused tax credits are assumed to be uncollectable.

C.  The Debtors inventory consists of Supplies Inventory, Beer Wine & Liquor Inventory and Food Inventory. The Debtors estimate that they will be able to recover approximately 50% of the cost of this inventory upon liquidation.

D.  The Debtors have reviewed their prepaid expenses and believe that certain prepaid expenses will be recoverable (e.g., prepaid sales taxes, prepaid marketing, etc.), while others will not (e.g., prepaid liquor license, prepaid rent, etc.).

E.  Proceeds from assets held for sale have already been reflected in the Cash balance as of April 30, 2005 or as a reduction in outstanding DIP borrowings as of April 30, 2005.

F.  The Debtors, with the assistance of its real estate advisors, analyzed the values of the leases and properties it holds. Based upon its experience selling individual properties, the fact that not all properties will sell, costs of carrying the properties while they are being marketed, sales expenses and the impact of selling these properties in a Chapter 7 liquidation, the Debtors estimate that it would receive approximately 50% of the total value of these properties in a liquidation sale. This represents approximately 34% of the Debtors' current book value of these properties.

G.  The Debtors do not expect to receive any proceeds from Deferred Income Taxes.

H.  Other assets consist of deferred amortization of sale lease back fees and loan fees. The Debtors do not expect to receive any proceeds from these items.

I.  Estimated Class 1 balance as of April 30, 2005

J.  The balance of the estimated Class 1 claim is reduced to eliminate the New Credit Facility Fees included in the April 30, 2005 balance. The Debtors will not need a New Credit Facility if it liquidates under Chapter 7.

K.  The Debtors estimate that it will incur $90,000 per restaurant in severance and closure costs. The Debtors will close 118 restaurants.

L.  This balance represents the Debtors accounts payable and accrued expenses outstanding as of April 30, 2005.

M.  Wind-down costs are estimated to be $400,000 per month for 3 months.

N.  Trustee fees are 3% of Proceeds Available for Distribution

O.  Represents the total priority tax claims. Under the Plan, $1.5 million of these would have been paid in cash with the remaining $23 million paid in an interest bearing obligation.

**APPENDIX D**

**Projections**

**Exhibit D**
**Financial Projections and Assumptions**
**(Unaudited)**

**(All $ in 000's Unless Otherwise Noted)**

In connection with its reorganization efforts and the appointment of a new CEO, the Debtors and its advisors have undertaken a thorough review of its business operations, results, and the business model on which its operations were based and have developed a business plan that addresses the issues that ultimately caused it to file this Chapter 11. Through that process, the Debtors' management developed a five (5) year business plan (the "Business Plan") and, from that Business Plan, a set of financial projections extending from 2005 to 2009 for Reorganized Avado (the "Projections"), summarized below.

The Projections contained herein reflect numerous assumptions, including the confirmation and consummation of the Plan of Reorganization (the "Plan") for the Debtors[1] as filed with the Bankruptcy Court. The Projections should be viewed in conjunction with a review of the assumptions including the disclaimers and footnotes as set forth herein. The Projections were prepared by management in good faith based upon assumptions believed to be reasonable. While presented with numerical specificity, the Projections are based upon a variety of estimates and assumptions subject to significant business, economic, and competitive uncertainties and contingencies, many of which are beyond the control of the Debtors. As with all projections, actual results may vary materially from those presented. The Projections have not been prepared to comply with the guidelines established with respect to Projections by the Securities and Exchange Commission or the American Institute of Certified Public Accountants ("AICPA") and have not been audited.

The Projections are based on the assumption that the Debtors will emerge from Chapter 11 on April 30, 2005[2] ("Effective Date"), with the Reorganized Avado Debtors continuing to operate 96 Don Pablo's restaurants and 22 Hops restaurants.

The Projections include (a) the Avado Brands, Inc., et al. Pre-Reorganization Balance Sheet as projected at April 30, 2005 and Adjustments to the Pre-Reorganization Balance Sheet to reflect projected payments and borrowings made as a result of consummation of the Plan and adjustments pursuant to the principles of "fresh-start accounting" as required by Statement of Position 90-7 ("SOP 90-7") issued by the AICPA and (b) post-Effective Date balance sheets, income statements and statements of cash flows for Reorganized Avado.

The Projections are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Factors that could cause actual results to differ materially include, but are not limited to, the Reorganized Debtors' ability to operate their business consistent with their projections, to comply with covenants of any financing agreements, to

---

[1] Capitalized terms not defined herein shall have the same meanings set forth in the Plan.
[2] If the Effective Date of the Plan is significantly delayed (i.e., approximately more than 90 days), additional expenses, including professional fees, may be incurred and operating results may be negatively impacted.

attract and to retain customers and key executives, to successfully implement its remodeling strategies and to accurately estimate claims.

**Exhibit D**

**Pro Forma Balance Sheets
(Unaudited)**

**(All $ in 000's Unless Otherwise Noted)**

<u>Footnotes</u>

1. The Pre-Reorganization Balance Sheet for the Debtors is based upon the Debtors' estimates of the results of operations of the Debtors' estates through April 30, 2005, the assumed Effective Date of the Plan.

2. The pro forma balance sheet adjustments contained herein account for the reorganization and related transactions pursuant to the Plan using the principle of "fresh-start" accounting as required by SOP 90-8 issued by the AICPA. The fresh start adjustments are based on an estimated reorganization value of the Debtors of $91 million. Actual adjustments will be determined at a later date and may be materially different from those presented herein, based upon completion of asset appraisals and other factors.

3. Under the Debtors new credit facilities, it will not be required to hold restricted cash to collateralize letters of credit.

4. Pursuant to SOP 90-7, certain receivable balances estimated to be uncollectable are written off.

5. Pursuant to SOP 90-7, property, plant & equipment are written-down because the Reorganization Value of the Debtors is less than the book value of the Debtors.

6. Pursuant to SOP 90-7, other assets are written-off as a result of the Reorganization Value of the Debtors being less than the book value of the Debtors.

7. Pursuant to SOP 90-7, liabilities are written-off to adjust to the value of the liabilities upon emergence.

8. This adjustment is made to reflect the Debtors' estimate of the value of tax liabilities upon emergence.

9. This adjustment is made to reflect the elimination of certain liabilities based on the forgiveness of debt as provided for under the Plan.

10. This adjustment is made to reflect the assumption of the Debtors capital leases under the Plan.

11. The adjustment to shareholders' equity & retained earnings is the result of generating income through debt forgiveness, offset by the write down of assets and elimination of retained earnings.

12. This adjustment is made to eliminate the Debtors' Old Common Stock and TECONS Securities under the Plan

13. This adjustment is made to reflect the borrowing at emergence on the Revolving Credit Facility and the Term Loan A.

14. This adjustment is made to reflect the borrowing at emergence on the Term Loan B.

15. This adjustment reflects the re-payment of the DIP loan.

16. This adjustment is made to reflect the issuance of the Debtors' New Convertible Preferred Stock.

17. This adjustment is made to reflect the write-off of restaurants closed in February 2005.

**Exhibit D**

**Projected Statement of Operations**
**(Unaudited)**

**(All $ in 000's Unless Otherwise Noted)**

## General Assumptions

The Projections assume a generally stable economic environment with low inflation, consistent with prevailing analysts forecasts. Interest rate projections are based on the LIBOR curve.

### General & Administrative Expenses

General & Administrative Expenses are generally fixed in nature and are projected to be 7.0% of total sales in 2005, 6.6 % in 2006, 6.4% in 2007, 6.2 % in 2008 and 6.0% in 2009. To reflect inflation, General & Administrative Expenses are projected to increase by approximately 3% per year. However, the Debtors have several initiatives that will impact the ongoing General & Administrative Expenses run rate. The most material initiative is that the Debtors anticipate becoming a private company under the Plan. As a private company, the Debtors believe that it will avoid the additional costs and burdens associated with being a public company and complying with the requirements of The Securities and Exchange Commission. The Debtors project that it will begin to achieve theses costs savings in mid-2005. The vast majority of these costs savings will be reflected in lower General & Administrative Expenses. In addition, since General & Administrative Expenses are typically fixed in nature, these expenses will decrease as a percentage of sales as sales increase from 2005 to 2009 at a rate greater than the growth rate of General & Administrative Expenses.

### Interest Expense

The Revolving Credit Facility and Term Loan A interest rates are based off of a 5.25% spread above LIBOR based on the type of borrowing outstanding. The Debtors have projected LIBOR through the projection period based upon the LIBOR curve. The Term Loan includes a 16% interest rate, which is assumed to accrue as additional funded borrowings under the Term Loan during the first two years after the effective date of the Plan and cash pay thereafter.

### Preferred Dividends

The dividends payable on the New Convertible Preferred Stock are accrued at 14%, which is assumed to accrue as additional units of Preferred Stock.

### Provision/(Benefit) from Income Taxes

The Debtors have performed a detailed calculation of estimated taxes based on the Projections of Net Income Before Taxes and anticipated tax attributes available to offset income. Taxes to be

paid in cash are presented on the profit and loss statements. The Debtors have not forecasted deferred tax assets or liabilities.

**Hops:**

*General Assumptions*

The Debtors' Business Plan assumes that Hops will operate 22 leased restaurants. The Debtors have developed a general capital investment plan for their Hops restaurants that, among other things, involves investing approximately $200 capital costs per unit to remodel existing units ("Hops Remodeling Program"). The Projections assume that all 22 units are remodeled by the end of 2007. The Debtors believe that the investment in the Hops Remodeling Program will provide increases in same store sales and profitability. If the Hops Remodeling Program is unsuccessful, it may have a material negative impact on the same store sales and profits included in the Projections.

Fixed costs are projected to increase at 3% per year.

*Sales*

The Company projects that it will reverse its negative monthly sales trends by the end of 2005 and begin to show positive year over year sales increases in 2006. Sales are projected to decline, on a year-over-year basis, by 47.3% in 2005 and 4.2% in 2006, the declines are due in large part to numerous store closures, and increase, on a year-over-year basis, by 6.5% in 2007, 5.5% in 2008 and 4.6% in 2009. These growth rates assume that the Hops Remodeling Program is successful and that the Debtors are able to increase guest count and average check at non-remodeled units prior to those units being remodeled.

*Cost of Sales*

Cost of Food Sales is projected to stay at 34.8% of Food Sales from 2005 to 2009, while Cost of Beer, Wine & Liquor Sales are projected to remain stable at 20.6% of Beer, Wine & Liquor Sales from 2005 to 2009.

*Payroll and Benefits*

Payroll & Benefits are semi-variable costs with respect to sales and are projected to be 33.9% of total sales in 2005, 32.9% in 2006, 32.5% in 2007, 32.2% in 2008 and 31.9% in 2009. The decline in Payroll and Benefits as a percentage of sales is due to the fixed nature of management payroll and economies of scale achieved as sales increase from 2005 to 2009.

*Management Controllables*

Management Controllables are semi-variable costs with respect to sales and are projected to be 15.4% of total sales in 2005, 15.6% in 2006, 15.3% in 2007, 13.7% in 2008 and 13.4% in 2009. The decline in Management Controllables as a percentage of sales is due to the fixed nature of some of the costs included as Management Controllables and economies of scale achieved as sales increase from 2005 to 2009.

*Non-Controllable Expenses*

Non-Controllable Expenses are generally fixed in nature and are projected to be 15.5% of total sales in 2005, 14.5% in 2006, 14.5% in 2007, 14.5% in 2008 and 14.3% in 2009. The Debtors are projected to increase its marketing expenditures from 2005 to 2009 as the Hops Remodeling Program is rolled out. This increase is largely offset by the fixed nature of rent, CAMS, taxes and other Expenses included as Non-Controllable Expenses.

**Don Pablo's**

*General Assumptions*

The Debtors' Business Plan assumes that Don Pablo's will operate from a base of 96 restaurants consisting of 84 leased units and 12 owned units. The Debtors have developed a general capital investment plan for their Don Pablo's restaurants that, among other things, involves investing on average $150 in capital costs per unit to remodel existing units ("Don Pablo's Remodeling Program") and opening new Don Pablo's restaurants. As of the date of the Plan, 7 Don Pablo's restaurants have been remodeled. The Debtors are evaluating the results from these units and may make modifications to future capital investments under the Don Pablo's Remodeling Program that may reduce costs and improve the design. The Projections assume that all 96 units are remodeled by the end of 2009. The Debtors believe that the investment in the Don Pablo's Remodeling Program will provide increases in same store sales and profitability. If the Don Pablo's Remodeling Program is unsuccessful, it may have a material negative impact on the same store sales and profits included in the Projections.

Don Pablo's general capital investment plan also includes opening new stores. The Debtors' Projections include the opening of 1 new Don Pablo's in 2005, 2 in 2006, 2 in 2007, 2 in 2008 and 2 in 2009 at capital costs of approximately $1,200 to $1,750 per unit.

Fixed costs are projected to increase at 3% per year.

*Sales*

Sales are projected to decline, on a year-over-year basis, by 7.4% in 2005 and increase, on a year-over-year basis, by 3.9% in 2006, 6.3% in 2007, 6.7% in 2008 and 6.0% in 2009. These growth rates assume that the Don Pablo's Remodeling Program is successful, the Debtors open its new stores as planned and that the Debtors are able to increase guest count and average check at non-remodeled units prior to those units being remodeled.

### *Cost of Sales*

Cost of Food Sales is projected to be 26% of Food Sales in 2005 and decline to approximately 25.5% in 2006 to 2009. The reduction in costs is due to improved back-office systems and purchasing. Cost of Beer, Wine & Liquor Sales are projected to remain stable at 22.8% of Beer, Wine & Liquor Sales from 2005 to 2009.

### *Payroll and Benefits*

Payroll & Benefits are semi-variable costs with respect to sales and are projected to be 35.2% of total sales in 2005, 34.8% in 2006, 34.6% in 2007, 34.3% in 2008 and 34.0% in 2009. The decline in Payroll and Benefits as a percentage of sales is due to the fixed nature of management payroll and economies of scale achieved as sales increase from 2005 to 2009.

### *Management Controllables*

Management Controllables are semi-variable costs with respect to sales and are projected to be 14.5% of total sales in 2005, 14.1% in 2006, 13.9% in 2007, 13.7% in 2008 and 13.5% in 2009. The decline in Management Controllables as a percentage of sales is due to the fixed nature of some of the costs included as Management Controllables and economies of scale achieved as sales increase from 2005 to 2009.

### *Non-Controllable Expenses*

Non-Controllable Expenses are generally fixed in nature and are projected to be 15.1% of total sales in 2005, 15.1% in 2006, 15.0% in 2007, 14.8% in 2008 and 14.7% in 2009. Because of the fixed nature of these costs, as sales increase these costs decrease as a percentage of sales.

**Exhibit D**

**Projected Balance Sheet and Statement of Cash Flows**
**(Unaudited)**

**(All $ in 000's Unless Otherwise Noted)**

**Cash:** The Projections assume that systematic cash remains at a minimum of approximately $1.5 million.

**Accounts Receivable:** The Debtors receipts are primarily in the form of cash and credit card receipts. Accounts receivable represents outstanding Credit Card receipts and miscellaneous accounts receivable.

**Inventories:** The Debtors inventory turns or days of inventory on hand are projected to stay flat from 2005 to 2009.

**Property Plant & Equipment, Net:** Due to SOP 90-7, the Debtors are projecting that they will be required to write down the book value of fixed assets.

**Other Current Assets:** Other current assets consist primarily of prepaid assets. They are not projected to fluctuate from 2005 to 2009.

**Other Assets:** Other current assets consist primarily of prepaid assets. They are not projected to fluctuate from 2005 to 2009.

**Account Payable & Accrued Liabilities:** The projection assumes that the Debtors accounts payable days outstanding do not fluctuate from 2005 to 2009. Certain accrued expenses are assumed to increase as expenses in the Profit & Loss Statement increase.

**Tax Liability:** Represents the Debtors estimate of the value of tax liabilities upon emergence, including those related to the tax settlement of OPIS. These liabilities are projected to be paid under the Plan over 6-years with annual interest accruing at 5%.

**Capital Leases:** Represents the assumption of the Debtors capital leases under the Plan.

**Revolving Credit Facility:** The Revolving Credit Facility will have a total borrowing capacity of $30 million, which will be limited by a borrowing base. As of April 30, 2005, the Debtors are expected to have a borrowing base of approximately $28.6 million before any reductions related to the capital expenditure reserve and $23.6 million after reductions related to the capital expenditure reserve. As of April 30, 2005, $17.2 million will be drawn or committed to undrawn letters of credit.

**Term Loan A:** The Term Loan A will be $10 million.

**Term Loan B:** The Term Loan B will be $12.5 million. The Term Loan B has a 16% interest rate that will be paid in cash or Paid in Kind ("PIK"), which is assumed to accrue as additional funded borrowings under the Term Loan B. The Debtors have assumed that interest on the Term Loan will PIK during the first two years of the facility and cash pay thereafter.

**Other Long-Term Liabilities:** Represent miscellaneous liabilities mainly associated with deferred rent and deferred gains. These balances are not projected to fluctuate from 2005 to 2009.

**New Convertible Preferred Stock:** The New Convertible Preferred Stock will be $17.5 million. The New Convertible Preferred Stock accrues a PIK dividend equal to 14%, which is assumed to accrue as additional New Convertible Preferred Stock.

**Capital Expenditures:** The Debtors are projecting to spend $7,755 in capital expenditures in 2005, $12,725 in 2006, $12,802 in 2007, $8,832 in 2008 and $5,764 in 2009. These expenditures will primarily be used for normal reoccurring maintenance capital expenditures, the Hops Remodeling Program for 22 stores, the Don Pablo's Remodeling Program for 96 stores and the construction of 9 new Don Pablo's during the 2005 to 2009 projection period.

**Avado Brands, Inc.**
**Avado Consolidated**
**Summary Profit & Loss Statement**
**For the Years 2004 Through 2009**
**($000s)**

| | Forecast 2005 | | Forecast 2006 | | Forecast 2007 | | Forecast 2008 | | Forecast 2009 | |
|---|---|---|---|---|---|---|---|---|---|---|
| Food Sales | $218,044 | 82.5% | $222,715 | 82.5% | $236,758 | 82.4% | $251,838 | 82.4% | $266,085 | 82.4% |
| Bar Sales (Beer/Wine/Liquor) | 46,173 | 17.5% | 47,297 | 17.5% | 50,416 | 17.6% | 53,760 | 17.6% | 56,923 | 17.6% |
| Merchandise Sales | 4 | 0.0% | - | 0.0% | - | 0.0% | - | 0.0% | - | 0.0% |
| Total Restaurants Sales | 264,221 | 100.0% | 270,012 | 100.0% | 287,174 | 100.0% | 305,598 | 100.0% | 323,008 | 100.0% |
| % Growth | -5.6% | | 2.2% | | 6.4% | | 6.4% | | 5.7% | |
| Total Food Cost | 60,880 | 27.8% | 60,894 | 27.3% | 64,807 | 27.4% | 68,944 | 27.4% | 72,843 | 27.4% |
| Total Beverage Cost | 10,319 | 22.3% | 10,589 | 22.4% | 11,285 | 22.4% | 12,034 | 22.4% | 12,743 | 22.4% |
| Total Merchandise Cost | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | - | 0.0% |
| Total Cost of Goods | 70,999 | | 71,483 | | 76,092 | | 80,978 | | 85,586 | |
| Total Gross Profit | 193,222 | 73.1% | 198,529 | 73.5% | 211,082 | 73.5% | 224,620 | 73.5% | 237,422 | 73.5% |
| Management Labor | 27,141 | 10.3% | 27,398 | 10.1% | 28,630 | 10.0% | 29,899 | 9.8% | 31,206 | 9.7% |
| Hourly Labor | 50,847 | 19.2% | 51,243 | 19.0% | 54,460 | 19.0% | 57,912 | 19.0% | 61,167 | 18.9% |
| Taxes & Benefits | 14,349 | 5.4% | 14,406 | 5.3% | 15,019 | 5.2% | 15,633 | 5.1% | 16,218 | 5.0% |
| Subtotal Payroll & Benefits | 92,337 | 34.9% | 93,047 | 34.5% | 98,109 | 34.2% | 103,444 | 33.8% | 108,592 | 33.6% |
| Management Controllables [1] | 38,759 | 14.7% | 38,839 | 14.4% | 40,673 | 14.2% | 41,871 | 13.7% | 43,607 | 13.5% |
| Profit After Controllables | 62,126 | 23.5% | 66,642 | 24.7% | 72,299 | 25.2% | 79,305 | 26.0% | 85,224 | 26.4% |
| Marketing | 8,003 | 3.0% | 7,784 | 2.9% | 8,557 | 3.0% | 9,252 | 3.0% | 9,804 | 3.0% |
| Rent & Cams | 12,874 | 4.9% | 12,948 | 4.8% | 13,551 | 4.7% | 14,171 | 4.6% | 14,810 | 4.6% |
| Taxes, Licenses & Insurance | 8,584 | 3.2% | 8,748 | 3.2% | 9,149 | 3.2% | 9,561 | 3.1% | 9,986 | 3.1% |
| Pre-Opening Expenses | 200 | 0.1% | 400 | 0.1% | 400 | 0.1% | 400 | 0.1% | 400 | 0.1% |
| Depreciation | 10,758 | 4.1% | 12,036 | 4.5% | 13,707 | 4.8% | 15,114 | 4.9% | 16,062 | 5.0% |
| Total Non-Controllable Expenses | 40,419 | 15.3% | 41,916 | 15.5% | 45,364 | 15.8% | 48,499 | 15.9% | 51,062 | 15.8% |
| Income From Restaurant Operations | 21,708 | 8.2% | 24,727 | 9.2% | 26,936 | 9.4% | 30,806 | 10.1% | 34,162 | 10.6% |
| General & Administrative Expenses | 18,500 | 7.0% | 17,767 | 6.6% | 18,300 | 6.4% | 18,849 | 6.2% | 19,349 | 6.0% |
| General & Administrative Depreciation | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Operating Income | 3,208 | 1.2% | 6,960 | 2.6% | 8,636 | 3.0% | 11,957 | 3.9% | 14,813 | 4.6% |
| Interest (Expense)/Income | (5,414) | -2.0% | (5,645) | -2.1% | (5,646) | -2.0% | (5,846) | -1.9% | (5,681) | -1.8% |
| Restructuring Expenses | (15,077) | -5.7% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Gain/(Loss) on Disposal | 4,134 | 1.6% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Net Income Before Taxes | (13,150) | -5.0% | 1,314 | 0.5% | 2,990 | 1.0% | 6,112 | 2.0% | 9,133 | 2.8% |
| Income Taxes | (121) | 0.0% | (154) | -0.1% | (328) | -0.1% | (1,144) | -0.4% | (2,150) | -0.7% |
| Net Income | ($13,270) | -5.0% | $1,161 | 0.4% | $2,662 | 0.9% | $4,968 | 1.6% | $6,983 | 2.2% |
| IRO EBITDA | $32,666 | 12.4% | $37,162 | 13.8% | $41,043 | 14.3% | $46,321 | 15.2% | $50,624 | 15.7% |
| EBITDA | $14,166 | 5.4% | $19,395 | 7.2% | $22,743 | 7.9% | $27,472 | 9.0% | $31,275 | 9.7% |
| % Growth | -44.6% | | 36.9% | | 17.3% | | 20.8% | | 13.8% | |

1 This line item includes cap ex maintenance.

**Avado Brands**
**Consolidated Cash Flow Statement**
**($ in thousands)**

| | Projected FY 2005 01/01/06 | Projected FY 2006 12/31/06 | Projected FY 2007 12/30/07 | Projected FY 2008 12/28/08 | Projected FY 2009 12/27/09 |
|---|---|---|---|---|---|
| Net Income | $ (13,270) | $ 1,161 | $ 2,662 | $ 4,968 | $ 6,983 |
| Depreciation/Amort (1) | 10,758 | 12,036 | 13,707 | 15,114 | 16,062 |
| Non Cash Asset Reval. & Special Charges | - | - | - | - | - |
| Change in Deferred Tax Assets | 16,427 | - | - | - | - |
| Changes in Restricted Cash | (139) | (178) | (141) | (152) | (143) |
| Changes in Receivables | 260 | (242) | (196) | (205) | (192) |
| Changes in Inventory | - | - | - | - | - |
| Changes in Prepaid Expenses & Other | - | - | - | - | - |
| Changes in Assets Held for Sale | - | - | - | - | - |
| Changes in Other Assets | (1,467) | 267 | 267 | 267 | 267 |
| Changes in Accounts Payable | (1,078) | 561 | 531 | 501 | 523 |
| Changes in Accrued Liabilities | (2,067) | 451 | 453 | 482 | 463 |
| Changes in Accrued Interest | - | - | - | - | - |
| Changes in Other Liabilities | - | - | - | - | - |
| Change in Liabilities Subject to Compromise | (4,015) | - | - | - | - |
| Cash From Operations | 5,408 | 14,054 | 17,282 | 20,975 | 23,962 |
| | | | | | |
| Capital Expenditures | (7,755) | (12,725) | (12,802) | (8,832) | (5,764) |
| Cash From/(Used) in Investments | (7,755) | (12,725) | (12,802) | (8,832) | (5,764) |
| | | | | | |
| Borrowings/(Payment) of DIP Facility | (36,952) | - | - | - | - |
| Borrowings/(Payment) of Tax Note | - | (3,833) | (3,833) | (3,833) | (3,833) |
| Borrowings/(Payment) of Revolving Credit Facility | - | - | - | - | - |
| Borrowings/(Payment) of Term Loan A | 10,000 | - | - | - | - |
| Borrowings/(Payment) of Term Loan B | 13,883 | 2,392 | 701 | - | - |
| Issuance/(Dividends) of New Convertible Pref. Stock | 17,500 | - | - | - | - |
| Capital Lease | (45) | (60) | (60) | (60) | (60) |
| Sale Leaseback Proceeds | - | - | - | - | - |
| Borrowings/(Payment) of Notes | - | - | - | - | - |
| Cash From/(Used) in Financing | 4,386 | (1,502) | (3,192) | (3,893) | (3,893) |
| | | | | | |
| Change in Cash | 2,039 | (173) | 1,287 | 8,250 | 14,305 |

**Avado Brands**
**Consolidated Balance Sheet**
**($ in thousands)**

| | Projected Dec-05 | Projected Dec-06 | Projected Dec-07 | Projected Dec-08 | Projected Dec-09 |
|---|---|---|---|---|---|
| Cash | 3,781 | 3,609 | 4,896 | 13,146 | 27,451 |
| Restricted Cash | - | - | - | - | - |
| Accounts Receivable | 2,996 | 3,174 | 3,316 | 3,468 | 3,611 |
| Inventories | 3,130 | 3,372 | 3,568 | 3,773 | 3,965 |
| Prepaid Expenses & Other | 2,589 | 2,589 | 2,589 | 2,589 | 2,589 |
| Assets Held for Sale | - | - | - | - | - |
| Total Current Assets | 12,496 | 12,744 | 14,369 | 22,976 | 37,616 |
| | | | | | |
| Net Premises & Equipment | 105,555 | 106,244 | 105,340 | 99,057 | 88,759 |
| Deferred Income Taxes | - | - | - | - | - |
| Other Assets | 12,770 | 12,503 | 12,236 | 11,970 | 11,703 |
| | | | | | |
| Total Assets | $ 130,821 | $ 131,492 | $ 131,945 | $ 134,003 | $ 138,078 |
| | | | | | |
| LOC Financing | $ - | $ - | $ - | $ - | $ - |
| Accounts Payable | 7,706 | 8,266 | 8,798 | 9,299 | 9,822 |
| Accrued Liabilities | 24,031 | 24,481 | 24,934 | 25,416 | 25,879 |
| Total Current Liabilities | 31,736 | 32,748 | 33,732 | 34,715 | 35,701 |
| | | | | | |
| Long-Term Debt | - | - | - | - | - |
| Tax Obligations | 23,000 | 19,167 | 15,333 | 11,500 | 7,667 |
| Capital Lease Obligations | 4,557 | 4,497 | 4,437 | 4,377 | 4,317 |
| Other Liabilities | 606 | 606 | 606 | 606 | 606 |
| Revolving Credit Facility | - | - | - | - | - |
| Term Loan A | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| Term Loan B | 13,883 | 16,275 | 16,976 | 16,976 | 16,976 |
| DIP Loan | - | - | - | - | - |
| Total Not Subject to Compromise | 83,783 | 83,293 | 81,084 | 78,174 | 75,266 |
| | | | | | |
| Liabilities Subject to Compromise | - | - | - | - | - |
| | | | | | |
| Redeemable Preferred Stock | - | - | - | - | - |
| New Convertible Preferred Stock | 18,725 | 21,438 | 24,545 | 28,101 | 32,173 |
| | | | | | |
| Common Stock | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Additional Paid-in Capital | 27,181 | 27,181 | 27,181 | 27,181 | 27,181 |
| Retained Earnings | 132 | (1,420) | (1,865) | (453) | 2,458 |
| Treasury Stock | - | - | - | - | - |
| Total Common Equity | 28,313 | 26,761 | 26,317 | 27,728 | 30,639 |
| | | | | | |
| Total Liabilities and Equity | $ 130,821 | $ 131,492 | $ 131,945 | $ 134,003 | $ 138,078 |
| | - | - | - | - | - |

**Avado Brands**
**Fresh Start Accounting Balance Sheet**
**($ in thousands)**

Assumed TEV: $ 96,400

| | Unadjusted (1) Apr-05 | Debt Discharge/ Plan Adjustments (2) | Elimination of Old Stock | Fresh Start | Reorganized Apr-05 |
|---|---|---|---|---|---|
| Cash | $ 1,441 | 128 (3) | | | $ 1,568 |
| Restricted Cash | 16,427 | (16,427) (3) | | | 0 |
| Accounts Receivable | 4,103 | | | (1,027) (4) | 3,076 |
| Inventories | 3,245 | | | | 3,245 |
| Prepaid Expenses & Other | 2,888 | | | (299) (6) | 2,589 |
| Assets Held for Sale | 1,678 | | | (1,678) (6) | - |
| Total Current Assets | 29,782 | (16,299) | | (3,004) | 10,479 |
| | | | | | |
| Net Premises & Equipment | 129,598 | (8,275) (17) | | (12,373) (5) | 108,951 |
| Deferred Income Taxes | 11,620 | | | (11,620) (6) | - |
| Other Assets | 21,020 | | | (9,717) (6) | 11,303 |
| | | | | | |
| Total Assets | $ 192,020 | (24,574) | - | $ (36,714) | $ 130,732 |
| | | | | | |
| LOC Financing | $ - | | | | $ - |
| Accounts Payable | 7,955 | | | | 7,955 |
| Accrued Liabilities | 24,873 | | | (670) (7) | 24,203 |
| Accrued Interest | - | | | | - |
| Current Portion LTD | - | | | | - |
| | | | | | |
| Total Current Liabilities | $ 32,828 | - | - | $ (670) | $ 32,158 |
| | | | | | |
| Long-Term Debt | - | 23,000 (8) | | | 23,000 |
| Tax Obligation | - | | | 4,602 (10) | 4,602 |
| Capital Lease Obligations | 606 | | | | 606 |
| Other Liabilities | - | 2,185 (13) | | | 2,185 |
| Revolving Credit Facility | - | 10,000 (13) | | | 10,000 |
| Term Loan A | - | 12,500 (14) | | | 12,500 |
| Term Loan B | - | | | | |
| DIP Financing | 54,484 | (54,484) (3), (15) | | | |
| Total Liabilities | $ 87,918 | (6,799) | - | $ 3,932 | $ 85,051 |
| | | | | | |
| Liabilities Subject to Compromise | 240,549 | (235,947) (9) | | (4,602) (10) | - |
| | | | | | |
| Redeemable Preferred Stock | 3,180 | | (3,180) (12) | | - |
| New Convertible Preferred Stock | - | 17,500 (16) | | | 17,500 |
| | | | | | |
| Common Stock | 436 | 1,000 (12) | (436) (11) | | 1,000 |
| Additional Paid-in Capital | 154,332 | 27,181 (12) | (154,332) (11) | | 27,181 |
| Retained Earnings | (197,978) | 172,491 (11) | 61,530 (11) | (36,044) (11) | - |
| Treasury Stock | (96,417) | | 96,417 (11) | | - |
| Total Common Equity | (139,627) | 200,672 | 3,180 | (36,044) | 28,181 |
| | | | | | |
| Total Liabilities and Equity | $ 192,020 | (24,574) | - | $ (36,714) | $ 130,732 |

**APPENDIX E**

**Restated Financials**

**[To be filed on or before the Plan Supplement Filing Date]**

**APPENDIX F**

**DDJ Capital Management Commitment Letter**

**DDJ CAPITAL MANAGEMENT LLC**
**141 Linden Street**
**Wellesley, MA 02482**

March 2, 2005

Avado Brands, Inc.
Hancock at Washington
Madison, GA 30650-1304

Re: Commitment Letter

Ladies and Gentlemen:

Further to our discussions and as contemplated in the Joint Plan of Reorganization of Avado Brands, Inc. and its Affiliated Debtors and Debtors in Possession, dated February 3, 2005 (such Joint Plan of Reorganization, the "Debtors' Plan"; terms used herein and not defined herein being used herein as therein defined), attached as Exhibits A and B hereto are summaries of the terms of a proposed $12,500,000 Term B Loan to be borrowed by Reorganized Avado (the "Tranche B Facility") and a proposed $17,500,000 investment in new convertible preferred stock to be issued by Reorganized Avado (the "New Convertible Preferred Stock"). We are pleased to advise you that certain funds and/or accounts managed or advised by DDJ Capital Management, LLC (such funds and/or accounts, collectively, the "Investors", and DDJ Capital Management LLC in such capacity, the "Investor Agent") are willing to lend to Reorganized Avado, subject to the terms and conditions set forth below and on the Tranche B Financing Term Sheet (the "Tranche B Term Sheet"), the Tranche B Facility and to purchase, subject to the terms and conditions set forth below and on the New Convertible Preferred Stock Term Sheet (the "Preferred Stock Term Sheet"), New Convertible Preferred Stock.

This Commitment Letter, the Tranche B Term Sheet and the Preferred Stock Term Sheet (together with the Tranche B Term Sheet, the "Term Sheets") are not meant to be and shall not be construed as an attempt to define all of the terms and conditions of the Tranche B Facility and New Convertible Preferred Stock (collectively, the "Transactions"), which terms and conditions shall be set forth in the definitive documentation with respect to the Transactions that shall be consistent with terms hereof and of the Term Sheets. The Investors' and the Investor Agent's obligations to complete the Transactions are subject to the conditions specified in the Term Sheets and the following conditions: (i) the accuracy and completeness in all material respects of all the information heretofore provided to the Investors and the Investor Agent (and/or their advisers) with respect to the Debtors and Reorganized Avado and its subsidiaries; (ii) none of the Investors or the Investor Agent becoming aware after the date hereof of any information or other

Avado Brands, Inc.
March 2, 2005
Page 2

matter affecting the Debtors or Reorganized Avado or its subsidiaries, which in the judgment of the Investors and/or the Investor Agent is inconsistent in a material and adverse manner with any information or other matter disclosed to the Debtors or Reorganized Avado (and/or their advisers) prior to the date hereof; (iii) the determination by the Investors and the Investor Agent that since January 2, 2005 no material adverse change in the business, financial condition, results of operations or properties of the Debtors (and Reorganized Avado and its subsidiaries as applicable) has occurred; (iv) the absence of a material breach of any representation, warranty or agreement of Avado set forth herein; (v) no Default or Event of Default (as defined in the DIP Credit Agreement) having occurred and be continuing; (vi) the Effective Date shall occur in accordance with the Plan, which shall be in form and substance satisfactory to the Investors; (vii) the Confirmation Order shall be in form and substance satisfactory to the Investors; (viii) the Tranche A Financing Facility shall have been consummated to the satisfaction of the Investors; and (ix) all fees, including without limitation the commitment fees, and reasonable, documented costs and expenses due and payable to the Investor Agent and the Investors shall have been paid in full.

Avado hereby represents and warrants that (a) all written information, other than Projections (defined below), which has been or is hereafter made available to the Investors and/or the Investor Agent (or their advisers) by or on behalf of the Debtors in connection with the transactions contemplated hereby (the "Information"), taken as a whole, is and will be, as of the date furnished, complete and correct in all material respects and does not and will not, as of the date furnished, contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not misleading in light of the circumstances under which such statements were or are made, and (b) all financial or other projections concerning the Debtors and/or Reorganized Avado and its subsidiaries or their business that have been or are hereafter made available to the Investors and the Investor Agent (or their advisers) by or on behalf of the Debtors (the "Projections") have been or will be prepared in good faith based upon assumptions the Debtors believed or believe, at the time such Projections were or are made, to be reasonable (it being understood that (i) no assurance has been or will be given that any Projections will be achieved, (ii) the Projections are not a guaranty of future performance and (iii) actual results may differ from projected or forward-looking results and such differences may be material). Avado agrees to furnish the Investors and the Investor Agent with such Information as the Investors or the Investor Agent may request and to supplement the Information from time to time until the closing date for the Transactions (the "Closing Date") so that the representations and warranties in clause (a) of the preceding sentence continue to be correct in all material respects on such Closing Date.

By acceptance of this offer, Avado agrees, on its own behalf and on behalf of the other Debtors, to reimburse and pay all reasonable and documented out-of-pocket fees and expenses (including reasonable and documented fees, time charges and expenses of outside attorneys for the Investor Agent and the Investors) incurred in connection with the preparation, negotiation, execution and enforcement of this Commitment Letter, the Term Sheets and any other documentation

Avado Brands, Inc.
March 2, 2005
Page 3

contemplated hereby or thereby. In furtherance of the foregoing, Avado agrees to pay to the Investor Agent a retainer in the amount of $60,000 upon its acceptance of this Commitment Letter, which retainer shall be applied by the Investor Agent for the payment of such reasonable and documented out-of-pocket fees and expenses; provided, however, that any unapplied balance of any retainer will be refunded to Avado on the earlier of the Closing Date and the date on which the commitments under this Commitment Letter expire or terminate for any reason.

Avado on its own behalf, and on behalf of the other Debtors, hereby agrees, in consideration for the commitments provided hereunder to pay to the Investor Agent, for the ratable accounts of the Investors, the following commitment fees, which commitment fees shall be fully earned as of the date hereof upon Avado's acceptance of such commitments: (i) a commitment fee of $281,250 (being 2 ¼ % of $12,500,000) for the Investors' commitment, on the terms and conditions set forth and in the Term Sheets, to make available the Tranche B Facility; and (ii) a commitment fee of $393,750 (being 2 ¼ % of $17,500,000) for the Investors' commitment, on the terms and conditions set forth herein and in the Term Sheets, to purchase the New Convertible Preferred Stock (such fees, the "Commitment Fees"). The Commitment Fees shall be in addition to any other fee, cost, interest, expense reimbursement, indemnification, other obligation or expense payable pursuant to the Transactions. The Commitment Fees shall be an administrative claim and shall be payable upon the earlier to occur of (x) the Effective Date pursuant to the Debtors' Plan, which shall be in form and substance reasonably satisfactory to the Investors Agent, (y) May 31, 2005 unless the Debtors' Plan, in form and substance satisfactory to the Investors Agent, shall have been confirmed on or before May 15, 2005, in which case, June 15, 2005, and (z) and the expiration or termination of the commitments under this Commitment Letter for any reason. In the event the Investors do not close on either of the commitments on account of the failure of Avado to meet one or more of the conditions set forth in this Commitment Letter or the Term Sheets that could be waived by the Investors, the Investors shall refund to Avado one-half (1/2) of the commitment fee paid to the Investor Agent with respect to any such commitment that does not close; provided, however, that no portion of the Commitment Fees shall be refunded if Avado elects to use other financing, fails to confirm a plan or fails to obtain authority to close on the financing contemplated by this Commitment Letter.

Avado on its own behalf, and on behalf of the other Debtors, hereby agrees to indemnify and hold harmless the Investor Agent, the Investors, and each of their respective affiliates, directors, partners, members, officers, employees and agents (each an "Indemnified Party") from and against any and all losses, claims, damages, liabilities, and reasonable costs and expenses (including, without limitation, all reasonable fees and expenses of outside counsel for such Indemnified Party) that are incurred by or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of (including, without limitation, in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith) this Commitment Letter, the Term Sheets, and the other transactions contemplated hereby except to the extent that, as to any Indemnified Party, it shall be determined in a final judgment by a court of competent jurisdiction that such losses, claims, damages, liabilities, costs

Avado Brands, Inc.
March 2, 2005
Page 4

or expenses resulted from any Indemnified Party's gross negligence or willful misconduct; provided that the foregoing indemnity shall not apply to any suit, action, investigation, litigation or proceeding commended by any Indemnified Party against any other Indemnified Party. In the case of any investigation, litigation or proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by the Debtors, their shareholders or creditors or an Indemnified Party and whether or not the Transactions are consummated or any borrowings or investments are made thereunder. One or more of the Indemnified Parties will promptly notify Avado upon receipt of written notice of any claim or threat to institute a claim (provided, however, that the failure so to notify Avado shall not relieve the Debtors from any obligation or liability except to the extent the Debtors are actually prejudiced by such failure). Avado on its own behalf, and on behalf of the other Debtors, hereby agrees that no Indemnified Party shall have any liability to any Debtor or any of its subsidiaries or affiliates or to its respective security holders or creditors on any theory of liability for any special, indirect, consequential or punitive damages arising out of, related to or in connection with the Transactions. The provisions of this paragraph and the immediately preceding paragraph shall remain in full force and effect upon execution by the Company regardless of whether any definitive documentation with respect to the Transactions shall be executed and regardless of whether this undertaking and commitment thereafter expires in accordance with the terms hereof.

Notwithstanding anything to the contrary contained in this Commitment Letter (including the Term Sheets) the obligations of the Avado, the other Debtors, Reorganized Avado and their respective affiliates under this Commitment Letter (including the Term Sheets) shall automatically terminate and if applicable be superseded by the provisions (if any) of the definitive documentation with respect to the Transactions upon the execution and delivery thereof, and each of Avado, the other Debtors, Reorganized Avado and their respective affiliates shall automatically be released from any and all liabilities and/or obligations in connection with this Commitment Letter (including the Term Sheets) at such time.

This Commitment Letter is issued solely to Avado and may not be assigned or otherwise transferred to, or enforced by, any other person without the prior written consent of the Investor Agent. This Commitment Letter is intended to be solely for the benefit of the parties hereto and the Indemnified Parties and the obligations of the Investors and the Investor Agent under this Commitment Letter shall be enforceable solely by Avado and may not be relied upon by any other person. The terms of this letter may not be modified or otherwise changed except pursuant to a written agreement signed by the Investor Agent and Avado. This Commitment Letter shall be governed by and construed in accordance with the laws of the State of New York. This letter may be executed in any number of counterparts, each of which shall be an original, but all of which shall constitute one instrument. This Commitment Letter (including the Term Sheets) sets forth the entire understanding between Avado and the other Debtors, on one hand, and the Investors and the Investor Agent, on the other hand, and supersedes all prior agreements, discussions and understandings relating to the subject matter hereof.

Avado Brands, Inc.
March 2, 2005
Page 5


This commitment shall expire at 3:00 p.m. eastern standard time on March 3, 2005 unless prior to that time the Company has executed this Commitment Letter and has returned it to DDJ Capital Management, LLC. Thereafter, this commitment shall expire at 3:00 p.m. eastern standard time on the earlier to occur of (x) March 15, 2005, unless the Bankruptcy Court shall have entered an order in the form and substance reasonably satisfactory to the Investor Agent approving the this Commitment Letter, (y) May 31, 2005, unless the Debtors' Plan in form and substance reasonably satisfactory to the Investors Agent shall have been confirmed , and (z) June 15, 2005, unless the Effective Date pursuant to the Debtors' Plan has occurred and definitive documents for the Transactions are executed and delivered by such date.


DDJ CAPITAL MANAGEMENT, LLC on behalf of certain funds and accounts it manages


By: _____
Name: David L. Brenzano
Title: Member

Avado Brands, Inc.
March 2, 2005
Page 6


AGREED AND ACCEPTED AS OF THE
DATE FIRST WRITTEN ABOVE:

AVADO BRANDS, INC.

By: _____
Name: RAYMOND P. BARBRICK
Title: CHIEF EXECUTIVE OFFICER

## Exhibit A

## TRANCHE B FINANCING TERM SHEET

## AVADO BRANDS, INC.

*Terms used herein and not defined herein are used herein as defined in the Commitment Letter, dated as of March 1, 2005 of which this Term Sheet is a part.*

| | |
|---|---|
| **The Company** | **AVADO BRANDS, INC.**, a Delaware corporation (the "Company"). |
| **Lenders** | Funds managed or advised by DDJ Capital Management LLC, including without limitation the DIP Lenders |
| **Principal** | $12.5 million term loan (the "Loan"). |
| **Maturity** | All outstanding obligations including the entire principal amount (including all amounts paid in kind) and all accrued and unpaid interest, fees and expenses due on the fifth anniversary. |
| **Interest** | 16% per annum calculated on the basis of a 360-day year for the actual number of days elapsed. Interest shall be payable monthly in arrears in cash; *provided* that prior to the second anniversary of the Loan, interest may be payable, at the Company's option, in kind. |
| **Collateral; Guaranty** | The Loan will be secured by a lien on all assets of the Company and its subsidiaries, which shall guarantee the Loan, which lien shall be junior and subordinate on terms reasonably satisfactory to the Investor Agent and ▮▮▮▮▮▮▮▮▮▮ to the liens securing the New Tranche A Financing Facility. |
| **Use of Proceeds** | To first repay outstanding indebtedness under the DIP Facility and thereafter to pay costs and expenses related to the Chapter 11 Cases. |
| **Prepayments** | The Loan may be repaid in whole or in part at any time, subject to the payment of prepayment premiums, as applicable. |
| | On any prepayment (whether optional or on account of an Event of Default, but not mandatory prepayments), the Company shall pay the lesser make-whole payment, either (x) calculated on the basis of T+50 and the principal then outstanding or (y) calculated as the percentage set forth below of the principal amount prepaid: |

| | |
|---|---|
| Prior to the first anniversary | 5% |
| First to second anniversary | 3% |

| | |
|---|---|
| Second to third anniversary | 2% |
| Third to fourth anniversary | 1% |
| Thereafter | 0% |

Notwithstanding the foregoing, the Company shall not be required to pay a make-whole amount on the optional prepayment of paid-in-kind interest or on optional prepayments where the Lenders agree in advance to accept such prepayment.

**Expenses**

The Company will reimburse the Lenders and the Investor Agent for all reasonable and documented out-of-pocket expenses incurred in connection with their due diligence, legal review and documentation of the investment, as well as those incurred in connection with future amendments, waivers or other modifications to the Loan.

**Documentation**

The making of the Loan and the granting of the liens in favor of the Lenders will be made pursuant to a credit agreement and other customary documentation, including without limitation, an intercreditor agreement reasonably satisfactory to the Investor Agent and the Company and security agreements, pledge agreements and other collateral documentation with terms reasonably satisfactory to the Investor Agent and the Company, drafted by counsel to the Investors, containing customary representations and warranties, indemnification provisions, affirmative and negative covenants, events of default, and conditions to closing, in each case, subject to limitations, qualifications and exceptions to be agreed upon.

**Conditions Precedent**

The closing of the Loan shall occur concurrently with the Effective Date in accordance with the Debtors' Plan, which shall be in form and substance satisfactory to the Investor Agent. Additional conditions include and are not limited to (i) the Confirmation Order shall be in form and substance reasonably satisfactory to the Investor Agent and (ii) each of the Tranche A Financing Facility and the New Convertible Preferred Stock shall have been consummated to the reasonable satisfaction of the Investor Agent.

**Closing**

Contemporaneous with the Effective Date, subject to the satisfaction of the Conditions Precedent set forth above and the other conditions precedent as set forth in the Commitment Letter and the Debtors' Plan.

## Exhibit B

## NEW CONVERTIBLE PREFERRED STOCK TERM SHEET

## AVADO BRANDS, INC.

*Terms used herein and not defined herein are used herein as defined in the Commitment Letter, dated as of March 1, 2005 of which this Term Sheet is a part.*

| | |
|---|---|
| **The Company** | **AVADO BRANDS, INC.**, a Delaware corporation (the "Company") |
| **Investors** | Funds managed or advised by DDJ Capital Management LLC, including without limitation the DIP Lenders |
| **Securities Offered** | [_____] shares of Series Convertible Preferred Stock (the "Preferred Stock"). |
| **Purchase Price** | $17,500,000 |
| **Pro Forma Capitalization** | Following the proposed investment, the capitalization of the Company will be as follows: |

| | % Outstanding* | % Fully-Diluted* |
|---|---|---|
| Common Stock | 61.665% | 55.499% |
| Preferred Stock | 38.335% | 34.501% |
| Reserved Option Pool | 0% | 10.00% |
| Total: | 100% | 100% |

*On an as-converted basis

Additionally, the Common Stock and the Preferred Stock will be diluted by any shares issued upon the exercise of the warrants issued under the Debtors' Plan, which warrants will in turn be diluted by the issuance of Reserved Options.

| | |
|---|---|
| **Use of Proceeds** | To repay outstanding indebtedness under the DIP Facility, to pay costs and expenses related to the Chapter 11 Cases and for general working capital purposes. |
| **Dividends** | The Preferred Stock will be entitled to preferential dividends at the rate of 14% per annum, which shall accrue daily and shall be paid |

E
LIBC/2108402.6

quarterly in kind, *provided* that such dividends may be paid in cash at the Company's option so long as (a) the Senior Debt (as defined below) to EBITDA ratio shall not exceed 3.0:1.0 and (b) the Board of Directors of the Company has determined in good faith that after paying such dividends in cash the Company has adequate financial flexibility and resources. "Senior Debt" shall mean indebtedness for money borrowed that is a senior obligation of the Company, including the Tranche A Financing, the Tranche B Facility, and outstanding letters of credit to the extent not cash collateralized, but excluding the Tax Note and capitalized leases, net of cash.

**Liquidation Preference**

Amount:

The Liquidation Preference shall be equal to the greater of (i) a fixed dollar amount per share, which shall be calculated on the date of issuance of the Preferred Shares as the number of Preferred Shares issued divided by $17,500,000 (the "Base Liquidation Preference") and (ii) the amount that would be received in a liquidation on an as-converted basis, with such amount to be received in the same form of consideration paid to common stockholders in connection with the triggering event.

When paid:

The Liquidation Preference with respect to all shares of Preferred Stock including those received as "paid-in-kind" shall be due upon (a) a dissolution or winding up, voluntary or involuntary, of the Company, or (b) upon a consolidation or merger of the Company with another entity or a sale, lease or transfer of all or substantially all of the Company's assets that has been duly approved by the shareholders of the Company.

**Conversion**

Optional

The Preferred Stock may be converted at the option of the holder at any time on a _____ shares of Common Stock for one share of Preferred Stock, subject to adjustment. Upon the election of holders of two-thirds in interest of the outstanding Preferred Stock, all of the shares of Preferred Stock shall convert into Common Stock.

2

<u>Mandatory</u>:

The Preferred Stock will be automatically converted at the then applicable conversion price in the event of a Qualified IPO (as defined below).

"Qualified IPO" means the Company's first underwritten offering to the public pursuant to an effective registration statement under the Securities Act, provided that (i) such registration statement covers the offer and sale of Common Stock the aggregate gross proceeds of which attributable to sales for the account of the Company exceed $55 million, at a price per share equal to at least three and fifteen one hundredths (3.15) times the price of the Preferred Stock (as appropriately adjusted for stock splits, stock dividends or other subdivisions or combinations of Common Stock) and (ii) the Common Stock is listed for trading on either the New York Stock Exchange or the NASDAQ National Market.

**Anti-Dilution**

Other than with respect to the issuance of any Common Stock for any Claims (including any disputed claims), the Preferred Stock will provide for standard anti-dilution protection, including weighted average adjustments for issuances of Common Stock at prices below the conversion price of the Preferred Stock (excluding shares issued pursuant to the Company's Incentive Plan or Common Stock issued upon exercise of the Warrants issued on the Effective Date). The Preferred Stock will provide for full ratchet anti-dilution protection for issuances after the Effective Date of Common Stock or any other equity security for any Claims (including any disputed Claims).

**Redemption**

Subject to the terms of the Senior Debt, upon the request of holders of 66 2/3% of the outstanding shares of Preferred Stock at any time on and after the seventh (7th) anniversary of the date of issue the Company shall redeem all of the outstanding shares of Preferred Stock at a price equal to the Base Liquidation Preference.

In the event of a default by the Company on a redemption, the holders of Preferred Stock shall be entitled: (1) to interest at a per annum rate equal to 16% on the unpaid amount, and (2) to elect a majority of the Board of Directors, until such default is cured.

**Voting Rights**

Each outstanding share of Preferred Stock shall be entitled to a number of votes, on an as-converted basis, equal to the greatest number of whole shares of Common Stock into which such share of Preferred Stock is then convertible.

3

**Protective Provisions**    Consent of two-thirds of the holders of the outstanding Preferred Stock, voting as a separate class, will be required for the Company to (in each case, subject to limitations, qualifications and exceptions, including the issuance of stock dividends, to be agreed upon):

1. alter or change the rights, preferences or privileges of the Preferred Stock;
2. repurchase any shares of Company capital stock, except for redemptions of the Preferred Stock or repurchases of shares issued pursuant to the Company's equity incentive plan;
3. declare or pay any dividend payable on any class of capital stock of the Company;
4. increase the authorized number of shares of Preferred Stock or Common Stock of the Company;
5. create any new class or shares having preference over or on parity with the Preferred Stock; or
6. reclassify any capital stock of the Company.

**Board Composition**    The Investors will have the right to elect two directors to serve on the Company's Board of Directors. The Board of Directors will initially consist of six members, including the two members elected by the Investors.

**Additional Shareholder Agreements**    All holders of capital stock, warrants and options of the Company shall be subject to tag-along and drag-along rights and certain voting agreements, including those set forth an Annex A hereto.

**Registration Rights**    On any one occasion more than 180 days after the Company's initial public offering, the holders of at least 50% of the outstanding Preferred Stock and Common Stock voting as a single class (with the Preferred Stock voting on an as-converted basis) shall be entitled to require the Company to offer for public sale all or any of the shares of Common Stock held by them, including any Common Stock receivable on conversion of the Preferred Stock. Any holders of at least 25% of the outstanding Preferred Stock and Common Stock voting as a single class (with the Preferred Stock voting on an as-converted basis) shall be entitled to require the Company to file and make effective an unlimited number of registration statements on Form S-3 under the Securities Act, or any successor form, at such times as the Company is eligible to file such form. Each holder of Preferred Stock and Common Stock shall also be entitled to customary "piggy back" registration rights. Each of these rights shall be subject to normal exceptions for market conditions.

4

The Company may not grant registration rights to any person that have priority over or are pari passu with the registration rights granted herein without the prior written approval of the holders of at least 50% of the outstanding Preferred Stock.

**Expenses**

The Company will reimburse the Investors and the Investor Agent for all reasonable and documented out-of-pocket expenses incurred in connection with their due diligence, legal review and documentation of the investment, as well as those incurred in connection with future amendments, waivers or other modifications to the Preferred Stock and/or the investment.

**Documentation**

The purchase of the Preferred Stock will be made pursuant to a securities purchase agreement and other standard documentation, including without limitation a shareholders agreement with terms reasonably satisfactory to the Investor Agent, drafted by counsel to the Investors, containing customary representations and warranties, indemnification provisions, affirmative and negative covenants and conditions to closing, in each case, subject to limitations, qualifications and exceptions to be agreed upon.

**Additional Conditions Precedent**

The closing of the proposed investment shall occur concurrently with the Effective Date in accordance with the Debtors' Plan, which shall be in form and substance reasonably satisfactory to the Investor Agent. In addition to customary conditions precedent indicated above, the definitive documentation will include the following conditions: (i) the Confirmation Order shall be in form and substance reasonably satisfactory to the Investor Agent and (ii) each of the Tranche A Financing Facility and the Tranche B Facility shall have been consummated to the reasonable satisfaction of the Investor Agent.

**Closing**

Contemporaneous with the Effective Date, subject to the satisfaction of the Conditions Precedent set forth above and the other conditions precedent as set forth in the Commitment Letter and the Debtors' Plan.

5

Annex A

Voting

| Majority of Entire Board and Super Majority of Shareholders | Majority of Entire Board and Majority of Board excluding the two Directors who are affiliates of DDJ, or Super Majority of Shareholders (to be defined as holders of at least 66.66% of the outstanding Preferred Stock, on an as-converted basis, and the outstanding Common Stock, voting as a single class) |
|---|---|
| • Sale of all or substantially all of the assets, merger, consolidation and similar transactions<br>• Filling of an S-1 and any other action authorizing the Company to pursue registration as a public company | • Transactions with a value over $50 million<br>• Offering in one or a series of related issuances more than 10% of the capital stock of the Company |

Additionally, all transactions with affiliates will require the approval of a majority of the unaffiliated (with respect to that transaction) directors in addition to any other required consents.

6

**APPENDIX G**

**Shareholders' Agreement**

GOODWIN PROCTER DRAFT:  3/2/05

STOCKHOLDERS AGREEMENT


By And Among


AVADO BRANDS, INC.


and


The Stockholders of Avado Brands, Inc.


Dated as of _____ ___, 2005

GOODWIN PROCTER DRAFT: 3/2/05

## TABLE OF CONTENTS

Page

SECTION I. DEFINITIONS ...................................................................................................1
    1.1.    Construction of Terms. ................................................................................1
    1.2.    Number of Shares of Stock.........................................................................2
    1.3.    Defined Terms. ...........................................................................................2

SECTION II. RESTRICTIONS ON TRANSFER....................................................................4
    2.1.    Restrictions on Transfer..............................................................................4
    2.2.    Severability. ...............................................................................................6
    2.3.    Inapplicability of Section 2.1.....................................................................6
    2.4.    Effect of Prohibited Transfers....................................................................6
    2.5.    Termination. ...............................................................................................6

SECTION III. RIGHTS AND OBLIGATIONS TO SELL.......................................................6
    3.1.    Drag-Along Obligations..............................................................................6
    3.2.    Termination.................................................................................................7

SECTION IV. CO-SALE..........................................................................................................8
    4.1.    Co-Sale Option............................................................................................8
    **4.2**    Termination.................................................................................................9

SECTION V. ELECTION OF DIRECTORS ...........................................................................9
    5.1.    Board of Directors Composition.................................................................9
    5.2.    Term; Removal; Vacancies.......................................................................10
    5.3.    Termination...............................................................................................10

SECTION VI. VOTING PROVISIONS..................................................................................10
    6.1.    Protective Provisions. ...............................................................................10
    6.2.    Special Approval Requirements. ...............................................................12
    6.3.    Affiliated Transactions..............................................................................12
    6.4.    Termination...............................................................................................13

SECTION VII. COVENANTS ................................................................................................13
    7.1.    Financial Statements, Reports, Etc. ..........................................................13
    7.2.    Directors and Officers' Insurance.............................................................13
    7.3.    Reimbursement of Directors.....................................................................14
    7.4.    By-laws. ....................................................................................................14
    7.5.    Lock-Up. ...................................................................................................14
    7.6.    Term. ........................................................................................................14

SECTION VIII. MISCELLANEOUS PROVISIONS .............................................................14
    8.1.    Reliance....................................................................................................14
    8.2.    Legend on Securities.................................................................................15
    8.3.    Amendment and Waiver. ...........................................................................15

8.4.   Notices. ...................................................................................................15
8.5.   Headings. .................................................................................................15
8.6.   Counterparts. ...........................................................................................16
8.7.   Remedies; Severability. ..........................................................................16
8.8.   Entire Agreement. ...................................................................................16
8.9.   Adjustments. ...........................................................................................16
8.10.  Law Governing. ......................................................................................16
8.11.  Successors and Assigns............................................................................16

EXHIBITS

Exhibit A        -        Form of Joinder Agreement

<u>SCHEDULES</u>

Schedule A        -        Preferred Stockholders and Common Stockholders
Schedule B        -        DDJ Investors

<u>STOCKHOLDERS AGREEMENT</u>

THIS STOCKHOLDERS AGREEMENT (the "Agreement") is made as of _____, 2005, by and among Avado Brands, Inc., a Delaware corporation (the "Company"), the Persons identified on <u>Schedule A</u> hereto as Preferred Stockholders (each, a "Preferred Stockholder" and collectively, the "Preferred Stockholders"), the Persons identified on <u>Schedule A</u> as Common Stockholders (each, a "Common Stockholder" and collectively, the "Common Stockholders"), and each Person that hereafter becomes a Stockholder (as defined below) and is required by this Agreement to become a party hereto.

### WITNESSETH:

WHEREAS, the Company filed a plan of reorganization (the "Plan") under chapter 11 of the United States Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Texas to effect a financial restructuring of the Company;

WHEREAS, on _____ __, 2005 (the "Effective Date"), the Plan became effective;

WHEREAS, on the Effective Date, the Preferred Stockholders, acquired shares of the Company's Series A Convertible Redeemable Preferred Stock, par value [$__] per share, pursuant to that certain [Stock Purchase Agreement] dated as of the date hereof between the Company and the Preferred Stockholders (the "Purchase Agreement");

WHEREAS, on the Effective Date, shares of Common Stock were issued to certain of the Common Stockholders pursuant to the Plan;

WHEREAS, pursuant to the Plan, the Stockholders have been deemed to have entered into, and certain Stockholders named on the signature pages hereto have executed, this Agreement to govern certain rights of the Stockholders, and to provide certain other rights and obligations among them;

NOW THEREFORE, in consideration of the promises and the mutual agreements, covenants and provisions contained herein, and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

## SECTION I.  **DEFINITIONS**

**1.1.** *Construction of Terms.*  As used herein, the masculine, feminine or neuter gender, and the singular or plural number, shall be deemed to be or to include the other genders or number, as the case may be, whenever the context so indicates or requires.  Any reference to "day" shall mean a calendar day unless indicated otherwise.

**1.2.** ***Number of Shares of Stock.*** Whenever any provision of this Agreement calls for any calculation based on a number of shares of capital stock issued and outstanding or held by a Stockholder, the number of shares deemed to be issued and outstanding or held by that Stockholder, unless specifically stated otherwise, as applicable, shall be the total number of shares of Common Stock then issued and outstanding or owned by the Stockholder, as applicable, plus, without duplication, the total number of shares of Common Stock issuable upon the conversion of any Preferred Stock then issued and outstanding or owned by such Stockholder, as applicable.

**1.3.** ***Defined Terms.*** The following capitalized terms, as used in this Agreement, shall have the meanings set forth below.

"Affiliate" shall mean with respect to any Person (as defined below), any Person which, directly or indirectly, controls, is controlled by or is under common control with such Person, including, without limitation, any partner, officer, director, member or employee of such Person and, with respect to any Person that is a venture capital fund, any investment fund now or hereafter existing which is controlled by or under common control with one or more general partners or managers of such Person.

"Beneficial owner" when used with respect to any security means a direct or indirect beneficial owner of such security within the meaning of Rule 13d-3 under the Exchange Act, as in effect on and as interpreted by the SEC through the date of this Agreement, and the terms (whether or not capitalized) "beneficially own," "beneficially owned" and "owned beneficially" shall have correlative meanings; provided, however, that any Person who at any time beneficially owns any convertible securities shall also be deemed to beneficially own the Common Stock underlying such convertible securities whether or not such convertible securities then are or within 60 days will be exercisable, exchangeable or convertible.

"Board of Directors" means the Board of Directors of the Company.

"Charter" means Company's _____ Amended and Restated Certificate of Incorporation in effect as of the date hereof, as amended from time.

"Code" means the Internal Revenue Code of 1986, as amended.

"Committee Designees" means  [_____] and [_____].

"Common Stock" means the Common Stock and any other common equity securities issued by the Company, and any other shares of stock issued or issuable with respect thereto (whether by way of a stock dividend or stock split or in exchange for or upon conversion of such shares or otherwise in connection with a combination of shares, recapitalization, merger, consolidation or other corporate reorganization).

"Company" shall mean Avado Brands, Inc., a Delaware corporation and any successors thereto.

"Creditors' Committee" means the Official Committee of Unsecured Creditors.

"DDJ Investors" means the Persons listed under the heading "DDJ Investors" on Schedule B hereto, which Persons are managed by DDJ Capital Management, LLC, a Massachusetts limited company.

"Drag-Along Right" shall mean the rights of the Drag-Along Holders to obligate the Stockholders to effect the Sale under Section 3.1 hereof.

"Equity Incentive Plan" means the Company's **[Stock Option and Grant Plan]**, **[to be adopted in connection with the Plan]** with a maximum number of shares of Common Stock reserved under such Equity Incentive Plan not to exceed [_____].

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Person" means an individual, a corporation, an association, a joint venture, a partnership, a limited liability company, an estate, a trust, an unincorporated organization and any other entity or organization, governmental or otherwise.

"Preferred Stock" means the Series A Convertible Redeemable Preferred Stock, par value $[__] per share, together with any shares issued or issuable with respect thereto (whether by way of a stock dividend or stock split or in exchange for or in replacement of such shares or otherwise in connection with a combination of shares, recapitalization, merger, consolidation or other corporate reorganization).

"Proceeding" means complaint, lawsuit or similar legal action filed in any court, any investigation, formal or informal, by any Person, regulatory or self-regulatory authority.

"Qualified Public Offering" means the first underwritten public offering pursuant to an effective registration statement under the Securities Act covering a sale of Common Stock to the public, that (A) results in gross proceeds to the Company in excess of $55 million, (B) for a price per share equal to at least three and fifteen one hundredths (3.15) times the price of the Preferred Stock (as appropriately adjusted for stock splits, stock dividends or other subdivisions or combinations of Common Stock) , (C) is led by a nationally recognized investment bank, and (D) results in the Common Stock being listed for trading on a national securities exchange or quoted on NASDAQ National Market.

"Securities Act" means the Securities Act of 1933, as amended.

"Series A Majority Interest" means the Preferred Stockholders holding not less than a majority of the outstanding Series A Preferred Stock held by all the Preferred Stockholders, calculated in accordance with Section 1.2 hereof.

"Shares" means, at any time, shares of (i) Common Stock, (ii) Preferred Stock, and (iii) any other capital stock now or hereafter issued by the Company, together with any other shares of capital stock issued or issuable with respect thereto (whether by way of a stock dividend, stock split or in exchange for or upon conversion of such shares or otherwise in connection with a combination of shares, recapitalization, merger, consolidation or other corporate reorganization).  At all times, the number of Shares deemed issued and outstanding or held or to be voted by any Stockholder shall be calculated in accordance with Section 1.2.

"Stockholders" means, collectively, the Preferred Stockholders, the Common Stockholders and each Person that beneficially owns Shares and becomes a party to this Agreement by operation of this Agreement and the Charter.

"Super Majority Stockholders" means the Stockholders beneficially owning at least 66 2/3% of the outstanding shares of Preferred Stock (on an as-converted basis) and Common Stock, voting together as a single class.

"Transaction Documents" means the Agreement, the Purchase Agreement and Registration Rights Agreement.

"Transfer" means any direct or indirect transfer, donation, sale, assignment, pledge, hypothecation, grant of a security interest in or other disposal or attempted disposal of all or any portion of a security, any interest or rights in a security, or any rights under this Agreement. "Transferred" means the accomplishment of a Transfer, and "Transferee" means the recipient of a Transfer.

## SECTION II.  **RESTRICTIONS ON TRANSFER**

### 2.1.  *Restrictions on Transfer.*

(a)     If any Stockholder shall attempt to Transfer in any manner whatsoever (including by way of sale, transfer, assignment, conveyance or other disposition, including without limitation by merger, operation of law, bequest or pursuant to any domestic relations order, whether voluntarily or involuntarily, other than a sale, transfer, assignment, conveyance or other disposition by or to the Company) any Shares, in each case, whether voluntary or involuntary, of record, by operation of law or otherwise, then such Transfer shall be void and shall not be recognized by the Company to the extent such Transfer is not in compliance with this Section II, as the case may be.

(b)     No Stockholder shall Transfer any Shares to any Person (regardless of the manner in which such Stockholder initially acquired such Shares), nor shall the Company issue, sell or otherwise transfer any Shares to any Person:

(i)     if the Company reasonably determines that such Transfer would, if effected, result in the Company having more than 290 holders of record (as such concept is understood for purposes of Section 12(g) of the Exchange Act and any relevant rules promulgated thereunder); and

(ii)     with respect to any Transfer unless (A) the certificates representing such Shares bear legends as provided in Section 8.2 and (B) such Transferee shall have executed and delivered to the Company, as a condition precedent to any acquisition of Shares, an instrument in form and substance satisfactory to the Company confirming that such Transferee takes such Shares subject to all the terms and conditions of this Agreement, and agrees to be bound by the terms of this Agreement.  The Company shall not Transfer upon its books any Shares to any Person except in accordance with this Agreement.

4

        (c)     (i)    <u>Request for Transfer</u>.  In order to provide for the effective policing of the provisions set forth in this Section 2.1, a potential transferor or Transferee who proposes to effect a Transfer, prior to the date of the proposed Transfer, must submit a request in writing (a "Request") that the Company review the proposed Transfer and authorize or not authorize the proposed Transfer pursuant to Section 2.1(c)(ii).  A Request shall be mailed or delivered to the Secretary of the Company at the Company's principal place of business or telecopied to the Company's telecopier number at its principal place of business. Such Request shall be deemed to have been delivered when delivered to the Secretary of the Company in accordance with Section 8.4.  A Request shall include (i) the name, address and telephone number of the proposed Transferee, (ii) the name and address of the Person that would be the holder of record (as such concept is understood for purposes of Section 12(g) of the Exchange Act and any relevant rules promulgated thereunder) of the transferred interest at the completion of the Transfer, (iii) a description of the interest proposed to be Transferred by the proposed Transferee, (iv) the date on which the proposed Transfer is expected to take place, (v) the name of the proposed transferor of the interest to be Transferred, (vi) the percentage of the proposed transferor's total interest to be Transferred and (vii) a Request that the Company authorize, if appropriate, the Transfer pursuant to Section 2.1 hereof and inform the proposed transferor and Transferee of its determination regarding the proposed Transfer.  As promptly as practicable, but in any case no more than five (5) Business Days after the receipt of any Request, the Secretary of the Company shall make an initial determination as to whether to authorize the proposed Transfer described in the Request under Section 2.1(c)(ii); <u>provided</u>, <u>however</u>, that if the Secretary of the Company denies such proposed Transfer, written notice of which will be provided to the potential transferor together with the reasons for such denial, then the Board of Directors, shall call a special meeting of the Board of Directors as soon as practicable, and in any case within fifteen (15) Business Days after receipt by the Secretary of the Company of a Request to determine whether to authorize the proposed Transfer described in the Request under Section 2.1(c)(ii).  Subject to the provisions of this Section 2.1, the Board of Directors shall conclusively determine whether to authorize the proposed Transfer, in its reasonable discretion and judgment, and shall immediately inform the proposed transferee or transferor making the Request of such determination.

        (ii)    <u>Authorization of Transfers</u>.  Notwithstanding anything to the contrary set forth in Section 2.1(b)(i), the Secretary of the Company and the Board of Directors shall authorize (A) a Transfer by a Stockholder to another Stockholder of record, (B) a Transfer of all Shares owned by the proposed transferor to a single Person who is treated as a single record holder under the Exchange Act, or (C) a Transfer so long as after giving effect to such Transfer the Company has no more than 290 holders of record (as such concept is understood for purposes of Section 12(g) of the Exchange Act and any relevant rules promulgated thereunder). For the avoidance of doubt, the Secretary of the Company and the Board of Directors shall approve the Transfers in the order in which the Requests are received; <u>provided</u>, <u>however</u>, that in the event that the Company denies a Request to Transfer any Shares, prior to approving any subsequent Request to Transfer any Shares, the Company shall use reasonable efforts to provide prior notice to any Stockholders who were previously denied their Request and a reasonable period of time for any such Stockholders to make subsequent Requests to Transfer their Shares, which subsequent Requests shall be approved in the order of which the initial Requests were previously received.

(d)      Authority of Board of Directors to Interpret.  Nothing contained in this Section 2.1 shall limit the authority of the Board of Directors to take such other action to the extent permitted by law as it deems necessary or advisable to preserve the Company's status as a non-reporting company and to maintain the ability of the Company to utilize its then-current net operating losses under the Exchange Act.

2.2.    *Severability.*  If any provision of this Section II is judicially determined to be invalid or otherwise unenforceable, such invalidity or unenforceability shall not affect the remainder of the provisions of this Section II, which shall be thereafter interpreted as if the invalid or unenforceable part were not contained herein, and, to the maximum extent possible, in a manner consistent with preserving the Company's status as a non-reporting company under the Exchange Act and preserving the Company's ability to utilize fully its they-current net operating loss carryforwards.

2.3.    *Inapplicability of Section 2.1.*  Notwithstanding anything to the contrary provided in Section 2.1, the restrictions on transfer set forth in Section 2.1 shall be inapplicable to any Sale under Section III.

2.4.    *Effect of Prohibited Transfers.*  If any Transfer by any Stockholder is made or attempted contrary to the provisions of this Agreement, such purported Transfer shall be void ab initio; the Company and the other parties hereto shall have, in addition to any other legal or equitable remedies which they may have, the right to enforce the provisions of this Agreement by actions for specific performance (to the extent permitted by law); and the Company shall have the right to refuse to recognize any Transferee of any Stockholder for any purpose.

2.5.    *Termination.*  This Section II shall terminate upon the closing of a Qualified Public Offering.

## SECTION III.  RIGHTS AND OBLIGATIONS TO SELL.

3.1.    *Drag-Along Obligations.*

(a)      In the event that (i) a majority of the Board of Directors and (ii) the Super Majority Stockholders (the "Drag-Along Sellers") determine to (i) sell or otherwise dispose of, in a single transaction or series of related transactions, Shares representing sixty-six and two-thirds percent (66 2/3%) or more of the Shares then issued and outstanding to any Person other than an Affiliate of the Drag-Along Sellers or (ii) sell or otherwise dispose of all or substantially all of the assets of the Company to any Person other than an Affiliate of the Drag-Along Sellers or (iii) to cause the Company to merge with or into or consolidate with any Person other than an Affiliate of the Drag-Along Sellers (in the cases of (i), (ii), and (iii), the "Third Party Buyer") in a bona fide negotiated transaction (a "Sale"), each of the other Stockholders shall be obligated to and shall upon the written request of the Drag-Along Sellers:  (i) sell, transfer and deliver, or cause to be sold, Transferred and delivered, to the Third Party Buyer, its Shares on substantially the same terms approved by the Drag-Along Sellers; and (ii) execute and deliver such instruments of conveyance and Transfer and take such other action, including voting their Shares in favor of such Sale and executing any voting agreements, proxies, purchase agreements, merger agreements, indemnity agreements, escrow agreements or related documents, as the

Drag-Along Sellers require in order to carry out the terms and provisions of this Section III. Each of the Stockholders hereby waives any appraisal or other dissenter rights associated with a Sale effectuated under this Section III regardless of whether such Sale takes the form of a merger, sale of assets or otherwise. The Drag-Along Sellers shall provide each of the other Stockholders with notice of any proposed Sale and a copy of any transaction documents required to be executed by the Stockholders in connection therewith for their review not less than ten (10) calendar days prior to the time when such documents must be executed (it being understood that each of the Stockholders shall have no right to negotiate or modify the terms of such documents). If a Stockholder fails or refuses to vote or sell his, her or its Shares as required by, or votes his, her or its Shares in contravention of this Section III, then such party hereby appoints the Drag-Along Sellers and each of them acting singly, his, her or its attorney in fact, to sell such Shares in accordance with the terms of this Section III. At the closing of such Sale, each Stockholder shall deliver, against receipt of the consideration payable in such Sale, certificates representing the Shares which such party holds of record or beneficially, with all endorsements necessary for transfer. In the event that any party fails or refuses to comply with the provisions of this Section III, the Drag-Along Sellers, the other Stockholders and the Third Party Buyer in such Sale, at their option, may elect to proceed with such Sale notwithstanding such failure or refusal and, in such event and upon tender of the specified consideration to any such party, the rights of any such party with respect to the Shares of such party shall cease; provided, however that nothing contained herein shall relieve any Stockholder from its obligations hereunder.

(b)     The obligations of the Stockholders pursuant to this Section III are subject to the satisfaction of the following conditions: (i) in connection with such Sale, each of the Stockholders shall be entitled to the economic benefit of any liquidation preferences as set forth in the Company's Charter as in effect immediately prior to such Sale (giving effect to any applicable orders of priority) and regardless of the structure of such Sale, the consideration paid for the capital stock of the Company shall take such liquidation preference into account; (ii) no Stockholder shall be required to make any representations or warranties or to provide any indemnities in connection the Sale which are different from those made by the Drag-Along Sellers; and (iii) no Stockholder shall be liable for more than its pro rata percentage of consideration received in the Sale after giving effect to the preference of the Preferred Stock, except with respect to a breach by any such Stockholder of representations by such Stockholder as to title to Shares and consideration.

(c)     Sale Closing. Any proposed Sale shall be consummated by the later of (i) sixty (60) calendar days after notice of the proposed Sale is provided by the Drag-Along Sellers to the other Stockholders and (ii) thirty (30) calendar days after the satisfaction of any governmental approval or filing requirements, if any. In the event that the Sale is not consummated within such period, the Drag-Along Sellers shall provide new notice to each of the other Stockholders and once again comply with the provisions of this Section 3.1 with respect to such Sale.

   **3.2.     *Termination.*** This Section III shall terminate upon the closing of a Qualified Public Offering.

## SECTION IV.  CO-SALE

**4.1.** ***Co-Sale Option.*** In the event that any Stockholder, or group of Stockholders acting together pursuant to a common plan or arrangement (individually, a "Selling Holder" and collectively, the "Selling Holders"), elect not to exercise its or their Drag-Along Right (if applicable) and propose to Transfer, in a single transaction or series of related transactions, to any Person other than to an Affiliate of such Selling Holder(s) (a "Buyer"), Shares representing sixty-six and two-thirds (66 2/3%) or more of the Shares then issued and outstanding (a "Transaction Offer"), such Selling Holder or Selling Holders, as the case may be, may Transfer such Shares only pursuant to and in accordance with the following provisions of this Section 4.1:

(a)     Co-Sale Notice.  As soon as practicable, and in no event later than twenty (20) calendar days prior to the proposed closing of such Transaction Offer, the Selling Holder, or Selling Holders, as the case may be, shall provide written notice to each of the Company and the other Stockholders (the "Co-Sale Notice") setting forth the terms and conditions of the Transaction Offer and offering the other Stockholders the right to participate in the Transaction Offer on a *pro rata* basis with the Selling Holder, or Selling Holders, as the case may be (the "Co-Sale Option").   To the extent one or more Stockholders exercise their Co-Sale Option in accordance with this Section 4.1, the number of Shares that the Selling Holder, or Selling Holders, as the case may Transfer in the Transaction Offer shall be correspondingly reduced.

(b)     Offer Acceptance. Each of the Stockholders shall have the right to exercise its Co-Sale Option by giving written notice of such intent to participate (the "Co-Sale Acceptance Notice") to the Company and the Selling Holder, or Selling Holders, as the case may be within ten (10) Business Days after receipt by such Stockholder of the Co-Sale Notice (the "Co-Sale Election Period").  Each Co-Sale Acceptance Notice shall indicate the maximum number of Shares subject thereto which the Stockholder wishes to sell.  Any Stockholder holding Preferred Stock shall be permitted to sell to the relevant Buyer in connection with any exercise of the Co-Sale Option, at its option, (i) shares of Common Stock acquired upon conversion of such Preferred Stock, (ii) an option to acquire Common Stock when such Stockholder receives the same upon conversion of such Preferred Stock, with the same effect as if Common Stock were being conveyed, or (iii) shares of Preferred Stock.  Notwithstanding anything herein to the contrary, appropriate adjustments (if any) shall be made to the per share consideration paid for the capital stock to account for the difference in value between the Preferred Stock and the Common Stock, based on the implied enterprise value of the Company reflected in the Buyer's offer price.

(c)     Allocation of Shares.  Each Stockholder shall have the right to sell a portion of its Shares pursuant to the Transaction Offer which is equal to or less than the product obtained by multiplying the total number of Shares available for sale to the Buyer subject to the Transaction Offer by a fraction, the *numerator* of which is the total number of Shares owned by such Stockholder and the *denominator* of which is the total number of Shares held by all Stockholders, as the case may be, in each case as of the date of the Offer Notice.

(d)     Co-Sale Closing.  Within ten (10) calendar days after the end of the Co-Sale Election Period, the Selling Holder or Selling Holders, as the case may be, shall

promptly notify each participating Stockholder of the number of Shares held by such Stockholder that will be included in the sale and the date on which the Transaction Offer will be consummated, which shall be no later than the later of (i) thirty (30) calendar days after the end of the Co-Sale Election Period and (ii) the satisfaction of any governmental approval or filing requirements, if any. Each participating Stockholder may effect its participation in any Transaction Offer hereunder by delivery to the Buyer, or to the Selling Holder or Selling Holders, as the case may be, for delivery to the Buyer, of one or more instruments or certificates, properly endorsed for transfer, representing the Shares it elects to sell pursuant thereto and shall execute appropriate documentation reasonably requested by the Buyer, provided that no participating Stockholder shall be required to make any representations or warranties or to provide any indemnities in connection therewith different from those made by the Selling Stockholders. At the time of consummation of the Transaction Offer, the Buyer shall remit directly to each participating Stockholder that portion of the sale proceeds to which the participating Stockholder is entitled by reason of its participation with respect thereto. No Shares may be purchased by the Buyer from the Selling Holder(s) unless the Buyer simultaneously purchases from the participating Stockholder all of the Shares that they have elected to sell pursuant to this Section 4.1.

(e)     <u>Sale to Third Party</u>.  Prior to the effectiveness of any Transfer to a Buyer hereunder, such Buyer shall have entered into a Joinder Agreement in substantially the form attached hereto as <u>Exhibit A</u>, and such Buyer shall have all the rights and obligations hereunder as if such Buyer were a Stockholder.  In the event that the Transaction Offer is not consummated within the period required by this Section 4.1 or the Buyer fails timely to remit to each participating Stockholder its respective portion of the sale proceeds, the Transaction Offer shall be deemed to lapse, and any Transfer of Shares pursuant to such Transaction Offer shall be in violation of the provisions of this Agreement unless the Selling Holder or Selling Holders, as the case may be, sends a new Offer Notice and once again complies with the provisions of Section 4.1 with respect to such Transaction Offer.

**4.2**     ***Termination.***  This Section IV shall terminate upon the closing of a Qualified Public Offering.

## SECTION V.  <u>ELECTION OF DIRECTORS</u>

**5.1.**     ***Board of Directors Composition.***  Each Stockholder agrees to vote all of his, her or its Shares having voting power (and any other Shares over which he, she or it exercises voting control), in connection with the election of directors and to take such other actions as are necessary so as to fix the number of directors at six (6) and to elect and continue in office as directors the following:

(a)     two (2) individuals (each, a "DDJ Nominee") nominated by the DDJ Investors, which DDJ Nominees shall initially be [_____] and [_____];

(b)     two (2) individuals (each, a "Committee Nominee") nominated by the Committee Designees, which Committee Nominees shall initially be  [_____] and [_____];

9

(c)     the Chief Executive Officer of the Company, who shall initially be _____ (it being understood that the Chief Executive Officer shall not be a third party beneficiary of this Agreement); and

(d)     one (1) individual (the "Lead Independent Director") selected by the DDJ Investors and reasonably acceptable to at least one of the Committee Nominees, who shall be the Lead Independent Director, and which Lead Independent Director shall initially be David Barr.

Notwithstanding anything herein to the contrary, if at any time the DDJ Investors cease to hold 20% of the Shares then issued and outstanding as a result of a Transfer of Shares by the DDJ Investors, then the DDJ Investors shall only have the right to appoint one director pursuant to subsection (a) and their rights under subsection (d) shall cease.

**5.2.     _Term; Removal; Vacancies._**  Each Director shall serve a two (2) year term, unless he earlier resigns or is removed by the Person entitled to nominate such Director.  Each Stockholder agrees to vote all of his, her or its Shares having voting power (and any other Shares over which he, she or it exercises voting control), or take any other action necessary for the removal of any Director upon the request of the Persons then entitled to nominate such Director as set forth in Section 5.1 above, and for the election to the Board of Directors of a substitute designated by such party in accordance with the provisions hereof.  Each Stockholder further agrees to vote all of his, her or its Shares having voting power (and any other Shares over which he, she or it exercises voting control) in such manner or take any other action as shall be necessary or appropriate to ensure that any vacancy on the Board of Directors occurring for any reason shall be filled only in accordance with the provisions of this Section V.

**5.3.     _Termination._**  This Section V shall terminate upon the closing of a Qualified Public Offering.

## SECTION VI.  **VOTING PROVISIONS**

**6.1.     _Protective Provisions._**  Without the prior written consent of the Super Majority Stockholders, the Company shall not:

(i)     amend, alter or repeal (by way of merger, consolidation, operation of law or otherwise) any provision of, or add any provision to, the Charter (including without limitation, increasing the total number of shares of Preferred Stock that the Company shall have the authority to issue), bylaws of the Company, or the governing documents of any subsidiary, in a manner that alters or changes the rights, preferences, privileges or powers of, or the restrictions provided for the benefit of, the Preferred Stock;

(ii)     directly or indirectly redeem, retire, purchase or otherwise acquire for consideration (or pay into or set aside for a sinking fund for such purpose) any Shares, directly or indirectly, through subsidiaries or otherwise or any other class of its capital stock (except for (i) the redemption of the Preferred Stock pursuant to and as provided in the Charter, dividends or distributions payable solely in shares of Common Stock, or (ii) the repurchase of Common Stock issued or

10

issuable in connection with awards granted or to be granted under the Equity Incentive Plan (subject to adjustment as provided therein) and any related agreements containing vesting and/or repurchase provisions under which the Company has the option or obligation to repurchase such shares upon the occurrence of certain events, including termination of employment);

(iii)    declare or pay any dividends or make any distributions of cash, property or securities of the Company in respect to any Shares or any other class of its capital stock (other than stock dividends payable in Common Stock);

(iv)    increase the authorized number of shares of any Preferred Stock or Common Stock or authorize the issuance of or issue any additional shares of Preferred Stock (except as provided above);

(v)    authorize or issue, or obligate itself to issue, any class or series of equity security, convertible debt or other debt security with an equity participation on parity with or senior to any existing series of any Preferred Stock in right of redemption, repurchase, conversion, payment of dividends, liquidation preference, or other distributions, or with any class or special voting rights, or permit any subsidiary of the Company to issue any capital stock, or securities convertible or exercisable or exchangeable for capital stock or other securities of such subsidiary, to any person or entity other than the Company;

(vi)    reclassify any capital stock of the Company;

(vii)    liquidate, dissolve or wind up the Company's operations, effect a recapitalization or reorganization (including, without limitation, any reorganization into a limited liability company, a partnership or any other non-corporate entity which is treated as a partnership for federal income tax purposes);

(viii)    enter into (A) a merger or consolidation of the Company with or into another entity (with respect to which less than a majority of the outstanding voting power of the surviving or consolidated company immediately following such event is held by persons or entities who were Stockholders of the Company immediately prior to such event); (B) the sale, license or Transfer of all or substantially all of the properties and assets of the Company and its subsidiaries; or (C) any acquisition by any Person (or group of affiliated or associated Persons) of beneficial ownership of a majority of the equity of the Company or any material subsidiary (whether or not newly-issued shares) in a single transaction or a series of related transactions;

(ix)    issue notes of the Company or otherwise incur indebtedness for money borrowed, except for the indebtedness issued on the Effective Date under the Plan and any refinancing of up to 110% of the Tranche A Financing and the Tranche B Financing (as such terms are defined in the Plan);

(x)    permit any subsidiary of the Company to issue any capital stock, other than to the Company;

11

(xi) make, or permit any subsidiary, if any, to make any change in the nature of the Company's or subsidiary's business or any material change in the business plan, each as of the date hereof;

(xii) take any action by written consent of Stockholders without giving all Preferred Stockholders at least 48 hours prior written notice; and

(xiii) adopt any new or amend any existing stock plan (including, without limitation, the Equity Incentive Plan), employee stock ownership plan or phantom stock or similar plan to increase the aggregate number of shares reserved under such plans.

**6.2.** ***Special Approval Requirements.*** In addition to the approvals required under Section 6.1, the Company shall obtain:

(a) The prior written consent of a majority of the Board of Directors and of the Super Majority Stockholders to:

(i) Enter into (A) a merger or consolidation of the Company with or into another entity (with respect to which less than a majority of the outstanding voting power of the surviving or consolidated company immediately following such event is held by persons or entities who were Stockholders of the Company immediately prior to such event); (B) the sale, license or Transfer of all or substantially all of the properties and assets of the Company and its subsidiaries; or (C) any acquisition by any Person (or group of affiliated or associated Persons) of beneficial ownership of a majority of the equity of the Company or any material subsidiary (whether or not newly-issued shares) in a single transaction or a series of related transactions; or

(ii) File a Form S-1 registration statement under the Securities Act or to otherwise take action to effect a registered public offering of its securities.

(b) The prior written consent of (A) a majority of the Board of Directors and a majority of the Board of Directors excluding DDJ Nominees or (B) the Super Majority Stockholders to:

(i) effect any transaction on behalf of the Company with an aggregate transaction value in excess of $50 million; or

(ii) offer in one or a series of related issuances more than ten percent (10%) of the outstanding capital stock of the Company.

**6.3.** ***Affiliated Transactions.*** In addition to any approvals required under Sections 6.1 and 6.2, or under the Charter, bylaws or applicable law, all transactions and agreements (including without limitation, any amendment of an existing agreement) by and between the Company and any officer, employee, director or stockholder of the Company or persons controlling, controlled by, under common control with, or a member of the family of, shall be conducted on an arm's-length basis, shall be on terms and conditions no less favorable to the Company than could be obtained from nonrelated persons and shall be approved in advance by a majority of the disinterested directors, after full disclosure thereof.

**6.4.** **_Termination._** This Section VI shall terminate upon the closing of a Qualified Public Offering.

## SECTION VII. COVENANTS

The Company and each of the Stockholders (as applicable) covenant and agree as follows:

**7.1.** **_Financial Statements, Reports, Etc._** The Company shall furnish to (i) each Preferred Stockholder, (ii) each Common Stockholder who beneficially owns at least __ shares of Common Stock and (iii) to any other Common Stockholder upon written request, the following reports:

(a)     Annual Financial Statements.  Within ninety (90) days after the end of each fiscal year of the Company, a consolidated balance sheet of the Company and its subsidiaries, if any, as of the end of such fiscal year and the related consolidated statements of income, stockholders' equity and cash flows for the fiscal year then ended, prepared in accordance with generally accepted accounting principles and certified by a firm of independent public accountants of recognized national standing selected by the Board of Directors;

(b)     Quarterly Financial Statements.  Within forty-five (45) days after the end of each fiscal quarter, a consolidated balance sheet of the Company and its subsidiaries, if any, and the related consolidated statements of income, stockholders' equity and cash flows, unaudited but prepared in accordance with generally accepted accounting principles and certified by the Chief Financial Officer of the Company, such consolidated balance sheet to be as of the end of such quarter and such consolidated statements of income, stockholders' equity and cash flows to be for such quarter and for the period from the beginning of the fiscal year to the end of such quarter, in each case accompanied by comparative statements for the prior fiscal year and a narrative discussion of the changes in the Company's financial condition and results of operations compared with the prior periods presented; and

(c)     Monthly.  Within thirty (30) days after the end of each month in each fiscal year (other than the last month in each fiscal year), a consolidated balance sheet of the Company and its subsidiaries, if any, and the related consolidated statements of income, stockholders' equity and cash flows, unaudited but prepared in accordance with generally accepted accounting principles and certified by the Chief Financial Officer of the Company, such consolidated balance sheet to be as of the end of such month and such consolidated statements of income, stockholders' equity and cash flows to be for such month and for the period from the beginning of the fiscal year to the end of such month, in each case with comparative statements for the prior fiscal year.

Notwithstanding anything contained herein to the contrary, each recipient of information provided under this Section 7.1 hereby agrees to maintain the strict confidentiality of all information received.

**7.2.** **_Directors and Officers' Insurance._** The Company shall, as promptly as practicable following the date hereof, obtain and maintain directors and officers' liability

13

insurance coverage on terms satisfactory to the Board of Directors, to the fullest extent permitted by law covering, among other things, violations of federal or state securities laws.

**7.3.** ***Reimbursement of Directors.*** The Company shall pay or promptly reimburse in full each non-employee director for all of his or her reasonable out-of-pocket expenses incurred in attending each meeting of the Board of Directors or any Committee thereof. The Board of Directors shall establish compensation for outside directors.

**7.4.** ***By-laws.*** The Company shall at all times cause its bylaws to provide that unless otherwise required by the laws of the State of Delaware, any one director shall have the right to call a meeting of the Board of Directors. The Company shall at all times maintain provisions in its bylaws and Charter indemnifying all directors against liability and absolving all directors from liability to the Company and its Stockholders to the maximum extent permitted under the laws of the State of Delaware.

**7.5.** ***Lock-Up.*** If (i) the Company shall file a registration statement (other than in connection with the registration of securities issuable pursuant to an employee stock option, stock purchase or similar plan or pursuant to a merger, exchange offer or a transaction of the type specified in Rule 145(a) under the Securities Act) with respect to an initial underwritten public offering of the capital stock of the Company, (ii) with reasonable prior notice, the managing underwriter or underwriters advises the Company in writing (in which case the Company shall notify the Stockholders) that a public sale or distribution of Shares would materially adversely impact such offering and (iii) the underwriter or underwriters have obtained written holdback agreements from the Company, each executive officer of the Company and each other Person who has been granted registration rights by the Company, then each Stockholder shall, to the extent not inconsistent with applicable law, refrain from effecting any public sale or distribution of Shares during the ten (10) days prior to the effective date of such registration statement and until the earliest of (A) the abandonment of such offering, and (B) 180 days from the effective date of such registration statement (each such period, a "Hold Back Period"). Notwithstanding the foregoing, any obligations of the Stockholders under this Section 7.5 shall terminate in the event that the Company or any underwriter terminates, releases or waives, in whole of in part, the holdback agreements with respect to the Company, any executive officer of the Company or any such other Person who has been granted registration rights by the Company.

**7.6.** ***Term.*** Except as provided below, the covenants set forth in this Section VII shall terminate upon the closing of a Qualified Public Offering. Notwithstanding the foregoing, (i) the covenants set forth in Sections 7.2 (Director and Officers' Insurance) and 7.3 (Reimbursement of Directors) hereof shall continue for so long as any DDJ Nominee or Committee Nominee is a member of the Board of Directors, and (ii) the covenants set forth in Section 7.5 (Lock-up) shall continue until the end of the Hold Back Period.

## SECTION VIII. <u>MISCELLANEOUS PROVISIONS</u>

**8.1.** ***Reliance.*** Each of the parties hereto agrees that each covenant and agreement made by it in this Agreement or in any certificate, instrument or other document delivered pursuant to this Agreement is material, shall be deemed to have been relied upon by the other

parties and shall remain operative and in full force and effect after the date hereof regardless of any investigation. This Agreement shall not be construed so as to confer any right or benefit upon any Person other than the parties hereto and their respective successors and permitted assigns to the extent contemplated herein.

8.2. *Legend on Securities.* The Company, the Stockholders acknowledge and agree that in addition to any other legend on the certificates representing Shares held by them, substantially the following legend shall be typed on each certificate evidencing any of the Shares held at any time by any of the Stockholders:

THE SECURITIES REPRESENTED HEREBY ARE SUBJECT TO THE PROVISIONS OF A CERTAIN STOCKHOLDERS AGREEMENT, DATED AS OF _____, 200__, INCLUDING CERTAIN RESTRICTIONS ON TRANSFER SET FORTH THEREIN. A COMPLETE AND CORRECT COPY OF SUCH AGREEMENT IS AVAILABLE FOR INSPECTION AT THE PRINCIPAL OFFICE OF THE COMPANY AND WILL BE FURNISHED UPON WRITTEN REQUEST AND WITHOUT CHARGE.

8.3. *Amendment and Waiver.* Any party may waive any provision hereof intended for its benefit in writing. No failure or delay on the part of any party hereto in exercising any right, power or remedy hereunder shall operate as a waiver thereof. The remedies provided for herein are cumulative and are not exclusive of any remedies that may be available to any party hereto at law or in equity or otherwise. This Agreement may be amended, modified or waived with the prior written consent of each of (i) the Company, (ii) the Series A Majority Interest and (iii) Common Stockholders holding at least sixty-six and two-thirds (66 2/3%) percent of the outstanding Common Stock. Notwithstanding anything herein to the contrary, in calculating the percent of outstanding Common Stock, the outstanding Preferred Stock shall not be included in such calculation. Any amendment, modification or waiver effected in accordance with the preceding sentence shall be binding on all Stockholders.

8.4. *Notices.* All notices and other communications provided for herein shall be in writing and shall be deemed to have been duly given, delivered and received (a) if delivered personally or (b) if sent by facsimile, registered or certified mail (return receipt requested) postage prepaid, or by courier providing next day delivery, in each case to the party to whom it is directed, which if to the Company, shall be at [_____ _____], and if to any Preferred Stockholder, at the addresses set forth below such party's signature hereto, with a copy to Goodwin Procter LLP, Exchange Place, Boston, MA 02109, Attn: _____ (or at such other address for any party as shall be specified by notice given in accordance with the provisions hereof, provided that notices of a change of address shall be effective only upon receipt thereof). Notices delivered personally shall be effective on the day so delivered, notices sent by registered or certified mail shall be effective five (5) days after mailing, notices sent by facsimile shall be effective when receipt is acknowledged, and notices sent by courier providing next day delivery shall be effective on the earlier of the second business day after timely deposit with the courier or the day of actual delivery by the courier.

8.5. *Headings.* The Section headings used or contained in this Agreement are for convenience of reference only and shall not affect the construction of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement and the

agreements, documents and instruments executed and delivered in connection herewith shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement and the agreements, documents and instruments executed and delivered in connection herewith.

      **8.6.**    *Counterparts.*  This Agreement may be executed in one or more counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which together shall be deemed to constitute one and the same agreement.

      **8.7.**    *Remedies; Severability.*  It is specifically understood and agreed that any breach of the provisions of this Agreement by any Person subject hereto will result in irreparable injury to the other parties hereto, that the remedy at law alone will be an inadequate remedy for such breach, and that, in addition to any other legal or equitable remedies which they may have, such other parties may enforce their respective rights by actions for specific performance (to the extent permitted by law) and the Company may refuse to recognize any unauthorized Transferee as one of its Stockholders for any purpose, including, without limitation, for purposes of dividend and voting rights, until the relevant party or parties have complied with all applicable provisions of this Agreement.

      In the event that any one or more of the provisions contained herein, or the application thereof in any circumstances, is held invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision in every other respect and of the remaining provisions contained herein shall not be in any way impaired thereby, it being intended that all of the rights and privileges of the parties hereto shall be enforceable to the fullest extent permitted by law.

      **8.8.**    *Entire Agreement.*  This Agreement is intended by the parties as a final expression of their agreement and intended to be complete and exclusive statement of the agreement and understanding of the parties hereto in respect of the subject matter contained herein.

      **8.9.**    *Adjustments.*  All references to share prices and amounts herein shall be equitably adjusted to reflect stock splits, stock dividends, recapitalizations and similar changes affecting the capital stock of the Company.

      **8.10.**    *Law Governing.*  This Agreement shall be construed and enforced in accordance with and governed by the laws of the State of Delaware (without giving effect to principles of conflicts of law).

      **8.11.**    *Successors and Assigns.*  This Agreement shall be binding upon and inure to the benefit of the respective successors and permitted assigns of the parties hereto as contemplated herein, and any successor to the Company by way of merger or otherwise shall specifically agree to be bound by the terms hereof as a condition of such successor.  The rights of the Preferred Stockholders and Common Stockholders hereunder shall be binding upon and inure to the benefit of their Transferees of their Shares as contemplated herein.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, the parties hereto have caused this Stockholders Agreement to be duly executed as of the date first set forth above.

THE COMPANY:

**AVADO BRANDS, INC.**

By: _____

 Name:
 Title:

PREFERRED STOCKHOLDERS:

_____

Address For Notice:

_____
_____
_____
_____

COMMON STOCKHOLDERS:

_____

Address For Notice:

_____
_____
_____
_____

17

<u>EXHIBIT A</u>

<u>Form of Joinder Agreement</u>

      The undersigned hereby agrees, effective as of the date hereof, to become a party to that certain Stockholders Agreement (the "Agreement") dated as of _____, 200\_\_, by and among **[Company]** (the "Company") and the parties named therein and for all purposes of the Agreement, the undersigned shall be included within the term **["Preferred Stockholder"/"Common Stockholder"]** (as defined in the Agreement).  The address and facsimile number to which notices may be sent to the undersigned is as follows:

Facsimile No._____

_____

**[NAME OF UNDERSIGNED]**

SCHEDULE A

Preferred Stockholders and Common Stockholders

SCHEDULE B

DDJ Investors